**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------- x

BALANCED HOUSING SOLUTIONS, by its
President, Hank Sheinkopf,

                Plaintiff,

          -against-

RUTHANNE VISNAUSKAS, in her official capacity
as Commissioner of the New York State Division of
Housing and Community Renewal,

              Defendant.

----------------------------------------------------------------- x

No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiff Balanced Housing Solutions ("BHS"), on behalf of its members, by and through

their attorneys, allege for their complaint against RuthAnne Visnauskas, in her official capacity as

the Commissioner of the New York State Department of Housing and Community Development

("DHCR"), as follows.

<u>**PRELIMINARY STATEMENT**</u>

       1.     This action seeks to restrain a regulatory taking that impacts hundreds of investors,

owners, and developers across New York City, who have worked for years to renovate decrepit

housing stock here.

       2.     The victims of this taking relied on existing law and made massive investments to

renovate degraded apartment buildings across the city only to learn—after the projects were

completed—that Defendant DHCR changed program requirements retroactively, disqualifying

them from reaping the fruits of their investment and years-long work.

       3.     Although these developers complied with program requirements—and invested

millions on gutting and rehabilitating hundreds of properties across the city to create high-quality

apartments—DHCR changed program requirements unilaterally and without public notice.  Worse

still, DHCR is applying these changes retroactively, demanding re-regulation of apartments that were properly deregulated under then-existing regulations. DHCR's campaign against building owners would effectively wipe out hundreds of millions of dollars of investment citywide.

## BACKGROUND

4.      DHCR oversees and regulates a program, created by the New York Legislature, to incentivize the real estate industry to substantially rehabilitate residential buildings that were "substandard" or had "seriously deteriorated" (the "SR Program"). 9 NYCRR (Rent Stabilization Code ("RSC")) § 2520.11(e).[1]

5.      The trade-off was simple. If a developer replaced 75% or more of the systems in these buildings, it could deregulate the rent-stabilized units therein. To provide certainty for investors, DHCR created a presumption: if a building was at least 80% vacant, it was presumed to be "substandard or seriously deteriorated." RSC § 2520.11(e). Because this presumption anticipated that as much as 20% of any substandard building would remain occupied, the Program never required a developer to prove the building was "uninhabitable." These two rules (collectively, the "Safe Harbor Provisions") gave owners reasonable certainty about the requisite steps for satisfying the substantial rehabilitation exemption from rent stabilization.

6.      Many BHS members participated in this program. BHS' members followed program requirements to the letter. They renovated dozens of buildings. Most were fully vacant at the time construction commenced. All were at least 80% vacant. All the buildings had 75% or more of the systems replaced. All, thereafter, satisfied building code requirements. All the buildings had been built before 1974, and some were much older. All were in advanced stages of

---

[1] Unless otherwise specified, references to the RSC are to the version that was effective until Nov. 7, 2023, after which certain amendments were made (the "Amended RSC"), as discussed below.

deterioration before the renovations.  Photographs of the pre-renovation conditions in some of these buildings are attached as Exhibit 1 hereto.

7.     Now that the renovations are long finished, DHCR is embarking on a political mission to re-regulate hundreds of thousands of apartments across the city, starting with buildings owned by BHS' members.  DHCR, in concert with the New York Attorney General ("NYAG"), is threatening BHS' members with regulatory enforcement actions without any basis in law or fact.  Specifically, these agencies now claim that completed projects cannot rely on the very presumptions—the Safe Harbor Provisions—that DHCR adopted to provide investment certainty, a key legislative aim of the Program.

8.     More importantly, DHCR's proposed enforcement actions ignore that BHS' members relied on DHCR's own interpretation of program requirements and regulations at the time the members undertook the substantial rehabilitation efforts.  Irrefutable evidence shows that BHS' members followed program requirements, as administered by DHCR at the time these projects were undertaken and completed.

9.     Indeed, DHCR actually *enforced* the Safe Harbor Provisions, when challenged by tenants, for years.  Over *many* years, rent-stabilized tenants filed claims with DHCR, claiming that their apartments should remain rent-stabilized because developers did not qualify under SR Program requirements.  DHCR consistently applied the Safe Harbor Provisions to reject the tenants' claims.

10.    Now, DHCR has turned 180 degrees, moving the regulatory goalposts without any process to give public notice, which is required before any such change could lawfully be effected.

11.     The stakes for New Yorkers are high.  The city is in the throes of a decades-long housing crisis, driven largely by lack of supply, which disproportionately impacts middle-income households.  Rental vacancy rates hover just above 1% citywide.

12.     In neighborhoods close to mass transit and with a high density of pre-1974 buildings, the acute housing shortage causes many working-class people and young professionals to leave the city.  These neighborhoods are home to large black and brown communities, who have been hit hardest by the housing crisis, including in Washington Heights, Inwood, Ocean Hill, Astoria, and the West Bronx.

13.     Most pre-1974 buildings are, almost by definition, "substandard" or "substantially deteriorated."  The overwhelming majority contain asbestos, lead paint, and other hazardous substances, which can harm tenants as the buildings degrade.  These buildings typically have other endemic problems—such as crumbling facades and foundations, mold, poorly functioning heating and plumbing systems, leaking roofs, and rodent infestation.[2]

14.     The Legislature looked to New York's real-estate community to solve the problem, creating the SR Program to provide financial incentives.  BHS members answered the call, which is exactly what the Legislature intended.  In so doing, BHS members relied on DHCR's own Safe Harbor Provisions.  The threatened retroactive application of new SR Program rules will have devastating consequences, causing many buildings to go into foreclosure.  Given that many of these buildings have debt obligations to federal and commercial lenders, DHCR's actions will have serious economic ripple effects.

---

[2] *See Testimony of New York Apartment Association before the NYC Rent Guidelines Board* (Apr. 24, 2025), available at https://housingny.org/s/2025_NYAA-RGB-Testimony-FINAL.pdf.

15.     More broadly, politicized and unconstitutional regulatory takings will chase developers and investors away from New York.  BHS' members are simply the point of DHCR's spear.   DHCR, through the NYAG, is threatening enforcement actions against SR Program participants across the city.

16.     In the past 30 years, more than 11,000 previously rent-stabilized apartments have been deregulated under the SR Program.[3]  DHCR's threatened *retroactive* change in regulatory requirements puts owners of all of those buildings at risk of new liabilities that could not possibly have been anticipated when they, relying on and complying with DHCR's rules, invested millions of dollars to substantially rehabilitate dilapidated housing stock with the expectation of thereafter yielding market-rate rents.

17.     BHS seeks a declaratory judgment that DHCR cannot retroactively apply new program requirements for projects completed before November 8, 2023, when DHCR changed the requirements of RSC § 2520.11(e), or for projects completed before January 2024, when the Legislature changed the Program through a prospective statutory amendment (the "Amendment").[4]  This action seek to restrain DHCR's *retroactive* change to the SR Program's requirements for pre-Amendment projects.

18.     Plaintiff's members are directly in the cross hairs of one of the largest attempts at a regulatory taking in history.  Unless enjoined, DHCR's unlawful and unconstitutional actions will

---

[3] *See* New York City Rent Guidelines Board*, Changes to the Rent Stabilized Housing Stock in NYC in 2024* (May 22, 2025), at 15, available at https://rentguidelinesboard.cityofnewyork.us/wp-content/uploads/2025/05/2025-Changes-Report.pdf.

[4] *See* DHCR Operational Bulletin 2023-3 ("OB 2023-3"), available at https://hcr.ny.gov/system/files/documents/2023/11/operational-bulletin-2023-3.pdf.  OB-2023-3 describes regulatory amendments, and the replacement of DHCR's prior Operational Bulletin 95-2, discussed *infra in* the text, which had created the 80% vacancy presumption and was later incorporated into DHCR's regulations as RSC § 2520.11(e).

wipe out hundreds of millions of dollars of investment and erode any appetite for further investment in New York City's already degraded housing stock.

## THE PARTIES

19.    Plaintiff BHS is a membership entity, formed as an unincorporated association under Section 12 of the New York General Associations Law. Its members include those with a financial stake in the dozens of buildings subject to DHCR's actions, as complained of herein. A membership organization, such as BHS, has standing to sue on behalf of its members. More than 20 members of BHS are participants in the SR Program.

    a.    BHS' members own buildings targeted by DHCR's threatened enforcement actions and thus have suffered or imminently will suffer concrete economic injury, including re-regulation of their buildings and liability for alleged overcharges. Each would have standing to sue in his, her, or its own right.

    b.    The interests BHS seeks to protect are germane to the organization's core purpose: safeguarding its members' investment-backed expectations and ensuring lawful administration of the SR Program.

    c.    Neither the claims asserted nor the relief sought require participation of individual members; the issues are purely legal and the relief—declaratory and injunctive—will apply uniformly.

    d.    Accordingly, BHS satisfies all three prongs of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

20.    Defendant Visnauskas is the Commissioner of DHCR, the agency responsible for administering the State's rent regulation laws, including, as relevant here, the SR Program. DHCR has threatened to initiate legal proceedings against BHS' members for conduct related to their

substantial rehabilitation of substandard or seriously deteriorated buildings.  She is sued in her official capacity.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and this action is properly commenced under 42 U.S.C. § 1983, because the claims herein arise under the Fifth and Fourteenth Amendments of the U.S. Constitution.  This Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201–02.

22.    This case is ripe for judicial review.  DHCR has taken a final and definitive position that members of BHS who completed substantial rehabilitations before November 2023 must nonetheless comply with DHCR's retroactive application of its new interpretation of the law or face enforcement consequences.   NYAG imminently intends to commence enforcement proceedings against several members of BHS—including the owners described above, in ¶ 19. The retroactive application of new rules to past conduct would impose immediate and significant hardship, requiring BHS' members to either re-regulate their buildings and pay alleged damages for rent overcharges or to face enforcement actions carrying severe civil and financial penalties. No further factual development is needed; the dispute here turns on a pure question of law, *i.e.*, whether retroactive application of a new standard violates BHS members' rights under the Fifth and Fourteenth Amendments.  Therefore, delaying judicial review would subject BHS' members to immediate, concrete, and irreparable consequences.

23.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action have occurred, and will continue to occur, in this district, and much of the property that is the subject of this action is situated in this district.

## FACTUAL ALLEGATIONS[5]

I.    **NEW YORK'S RENT-STABILIZED BUILDINGS HAVE SERIOUSLY DEGRADED**

24.    In New York City, approximately 996,600 apartments—representing about 41% of the total rental units—are rent stabilized.[6]

25.    Approximately 80% of buildings with rent-stabilized units were built before 1974. More than half were built before 1947.[7]   The median age of all residential buildings in NYC is nearly 80 years.[8]

26.    Maintenance deficiencies in rent-stabilized buildings have reached epic proportions.  Pre-1974 rent-stabilized units have 75% more problems than post-1974 units.[9]  These problems include water leaks, crumbling facades and foundations, heating and electrical breakdowns, blackouts, leaching asbestos, peeling lead paint, mold, non-functioning toilets and rodent infestation.[10]

27.    The primary reason for the deterioration of rent-stabilized buildings is obvious: owners of buildings with artificially capped rents cannot recover the cost of the improvements from the buildings' operating revenue.  Thus, the buildings are subject to chronic under-investment.

---

[5] The facts herein are pled on information and belief, with sources noted where appropriate.

[6] NYC Div. Housing Preservation & Development, *2023 New York City Housing and Vacancy Survey, Selected Initial Findings* ("*Survey*"), at 5, available at https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023%20NYCHVS%20Selected%20Initial%20Findings.pdf.

[7] *Id.* at 3.

[8] *Id.* at 4–5.

[9] Sean Campion, Director of Housing and Economic Development Studies, Citizens Budget Commission (Submitted to the New York City Rent Guidelines Board, May 22, 2025), at 2, *available at* https://cbcny.org/sites/default/files/media/files/CBCTESTIMONY_NYC-Rent-Stabilized_05222025_2.pdf.

[10] *See Survey*, *supra* n.6, at 32, 35–37.

28.     A building's operating revenue is rent.  If the rent is artificially capped at a below-market rate, then buildings will not generate income to meet the substantial additional expense of renovating and maintaining an upgraded building.   The problem becomes worse with new regulatory requirements, which make building upgrades ever more expensive.  This is just one of the dysfunctions of the rent-stabilization regime.

29.     To address this problem, the New York State Legislature created an exemption to the rent-stabilization law to incentivize significant capital investments in substandard buildings, to wit, the SR Program.

## II.     DHCR'S PROGRAM TO SPUR RENOVATIONS OF DEGRADED BUILDINGS

30.     Pursuant to the New York State Emergency Tenant Protection Act ("ETPA"),[11] rent stabilization in New York City is governed by the Rent Stabilization Code ("RSC"),[12] promulgated by DHCR.

31.     ETPA § 5,[13] titled "Housing accommodations subject to regulation," created an exemption from the rent-stabilization laws for buildings that have been "substantially rehabilitated" on or after January 1, 1974. *Id.* § 5(a)(5).

32.     The phrase "substantially rehabilitated" in ETPA § 5(a)(5) is not technical term of art.  Rather, as the Appellate Division has held, it is a "general, commonly used [phrase] which may not be limited by judicial or administrative construction, and should be accorded [its] commonly understood meaning."[14]

---

[11] NY UNCON. LAWS §§ 8621–8634.
[12] 9 NYCRR §§ 2520–2530.
[13] NY UNCON. LAWS §§ 8625.
[14] *E. Pork Prods. Co. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 187 A.D.2d 320, 323 (1st Dep't 1992).

33.     Implementing this section of the ETPA, DHCR promulgated RSC § 2520.11(e) to address the exemption from rent stabilization for "substantially rehabilitated" buildings.

34.     The "substantial rehabilitation" exemption sought to spur widespread renovation of degraded buildings, which the regulation refers to as buildings in "substandard or seriously deteriorated condition."  RSC § 2520.11(e)(3).

35.     This exemption was intended "to encourage landlords to renovate buildings," thus restoring units to the housing stock.[15]

36.     There are two requirements under the SR Program to qualify for the exemption:

   a.     The rehabilitation must be done to a building that was in "substandard or seriously deteriorated condition," and

   b.     Certain "building-wide and individual housing systems," such as plumbing, heating, electrical wiring, windows and roofs, must be replaced.  RSC § 2520.11(e)(1), (3).

## III.    DHCR ISSUED OFFICIAL GUIDANCE TO ADMINISTER THE SR PROGRAM

37.     The SR Program requirements appeared in DHCR's official guidance, to wit, an Operational Bulletin issued in 1995.[16]  The Bulletin was the definitive agency guidance between December 1995 and November 2023.[17]

### A.    The Bulletin's Two Criteria for Exemption under the SR Program

38.     Courts have long held the Bulletin to be DHCR's authoritative guidance.[18]

---

[15] *22 CPS Owner LLC v. Carter*, 84 A.D.3d 456, 457 (1st Dep't 2011).

[16] *See* DHCR Operational Bulletin 95-2 (1995), at 1, available at https://hcr.ny.gov/system/files/documents/2023/11/operational-bulletin-95-2.pdf.

[17] On November 21, 2023, DHCR issued new guidance on substantial rehabilitation under the ETPA, Operational Bulletin 2023-3, which replaced Operational Bulletin 95-2 and eliminated the 80% vacancy presumption.  *See supra* n.4.

[18] *See H.M. Village Realty v. DHCR*, 304 A.D.2d 346 (1st Dep't 2003) (observing that, "[i]n the seven years since the promulgation of Operational Bulletin 95-2, neither the courts nor the

39.    DHCR was compelled to issue the Bulletin because of a lack of regulatory clarity. Before December 1995, courts struggled to define the circumstances under which ETPA § 8625(a)(5) permitted a building to be deemed "substandard or seriously deteriorated" before renovations began, and "substantially rehabilitated" by a Program participant's work thereafter.[19]

40.    Thus, on December 15, 1995, DHCR promulgated the Bulletin to "clarify the procedures the [DHCR] will use to determine issues of exemption from rent regulation due to substantial rehabilitation."  (OB 95-2, at 1.)

41.    The Bulletin acknowledged that confusion about the law would cause the SR Program to backfire by making owners unwilling to invest in deteriorated buildings.

42.    The Bulletin acknowledged that DHCR "has not previously issued any formal directive or clarification on this subject and the lack of such guidance has made it difficult for applicants to have an understanding of how an application for exemption will be treated."  (OB 95-2, at 1.)

43.    The Bulletin also acknowledged that "potential applicants have indicated that uncertainty about our procedures could contribute to an unwillingness to undertake substantial rehabilitation projects in deteriorated buildings. Accordingly, lack of clear procedures works to prevent use of this mechanism as intended in law and regulation."  (OB 95-2, at 1.)

---

Legislature have disturbed DHCR's substantial rehabilitation criteria," and that the First Department "implicitly recognized the validity of those criteria" in a prior decision); *446 Realty Co. v. Higbie*, 718 N.Y.S.2d 567, 570 (Civ. Ct. N.Y. Cty. 2000) ("Courts have struggled greatly over the years in seeking to define what work constitutes substantial rehabilitation sufficient to remove a building from the purview of the rent stabilization laws.  In reaching a determination of whether or not a building is substantially rehabilitated pursuant to the ETPA [prior to 2023], DHCR employs Operational Bulletin 95–2."), *aff'd as modified*, 761 N.Y.S.2d 428 (App. Term, 1st Dep't 2003).

[19] *See, e.g., 81 Russell Street Assoc. v. Scott*, 625 N.Y.S.2d 400, 401 (App. Term, 2d Dep't 1995).

44.    To provide "clear procedures" for administering the SR Program, and to promote "use" of the SR Program "as intended in law and regulation," the Bulletin announced the Safe Harbor Provisions:

> a.    **Building Condition**:  if a building is 80% vacant at the time of construction, DHCR will presume it was "substandard or seriously deteriorated" unless vacancy was procured by arson or tenant harassment. (*Id.*)
>
> b.    **Scope of Renovation**:  if an owner replaces 75% or more of the building-wide and apartment systems, DHCR will presume it qualified as a substantial rehabilitation. (*Id.* at 2.)

45.    DHCR's creation of the Safe Harbor Provisions for the "substantial rehabilitation" of buildings in a "substandard or seriously deteriorated condition" was critically important because DHCR's authoritative pronouncement superseded judicial interpretations which, before the Bulletin, had required Program participants to make a particularized showing in every project.

**B.    What the Bulletin *Did Not* Say**

**1.    *The Bulletin Did Not Prohibit the Use of Buyout Agreements to Obtain 80% Vacancy***

46.    Owners who wanted to substantially rehabilitate their rent-stabilized buildings, and who also wanted to be certain that their buildings satisfied DHCR's criteria for the SR Program, knew the buildings should be at least 80% vacant prior to commencing the rehabilitation work.

47.    Moreover, substantial rehabilitation projects are generally easier, more comprehensive, and safer if the buildings are vacant before the work starts.

48.    Accordingly, one common transaction in the real estate industry was for a landlord and tenant to enter into a "surrender agreement"—sometimes called a *buyout*—where the tenant

agrees to vacate the unit in exchange for some consideration, which could range from a modest amount covering moving expenses or a few months' rent, to cash payments of six-figures or more.

49.     Tenants in degraded buildings may wish to move elsewhere but may lack the resources to move or to pay higher rent in a desirable environment.  The cash payments from a buyout can unlock the door to a better life for these tenants.

50.     Crucially, neither DHCR's regulations nor its official guidance in the Bulletin mention, much less prohibit buyouts.  DHCR never promulgated rules to provide for regulatory review or approval of buyout agreements.  That remains true to this day.

51.     As relevant here, the Bulletin *does not* preclude or limit the use of buyouts to obtain vacancies in order to make a project qualify for the 80% vacancy presumption.

52.     To the contrary, the Bulletin expressly provided two and only two grounds for rebutting the presumption: if a program participant committed (and was convicted of) arson or if DHCR made an express finding of tenant harassment.[20]

53.     More to the point, DHCR regulatory oversight permitted SR Program participants to negotiate buyout agreements with tenants, so long as those agreements were not procured through threats or harassment.  This was true for almost true for almost 30 years (1995–2023).

54.     Indeed, so-called buyout agreements were common and widely used in the New York City real estate industry.[21]

---

[20] "DHCR will not find the building to have been substantially rehabilitated if it can be established that [i] the owner has attempted to secure a vacancy by an act of arson resulting in criminal conviction of the owner or the owner's agent, and/or [ii] DHCR has made an outstanding finding of harassment . . . ."  (OB 95-2, at 2)

[21] *See* Marc Santora, *The Lucky Break of Rent Stabilization*, N.Y. TIMES (Feb. 4, 2011), available at https://www.nytimes.com/2011/02/06/realestate/06cov.html.

55.     In short, DHCR's policy was to count vacancies procured by buyouts as part of the 80% vacancy presumption, without interrogation or regulatory scrutiny.

56.     DHCR's policy was repeatedly reaffirmed, *inter alia*, in sworn affidavits, DHCR agency decisions, DHCR Fact Sheets, and industry guidance.  As examples:

a.     **Sworn Statement**:  In determining program eligibility for a program participant, DHCR Attorney Patrice Huss submitted a sworn affidavit, dated April 23, 2021, in which she counted units rendered vacant through buyout agreements in calculating whether a building was 80% vacant at the time of construction.[22]

b.     **DHCR Agency Decisions**:  A consistent pattern of decisions applying the 80% vacancy Safe Harbor, without any inquiry into whether vacancies were obtained through buyout or surrender agreements:

i.     2004:  DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[23]

ii.     2005:  DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[24]

---

[22] *See 852 Hart LLC v. DHCR*, Index No. 502737/2021, NYSCEF Doc. No. 27, Answering Affirmation of Patrice Huss in Opposition to Article 78 Petition, dated Apr. 23, 2021, at ¶ 26.
[23] *In the Matter of 445 17th Street*, Docket No. RJ210007UC (10/13/04).
[24] *In the Matter of Akpan*, Docket No. SF210002UC (5/19/2005).

      iii.    2008:  DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[25]

      iv.    2010:  DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[26]

      v.    2016:  DHCR declared an apartment exempt from rent regulation, overruling a tenant's complaint that the owner used a buyout agreement to procure a vacancy.[27]

c.    **Fact Sheets**:  In 2019, DHCR issued a "Fact Sheet" to the real estate community, stating that the 80% vacancy rule applied unless there had been a "criminal conviction of the owner or the owner's agent" for arson or an actual agency "finding" of tenant harassment, precluding DHCR from failing to apply the presumption where a vacancy followed a voluntary tenant buyout.[28]

d.    **Industry Guidance**:  Over the years, many lawyers advertised to tenants about their right to seek buyouts of rent-stabilized leases.  Other lawyers also provided guidance to developers to retain buyout agreements as proof

---

[25] *In the Matter of Cholakian*, Docket No. VG210054RO (1/9/2008).

[26] *In re Matter of Various Tenants of 505 Lafayette Avenue*, Docket No. WE2100022RT (5/7/2010).

[27] *In re Appeal of Amos Fisher*, Docket No. BO210007UC (5/18/2016).

[28] DHCR Fact Sheet #38 (Substantial Rehabilitation), available at https://hcr.ny.gov/system/files/documents/2025/06/fact-sheet-38-06-2025.pdf.

of vacancy, all confirming DHCR's policy was to allow and count them toward the 80% vacancy Safe Harbor.[29]

57.    Not only did DHCR policy and practice explicitly and implicitly accept that buyout agreements play a legitimate role in a rent-regulated building becoming at least 80% vacant, but other guidance from DHCR and NYAG also sanctioned the use of buyouts in rent-regulated buildings.

58.    DHCR uses a form titled "Report and Certification to Alter or Demolish Rent Controlled Occupied Housing Accommodations," which alerts tenants to their right to "negotiate an agreement with your owner for the voluntary surrender" of their rent-controlled apartments.[30]

59.    NYAG's Department of Law issued a Memorandum in 2015, titled "Tenant Buyouts,"[31] which defines a "buyout agreement" as "a private contract between a building owner and a tenant under which the tenant agrees to surrender their unit in return for some consideration, usually a lump sum payment."  The Memorandum then explains that the Department of Law is "permitting buyout offers to be made to tenants in rent-regulated units, under certain circumstances and with certain disclosures."

---

[29] For examples of lawyers offering guidance to tenants about buyout transactions, see https://alblawfirm.com/press-mentions/can-i-still-get-a-buyout-of-my-rent-stabilized-apartment/; https://www.queenslandlordtenantlaw.com/landlord-tenant-law/lease-buyout-agreements/; https://www.singhranilaw.com/post/understanding-and-negotiating-buyout-agreements.    For examples of due diligence concerning retention of buyout agreements as proof of program requirements, see Rent Stabilization Due Diligence for Multifamily Buildings, available at https://itkowitz.com/booklets/Rent-Stabilization-Due-Diligence-for-Multi-Family-Acquisitions.pdf.

[30] DHCR Form RC-50, available at https://hcr.ny.gov/system/files/documents/2021/06/rc-50-fillable.pdf.

[31] Available at https://ag.ny.gov/sites/default/files/tenant_buyouts_7-9-2015.pdf.

60. Even in the context of prior enforcement actions, NYAG explicitly permitted buildings owners to offer tenants buyout agreements.[32]

61. BHS' members reasonably relied on these authoritative regulatory interpretations.

### 2. *The Bulletin Did Not Have an "Uninhabitability" Requirement*

62. The Bulletin did not define the phrase "substandard or seriously deteriorated," but the circumstances of adoption make clear that the phrase "substandard or seriously deteriorated" did *not* mean "uninhabitable."

63. The Bulletin "recognize[d] a recent court decision" (apparently a reference to *Eastern Pork*), which held that "a building did not have to be completely vacant to qualify for [the substantial rehabilitation] exemption . . . ."[33]

64. To address how building vacancy pertained to the "substandard condition" requirement, DHCR did *not* set forth discretionary standards or a qualitative multifactor test. Rather, DHCR announced a bright-line, easy to administer rule that the agency, owners, and courts could understand and apply—the 80% vacancy presumption. Provided there was no showing of arson or tenant harassment, demonstrating at least 80% vacancy was sufficient proof of substandard condition.[34]

65. According to DHCR's own bright-line rule, *substandard* cannot mean *uninhabitable* because a building can be substandard while still having 20% occupancy.

---

[32] *See, e.g.*, *People v. Croman*, Index No. 450545/2016, NYSCEF Doc. No. 155, Consent Decree (Amended) (Aug. 9, 2018), at 3, 47; *People v. Toledano*, Index No. 450919/2019, NYSCEF Doc. No. 11, Consent Order and Judgment (June 20, 2019), at 2, 9–10 (allowing buyouts with compliance assurances).
[33] OB 95-2, at 1.
[34] OB 95-2, at 2.

66.    For this reason, in the period between 2004 and 2023, DHCR accepted that many projects qualified for the substantial rehabilitation exemption even though tenants still lived in those buildings.  Thus, those buildings were not "uninhabitable."[35]

67.    The Bulletin explicitly addresses the topic by stating that, if a unit is not rehabilitated because it remains occupied while the rest of the building is rehabilitated, then the unit remains rent regulated.[36]

68.    Tellingly, the Bulletin uses the term "habitable condition" elsewhere,[37] showing that DHCR was aware of the term and could have used it to define building conditions that are or are not substandard.  But DHCR chose not to use that term.

69.    If DHCR's Bulletin or RSC § 2520.11(e) meant "uninhabitable" by "substandard or seriously deteriorated," then they would have said "uninhabitable"; they would not have created a presumption of substandard condition upon a showing of 80% vacancy.  The Bulletin and the regulation could have referenced the definition of habitability, *see* N.Y. Real Prop. § 235-b or required 100% vacancy or a vacate order (full or partial) or some other finding of uninhabitability.  Again, DHCR did no such thing.

70.    BHS's members reasonably relied on these authoritative regulatory interpretations.

---

[35] *See, e.g., Copeland v. New York State Div. of Hous. & Cmty. Renewal*, 623 N.Y.S.2d 505, 511 (Sup. Ct. Kings Cnty. 1994) ("Allowing landlords to raise the rents on *substantially all* apartments will provide sufficient incentive to landlords to 'rehabilitate' substandard housing stock, while protecting continuously occupying tenants against the monumental intrusion imposed, willy-nilly, by destabilized rent.").

[36] OB 95-2, § I.F, at 2.  RSC § 2520.11(e)(6) incorporated the same point, *i.e.*, that tenants may remain in their units during a substantial rehabilitation.

[37] OB 95-2, IV, at 3.

**C.    DHCR Administered the Mandatory 80% Presumption Consistent with the Actual Text of the Regulation for Almost 30 Years**

71.    In 2000, five years after issuing guidance in the Bulletin on the criteria for satisfying the substantial rehabilitation exemption, DHCR promulgated parallel regulations that were incorporated into the Rent Stabilization Code, at 9 NYCRR § 2520.11(e).

72.    In particular, the mandatory 80% vacancy presumption was incorporated into the RSC: "Where the rehabilitation was commenced in a building in which at least 80 percent of the housing accommodations were vacant of residential tenants, there shall be a presumption that the building was substandard or seriously deteriorated at that time."  RSC § 2520.11(e)(3) (emphasis added).

73.    DHCR's regulations also incorporated the two and only two grounds for overcoming the presumption:  "except in the case of extenuating circumstances, the DHCR will not find the building to have been in a substandard or seriously deteriorated condition where it can be established that the owner has attempted to secure a vacancy by an act of arson resulting in criminal conviction of the owner or the owner's agent, or the DHCR has made a finding of harassment . . . ."  RSC § 2520.11(e)(4) (emphasis added).

74.    Notably, DHCR did not include any general or policy-oriented catch-all basis to rebut the 80% vacancy presumption.  It did not declare that buyouts were invalid, despite being on notice of their widespread use.  It incorporated no requirement of uninhabitability.

75.    For many years after the Bulletin was issued in 1995, and the regulations were adopted in 2000, DHCR consistently and repeatedly applied the 80% vacancy presumption, and recognized two and only two grounds for rebutting the presumption:  arson and harassment.  It never suggested that buyouts disqualify a project from the 80% vacancy presumption.

76.    For example, in *Matter of Various Tenants of 505 Lafayette Avenue*, Docket No. XJ210022RT (May 7, 2010), DHCR denied tenants' challenge of an owner's application for deregulation based on a substantial rehabilitation, where "the underlying record supports the owner's contention that at least 80% of the subject building was vacant *giving rise to the presumption* that the building was 'substandard or seriously deteriorated' prior to rehabilitation" (emphasis added).

77.    In *Matter of the Administrative Appeal of Lorraine St. Pierre*, Docket No. AO410028RT (July 31, 2014), DHCR denied a tenant's challenge to the approval of owner's application for exemption due to substantial rehabilitation, where "[i]t is uncontested that the building was vacant when the rehabilitation work was performed in 1984-1986 and, *as such*, was in a substandard or seriously deteriorated condition" (emphasis added).  DHCR also noted that "[t]he fact that the building was vacant at the time of the rehabilitation is proof that the building was in [substandard or seriously deteriorated] condition."

78.    In *Matter of the Administrative Appeal of Amos Fisher*, Docket No. DT210040RT (May 18, 2016), DHCR denied a challenge by a tenant to the deregulation of the building, where "it [wa]s not contested that the building was more than 80% vacant of residential tenants at the relevant time."  Despite acknowledging that the last tenant in the building "moved out of the premises pursuant to a surrender agreement," DHCR nonetheless concluded without any inquiry into the departure of the other five tenants, that because the building was "more than 80% vacant," OB 95-2 dictated that "the building is presumed to have been 'substandard or seriously deteriorated at that time,' and the owner was permitted to commence the substantial rehabilitation at issue."

79.    In *Matter of the Administrative Appeal of Edwina Stroud*, Docket No. FV210027RT (June 14, 2018), DHCR denied a tenant's challenge to the deregulation of the building due to

substantial rehabilitation, where DHCR rejected the tenant's allegation that the building was not in substandard condition because an engineer's affidavit stated that the building was vacant when the rehabilitation commenced, and "[s]uch evidence satisfies the Operational Bulletin requirement that the building was in substandard or seriously deteriorated condition at the time the work commenced."  DHCR also noted that "[t]he fact that the building was vacant at the time of the rehabilitation is proof that the building was in [substandard or seriously deteriorated] condition."

80.     In every one of these cases and others, DHCR reinforced that the 80% vacancy rule was a safe harbor for project participants.

81.     It was extremely important to the public and to courts for DHCR's positions to be clearly set forth first in the Bulletin and then in RSC § 2520.11(e) because the rent stabilization laws are notoriously confusing and opaque.  The Court of Appeals has "described the patchwork of rent-control legislation as 'an impenetrable thicket, confusing not only to laymen but to lawyers.'"[38]

82.     Between 1995 and about 2022, based on DHCR's promulgated regulations and practice, the New York City real estate community—including owners, investors, brokers, attorneys, and former DHCR personnel—understood and acted in reliance on DHCR's policy position that buyout agreements counted towards the 80% vacancy presumption.

83.     DHCR treated 80% vacancy, unless caused by proven arson or tenant harassment, as conclusive and did not pretend that there were other exceptions to the presumption.

84.     DHCR did not purport to disqualify vacancies based on secret criteria outside its promulgated regulation.

---

[38] *City of New York v. New York State Div. of Hous. & Cmty. Renewal*, 97 N.Y.2d 216, 219 (2001).

85.    DHCR's consistent approach to the SR Program gave the real estate market sufficient certainty to be incentivized to make capital investments on the understanding that the rehabilitated buildings would be deregulated.

## IV.    DHCR BEGINS A *RETROACTIVE* ENFORCEMENT CAMPAIGN TO CLAW BACK SUBSTANTIALLY REHABILITATED BUILDINGS

### A.    DHCR's Novel Presumptions

86.    In 2019, the New York State Legislature passed the Housing Stability and Tenant Protection Act, which eliminated several paths to deregulate rent-stabilized buildings.  These changes made it even harder for owners to recoup their investments in renovating substandard residential housing stock.

87.    The SR Program remained the last available avenue to de-regulate apartments in exchange for substantial renovations.

88.    But DHCR quietly began dismantling the SR Program on its own.

89.    From about 2021 to 2023, without notice, public comment, or promulgation of regulatory amendments, DHCR began to challenge substantial rehabilitations on grounds that contradicted its own regulations, almost 30 years of enforcement policy, and the investment-backed expectations of building owners.

90.    DHCR began attacking already completed substantial rehabilitations by making up new criteria and flipping the burden of proof.

91.    For example, DHCR began taking the position that vacancies pursuant to buyout agreements did not count towards the 80% vacancy presumption.

92.    This is not hypothetical or speculative.  For example, in a 2023 administrative appeal, DHCR looked past the owner's proof of 80% vacancy, refused to apply the presumption, and focused instead, not on arson or harassment, but on the fact that five of the six apartments had

been vacated pursuant to buyout agreements.[39]  In so doing, DHCR applied a new presumption: if there were buyouts, then the building presumptively was *not* in substandard condition.

93.    In other words, DHCR now presumes that the very fact that a tenant vacated pursuant to a buyout agreement means that the units in the building had value and were habitable. This turns OB 95-2 and RSC § 2520.11(e) on their heads by placing additional requirements on the 80% vacancy presumption that do not exist, *i.e.*, that the 80% number cannot include buyouts and, even if the 80% number did not include buyouts, the owner must also prove uninhabitability.[40]

94.    That is, DHCR began demanding that owners show that the buildings were essentially uninhabitable prior to the rehabilitation work, regardless of whether the owner had proven 80% vacancy.

95.    In one brief, filed in 2023, DHCR went so far as cite a 30-year-old unpublished local civil court's decision, issued before the 80% vacancy presumption was established, to argue that a building must be *uninhabitable* in order to qualify as substandard.[41]  DHCR cited that case despite the fact that the First Department had long ago rejected the contention that *substandard* meant *uninhabitable*.[42]  The appellate court held that DHCR could not condition the substantial rehabilitation exemption on the "'gutting' of an entire, *vacant building*," and in attempting to do so, DHCR had "employed overly rigid standards which are inconsistent with the intent and

---

[39] *See Matter of the Administrative Appeal of Cypress Hills Ventures LLC*, Docket No. LQ11007RO (July 24, 2023).  DHCR decisions cited herein are collected in Exhibit 2.

[40] *See also, e.g.*, *Matter of the Administrative Appeal of 219 Troutman LLC*, Docket No. LO210030RO (June 6, 2023) (holding that "a majority of the apartments in the subject building were in fact habitable prior to the work at issue, as shown by the fact that the vacancies of said apartments were obtained by surrender agreements providing for substantial payments . . . .").

[41] *See In the Matter of the Application of 245 Sullivan Ave LLC v. N.Y.S. Div. of Housing and Community Renewal*, No. 524550/2023, 2023 WL 11997153 (Sup. Ct. N.Y. Cnty. Nov. 1, 2023).

[42] *E. Pork Prods. Co. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 187 A.D.2d 320, 324–25 (1st Dep't 1992).

language of the statute, and unreasonable."[43]  If the Legislature had intended the exemption only to apply if "all apartments and rooms are vacant," then "the Legislature could easily have so specified."[44]

96.     In another administrative appeal from 2024, DHCR likewise took the position that only uninhabitable buildings can be in substandard condition, treating the mandatory 80% vacancy presumption ("there shall be a presumption") as an optional proxy for substandard housing, rather than according the 80% vacancy presumption the force of law.[45]

97.     As alleged above, RSC § 2520.11(e) sets forth explicitly the 80% vacancy presumption, as well as the two and only two grounds for rebutting that presumption (arson and tenant harassment).

98.     Although RSC § 2520.11(e) provided that the criteria set forth in the regulation, § 2520.11(e)(1)–(10), may, at the DHCR's discretion, "be effectuated by operational bulletin," the regulation did not give DHCR the power to invent new criteria as it pleases.

99.     Without amending its regulations and without issuing new guidance, DHCR simply created new policies, backed by threats of enforcement action, namely: (a) if a tenant vacated a unit pursuant to a buyout agreement, the building must not have been in substandard or seriously deteriorated condition; and (2) every unit in a substandard or seriously deteriorated building must be uninhabitable.  Neither of DHCR's novel presumptions are the law, and in fact both are *contradicted* by the law.  *See supra* ¶¶ 71–85.

---

[43] *Id.* at 325 (emphasis added).
[44] *Id.* at 323.
[45] *See Matter of the Administrative Appeal of Creas, Inc.*, Docket No. MN210018RO (Oct. 30, 2024).

100.    DHCR has applied its new, unlawful standards to BHS members, holding that vacancies pursuant to buyout agreements do not count towards the 80% vacancy presumption and, even where the 80% vacancy threshold is satisfied without buyout agreements, demanding a showing the buildings were *uninhabitable* in order for DHCR to deem them substandard or seriously deteriorated, effectively gutting the Safe Harbor Provisions.

101.    DHCR's Operational Bulletin, regulations, and prior enforcement practice have not deterred the DHCR Office of Rent Administration from repeatedly asserting in recent administrative appeals that, *even if the owner demonstrates 80% vacancy*, and even without any proof of arson or tenant harassment in rebuttal, an owner must still demonstrate that the building was *uninhabitable* in order to satisfy the requirement that the building is in substandard or seriously deteriorated condition.  *See supra* ¶ 93.

102.    Accordingly, it is clear that DHCR intends, through administrative action and litigation, to try to erase 30 years of its own substantial rehabilitation precedent and practice by pretending the 80% vacancy presumption was never the law.

103.    These sorts of retroactive changes are precisely what the New York Court of Appeals invalidated in *Regina Metro. Co. v. DHCR*, which held, under the Housing Stability and Tenant Protection Act of 2019, that "enforcement provisions may not be applied retroactively."[46] Such action "would impose new liability . . . altering substantive rights in multiple ways . . . ."[47]

---

[46] 35 N.Y.3d 332, 350 (2020).
[47] *Id.* at 367.

**B.     DHCR Amends RSC § 2520.11(e) and Issues New Operational Bulletin 2023-3**

104.     In August 2022, DHCR published proposed regulatory changes in the State Register for public review and comment. Most significantly, DHCR proposed to eliminate the 80% vacancy presumption.[48]

105.     In connection with this publication, DHCR also included a Regulatory Impact Statement, dated August 16, 2022, which confirmed that the 80% vacancy presumption had long *required* the finding of substandard condition absent arson or harassment: "A presumption regarding the deteriorated condition of the premises due to being at least 80% vacant is repealed as the [presumption] seemingly rewards keeping units off the market, in favor of *making a true factual evaluation of the circumstances surrounding the vacancies*."[49]

106.     That is to say, "making a true factual evaluation of the circumstances surrounding the vacancies" is the _new_ policy enacted in the regulatory change. DHCR's own explanation of the new regulation admitted that, under the prior regulation, the 80% vacancy presumption required a finding of substandard condition without evaluating "the circumstances surrounding the vacancies."

107.     Thus, DHCR's publication confirmed that the 80% vacancy rule had operated as a safe harbor for project participants.

108.     To this day, DHCR has not promulgated regulations addressing buyouts, or stating that a unit can only be in substandard condition if it is uninhabitable or requiring owners to file substantial rehabilitation exemption applications for projects initiated prior to January 1, 2024.

---

[48] *See* 8/31/22 N.Y. St. Reg. HCR-35-22-00007-P (referring to DHCR website for additional reports), available at https://dos.ny.gov/system/files/documents/2022/08/083122.pdf.

[49] DHCR Regulatory Impact Statement, Rent Stabilization Code, at 16, available at https://hcr.ny.gov/system/files/documents/2022/08/rsc-reg-impact-stmt-ris-8.16.22.pdf (emphasis added).

109.    On November 21, 2023, DHCR replaced Operational Bulletin 95-2 with a revised Operational Bulletin 2003-2, dated November 21, 2023, mainly to eliminate the 80% vacancy presumption.

110.    As noted elsewhere, all of the BHS members commenced—and completed—work on buildings prior to November 21, 2023.

## V.    ETPA § 8625(e) WAS AMENDED TO PLACE NEW RESTRICTIONS ON THE SUBSTANTIAL REHABILITATION EXEMPTION

111.    On December 22, 2023, the New York State Legislature amended ETPA § 8625(a)(5) by adding several qualifications to the provision that created the substantial rehabilitation exemption to the rent stabilization laws.

112.    The Legislature initially passed a version of § 8625(a) that required owners claiming exemption from rent stabilization to seek prior approval from DHCR, *and made this application requirement retroactive*.  Owners of "any building previously alleged to have been substantially rehabilitated" would have been required to apply for DHCR approval of the deregulation within six months of the effective date of the amendment.

113.    As initially proposed, this amendment would have meant that every building in New York that had undergone substantial rehabilitation, and had not previously been approved by DHCR, would need to apply for deregulation.  The implications would be staggering, given the number of buildings affected, passage of time and the investment-backed expectations suddenly at stake.

114.    The Governor understood the problem.  She agreed to sign this amendment on the condition that the Legislature amend the chapter further to remove the retroactive requirement that owners seek approval for prior exemptions due to substantial rehabilitation.

115.    Accordingly, the Legislature removed the retroactivity provision from the final bill.[50]

116.    The clear intent of the Legislature, therefore, in enacting the 2023 amendments to ETPA § 8625 (the "Amendments"), and of the Governor in signing those amendments, is that the changes are prospective and *not* retroactive.

117.    By its terms, the Amendments applied only to projects started on or after January 1, 2024.[51]

118.    Because all the work for the substantial rehabilitations undertaken by BHS's members was commenced—and completed—prior to January 1, 2024, both the new application regime and the new statutory grounds for denying such an application cannot lawfully be applied to BHS's members.

---

[50] Senate Bill S8011 explained that the Chapter Amendment "amends the underlying chapter by removing the provision in Part A allowing the Division of Housing and Community Renewal to set new rents upon the combination or division of a rent-regulated unit and to require that only new substantial rehabilitation to rent-stabilized units be approved by the Division of Housing and Community Renewal, removing the portion of the Part A applying retroactively." *See* Summary of Provisions, 2023-S8011 (ACTIVE) - Sponsor Memo, available at https://www.nysenate.gov/legislation/bills/2023/S8011.

[51] Following the Chapter Amendment, which was signed by the Governor, the new law stated that "housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four" are exempt from the rent control laws, "provided that an owner claiming exemption from rent stabilization on the basis of a substantial rehabilitation, **where the work for such rehabilitation was initiated on or after the first day of January, two thousand twenty-four**, shall seek approval from state division of housing and community renewal within one year of the completion of the substantial rehabilitation, and ultimately obtain such approval, which shall be denied on the following grounds: (a) the owner or its predecessors in interest have engaged in harassment of tenants in the five years preceding the completion of the substantial rehabilitation; (b) the building was not in a substandard or seriously deteriorated condition requiring substantial rehabilitation; or (c) any additional grounds as set forth by regulation."  ETPA § 8625(a)(5).

119.    Nevertheless, DHCR is attempting to retroactively eliminate the 80% vacancy presumption by making up new exceptions and requiring proof of uninhabitability even when 80% vacancy is established.

## VI.    DHCR THREATENS BHS MEMBERS WITH A RUINOUS ENFORCEMENT ACTION BASED ON AN UNCONSTITUTIONAL LEGAL THEORY

120.    Using threats of enforcement as a cudgel, backed by the New York Attorney General and its Tenant Protection Unit, DHCR is attempting to secure *retroactive* application of the Amendments, just as it has sought to impose *retroactive* program requirements nowhere mentioned in the Bulletin.  The law does not permit this.

121.    The New York State Administrative Procedure Act ("NY SAPA"), § 202(1)(a) provides that, "[p]rior to the adoption of a rule, an agency shall submit a notice of proposed rule making to the secretary of state for publication in the state register and shall afford the public an opportunity to submit comments on the proposed rule."

122.    N.Y. Const. Art. IV § 8 provides that "[n]o rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state department, board, bureau, authority or commission shall be effective until it is filed in the office of the department of state."

123.    DHCR has not followed these procedures.  Instead, DHCR arrogated to itself the power to contrive new rules, and now accuses BHS's members of gaming the system for substantial rehabilitation projects that were completed years ago.

124.    BHS's members have substantially renovated dozens of substandard buildings, including buildings in Queens and Brooklyn.

125.    BHS' members, their investors, and their lenders put tens of millions of dollars into these projects.  The result is that hundreds of New Yorkers moved into beautiful apartments, many

of which had previously been off-market, at rents they can afford because they met the income requirements for market-rate units.

126.    Even where the 80% vacancy presumption was satisfied, and DHCR made no finding of arson or tenant harassment, DHCR has nonetheless threatened enforcement actions against BHS members who substantially rehabilitated buildings, claiming that buyouts disqualify reliance on the 80% vacancy rule, or that the buildings, although substantially degraded, were not uninhabitable.

127.    DHCR is making these threats because it knows full well that once any program participant is accused—even falsely—of regulatory violations they will suffer severe reputational and other harm.  Making these threats despite knowing that BHS's members complied with all applicable SR Program requirements is tantamount to extortion.

128.    Indeed, in other matters, DHCR has conceded that the 2024 statutory and regulatory amendments, and the November 21, 2023 Operational Bulletin 2023-3 (which replaced Operational Bulletin 95-2), apply *only* to rehabilitation work that occurred subsequent to the effective date.[52]

129.    BHS's members performed extensive and substantial rehabilitations on many buildings *by the book—DHCR's book*.  Now, DHCR inexplicably claims that BHS's members broke the rules and that previously deregulated buildings must be recaptured by the rent stabilization regime and returned to the prior rents.  DHCR also demands that BHS's members pay the difference between the prior regulated rent for the un-rehabilitated buildings and the market-rate rent for the rehabilitated buildings, calling market rent "overcharges."

---

[52] *See Matter of the Administrative Appeal of ZG Court LLC*, MQ210009RO (Oct. 8, 2024) ("The [Rent Administrator] erred in retroactively applying the rent law amendments of November 2023 and Operational Bulletin 2023-3 to the owner's substantial rehabilitation application.").

130.    The financial consequences for BHS's members would be catastrophic.  Because many of BHS members' buildings have federal or commercial loans, there will also be substantial ripple effects.  For example, the federal government (through Freddie Mac and Fannie Mae) invested over $15 million in BHS's members' buildings.

131.    The bottom line here is that BHS's members invested tens of millions of dollars in rehabilitating housing for New Yorkers, and DHCR is attempting to seize and/or redistribute the fruits of that investment through a fundamentally unfair, retroactive application of new rules to already completed projects, despite the fact that the Governor and then the Legislature expressly rejected any retroactive application of the Amendments.

132.    If DHCR is allowed to proceed with its attempt to unlawfully and retroactively re-regulate buildings that were properly exempted from rent stabilization through the SR Program, then many buildings will be left with insufficient income to cover their operating expenses—including repaying loans taken out to finance the substantial rehabilitations—likely pushing these buildings into foreclosure and either removing them from the rental market or returning them to uninhabitable conditions.

133.    DHCR's attempt to capture the investments of BHS members for its own political purposes is unconstitutional and violates applicable statutes and regulations.  To protect New Yorkers from this lawless agency overreach, this Court's intervention is urgently needed.

**FIRST CAUSE OF ACTION**
**Regulatory Taking, As Applied**
**U.S. Const. Amend. V and XIV**

134.    Plaintiff repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

135.    The Fifth Amendment Takings Clause, incorporated against the States by the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation."

136.    "The aim of the [Takings] Clause is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[53]

137.    DHCR's threatened enforcement action would effect an unconstitutional regulatory taking, under *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) and its progeny.

*Economic Impact of DHCR's Regulatory and Enforcement Action*

138.    By retroactively imposing new and contradictory rules on substantial rehabilitation projects completed years ago, DHCR seeks to confiscate the rents, value, and economic benefits earned from those rehabilitations—benefits BHS's members lawfully obtained under the regulatory framework in place at the time.  This action constitutes a forced transfer of private investment value to tenants, the public, and the State without just compensation.

139.    For nearly 30 years, DHCR administered the substantial rehabilitation exemption pursuant to a uniform and authoritative regime.  Under that regime: (1) 80% vacancy at the commencement of rehabilitation mandated a presumption that a building was "substandard or

---

[53] *E. Enter's. v. Apfel*, 524 U.S. 498, 522 (1998) (internal quotation marks and citation omitted).

seriously deteriorated," and (2) that presumption could be rebutted only by proof of arson or tenant harassment.

140.    DHCR reaffirmed these rules repeatedly through Operational Bulletin 95-2, the Rent Stabilization Code, agency determinations, published guidance, and sworn affidavits. Owners, investors, and lenders—including BHS's members—invested tens of millions of dollars rehabilitating deteriorated buildings in reliance on these well-settled assurances.

141.    Beginning in 2021–2023, DHCR abruptly reversed its interpretation, without rulemaking, statutory authority, or public notice.  DHCR now asserts for the first time that vacancies obtained through voluntary buyouts cannot count toward the 80% presumption, that buildings must be "uninhabitable" to qualify as "substandard," that the presumption is discretionary, and that owners must meet additional criteria never before codified or announced.

142.    DHCR intends to apply these novel standards retroactively to projects completed between 2020 and 2022—years before the November 2023 amendments to the Operational Bulletin 95-2 and RSC § 2520.11(e), and the December 2023 amendments to ETPA § 8625(a)(5), intentionally disregarding that the Legislature *expressly rejected retroactive application of those amendments*.

### Interference with Reasonable Investment-Backed Expectations

143.    If allowed to proceed, DHCR would interfere with BHS members' reasonable investment-backed expectations in those properties.  DHCR's aggressive interference with these investment-backed expectations is the functional equivalent of a government appropriation without just compensation.

144.    Applying these unprecedented rules retroactively would destroy the reasonable, investment-backed expectations of BHS's members.  DHCR seeks to re-regulate buildings long ago deregulated under DHCR's own rules, to impose crippling "overcharge" liability for years of

lawful rents, and to strip owners of the economic value created by their capital investment – all without compensation.

### *Character of the Governmental Action*

145.     The character of DHCR's threatened action shows that it is undertaken solely for the benefit of private persons and not to serve important public interests because DHCR's threatened action would take the investment of a small firm and small investors (*i.e.*, deprive them of the opportunity to be made whole after having put millions into the buildings) and give that investment for free to tenants who enjoy high incomes and who agreed to rent and pay for market rate apartments.

146.     For the foregoing reasons, DHCR's threatened action is arbitrary and irrational and "goes 'too far'" in depriving BHS members of (a) their rights to use, control, improve, and make productive economic use of their own properties and (b) their investment in the rehabilitated buildings.

147.     The destruction of these reliance interests and appropriation of the value generated by BHS's members' investments constitutes an unconstitutional regulatory taking.

148.     BHS members will be irreparably harmed and deprived of their constitutional rights in the absence of declaratory and injunctive relief.

### SECOND CAUSE OF ACTION
### Substantive Due Process, As Applied
### U.S. Const. Amend. XIV; 42 U.S.C. § 1983

149.     Plaintiff repeats and realleges each allegation above as if fully set forth herein.

150.     The retroactive application of new rules to transform what were lawful, valuable, and expensive investments to substantially rehabilitate substandard building (thereby lawfully causing their deregulation) into coerced windfall payments to tenants violates the rights of BHS members to Substantive Due Process.

*Valid Property Interest*

151.    DHCR's threatened enforcement action violates substantive due process because it represents an arbitrary, irrational, and retroactive change in the applicable legal rules that destroys vested rights and legitimate reliance interests.

152.    For nearly 30 years, DHCR assured owners—through the text of the RSC, through Operational Bulletin 95-2, and through agency determinations and affirmations—that 80% vacancy gave rise to a mandatory presumption of substandard condition, that no further showing of substandard condition was required (certainly no showing of uninhabitability), and that buyouts counted toward that 80% vacancy threshold.

153.    Owners reasonably relied on these long-settled rules when undertaking expensive and complex rehabilitations of substandard buildings.

*Arbitrary or Irrational Infringement of Property Interest*

154.    DHCR now asserts the opposite of these settled rules: that buyouts invalidate the presumption, that buildings must have been "uninhabitable," and that the presumption was never binding.  DHCR seeks to apply these new, contradictory standards retroactively to fully completed projects.  The Legislature explicitly rejected retroactive application of the 2023 amendments, yet DHCR attempts to achieve the same result by changing the rules and retroactively enforcing them.

155.    DHCR's conduct serves no legitimate governmental purpose; it appears driven by political pressure to revisit and invalidate previously settled deregulations, despite the Legislature's explicit rejection of retroactive application in the 2023 statutory amendments.

156.    Such harsh retroactive imposition of onerous liabilities for beneficial and expensive renovations and lawful deregulation is unconstitutional because it arbitrarily and irrationally infringes upon owners' property interests.  Where an agency seeks to give retroactive application to changes in the law that the Legislature and Governor expressly forbade from applying

retroactively, it is deliberately flouting the law in a manner that violates the owners' significant personal or property rights.

### THIRD CAUSE OF ACTION
**Procedural Due Process, As Applied**
**U.S. Const. Amend. XIV; 42 U.S.C. § 1983**

157.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

158.    The retroactive application of new rules to transform what were lawful, valuable, and expensive investments to substantially rehabilitate substandard building (thereby lawfully causing their deregulation) into coerced windfall payments to tenants violates the rights of BHS members to Procedural Due Process.

159.    BHS members have property rights in the buildings they own, including the improvements and renovations made through the substantial rehabilitation process.

160.    Regulated parties must receive fair notice of the conduct that will subject them to liability.

161.    At the time BHS's members commenced and completed their projects, DHCR had never suggested that buyouts were disqualifying, that buildings must be uninhabitable, or that the 80% vacancy presumption was discretionary.  DHCR did not amend its regulations before November 2023, did not issue revised guidance via amended operational bulletin, and did not engage in regular rulemaking.

162.    The 2023 amendments to the ETPA expressly rejected (via the Governor's Chapter Amendments) retroactive application of the requirement that owners must file substantial renewal applications with DHCR prior to deregulation.

163.    BHS's members had no notice, and no reason to believe, that the rules of the substantial rehabilitation exemption were not DHCR's promulgated rules and guidance, but

malleable and discretionary policies that would be retroactively applied to achieve the desired result—re-regulation of formerly rent-stabilized buildings, especially ones that had recently been dramatically upgraded.

164.    DHCR now seeks to impose penalties—including re-regulation and overcharge liability—based on interpretations that did not exist when BHS's members acted.

165.    By attempting to impose penalties based on undisclosed, post hoc reinterpretations, DHCR threatens to deprive BHS's members of their property without due process of law.  Because DHCR's enforcement standards are different from its promulgated rules, the risk of erroneous deprivation under existing procedures is great.

166.    DHCR's new enforcement policy flouts the law that was in effect when the BHS members made investments and took out loans to finance substantial rehabilitations.  DHCR's new enforcement policy would also make *retroactive* state laws that are expressly *not retroactive*. These retroactive actions will cause harsh and oppressive consequences because the owners will lose their investments and be unable to make whole their investors or repay their loans.

167.    Aspects of DHCR's new enforcement policy have been challenged via Article 78 proceeding in New York State court.[54]  However, the state courts give substantial deference to the agency's judgment, interpretations, and findings.  On information and belief, to date, no Article 78 proceeding has resulted in DHCR's determinations under its new enforcement policy being enjoined, vacated, or corrected.  Accordingly, the post-deprivation state procedures in place would be insufficient under the Fourteenth Amendment.

---

[54] *See Creas v. DHCR*, Index No. 535355/2024, 2025 WL 1913548 (Sup. Ct. Kings Cnty. July 2, 2025).

168.    Moreover, the property interest at issue here is real property, which is unique and not adequately compensable with money damages.  Thus, the threat of loss of real property, for example, through foreclosure, cannot adequately be addressed in a post-deprivation hearing.

169.    Consequently, in the absence of declaratory and injunctive relief, BHS members will be irreparably harmed and deprived of their substantive and procedural due process rights.

## PRAYER FOR RELIEF

WHEREFORE, BHS respectfully requests that this Court enter judgement in its favor and grant the following relief:

A.    A declaration that administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the 80% vacancy presumption (as detailed above), would effect an unlawful regulatory taking in violation of U.S. Const. Amend. V and XIV.

B.    A declaration that administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the 80% vacancy presumption (as detailed above), would violate BHS' members' substantive due process rights in violation of U.S. Const. Amend. XIV.

C.    A declaration that any manner of administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the 80% vacancy presumption (as detailed above), would violate BHS' members' procedural due process rights in violation of U.S. Const. Amend. XIV.

D.    A preliminary injunction enjoining the enforcement, by or on behalf of DHCR, of DHCR's new construction of "substantial rehabilitation" and rejection of the 80% vacancy presumption (as detailed above) with respect to any substantial rehabilitation projects initiated prior to November 8, 2023, on account of the violations of the Takings Clause and the Due Process Clause (Substantive and Procedural) enumerated above.

E.    A permanent injunction enjoining the enforcement, by or on behalf of DHCR, of DHCR's new construction of "substantial rehabilitation" and rejection of the 80% vacancy presumption (as detailed above) with respect to any substantial rehabilitation projects initiated prior to November 8, 2023, on account of the violations of the Takings Clause and the Due Process Clause (Substantive and Procedural) enumerated above.

F.    An award of BHS's reasonable costs, litigation expenses, and attorney's fees pursuant to 42 U.S.C. § 1988; and

G.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.


Dated:  New York, New York
        November 25, 2025

WALDEN MACHT HARAN & WILLIAMS LLP

*/s/ Jim Walden*
Jim Walden
Brian Mogck
250 Vesey Street, 27th Floor
New York, New York
jwalden@wmhwlaw.com
bmogck@wmhwlaw.com
(212) 335-2030

*Counsel for Plaintiff*