# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the
State of New York, and NEW YORK STATE DIVISION OF
HOUSING AND COMMUNITY RENEWAL,

                                  Plaintiffs,                    <u>COMPLAINT</u>

           -against-                          Index No. _____
                                                   IAS Part

PEAK CAPITAL ADVISORS, LLC, JUAN DAVID
GOMEZ, ALEX RABIN, AMNAY LABOU, MICHAEL
LOHAN, BRYAN ANDERSON, ALEX KASKEL, ALEX
MENDIK, 4836 41 STREET OWNERS LLC,
48-33 47TH STREET LLC, 47-21 47TH STREET OWNER
LLC, 51ST AVENUE OWNER LLC, 41ST STREET
OWNER LLC, 47TH ROAD OWNER LLC, 70 MIDDAGH
OWNER LLC, 45TH STREET NEW OWNER LLC, 44TH
STREET OWNER LLC, 5317 SKILLMAN OWNER LLC,
32ND STREET OWNER LLC, 3070 44TH STREET
OWNER LLC, 4745 43RD STREET OWNER LLC, 4707
OWNER LLC, 4709 47TH AVENUE OWNER LLC, 3093
44TH OWNER LLC, 4127 49TH OWNER LLC, 4542
VERNON OWNER LLC, 131 GREENPOINT OWNER
LLC, 586 MANHATTAN OWNER, LLC, 94 MILTON
OWNER LLC, 3230 OWNER LLC, 311 ECKFORD
OWNER LLC, 250 OWNER LLC, 515 GRAHAM OWNER
LLC, 4544 40TH OWNER LLC, 251 NORTH 8TH OWNER
LLC, 2559 35TH OWNER LLC, 154 ATLANTIC OWNER
LLC, 724 METROPOLITAN OWNER LLC,
101 GREENPOINT OWNER LLC,

                                  Defendants.
-----------------------------------------------------------------------X

       The People of the State of New York by Letitia James, Attorney General of the State of

New York ("OAG") and the New York State Division of Housing and Community Renewal

("HCR") (together, "Plaintiffs") respectfully allege, upon information and belief:

1

## INTRODUCTION

1.       Defendant Peak Capital Advisors, LLC ("Peak"), a real estate development company based in New York County, generates income for its principals and investors by illegally deregulating rent-stabilized apartments.  Its business model relies on one of the few remaining regulatory exemptions contained in the rent stabilization laws called the substantial rehabilitation exemption.  It does this through "rinse and repeat" renovations of old housing stock in New York City neighborhoods that Peak has identified as "high growth" and attractive to young professionals.  Yet, this business model has a fundamental flaw: renovations of habitable, average buildings do not meet the substantial rehabilitation exemption standard under Section 2520.11(e) of the Rent Stabilization Code.  That provision requires that buildings must be in substandard or seriously deteriorated condition before renovation to qualify as exempt.  Peak's buildings were not in substandard or seriously deteriorated condition before Defendants renovated them and, thus, they remain rent-stabilized today.

2.       By treating rent-stabilized apartments in their buildings as deregulated, Defendants have deprived the tenants of those apartments of their rights under the rent stabilization laws, overcharged those tenants, and misrepresented the regulatory status of those apartments to thousands of consumers through deceptive apartment listings, to multiple lenders and investors, and to the regulatory agency, HCR, which is a Plaintiff here.  Moreover, Defendants have misrepresented the regulatory status of apartments to purchasers of three of their buildings and in marketing materials advertising another three buildings for sale.

3.       Defendants have engaged in the speculation and profiteering the Legislature was concerned about when it passed the Rent Stabilization Law and Emergency Tenant Protection Act of 1974.  They executed their business plan without any independent legal advice about

2

whether the renovations planned for the apartments would lawfully exempt them from rent stabilization. It was only when Plaintiffs began investigating whether Peak's apartments met the substantial rehabilitation exemption that Defendants had their architect prepare false and misleading affidavits swearing that all of the systems in many of the buildings that are the subject of this complaint (hereinafter "complaint properties") were in substandard condition prior to renovation. Defendants submitted these affidavits to HCR with a statement from a non-attorney consultant claiming that the substantial rehabilitation exemption was applicable in all cases.

4.      The complaint properties were not in substandard or seriously deteriorated condition when Peak purchased and renovated them. Indeed, Property Condition Assessments prepared by a professional environmental consultant who inspected the buildings before renovation confirmed that the complaint properties were in fair condition at the time of purchase and had decades of estimated remaining useful life. Peak carried out renovations to the complaint properties not to correct deterioration but, rather, to make the buildings aesthetically attractive to New Yorkers willing to pay high rents.

5.      Plaintiffs seek an injunction directing that Defendants comply with the rent stabilization laws by taking the steps necessary to register the apartments' rent-stabilized status and issue rent-stabilized leases to tenants at appropriate legal regulated rents. Plaintiffs also seek an order directing restitution of overcharged rents to affected tenants, as well as equitable relief and statutory penalties for Defendants' illegal business practices.

## PARTIES

6.      Plaintiff, the People of the State of New York, is represented by its attorney, Letitia James, the Attorney General of the State of New York ("Attorney General"). The

3

Attorney General has her principal place of business at 28 Liberty Street, New York, New York, 10005, in New York County.

7.      Plaintiff New York State Division of Housing and Community Renewal is an enforcement agency of the Executive Department of the State of New York, established to administer and enforce New York State's rent regulation laws. HCR's principal place of business is located at 25 Beaver Street, New York, New York, 10004, in New York County.

8.      Defendant Peak Capital Advisors, LLC is a New York State limited liability company that was founded in 2017 by Defendants Juan David Gomez and Alex Rabin. Peak has its principal place of business at 900 Broadway, Suite 803, New York, New York 10003, in New York County. Peak conducts business in the State of New York.

9.      Defendant Juan David Gomez is an individual residing in Kings County. He is co-founder and Head of Operations and Development at Peak. Mr. Gomez is the controlling member of Gomez Holdings LLC, with an address of 306 Gold Street, Suite 32D, Brooklyn, New York 11201. Gomez Holdings LLC holds an interest in all or nearly all the complaint properties. Upon information and belief, Mr. Gomez receives rent or is entitled to receive rent from the complaint properties. He is an agent of the companies that are fee owners of the complaint properties.

10.      Defendant Alex Rabin is an individual residing in New York County. He is co-founder and Head of Investments and Acquisitions at Peak. Mr. Rabin is a member of Rabinfam LLC, with an address of 140 West End Avenue, Apt. 9H, New York, New York 10023. Rabinfam LLC holds an interest in all or nearly all complaint properties. Upon information and belief, Mr. Rabin receives rent or is entitled to receive rent from the complaint properties. He is an agent of the companies that are fee owners of complaint properties.

4

11. Defendant Amnay Labou is an individual residing in Queens County. He is principal and Head of Marketing and Project Management at Peak. Mr. Labou is the controlling member of Labou Holdings LLC, with an address of 325 Broadway, Suite 302, New York, New York 10007. Labou Holdings LLC holds an interest in all or nearly all complaint properties. Upon information and belief, Mr. Labou receives rent or is entitled to receive rent from the complaint properties. He is an agent of the companies that are fee owners of the complaint properties.

12. Defendant Michael Lohan is an individual residing in Kings County. He is a principal and Head of Investor Relations at Peak. Mr. Lohan is the controlling member of Nineteen Blocks Group LLC, with an address of 626 First Avenue, Apt. W21N, New York, New York 10016. Nineteen Blocks Group LLC holds an interest in all or nearly all complaint properties. Upon information and belief, Mr. Lohan receives rent or is entitled to receive rent from the complaint properties. He is an agent of the companies that are fee owners of the complaint properties.

13. Defendant Bryan Anderson is an individual residing in Kings County. He is a principal, General Counsel, and Head of Legal at Peak. Mr. Anderson is controlling member of Anderson 2 LLC, Anderson 3 LLC, Anderson 4 LLC, and Anderson Residential LLC, and he is the founding member of the law firm Anderson Law 2 PLLC ("Anderson Law"), with an address of 104 West 27th Street, 11th Floor, New York, New York 10001. Upon information and belief, Anderson 2 LLC, Anderson 3 LLC, and Anderson 4 LLC hold interests in many of the complaint properties. Mr. Anderson receives rent or is entitled to receive rent from the complaint properties. He is an agent of the companies that are fee owners of the complaint properties.

14.     Defendant Alex Kaskel is an individual residing in New York County.  He is a principal and the Head of Capital Markets at Peak.  Mr. Kaskel is responsible for the firm's capital market efforts, which include raising capital and is involved with sourcing new acquisition opportunities.  Upon information and belief, he receives rent or is entitled to receive rent from the complaint properties.  He is an agent of the companies that are fee owners of the complaint properties.

15.     Defendant Alex Mendik is an individual residing in New York County.  He is a principal and Head of Research and Analytics at Peak.  He is a minority owner of Gomez Holdings LLC, which holds an interest in all or nearly all complaint properties.  Upon information and belief, Mr. Mendik receives rent or is entitled to receive rent from the complaint properties.  He is an agent of the companies that are fee owners of the complaint properties.

16.     Defendant 4836 41 STREET OWNERS LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 900 Broadway, Suite 803, New York, New York 10003, in New York County.  4836 41 STREET OWNERS LLC is the owner of residential real property located at 48-36 41st Street, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent from that property.

17.     Defendant 48-33 47TH STREET LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 47-21 47th Street, Lower Level, Sunnyside, New York 11377, in Queens County.  48-33 47TH STREET LLC is the owner of residential real property located at 48-33 47th Street, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent from that property.

18.     Defendant 47-21 47TH STREET OWNER LLC is a domestic limited liability

company duly organized and doing business under the laws of the State of New York and has its

principal place of business located at 47-21 47th Street, Sunnyside, New York, in Queens

County.  47-21 47TH STREET OWNER LLC is the owner of residential real property located at

47-21 47th Street, Sunnyside, New York, in Queens County and receives rent or is entitled to

receive rent from that property.

19.     Defendant 51ST AVENUE OWNER LLC is a domestic limited liability company

duly organized and doing business under the laws of the State of New York and has its principal

place of business located at 47-21 47th Street, Sunnyside, New York, 11377, in Queens County.

51ST AVENUE OWNER LLC is the owner of residential real property located at 5-13 51st

Avenue, Long Island City, New York, in Queens County and receives rent or is entitled to receive

rent from that property.

20.     Defendant 41ST STREET OWNER LLC is a domestic limited liability company

duly organized and doing business under the laws of the State of New York and has its principal

place of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County.

41ST STREET OWNER LLC is the owner of residential real property located at 45-35 41st

Street, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent

from that property.

21.     Defendant 47TH ROAD OWNER LLC is a domestic limited liability company

duly organized and doing business under the laws of the State of New York and has its principal

place of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County.

47TH ROAD OWNER LLC is the owner of residential real property located at 5-35 47th Road,

Long Island City, New York, in Queens County and receives rent or is entitled to receive rent from that property.

22.     Defendant 70 MIDDAGH OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County. 70 MIDDAGH OWNER LLC is the owner of residential real property located at 70 Middagh Street, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

23.     Defendant 45TH STREET NEW OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County.  45TH STREET NEW OWNER is the owner of residential real property located at 47-34 45th Street, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent from that property.

24.     Defendant 44TH STREET OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County.  44TH STREET NEW OWNER is the owner of residential real property located at 47-25 44th Street, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent from that property.

25.     Defendant 5317 SKILLMAN OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in

8

New York County. 5317 SKILLMAN OWNER LLC is the owner of residential real property located at 53-17 Skillman Avenue, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent from that property.

26.     Defendant 32ND STREET OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 32ND STREET OWNER LLC is the owner of residential real property located at 35-34 32nd Street, Astoria, New York, in Queens County and receives rent or is entitled to receive rent from that property.

27.     Defendant 3070 44TH STREET OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 3070 44TH STREET OWNER LLC is the owner of residential real property located at 30-70 44th Street, Astoria, New York, in Queens County and receives rent or is entitled to receive rent from that property.

28.     Defendant 4745 43RD STREET OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 4745 43RD STREET OWNER LLC is the owner of residential real property located at 47-45 43rd Street, Sunnyside, New York, in Queens County and receives rent or is entitled to receive rent from that property.

29.     Defendant 4707 OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place

of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County. 4707

OWNER LLC is the owner of residential real property located at 47-07 47th Avenue, Sunnyside,

New York, in Queens County and receives rent or is entitled to receive rent from that property.

30.     Defendant 4709 47TH AVENUE OWNER LLC is a domestic limited liability

company duly organized and doing business under the laws of the State of New York and has its

principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in

New York County. 4709 47TH AVENUE OWNER LLC is the owner of residential real property

located at 47-09 47th Avenue, Sunnyside, New York, in Queens County and receives rent or is

entitled to receive rent from that property.

31.     Defendant 3093 44TH OWNER LLC is a domestic limited liability company duly

organized and doing business under the laws of the State of New York and has its principal place

of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County.

3093 44TH OWNER LLC is the owner of residential real property located at 30-93 44th Street,

Astoria, New York, in Queens County and receives rent or is entitled to receive rent from that

property.

32.     Defendant 4127 49TH OWNER LLC is a domestic limited liability company duly

organized and doing business under the laws of the State of New York and has its principal place

of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County.

4127 49TH OWNER LLC is the owner of residential real property located at 41-27 49th Street,

Long Island City, New York, in Queens County and receives rent or is entitled to receive rent

from that property.

33.     Defendant 4542 VERNON OWNER LLC is a domestic limited liability company

duly organized and doing business under the laws of the State of New York and has its principal

10

place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 4542 VERNON OWNER LLC is the owner of residential real property located at 45-42 Vernon Boulevard, Long Island City, New York, in Queens County and receives rent or is entitled to receive rent from that property.

34.     Defendant 131 GREENPOINT OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 131 GREENPOINT LLC is the owner of residential real property located at 131 Greenpoint Avenue, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

35.     Defendant 586 MANHATTAN OWNER, LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 586 MANHATTAN OWNER, LLC is the owner of residential real property located at 586 Manhattan Avenue, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

36.     Defendant 94 MILTON OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 306 Gold Street, Apt. 32D, Brooklyn, New York 11201, in Kings County. 94 MILTON OWNER LLC is the owner of residential real property located at 94 Milton Street, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

37.     Defendant 3230 OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 3230 OWNER, LLC is the owner of residential real property located at 32-30 41st Street, Astoria, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

38.     Defendant 311 ECKFORD OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 900 Broadway, New York, New York 10003, in New York County. 311 ECKFORD OWNER LLC is the owner of residential real property located at 311 Eckford Street, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

39.     Defendant 250 OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 250 OWNER LLC is the owner of residential real property located at 250 North 6th Street, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

40.     Defendant 515 GRAHAM OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County. 515 GRAHAM OWNER LLC is the owner of residential real property located at 515 Graham

12

Avenue, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

41.     Defendant 4544 40TH OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County.  4544 40TH OWNER LLC is the owner of residential real property located at 45-44 40th Street, Sunnyside, in Queens County and receives rent or is entitled to receive rent from that property.

42.     Defendant 251 NORTH 8TH OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 900 Broadway, Suite 803, New York, New York 10003, in New York County.  251 NORTH 8TH OWNER LLC is the owner of residential real property located at 251-253 North 8th Street, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

43.     Defendant 2559 35TH OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 47-21 47th Street, Sunnyside, New York 11377, in Queens County.  2559 35TH OWNER LLC is the owner of residential real property located at 25-59 35th Street, Astoria, New York, in Queens County and receives rent or is entitled to receive rent from that property.

44.     Defendant 154 ATLANTIC OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County.  154 ATLANTIC OWNER LLC is the owner of residential real property located at 154

Atlantic Avenue, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

45. Defendant 724 METROPOLITAN OWNERS LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 724 METROPOLITAN OWNER LLC is the owner of residential real property located at 724 Metropolitan Avenue, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

46. Defendant 101 GREENPOINT OWNER LLC is a domestic limited liability company duly organized and doing business under the laws of the State of New York and has its principal place of business located at 343 Canal Street, Fl. 2, New York, New York 10013, in New York County. 101 GREENPOINT OWNER LLC is the owner of residential real property located at 101 Greenpoint Avenue, Brooklyn, New York, in Kings County and receives rent or is entitled to receive rent from that property.

## JURISDICTION AND VENUE

47. This Court has jurisdiction over this action pursuant to N.Y. Executive Law § 63(12), which authorizes the Attorney General to commence an action in this Court seeking injunctive relief, restitution, damages, disgorgement, and costs on behalf of the People of the State of New York "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." N.Y. Exec. Law § 63(12).

48. Under General Business Law ("GBL") Article 22-A, § 349, the Attorney General is empowered to seek injunctive relief, restitution, civil penalties and equitable relief against any

14

person or business entity that has engaged in deceptive acts and practices in the conduct of business.

49.     This Court also has jurisdiction over the action pursuant to Rent Stabilization Law § 26-516(e) and Rent Stabilization Code § 2526.3, which authorize HCR to seek injunctive relief in New York State Supreme Court for violations of the Rent Stabilization Law and Code, and Public Housing Law § 14(1)(x), which authorizes the HCR Commissioner and her designees to enforce the rent regulation laws with all the powers granted therein.

50.     Personal jurisdiction exists as to each Defendant because each Defendant is domiciled within the State of New York and/or regularly transacts business within the State of New York.

51.     Before the filing of the instant action, counsel for Defendants agreed to waive the pre-litigation notice requirement in General Business Law § 349(c).

52.     Venue is properly laid in New York County because Plaintiffs, Defendant Peak Capital Advisors, LLC, and the majority of the single purpose entity defendants, have their respective principal offices in New York County.

## REGULATORY FRAMEWORK

**A.      Enforcement of the Rent Regulation Laws**

53.     In New York City, the laws and regulations governing the rent stabilization system are the Rent Stabilization Law codified at Chapter 4 of Title 26 of the New York City Administrative Code (hereinafter "NYC Admin. Code"), the Emergency Tenant Protection Act of 1974 (hereinafter "ETPA"), codified at Chapter 1974 of the Unconsolidated Laws of New York, and the Rent Stabilization Code (hereinafter "RSC"), Title 9, Subtitle S, Chapter VIII of the New

15

York Codes, Rules and Regulations (hereinafter "N.Y.C.R.R.") (collectively, "the rent regulation laws").

54. The New York State Legislature passed the ETPA and the RSL upon finding that, due to a shortage of residential rental housing, government intervention into rent-setting was necessary to prevent the exaction of unreasonable rents and rent increases and to "forestall profiteering [and] speculation." ETPA § 2, RSL § 26-501. The Legislature designated HCR as the State agency to administer the ETPA and RSL. ETPA § 10(a), L. 1983, ch. 403, Section 3. HCR is empowered to promulgate regulations thereunder and to enforce the law through, among other things, issuance of administrative orders. RSL § 26-511(b); RSL § 26-516(b). The RSC is promulgated by HCR pursuant to its authority under the RSL. NYC Admin. Code § 26-511.

55. The Tenant Protection Unit is a unit within HCR that proactively conducts investigations and seeks administrative and judicial relief to enforce compliance with the rent regulation laws, including seeking injunctive relief, investigating violations of the rent regulation laws, and educating the public on the rent regulation laws.

56. HCR is empowered to commence proceedings in Supreme Court to enjoin violations of the rent regulation laws and generally enforce the law. 9 N.Y.C.R.R. § 2526.3; NYC Admin. Code § 26-516; Public Housing Law § 14(1)(x).

57. The Office of the New York State Attorney General is empowered to seek permanent injunctive relief, disgorgement of profits, restitution, damages and other forms of appropriate equitable relief whenever a person or business engages in "repeated or persistent fraud or illegality." N.Y. Exec. L. § 63(12). This includes violations of rent regulation laws.

16

**B.      The Substantial Rehabilitation Exemption**

58.      The RSL, ETPA and RSC set forth which housing accommodations qualify as rent-stabilized.  *See* NYC Admin. Code § 26-504, ETPA § 5, 9 N.Y.C.R.R. § 2520.11.

59.      Generally, all buildings in New York City with six (6) or more units built before January 1, 1974 are presumed to be rent-stabilized.  9 N.Y.C.R.R. § 2520.11.  The rent regulation laws, however, carve out exemptions from this rule.

60.      While the Legislature modified many previously existing exemptions from rent stabilization when it passed the Housing Stability and Tenant Protection Act of 2019, one exemption that remained and is relevant here is the substantial rehabilitation exemption.

61.      The substantial rehabilitation exemption allows owners to remove housing accommodations from rent regulation when they have been substantially rehabilitated, as defined by the Code and interpreted by HCR.  The exemption is not codified in the RSL but rather is applicable to New York City housing accommodations under Section 2520.11(e) of the RSC and Section 5(a)(5) of the ETPA.

62.      The purpose of the exemption is to encourage rehabilitation of dilapidated and basically uninhabitable housing stock.

63.      In keeping with this purpose, HCR promulgated rules establishing the criteria that owners must meet in order for an accommodation to qualify as exempt under the substantial rehabilitation exemption.  According to these rules, there are two prongs that the owner must meet: (1) the owner must demonstrate that it replaced at least 75 percent of building-wide and individual housing accommodation systems ("first prong"); and (2) the owner must demonstrate

17

that it commenced the rehabilitation "in a building that was in a substandard or seriously deteriorated condition" ("second prong"). 9 N.Y.C.R.R. § 2520.11(e)(2).[1]

64.     The burden is on the owner to establish that housing accommodations meet both prongs of the substantial rehabilitation exemption in 9 N.Y.C.R.R. § 2520.11(e)(2).  An owner has failed to meet its burden of satisfying the second prong when, in lieu of actual evidence of deterioration, it offers conclusory assertions about the condition of the building before renovation.

65.     As it is authorized to do under the RSL and ETPA, HCR has issued operational bulletins as guidance in interpreting the substantial rehabilitation exemption.  The bulletin in effect at the time the renovations described in this complaint took place was Operational Bulletin 95-2.  That bulletin was in effect for nearly 30 years.

66.     As to the second prong, O.B. 95-2 clarified what evidence the agency would consider in assessing whether a building was in substandard or seriously deteriorated condition prior to renovation.  The bulletin listed several examples of the type of documentation owners must proffer to the agency to show the exemption applies, including building plans, government approvals, photographs, and proof of payment.  In addition to this documentation, the bulletin noted that "[t]he extent to which the building was vacant of residential tenants when the

---

[1] While a recent amendment to the ETPA requires owners to submit all substantial rehabilitation applications to HCR concerning renovations initiated on or after January 1, 2024, during the time that the events alleged in this complaint took place there was no requirement to obtain approval from HCR.  Rather, owners could achieve substantial rehabilitation without advanced HCR approval as long as they were able to demonstrate to the agency or a court with concurrent jurisdiction that they had satisfied the requirements when challenged.  Owners have always had the option of applying to HCR for an advisory prior opinion that proposed work would qualify as a substantial rehabilitation.  D.H.C.R. O.B. 95-2; D.H.C.R. O.B. 2023-3. Defendants have never done so.

rehabilitation was commenced shall constitute evidence of whether the building was in fact in such condition," and it further provided: "Where the rehabilitation was commenced in a building that was at least 80% vacant of residential tenants, there shall be a presumption that the building was substandard or seriously deteriorated at that time" ("80% vacancy presumption").[2]

67.    The 80% vacancy presumption set forth in O.B. 95-2 has been used by HCR as a gauge of a building's habitability before renovation.  When such a high degree of vacancy occurs, it usually indicates that the apartments in a building are not habitable, and that this lack of habitability is due to the deteriorated conditions of the building.  The presumption, however, is not absolute and does not automatically lead to a finding of a substandard and seriously deteriorated condition.  Vacancy alone is not enough to satisfy the second prong.

68.    Indeed, the agency recognizes that a building may be vacant for reasons other than its condition at the time of renovation.  HCR has determined (and it is common sense) that the presumption is not useful as a gauge of a building's habitability when it is evident that an owner achieved the 80% vacancy artificially by, for example, offering tenants money to surrender their apartments ("buyouts").   In administrative adjudications applying O.B. 95-2, HCR has considered evidence of how a building became vacant in addition to the percentage of vacancy to determine whether a building was in substandard or seriously deteriorated condition, and HCR has denied substantial rehabilitation applications when the owner achieved 80% vacancy using buyouts.

_____

[2] The current bulletin, Operational Bulletin ("O.B.") 2023-3, reiterates that the owner must demonstrate that it replaced at least 75 percent of building-wide systems to meet the first prong.  These systems are listed in the bulletin.  The O.B. also states that the owner must show that "the building was in a substandard or seriously deteriorated condition" before the renovation in order to meet the second prong.  D.H.C.R. O.B. 2023-3 (available at https://hcr.ny.gov/system/files/documents/2023/11/operational-bulletin-2023-3.pdf).

19

C.      **Rent Stabilization Restrictions and Protections, In General**

69.     For housing accommodations that are rent-stabilized, the RSC imposes certain requirements on owners and grants certain rights to tenants. For example, the RSC controls the amount of rent chargeable for each accommodation, 9 N.YC.R.R. § 2522.5, the content of leases between the landlord and tenant, and it obligates owners to register information about their rent-stabilized units with HCR, also known as rent registration, 9 N.Y.C.R.R. § 2524.1.

70.     With respect to rents, the RSC prohibits owners of accommodations covered by the RSC from charging, collecting, demanding, and/or receiving any rent in excess of the legal regulated rent. 9 N.Y.C.R.R. § 2525.1. The amount owners can increase the legal regulated rent of a covered accommodation is set by the New York City Rent Guidelines Board[3] ("RGB") and is raised incrementally based on the legal regulated rent charged in the previous lease in effect.

71.     Owners who willfully collect rents in excess of the legal regulated rents for rent-stabilized housing accommodations are liable for damages equivalent to three times the amount of the overcharged rent unless the owner can show the overcharge was not willful. 9 N.Y.C.R.R. § 2526.1, § 2526.7(i).

72.     With respect to leases, owners are required to provide tenants with fully executed leases and lease riders, which bear the signatures of both the owner and tenants. 9 N.Y.C.R.R. § 2522.5. A "vacancy lease" is the first lease or rental agreement an owner and a tenant enter into for a unit. 9 N.Y.C.R.R. § 2520.6(g). Tenants have a right to a contractual extension of their occupancy of the unit through a "renewal lease." 9 N.Y.C.R.R. § 2520.6(h). Every vacancy and renewal lease must include a lease rider, in a form promulgated or approved by HCR, that

---

[3] The New York City Rent Guidelines Board was created by the Legislature in 1969 in order to establish annual rent adjustments for all apartments subject to the Rent Stabilization Law in New York City.

informs the regulated tenants of their rights and duties under the rent regulation laws. 9

N.Y.C.R.R. § 2522.5(c)(1).

73.     Owners are prohibited from entering into agreements with tenants that waive

benefits or rights granted under the RSC. 9 N.Y.C.R.R. § 2520.13.

**D.      Rent Registrations and Rental History**

74.     Owners of rent-stabilized housing must register those accommodations with HCR

when they become stabilized and thereafter file annual registration statements indicating, *inter*

*alia*, which apartments in the building are subject to rent stabilization and the legal regulated rent

for the accommodation. RSL § 26-517; RSC § 2528.3. Owners must deliver a copy of annual

registrations filed with HCR to each tenant in occupancy. 9 N.Y.C.R.R. 2528.3(b). Failure to

file such annual registration statements bars owners from collecting rent in excess of the last

legal regulated rent in effect on the date of the last registration statement filed with HCR. RSL §

26-517(e).

75.     Tenants have the right to request from HCR a history of the registrations on file

for their apartment. As the rental history is a record of what the owner has submitted to HCR via

annual registration statements, the rental history will reveal whether the apartment has ever been

rent-regulated, and the rent, tenant name, and lease information which the owner registered with

HCR for that particular unit, year by year.

76.     In order to obtain the rental history for their apartment, tenants can submit

requests for rental histories directly through HCR's website form, by email, by mailing in a

"Request for Records Access" form to HCR, or by making an appointment and completing the

"Request for Record Access" in person. The rental history provided by HCR is specific to the

apartment requested. HCR cannot guarantee that it is able to match a renumbered apartment

with the history of the apartment under the prior number. For example, if a tenant resides in apartment 3R and requests the rental history for apartment 3R from HCR, the tenant would be given the rental history for every year which the owner registered apartment 3R with HCR. If the owner of the apartment in question recently changed the numbering of apartment 3R to 3D, for example, the tenant's request for rental history for 3D might only show registration years in which the owner submitted registrations for 3D and not for 3R. The renumbering of apartments can affect the rental information the tenant receives, thereby depriving tenants of their right to a full and accurate rental history of their rent-regulated unit.

## **FACTUAL ALLEGATIONS**

77. The Defendants are individuals and entities affiliated with Peak. The following references to "Defendants" and "Peak" are used interchangeably to mean one or more of the Defendants named herein.

78. Upon information and belief, all individual Defendants had knowledge of or participated in the illegal and fraudulent acts alleged in this complaint. Upon information and belief, all individual defendants receive rent or are entitled to receive rent from the complaint properties.

79. All of the allegations below occurred in or after October 2019.

### A.    Peak's Business Model

80. Peak's business model is to profit from developing residential properties in New York City "submarkets" that are, in the Defendants' estimation, the "next major growth areas" of the New York City market. In particular, using capital contributed by the Peak principals, various investors, and conventional bank mortgages, Peak has acquired dozens of small- to medium-size residential buildings in neighborhoods such as Sunnyside, Queens and Greenpoint,

22

Brooklyn, renovated those buildings using high-end finishes, and marketed and leased the apartments for high rents.

81. These buildings include the 31 complaint properties listed in paragraph 89 of this Complaint. The complaint properties are presumptively rent-stabilized because they contain six or more apartments and were built before 1974.

82. Peak represented to its lenders and investors that the development of the complaint properties would be profitable because they were able to acquire properties at a "considerable discount," then "reposition" them by renovating, including adding luxury finishes to each apartment and increasing the building's rental income through substantial rent increases.

83. Yet, the "repositioning" promised by Peak was not possible under the rent regulation laws, which restrain allowable rent increases in covered apartments. Indeed, the reason the complaint properties were sold by prior owners at a discount is precisely because the income they can generate from rents is limited compared with market-rate rental housing.

84. The complaint properties were habitable at the time Peak bought them. Property Condition Assessments ("PCAs") prepared by Lawrence ENV, LLC—an environmental consulting company—at or around the time of purchase confirmed that 20 of the complaint properties were in "fair" condition, meaning, "average," or "satisfactory," with decades of remaining expected useful life. There are no PCAs indicating that any of the complaint properties were in poor condition.

85. Professional appraisers agreed that the buildings were in average or good condition at the time Peak purchased them.

86. Contrary to the representations made to investors and lenders, therefore, the gut renovation of each of the complaint properties did not remove each building from rent

23

regulation.  Nor did the complaint properties automatically become deregulated because Defendants were able to achieve 80% vacancy rates through various means, including by requiring sellers to secure vacancies before closing and by offering five- and six-figure buyouts to tenants in occupancy.

87.     The Defendants' plan to increase the complaint properties' rents to market rates was plainly not permissible under the rent regulation laws.

88.     Defendants knew that the conditions of the complaint properties were not substandard or seriously deteriorated.  They saw the buildings for themselves.  They received PCAs concluding that the complaint properties were in fair condition.  They knew the complaint properties had no history of excessive—or, in some case, any—violations from the New York City Department of Housing Preservation and Development ("HPD") or the New York City Department of Buildings ("DOB").  They knew that the buildings were habitable, as evidenced by the tenants residing in them before Defendants caused them to vacate in exchange for lump-sum payments as high as $270,000.  They knew that, in addition to the environmental consultant they hired, professional appraisers had evaluated the complaint properties to be in "average" or "good" condition with no deferred maintenance.  They certified to lenders and, upon information and belief, insurers that the buildings were not damaged, that they were code-compliant, and that utility service was adequate before renovation.  Nevertheless, after the buildings were renovated, Defendants invoked the substantial rehabilitation exemption to deregulate rent-stabilized apartments, thereby deceiving tenants, lenders, investors and regulators about the apartments' regulatory status.

89.     There is no basis to exempt the 159 apartments below (hereinafter "complaint apartments") from rent stabilization coverage.

24

| | Complaint Property Address | Illegally Deregulated Complaint Apartments | Total Complaint Apartments |
|---|---|---|---|
| 1 | 48-36 41st Street, Sunnyside, NY 11377 | 1F (now 1A), 1R (now 1B), 2F (now 2A), 2R (now 2B), 3F (now 3A), 3R (now 3B) | 6 |
| 2 | 48-33 47th Street, Sunnyside, NY 11377 | 1F (now 1A), 1R (now 1B), 2F (now 2A), 2R (now 2B), 3F (now 3A), 3R (now 3B) | 6 |
| 3 | 47-21 47th Street; Sunnyside, NY 11377 | 1R (now 1B) | 1 |
| 4 | 5-13 51st Avenue, Long Island City, NY 11101 | 1L (now 1W), 1R (now 1E), 2L (now 2W), 2R (now 2E), 3L (now 3W), 3R (now 3E) | 6 |
| 5 | 45-35 41st Street, Sunnyside, NY 11104 | 1F (now 1A), 1R (now 1B), 2F (now 2A), 2R (now 2B), 3F (now 3A) | 5 |
| 6 | 5-35 47th Road, Long Island City, NY 11101 | 1R (now 1E), 1L (now 1W), 2R (now 2E), 2L (now 2W), 3R (now 3E), 3L (now 3W) | 6 |
| 7 | 70 Middagh Street, Brooklyn, NY 11201 | 1F (now 1A), 1R (now 1B), 2F (now 2A), 2R (now 2B), 3F (now 3A), 3R (now 3B), 4F (now 4A), 4R (now 4B), 5F (now 5A), 5R (now 5B), BSMT | 11 |
| 8 | 47-34 45th Street, Sunnyside, NY 11377 | 1F (now 1A), 1R (now 1B), 2F (now 2A), 2R (now 2F), 3F (now 3A), 3R (now 3B) | 6 |
| 9 | 47-25 44th Street, Sunnyside, NY 11377 | 1F (now 1A), 2F (now 2A), 2R (now 2B), 3F (now 3A), 3R (now 3B) | 5 |
| 10 | 53-17 Skillman Avenue, Sunnyside, NY 11377 | 1L (now 1W), 3L (now 3E), 3R (now 3W) | 3 |
| 11 | 35-34 32nd Street, Astoria, NY 11106 | E1 (now 1A), E2 (now 1B), E3 (now 2F), W1 (now 2A), W2 (now 2B), W3 (now 3A) | 6 |
| 12 | 30-70 44th Street, Astoria, NY 11103 | 1L (now 1W), 1R (now 1E), 2L (now 2W), 2R (now 2E), 3L (now 3W), 3R (now 3E) | 6 |
| 13 | 47-45 43rd Street, Sunnyside, NY 11377 | 1F (now 1A), 1R (now 1B), 2F (now 2A), 2R (now 2B), 3F (now 3A), 3R (now 3B) | 6 |
| 14 | 47-07 47th Avenue, Sunnyside, NY 11377 | 1F, 1R, 2R, 3F and 3R | 5 |
| 15 | 47-09 47th Avenue, Sunnyside, NY 11377 | 1F (now 1A), 1R (now 1B), 2R (now 2B), 3F (now 3A), 3R (now 3B) | 5 |
| 16 | 30-93 44th Street, Astoria, NY 11103 | 1L (now 1W), 1R (now 1E), 2L (now 2W), 3L (now 3W), 3R (now 3E) | 5 |
| 17 | 41-27 49th Street, Long Island City, NY 11104 | 1F (now 1A), 1R (now 1B), 2R (now 2B), 3R (now 3B) | 4 |
| 18 | 45-42 Vernon Boulevard, Long Island City, NY 11101 | 1 (now 1E), 2 (now 1L), 3 (now 2E), 4 (now 1W), 5 (now 3E), 6 (now 3R) | 6 |
| 19 | 131 Greenpoint Avenue, Brooklyn, NY 11222 | 1 (now 2A), 2 (now 2B), 3 (now 3A), 4 (now 3B), 5 (renumbered), 6 (renumbered) | 6 |
| 20 | 586 Manhattan Avenue, Brooklyn, NY 11222 | 1L (now 1W), 1R (now 1E), 2L (now 2W), 2R (now 2E), 3L (now 3W), 3R (now 3E) | 6 |

25

| 21 | 94 Milton Street, Brooklyn, NY 11222 | 1LT (now 1L), 1RT (now 1R), 2LT (now 2L), 2RT (now 2R), 3RT (now 3R), 4LT (now 4L), 4RT (now 4R) | 7 |
|----|----|----|----|
| 22 | 32-30 41st Street, Astoria, NY 11103 | 1D | 1 |
| 23 | 311 Eckford Street, Brooklyn, NY 11222 | 2L (now 2W), 2R (now 2E), 3R (now 3E), 4R (now 4E) | 4 |
| 24 | 250 North 6th Street, Brooklyn, NY 11211 | 9 | 1 |
| 25 | 515 Graham Avenue, Brooklyn, NY 11222 | 1L, 1R, 2R, 2F, 3F 3R | 6 |
| 26 | 45-44 40th Street, Sunnyside, NY 11377 | 1R, 2F, 2R | 3 |
| 27 | 251 North 8th Street, Brooklyn, NY 11211 | 4R, 4L | 2 |
| 28 | 25-59 35th Street, Astoria, NY 11103 | 1L, 2L, 2R, 3L, 3R | 5 |
| 29 | 154 Atlantic Avenue, Brooklyn, NY 11201 | 1F, 2F, 2R, 3F, 3R, 4F, 4R | 7 |
| 30 | 724 Metropolitan Avenue, Brooklyn, NY 11211 | 1L, 1R, 2L, 2R, 3L, 3R | 6 |
| 31 | 101 Greenpoint Avenue, Brooklyn, NY 11222 | 1F, 3B (now 2L), 4B (now 2R), 5B (now 3L), 6B (now 3R), 7B (now 4L), 8B (now 4R) | 7 |
| | | **TOTAL APARTMENTS** | 159 |

## B.    Life Cycle of a Typical Deal

90.    Though each complaint property listed in the table in paragraph 89 above was acquired by Defendants on a unique date, renovated on a unique date, and financed by a distinct combination of lenders and investors, the life cycle of each deal was substantially the same for the development of all 31 buildings.  The following factual allegations set forth the common strategies repeatedly used by Defendants in the development of the 31 complaint properties.

### i. Acquisition and First Steps to Implement the Business Plan

91.    Using its relationship with a network of local brokers, Peak looked for buildings in neighborhoods such as Sunnyside, Astoria, Long Island City, and Greenpoint with "significant upside potential."  In particular, Peak repeatedly targeted buildings with rents lower than the area

26

market rents.

92.     Peak created a budget model for each deal with renovation costs factored in.  The budget model template also contained a line item for costs to buyout tenants from their leases. The budget model assumed all vacant rent-stabilized apartments would be deregulated and therefore it projected the future income of the building using free-market rents.  In the unusual case that a rent-stabilized apartment was projected to remain occupied by a rent-stabilized tenant after purchase, the model projected that the apartment would continue to generate a low rent into the future.

93.     When Peak entered into a purchase and sale agreement to acquire a complaint property, the agreement included a provision for the building to be vacant or nearly vacant upon closing.  Peak knew it would gut renovate the building; therefore, vacancy was key to Peak carrying out its business plan.

94.     At or around the time of purchase of at least 20 of the complaint properties, Peak hired Lawrence ENV, LLC to prepare Property Condition Assessments.[4]  A representative of Lawrence ENV, LLC personally surveyed these complaint properties and took photographs. Lawrence ENV, LLC then prepared a report for these 20 complaint properties, the purpose of which was to document physical defects and "determine if conditions exist which may have a

---

[4] These properties include: (1) 5-35 47th Road, Long Island City, NY; (2) 47-34 45th Street, Sunnyside, NY; (3) 47-25 44th Street, Sunnyside, NY; (4) 53-17 Skillman Avenue, Sunnyside, NY; (5) 35-34 32nd Street, Astoria, NY; (6) 30-70 44th Street, Astoria, NY; (7) 47-45 43rd Street, Sunnyside, NY; (8) 47-07 47th Avenue, Sunnyside, NY; (9) 47-09 47th Avenue, Sunnyside, NY; (10) 30-93 44th Street, Astoria, NY; (11) 41-27 49th Street, Long Island City, NY; (12) 45-42 Vernon Boulevard, Long Island City, NY; (13) 131 Greenpoint Avenue, Brooklyn, NY; (14) 94 Milton Street, Brooklyn, NY; (15) 311 Eckford Street, Brooklyn, NY; (16) 515 Graham Avenue, Brooklyn, NY; (17) 45-44 40th Street, Sunnyside, NY; (18) 25-59 35th Street, Astoria, NY; (19) 154 Atlantic Avenue, Brooklyn, NY; and (20) 101 Greenpoint Avenue, Brooklyn, NY.

significant impact on the continued operation of the facility during the evaluation period." These
20 Property Condition Assessments concluded that the respective complaint properties were in
"fair" condition and that they had decades of estimated remaining useful life.

95. Sellers caused tenants to vacate the complaint properties in preparation for sale
and not because of conditions at the buildings.

96. When buildings were not delivered vacant by the seller, Peak devoted large sums
to paying tenants to leave their rent-stabilized apartments. On several occasions, Peak funded
these buyouts before they closed on a building by allowing sellers to use the downpayment on
deposit to fund buyouts. Peak's purchase and sale agreements often contained a clause allowing
Peak to contact tenants to offer buyouts before closing. When Peak could not secure tenants'
vacancies prior to closing, Peak quickly executed buyout agreements with remaining tenants
immediately after closing.

97. Peak contracted to buy the complaint properties "as is," meaning that it
understood that any physical defects were immaterial to its decision to purchase the building.

98. The seller provided Peak with a rent roll which included a representation about
the rent regulated status of each apartment in the complaint properties and the current legal
regulated rent. Upon information and belief, Peak did not undertake any efforts to verify the
representations made by the seller as to the rent regulated status of any particular apartment. For
example, Peak did not undertake any due diligence into the regulatory status of apartments
claimed by the seller to be exempt from rent stabilization. Peak did not demand or receive any
documentation from the former owner substantiating the deregulation of any particular
apartment.

99. Once a purchase and sale agreement was executed but before closing, Peak

28

solicited investments from outsiders. Peak prepared slide decks called "summary of proposed transaction" or "confidential offering memorandum" to advertise the joint venture (hereinafter "Offering Memo"). The Offering Memo included a description of the building, including whether it was vacant or near vacant, and the proposed plans for renovation, and projected rents. Frequently, the Offering Memo listed which apartments in the building were rent-stabilized and claimed that the vacant rent-stabilized apartments would be deregulated using substantial rehabilitation. The Offering Memo always stated that Peak would add high-end finishes in order to "increase rents," modernize the systems in the building to "increase the building[']s efficiency," and that it would modernize the hallways, vestibules and stairways to "increase marketability."

100.    Peak's Offering Memo never described the current state of a complaint property as substandard or deteriorated. Besides a few photos of the current condition of the building, which often depicted the building in average or good condition, there was no description of a complaint property's systems in the Offering Memo.

101.    Peak never applied to HCR for an advisory prior opinion on whether their planned renovations would qualify as substantial rehabilitations.

102.    Peak did not seek advice from outside legal counsel on whether each of their planned renovations would qualify as substantial rehabilitations under the RSC.

**ii. Organizational Structure of Owning Entity**

103.    At or around the time of entering into a purchase and sale agreement, Peak would establish a limited liability corporation ("LLC") that had the single purpose of holding title to each of the complaint properties. These 31 single purpose entity companies named as Defendants in this complaint are those owners, and they, in turn, are owned by a variety of

29

investors and investor-owned entities.

104.    Defendants Gomez, Rabin, Kaskel, Anderson, Labou and Lohan have personal stakes in all or nearly all deals through LLCs that they own or control.  Mr. Gomez maintains this interest through entities he controls, including Gomez Holdings LLC and DGMU PEAK LLC. Mr. Rabin maintains this interest through Rabinfam LLC.  Mr. Anderson maintains this interest through entities including Anderson 2 LLC and Anderson 3 LLC.  Mr. Kaskel maintains this interest through Chronos Real Estate LLC.  Mr. Lohan maintains this interest through Nineteen Blocks LLC.  Mr. Labou maintains this interest through LABOU Holdings LLC.

105.    For each deal, Defendants established a limited liability company that acted as general partner and sponsor of the deal.  In the example of 101 Greenpoint Avenue shown below, that Peak Capital Advisors limited liability company was PEAK GP 7 LLC.

106.    A representative organizational chart for the ownership of the building at 101 Greenpoint Avenue in Brooklyn is reproduced here:



107.    Defendants used the affiliated entity Camelot Property Management Services Corp. to serve as property manager for all or nearly all of the complaint properties.

### iii. Financing the Purchase and Renovation of the Complaint Properties

108.    Peak financed the purchase and renovation of the 31 complaint properties with a combination of direct investment and loans from a variety of outside sources, including traditional banks, individuals, and private equity firms.

109.    To solicit investments from private equity firms and outside individuals, Defendants used the Offering Memos discussed above, which described the building, the proposed plans for renovation, and projected rents.  The Offering Memos often claimed that the vacant rent-stabilized apartments would be deregulated using substantial rehabilitation.

110.    These Offering Memos were also provided to traditional banks in support of mortgage applications.  Every mortgage application to a bank uniformly made representations about the projected net operating income that the building would generate after renovation. These applications projected a net operating income that was only possible if the apartments were unregulated.

111.    As is customary, nearly all lenders hired professional appraisers to assess the value of the building before approving a loan.  Among other tools, these appraisers used the projected net operating income of a building to determine its market value.  Peak represented to the appraisers that the vacant rent-stabilized apartments in each building would be deregulated pursuant to the substantial rehabilitation exemption, enabling Peak to charge high rents.  Thus, all of the appraisers used the market rents projected by Peak to determine the net operating income the buildings would achieve once renovated.  This significantly inflated the appraised value of the buildings, as the value was based on false representations by Peak that they could charge market rents for the renovated units.

112.    None of the appraisals conducted described any of the complaint properties as

substandard or substantially deteriorated. None of the appraisals described the complaint properties as uninhabitable. Rather, the appraisals described buildings that were in average or, in some cases, good condition, and adequate for residential use.

113.    In order to induce some lenders to issue mortgages to acquire the buildings, Peak executed certain guarantees and agreements, including certificates in which Peak represented to the lenders that the buildings were not damaged and were code-compliant. For example, Defendant Rabin signed certificates on behalf of Defendants 101 Greenpoint Owner LLC, 5317 Skillman Owner LLC, 724 Metropolitan Owner LLC, 44th Street Owner LLC, and also on behalf of the former owner of 150 North 9th Street, certifying to Patriot Bank that the buildings at 101 Greenpoint Avenue, 53-17 Skillman Avenue, 724 Metropolitan Avenue, 47-25 44th Street, and 150 North 9th Street were fully compliant with building codes, and that all municipal utilities, including water, gas, and electricity, were operating an providing adequate service to the buildings.

114.    Upon information and belief, in applying for general liability and property insurance for the complaint properties, Defendants did not disclose to any insurer that there were substandard or seriously deteriorated conditions at any of the complaint properties.

**iv. Renovation of the Buildings**

115.    For each renovation performed on the 31 complaint properties, Peak hired the architect Joon H. Chai (a/k/a James Chai) to draft blueprints and obtain permits. James Chai is an architect based in New Jersey who, after an audit by the Special Enforcement Team of the DOB, voluntarily surrendered professional certification privileges with that Department in 2023.

116.    In an August 25, 2021 email to a consultant hired by Peak, Defendant Gomez characterized all of Peak's renovations as "a 'rinse and repeat' formula" using the "same

materials and vendors."

117.     Before drafting blueprints, James Chai or someone from his staff went to each

building to conduct a survey.  The purpose of this survey was to be able to prepare sketches and

plans for the gut renovation that Defendants had planned and not to assess the condition of the

building's systems.  Neither James Chai nor his staff inspected the condition of building systems

when they performed the survey.  They did not open the walls to evaluate plumbing or electrical

systems, and they did not record the presence of any deteriorated conditions in any building.

James Chai took photos and, occasionally, videos of the buildings in order to be able to prepare

sketches and plans.

118.     Using his status as a registered architect with professional certification privileges

at DOB, James Chai applied for and was issued permits from DOB for the renovation work.

James Chai never filed any post approval amendments in these permitted jobs indicating that any

of the planned work was changed, for example, to reflect unanticipated structural damage.

119.     James Chai never notified the DOB that there was an unsafe condition at any of

the complaint properties.

120.     Defendants entered into a construction contract to undertake each renovation.  For

all or nearly all of the 31 complaint properties, the contractor was JKO USA Management Inc., a

New York State corporation based in Queens, New York.

121.     All renovations were gut renovations or near-gut renovations, meaning that JKO

USA Management Inc. replaced all mechanical and servicing systems such as plumbing lines,

plumbing fixtures, basement sewage lines, traps, electrical wiring and panels, water tanks, and

cooling/heating systems.  In the vacant apartments, JKO USA Management Inc. replaced all

flooring, walls, doors, ceilings, lights, moldings, moldings, baseboards, hardware, kitchen

cabinets, countertops, appliances, tiling, intercoms, and windows.

122.    With very few exceptions, the renovations maintained the perimeter walls and outer dimensions of the apartments.  The changes were exclusively to the apartments' interior finishes and systems.

123.    In the rare case that one or more of the apartments remained occupied during the renovation, Defendants directed that JKO USA Management Inc. renovate every other space but the occupied apartment.

124.    As discussed above, Peak and JKO USA Management Inc. undertook these "rinse and repeat" renovations regardless of the present condition of the building and, therefore, the present condition of the building was largely immaterial to the work performed.

125.    No one from JKO USA Management Inc. or any other design professional ever notified the DOB that there were any unsafe conditions at the complaint properties.

126.    Upon information and belief, Defendants never hired a professional engineer to address any structural damage encountered in any of the complaint properties.

**v.  Deceptively Leasing and Advertising Renovated Apartments**

127.    Once the complaint properties were renovated, Defendants renumbered the apartment numbers in at least 22 of the complaint properties.  For example, in the case 45-42 Vernon Boulevard, discussed in paragraphs 173 through 193 below, the apartments were numbered 1L, 1R, 2L, 2R, 3L, and 3R, before renovation, and Peak changed the numbering to 1E, 1W, 2E, 2W, 3E and 3W after the renovation.

128.    The effect of this renumbering is that government records, including but not limited to HCR rent registration statements, no longer contain a comprehensive history for each apartment in the building.  For example, if a tenant of newly numbered Apartment 1E at 45-42

34

Vernon Boulevard wanted to research the history of legal regulated rents charged for their apartment, they would not find any history, as Apartment 1E was previously named Apartment 1L.

129. The renumbering did not reflect a change in perimeter walls or outer dimensions of the apartments.

130. Upon information and belief, Defendants employed the tactic of renumbering apartments, in part, to deceive tenants and regulators reviewing the HCR rent registration histories for Peak buildings.

131. Defendants listed and marketed the complaint apartments for rent without the use of an outside broker. In 2024, Defendants started listing Cindy Kieffer as the licensed real estate salesperson for its listings. The listing states that Ms. Kieffer is affiliated with Anderson Residential LLC. Anderson Residential LLC is an entity formed by and controlled by Defendant Bryan Anderson.

132. Defendants have used platforms including Streeteasy.com to advertise the complaint apartments for rent.

133. The listings for the complaint apartments advertised rents in excess of the legal regulated rents. The listings did not disclose that the apartments are rent-stabilized. The listings for the complaint apartments used the renumbered apartment numbers rather than the original apartment numbers, which made it more difficult for consumers to research the rent history of said apartments.

134. Defendants repeatedly offered tenants of the complaint apartments leases entitled "standard form of apartment lease," which stated that their apartment is "not subject to the rent stabilization law." Such leases did not give the tenants the option of a one- or two-year lease,

35

and they did not contain a rider form promulgated or approved by HCR that informed the regulated tenants of their rights and duties under the rent regulation laws.

135.     Defendants repeatedly required that tenants of the complaint apartments sign a rider entitled "work rider."  This rider, among other things, required that the tenant acknowledged being advised by Peak that "the Building underwent a full 'gut' renovation" prior to the lease signing, and that therefore the building became "permanently exempt from rent stabilization as a result of a 'substantial rehabilitation,' pursuant to §§ (5)(a)(5) of the Emergency Tenant Protection Act of 1974 ("ETPA")and 2520.11(e) of the Rent Stabilization Code ("RSC")."

### vi.  Refinancing

136.     Defendants have refinanced the original mortgages for several of the complaint properties.  In the applications for such loans, Defendants have falsely represented that the complaint apartments were not subject to rent regulation.

### vii. Failure to Comply with Annual Rent Registration Requirements

137.     For some of the complaint properties, Defendants have failed to file annual registration statements with HCR indicating that the complaint apartments are subject to rent stabilization and the legal regulated rent for those apartments.

138.     In other cases, Defendants have filed annual registration statements with HCR falsely representing that the complaint apartments are exempt from rent-stabilization due to substantial rehabilitation.

139.     Upon information and belief, Defendants have failed to deliver copies of annual registrations filed with HCR to each tenant in occupancy of the complaint apartments.

140.     Defendants have never submitted an application to the HCR Office of Rent

Administration for a determination that a building is exempt from rent stabilization due to substantial rehabilitation.

**C. Representative Building No. 1: 101 Greenpoint Avenue, Brooklyn, NY 11222**

141. The building at 101 Greenpoint Avenue is an eight-unit building owned by Defendant 101 Greenpoint Owner LLC. It was built before 1974 and is presumptively rent-stabilized, and all eight apartments were registered with HCR as occupied until Defendants purchased the property in 2022. The prior owner claimed that four of the occupied apartments were temporarily exempt from rent stabilization and that the other four were occupied by rent-stabilized tenants.

142. Upon information and belief, Peak did not ask for any documentation from the former owner substantiating that four of the apartments were exempt from rent stabilization.

143. Before Defendants purchased the property, the eight apartments were numbered 1F, 2B, 3B, 4B, 5B, 6B, 7B, and 8B.

144. Defendants formed 101 Greenpoint Owner LLC in August 2022 for the purpose of acquiring the building. In addition to other investors, Defendants Gomez, Mendik, Labou, Rabin, Anderson, Kaskel and Lohan have ownership stakes in 101 Greenpoint Owner LLC through companies they own and control.

145. On August 5, 2022, Defendants entered into a purchase and sale agreement with the former owner of the building to purchase the building for $3,365,000. The purchase and sale agreement included a provision requiring the seller to deliver six of the eight apartments in the building vacant of all tenants. Upon information and belief, the former owner represented to Defendants that three of the six apartments that would be delivered vacant were owner-occupied at the time. The two occupied apartments (Apartments 2B and 8B) had monthly rents of $864.07

and $1,408.16, respectively.

146.    As for the three remaining apartments that were to be delivered vacant, the purchase and sale agreement included a provision that enticed the seller to cause them to become vacant by promising a "vacancy bonus" to the seller.  If the seller was able to vacate seven apartments, including one of the rent-stabilized apartments, the purchase price would be increased to $3,700,000.  If the seller was able to vacate all eight apartments, the purchase price would be increased to $4,100,000.

147.    On August 16, 2022, James Chai visited the building in order to conduct a survey. The purpose of this survey was to be able to prepare sketches and plans for the gut renovation that Defendants had planned.  James Chai did not do an inspection of the condition of all building systems, did not open the walls to evaluate plumbing or electrical systems, and did not record the presence of any deteriorated conditions in the building.

148.    James Chai did not notify the DOB that there was an unsafe condition at the building.

149.    Apart from three HPD violations for chipping paint in the 1990s, the only HPD violations placed on the building before 2022 were for the owner's failure to file a bedbug report, failure to file an HPD registration, and for failure to provide adequate lighting at the entrance way.  There were no violations issued indicating any defective condition of the building.

150.    In its offering memorandum to investors prepared before the building was purchased, Peak represented that it had negotiated with the seller for seven of the eight apartments to be vacant within 90 days of closing.  Peak represented that this would "allow PEAK to execute a substantial rehabilitation, ultimately marking all vacant units to market rate." Peak stated that it would add high-end finishes in order to "increase prospective rents,"

modernize the systems in the building to "increase the building[']s energy efficiency," and modernize the hallways, vestibules and stairways to "increase marketability." The offering memorandum did not indicate that the building was uninhabitable, substandard, or seriously deteriorated.

151.     The offering memorandum stated that three apartments were owner occupied and a "surrender agreement was apart [sic] of the PSA."

152.     Defendants applied to Patriot Bank for a mortgage to acquire and renovate the building. Defendants represented to the bank that the property would be delivered with all eight apartments vacant at closing and that that they would be deregulated after renovation pursuant to the substantial rehabilitation exemption. Defendants determined the projected budget for a gut renovation of the entire building was over $1,500,000.

153.     As is customary, Patriot Bank retained a professional appraiser in order to receive an objective valuation of the building. On September 15, 2022, a professional appraiser affiliated with Leitner Berman inspected the building. The appraiser concluded that overall, the building was "a good quality apartment building with no deferred maintenance noted or significant updating required." The appraiser also noted that the roof was in good condition. A sample of photographs from the resulting appraisal report are below.[5]

---

[5] Leitner Berman Appraisal Report File No. 2022-1405 at 115, 120 (photos taken September 15, 2022).

 

154.     The appraiser concluded that the "as is" market value of the building was $3,400,000 and the prospective market value once the renovations were completed and the apartments were rented at market-rate unregulated rents was $5,400,000.

155.     Defendants were able to entice one of the two remaining rent-stabilized tenants to leave the building. A November 5, 2022 surrender agreement executed between Peak and the rent-stabilized tenant of Apartment 8B (a/k/a 4R) promised the tenant $270,000 to leave his apartment by March 1, 2023. Only the rent-stabilized tenant of Apartment 1R remained.

156.     On November 22, 2022, Defendant 101 Greenpoint Owner LLC purchased the building for $3,295,000. Patriot Bank financed the purchase with a mortgage of $3,155,000.

157.     As a condition of obtaining the mortgage, on November 22, 2022, Defendant Alex Rabin certified on behalf of Defendant 101 Greenpoint Owner LLC, inter alia, that "no portion of the Property is presently damaged by fire, water, wind or other casualty and any previous damage has been fully restored," that the building was in full compliance with building codes,

and that all utilities and municipal services, including gas, electric and water, were "operating and providing adequate service to the Property."

158.    On December 6, 2022, Lawrence ENV, LLC surveyed the building and took photographs.  Thereafter, Lawrence ENV, LLC prepared a Property Condition Assessment.  The PCA concluded that the building was in "fair" condition, that the only areas of deferred maintenance that required immediate attention were sagging floors near the interior stairwell, missing or worn sealant in the rear masonry, aged windows, a rusted fire escape, an aged boiler, aged electrical service, aged common area finishes, and five open HPD violations.  All other building systems and components were observed to be in fair and functional condition.  The report concluded that the building had an estimated remaining useful life of 30-35 years.

159.    Construction work began in December 2022 and was completed in May 2023.  At no time did any design professional notify the DOB that there was an unsafe condition at the building.

160.    Defendants changed the numbering of all apartments in the building except for Apartment 1F.

161.    In June 2023, Defendants placed advertisements on Streeteasy.com listing Apartment 1F for rent for $6,800 per month and listing Apartment 3L for rent for $4,800 per month.  The last legal regulated rents for these apartments were $1,194.38 and $1,331.01, respectively.  The listing for Apartment 3L did not disclose that Apartment 3L used to be called Apartment 5B.  There was no legal basis to increase the rents to $6,800 and $4,800, respectively.

162.    In July 2023, Defendants placed an advertisement on Streeteasy.com listing Apartment 3R for $4,800 per month.  The listing did not disclose that Apartment 3R used to be Apartment 6B.  The last legal regulated rent for this apartment was $844.75, and there was no

41

legal basis to increase the rent to $4,800.

163. The listings for the apartments on Streeteasy.com did not disclose that the apartments were subject to rent stabilization. Upon information and belief, thousands of consumers viewed the advertisements.

164. By listing and collecting these rents, Defendants willfully collected rent in excess of the legal regulated rent for this apartment.

165. In August 2024, Defendants retained Cindy Kieffer from Anderson Residential LLC to advertise Apartment 2L for rent for $4,800 per month. The listing did not disclose that Apartment 2L used to be Apartment 3B. The last legal regulated rent for this apartment was $1,027.23, and there was no legal basis to increase the rent to $4,800.

166. The listing for this apartment on Streeteasy.com did not disclose that the apartment was subject to rent stabilization. Upon information and belief, thousands of consumers viewed the advertisement.

167. By listing and collecting this rent, Defendants willfully collected rent in excess of the legal regulated rent for this apartment.

168. Defendants have not provided tenants in Apartments 1F, 2L, 2R, 3L, 3R, 4L and 4R with rent-stabilized leases.

169. In 2023, Defendants submitted annual rent registrations to HCR falsely stating that all apartments except for apartment 1R were permanently exempt from rent stabilization due to substantial rehabilitation.

170. In early 2025, Defendants marketed 101 Greenpoint Avenue for sale for $7,200,000. The sale was being brokered by Baseline Real Estate Advisors.

171. Upon information and belief, hundreds of consumers viewed the listing.

42

172. The listing indicated that the building was a "fully remodeled boutique luxury loft building in the heart of Greenpoint." The listing did not state that any of the apartments in the building were rent-stabilized.

**D.    Representative Building No. 2: 45-42 Vernon Boulevard, Long Island City, NY 11101**

173. The building at 45-42 Vernon Boulevard is a six-unit building owned by Defendant 4542 Vernon Owner LLC. It was built before 1974 and is presumptively rent-stabilized, and all six apartments were registered with HCR as occupied and rent-stabilized until 2021.

174. Before Defendants purchased the property, the six apartments were numbered 1, 2, 3, 4, 5 and 6.

175. On September 1, 2021, Defendants formed 4542 Vernon Owner LLC for the purpose of acquiring the building. In addition to various investors, Defendants Rabin, Anderson and Lohan have ownership stakes in 4542 Vernon Owner LLC through companies they own and control.

176. In September 2021, Defendants entered into a purchase and sale agreement with the former owner of the building to purchase the building for $2,600,000. The agreement included a provision requiring the former owner to deliver the building vacant of all tenants. Upon information and belief, the former owner caused all six tenants to vacate in preparation for the sale, as required by the agreement.

177. The only open HPD violations on the building at the time of sale was a 2015 violation for an illegal alteration on the third floor. There were no open violations indicating that the building was in a substandard or deteriorated state.

178. In its offering memorandum to investors prepared in 2021 before the building was

43

purchased, Peak represented that the building was in a "high growth submarket." In particular, Peak represented that Long Island City was "appealing to young professionals who seek luxury amenities." Peak stated that all six apartments were rent-stabilized, that the building would be delivered entirely vacant at closing, and that Peak would deregulate all apartments through the substantial rehabilitation exemption.

179. Defendants stated that they would add high-end finishes in order to "increase rents," modernize the systems in the building to "increase the building[']s efficiency," and modernize the hallways, vestibules and stairways to "increase marketability." The offering memorandum did not indicate that the building was uninhabitable, substandard, or seriously deteriorated. To the contrary, the memorandum included photos of the "representative condition" of the building before purchase that showed apparently functioning and well-maintained spaces.



Representative Condition

180. A rent analysis included in the offering memorandum represented that each apartment was rent-stabilized but would be free market upon "re-positioning."

181. On September 22, 2021, James Chai visited the building in order to conduct a survey. The purpose of this survey was to be able to prepare sketches and plans for the gut renovation that Defendants had planned. James Chai did not do an inspection of the condition of all building systems, did not open the walls to evaluate plumbing or electrical systems, and did

44

not record the presence of any deteriorated conditions in the building.

182.    James Chai did not notify the DOB that there was an unsafe condition at the building.

183.    On September 23, 2021, Lawrence ENV, LLC surveyed the building and took photographs. Thereafter, Lawrence ENV, LLC prepared a Property Condition Assessment. The PCA concluded that the building was in "fair" condition, that the only areas of deferred maintenance that required immediate attention were an overgrown rear yard, lack of a fire barrier in the basement ceiling, missing railings on the roof, an expired fire extinguisher in the basement, the above open HPD violations, and an open DOB boiler violation. All other building systems and components were observed to be in fair and functional condition. The report concluded that the building had an estimated remaining useful life of 30-35 years.

184.    Defendants applied to Derby Copeland Capital for financing in connection with the acquisition and renovation of the building. Defendants determined the projected budget for a gut renovation of the entire building was over $600,000. Defendants represented to Derby Copeland Capital that all six apartments would become deregulated upon renovation.

185.    As is customary, Derby Copeland Capital retained a professional appraiser in order to receive an objective valuation of the building. On November 23, 2021, a professional appraiser affiliated with Leitner Berman inspected the building. The appraiser noted that all six apartments were vacant. The appraiser stated the condition of the building was "good quality apartment building with no deferred maintenance noted or significant updating required" and that the building was "functional for residential use." A sample of photographs from the resulting

appraisal report are below.[6]



186.    On December 22, 2021, Defendant 4542 Vernon Owner LLC purchased the building for $2,600,000.  An affiliated entity of Derby Copeland Capital named Derby Davis 85 LLC recorded a mortgage on the property for $2,400,000.

187.    Construction work began at the end of December 2021 and was completed in April 2022.  At no time did any design professional notify the New York City Department of Buildings that there was an unsafe condition at the building.

188.    Defendants changed the numbering of all apartments in the building.  Whereas previously the apartments were numbered 1, 2, 3, 4, 5 and 6, Defendants changed the numbering to 1E, 1W, 2E, 2W, 3E and 3W.

---

[6] Leitner Berman Appraisal Report File No. 2021-0592, at 107 (photos taken on November 23, 2021).

46

189.     Thereafter, Defendants leased all apartments to tenants using unregulated lease forms and without giving those tenants the protections of rent stabilization.

190.     Defendants willfully charged and collected rents in excess of the legal regulated rents for all six apartments.

191.     In 2024, Defendants retained Cindy Kieffer from Anderson Residential LLC to advertise apartments 3E, 3W and 2E for rent at $3,500 per month.  The listings for these apartments on Streeteasy.com did not disclose that the apartments were subject to rent stabilization.  The last legal regulated rents for these apartments were $2,519.58, $2,909.83 and $2,494.05, respectively, and there was no legal basis to increase the rents to $3,500.  The listings did not disclose that Apartment 3E used to be Apartment 5, Apartment 3W used to be Apartment 6, and Apartment 2E used to be Apartment 3. Upon information and belief, thousands of consumers viewed the advertisements.

192.     By listing and collecting these rents, Defendants willfully collected rent in excess of the legal regulated rent.

193.     In the year 2022, Defendants filed with HCR annual registrations for all six apartments but falsely claimed that all apartments were permanently exempt from rent-stabilization due to substantial rehabilitation.  Defendants have not filed annual rent registrations for any apartments in the building in 2023 or 2024.

**E.     Representative Building No. 3: 47-34 45th Street, Flushing, NY 11377**

194.     The building at 47-34 45th Street is a six-unit building owned by Defendant 45th Street New Owner LLC.   It was built before 1974 and is presumptively rent-stabilized, and all six apartments were registered with HCR as occupied and rent-stabilized through the year 2020, though Apartment 2R was registered as temporarily exempt due to owner occupancy.

47

195.    Upon information and belief, Peak did not ask for any documentation from the former owner substantiating that Apartment 2R was actually exempt from rent stabilization.

196.    Before Defendants purchased the property, the six apartments were numbered 1F, 1R, 2F, 2R, 3F and 3R.

197.    In March 2021, Defendants formed 4734 45th Street Owner LLC for the purpose of acquiring the building.

198.    In April 2021, Defendants entered into a purchase and sale agreement with the former owner of the building to purchase the building for $1,300,000. The agreement included a provision requiring the former owner to deliver Apartment 2F vacant at closing.

199.    On April 28, 2021, Lawrence ENV, LLC surveyed the building and took photographs. Thereafter, Lawrence ENV, LLC prepared a Property Condition Assessment. The Property Condition Assessment concluded that the building was in "fair" condition, that the only areas of deferred maintenance that required immediate attention were damaged concrete in the rear courtyard, a rusted fire escape, separated and rusted lintels on the façade, an aged boiler, and a missing inspection tag on the basement fire extinguisher. All other building systems and components were observed to be in fair and functional condition. The report concluded that the building had an estimated remaining useful life of 30-35 years.

200.    On June 28, 2021, 4734 45th Street Owner LLC purchased the building for $1,300,000. In lieu of payment, the seller recorded a mortgage on the property in the amount of $1,050,000, and the purchase price that was paid over time with interest.

201.    There were no HPD violations on the building at any time before Defendants purchased it, and the only violation placed on the building before renovation was a September 2021 violation for failing to provide electric service to the fixtures in the ceiling of the common

48

hall.

202.    In a deal sheet to investors prepared around this time, Peak represented that five of the six apartments in the building (Apartments 1R, 2F, 2R, 3F and 3R) were rent-stabilized and showed photos of the "representative condition" of the building before purchase.



Representative Condition

203.    Between June 2021 and November 2021, Defendants negotiated buyouts with the tenants of the five occupied apartments of the building, paying them sums ranging from $20,000 to $80,000 to surrender their apartments.

204.    On July 29, 2021, James Chai visited the building in order to conduct a survey. The purpose of this survey was to be able to prepare sketches and plans for the gut renovation that Defendants had planned.  James Chai did not do an inspection of the condition of all building systems, did not open the walls to evaluate plumbing or electrical systems, and did not record the presence of any deteriorated conditions in the building.  On September 23, 2021, James Chai prepared a proposal to Defendants for providing blueprints and construction document services to Defendants in connection with the renovation of all residential apartments and the common areas.  These plans did not indicate the presence of any deteriorated conditions in the buildings.

205.    James Chai did not notify the DOB that there was an unsafe condition at the building.

49

206. In October 2021, Defendants formed 45th Street New Owner LLC and in December 2021 transferred title of the building to the new company. Upon information and belief, Defendants formed the new owner LLC in order to solicit outside investment to repay the seller's mortgage.

207. Defendants Gomez, Mendik, Labou, Rabin, Anderson, Lohan and Kaskel have ownership stakes in Defendants 4734 45th Street New Owner LLC through companies they own and control.

208. Defendants applied to Derby Copeland Capital for funds to repay the seller's mortgage and for funds to renovate the building. Defendants determined the projected budget for a gut renovation of the entire building was over $700,000. In contrast to the earlier deal sheet's representation that five of the six apartments were rent-stabilized, Defendants represented to Derby Copeland Capital that none of the apartments in the building were subject to rent stabilization.

209. As is customary, Derby Copeland Capital retained a professional appraiser in order to receive an objective valuation of the building. On October 20, 2021, a professional appraiser affiliated with Leitner Berman inspected the building. The appraiser concluded that overall, the building was "a good quality apartment building with no deferred maintenance noted or significant updating required." The appraiser also concluded that the subject property was "functional for residential use."

210. In November 2021, Derby Copeland Capital consolidated the existing debt on the property, paid off the mortgage from the prior owner, and issued a single first lien of $2,000,000 to Defendant 45th Street New Owner LLC. Derby Copeland Capital also issued a second gap mortgage for $900,000.

50

211.     Construction began in November 2021 and ended in January 2022.  At no time did any design professional notify the DOB that there was an unsafe condition at the building.

212.     Defendants changed the numbering of all apartments in the building.  Whereas previously the apartments were number 1F, 1R, 2F, 2R, 3F, and 3R, Defendants changed the numbering to 1A, 1B, 2A, 2B, 3A and 3B.

213.     Since January 2022, Defendants have leased all apartments in the building without giving tenants the protection of rent stabilization.  Defendants have charged rents in excess of the legal regulated rents.  By listing and collecting these rents, Defendants have willfully collected rent in excess of the legal regulated rent for these apartments.

214.     In 2024, Defendants retained Cindy Kieffer from Anderson Residential LLC to advertise apartment 2B for rent at $3,400 per month and 1B at $3,700 per month.  The listings for these apartments on Streeteasy.com did not disclose that the apartments were subject to rent stabilization.  The last legal regulated rent registered for Apartment 1R (a/k/a 1B) was $1,500, and there was no legal basis to increase the rent.  The last legal regulated rent registered for Apartment 2R (a/k/a 2B) was $990, and there was no legal basis to increase the rent.  The listings did not disclose that Apartment 1B used to be Apartment 1R and Apartment 2B used to be Apartment 2R.

215.     Upon information and belief, thousands of consumers viewed the advertisements.  Upon information and belief, by listing and collecting these rents, Defendants willfully collected rent in excess of the legal regulated rent for this apartment.

216.     In the year 2022, Defendants filed with HCR annual registrations for all six apartments but falsely claimed that all apartments were permanently exempt from rent-stabilization due to substantial rehabilitation.  Defendants have not filed annual rent registrations

for any apartments in the building in 2023 or 2024.

**F.      Deceptive Conduct in Response to HCR Investigation**

217.    On March 23, 2023 the Tenant Protection Unit of HCR issued a subpoena *duces tecum* to Defendants.  The subpoena asked for, *inter alia*, all documents to substantiate the substantial rehabilitations of a set of buildings in accordance with RSC § 2520.11(e).

218.    At or around the time the HCR subpoena was issued, Defendant Gomez and Defendant Labou had a conversation with James Chai about what information was necessary to include in a substantial rehabilitation application to be submitted to HCR.

219.    James Chai referred Defendants Gomez and Labou to Johnny Kim at City5 Consulting, LLC.  James Chai represented that Johnny Kim was able to get HCR to approve substantial rehabilitation applications "so easily."

220.    City5 Consulting, LLC is a New York company owned by Isaac Katz and Jordan Bardach.  Until recently, it advertised itself on its website as a real estate consulting business that offered "advisory services and up-to-date insights on laws and regulations that govern rent-controlled and rent-stabilized tenancies to ensure compliance and maximize building value."  Beginning in 2022, the two 50% partners of City5 Consulting have been engaged in protracted litigation over the company, resulting in one of the partners, Isaac Katz, filing a Chapter 11 bankruptcy petition in 2024.  As of the date of this complaint, City5 Consulting is no longer a functioning business.

221.    Before it became defunct, Defendants retained City5 Consulting to prepare documents to be submitted to HCR in response to the March 23, 2023 subpoena.  Upon information and belief, Defendants had hired City5 Consulting previously in connection with rent regulatory issues; however, it was not until March 2023 that Defendants had the company

52

prepare documents to try to substantiate the deregulation of the complaint properties.

222.    Johnny Kim gathered documents from Defendants and James Chai regarding the renovations completed on a subset of the complaint buildings.

223.    Johnny Kim also requested that James Chai sign affidavits in support of the subpoena responses.

224.    Johnny Kim prepared a draft affidavit template for each building. The template's third paragraph used the same language that was used in an affidavit prepared for every building. Reproduced below is the substance of paragraph 3 of the template. This particular image is from the affidavit for 101 Greenpoint:

> 3. I have inspected the property on **August 16th, 2022 (08/16/2022)** prior to commencement of construction. Based on my inspection, the following building-wide and apartment systems listed below were in a substandard condition and in need of replacement:
>
> | | | |
> |---|---|---|
> | a. Plumbing | f. Windows | k. Bathrooms |
> | b. Heating | g. Roof | l. Floors |
> | c. Gas supply | h. Fire escapes | m. Ceilings and wall surfaces |
> | d. Electrical Wiring | i. Interior stairways | n. Pointing or exterior surface |
> | e. Intercoms | j. Kitchens | o. Doors |

225.    Johnny Kim forwarded the affidavit templates for each building to James Chai for his review and signature.

226.    The only modification James Chai and his staff made to paragraph 3 was the addition of the date of "inspection" in the first line; otherwise, paragraph 3 in each affidavit attested to the substandard condition of the same 15 systems.

227.    James Chai and his staff affixed images to each affidavit to make them appear to be notarized. In fact, they were not notarized.

228.    James Chai and his staff affixed electronic images of both the signatures and notary stamps of Cynthia Ramirez and Cindy Kieffer, two individuals who work for Defendants,

53

to the affidavits. In fact, they were not signed by Cynthia Ramirez and Cindy Kieffer.

229. Though James Chai represented in each affidavit for each building that the 15 systems listed in paragraph 3 were in "substandard condition" and in need of replacement, in fact, he did not believe that each system listed in paragraph 3 was in substandard condition for each building.

230. In fact, James Chai did not know the condition of many of the systems he represented to be in substandard condition before renovation. James Chai and his staff did not analyze the condition of all of the systems listed in paragraph 3 for each building. James Chai did not open the walls to evaluate plumbing or electrical systems, and he did not record the presence of any deteriorated conditions in the building contemporaneously.

231. After receiving the signed affidavits back from James Chai, Johnny Kim prepared packets of documents for many of the buildings. The cover page of each packet was entitled "Rider to Owner's Application to Determine Whether Building/Apartment is Exempt from the Rent Stabilization Law." The packets consisted of several documents pertaining to each building, including but not limited to the deed, purchase and sale agreement, work permits and plans, and surrender agreements signed by tenants.

232. In addition, each packet contained an affidavit signed by James Chai.

233. Occasionally, the cover letter of each packet contradicted the representations of James Chai. For example, in the case of 101 Greenpoint, Johnny Kim stated in the cover letter that the fire escapes and pointing were in "good condition," yet James Chai's affidavit represented that the fire escapes and pointing were in substandard condition.

234. Defendants submitted the packets to HCR in response to its subpoena.

54

## G. Deceptive Conduct in Connection with Listings and Sales of Various Peak Properties

235.　In recent years, Defendants have sold buildings in their portfolio.  Three buildings which are not included among the complaint properties were recently sold, and three additional complaint properties were, until recently, listed for sale.  Defendants have misrepresented the rent-stabilized status of apartments in these buildings to prospective purchasers and purchasers.

### 1. 161 and 163 East 89th Street, Manhattan

236.　On March 17, 2022, Defendants purchased 161 East 89th Street and 163 East 89th Street, Manhattan, for $11,650,000.  The buildings, which contain 13 units and 14 units, respectively, are presumptively rent-stabilized.

237.　Defendants used the business model described in Section A of this complaint to develop the buildings.  The buildings were not in substandard or seriously deteriorated condition before Defendants renovated them.  No design professional notified the DOB that there was an unsafe condition at the buildings.

238.　In July 2023, Defendants submitted annual rent registrations to HCR falsely stating that 13 out of 14 apartments in 161 East 89th Street and all 13 apartments in 163 East 89th Street were exempt from rent stabilization due to substantial rehabilitation.

239.　Defendants then marketed the buildings for sale.

240.　In September 2023, when Defendants were in negotiations to sell the buildings to Fukuoka Road Co., Ltd., Defendant David Gomez and James Chai consulted with Johnny Kim from City5 Consulting about whether the buildings qualified as exempt from rent stabilization due to substantial rehabilitation.

241.　Johnny Kim stated that "[b]oth 161 and 163 E 89th St are not ideal candidates for sub rehab."

242.     Nevertheless, despite knowing that their own consultant had determined that they were not likely to be able to establish that apartments in the buildings were exempt from rent stabilization under the substantial rehabilitation exemption, Defendants did not amend the HCR registrations filed in July 2023 or withdraw any representations that the buildings were not subject to rent stabilization.

243.     Upon information and belief, Defendants falsely represented to the ultimate purchaser, Fukuoka Road Co., Ltd., that all apartments except for Apartment 5W at 161 East 89th Street were exempt from rent stabilization due to substantial rehabilitation.

244.     On November 12, 2024, Fukuoka Road Co., Ltd. bought the buildings for $22,800,000, which was $11,150,000 more than Defendants paid for the buildings in 2022.

245.     Upon information and belief, one of the factors for the sales price of $22,800,000 was the misrepresentation that Defendants made about the regulatory status of the apartments, including that there was a legal basis for deregulation of all apartments except for Apartment 5W at 161 East 89th Street.

**2.     150 North 9th Street, Brooklyn**

246.     On May 24, 2022, Defendants purchased the building at 150 North 9th Street, Brooklyn, for $4,712,500.  The building, which contains eight units, is presumptively rent-stabilized.

247.     Defendants used the business model described in Section A of this complaint to develop the building.  The building was not in substandard or seriously deteriorated condition before Defendants renovated it.  A professional appraiser who inspected the property on February 16, 2022, at the time Peak was in contract to purchase the property, concluded that the building was in average condition and that the building was "adequately maintained."  In order to get a

56

first mortgage for the acquisition of the property, Defendants certified to Patriot Bank that the building was not damaged, that it was code-compliant, and that utility service was adequate. During the subsequent renovation of the building, no design professional notified the DOB that there was an unsafe condition at the building, and no DOB filings indicated the presence of any structural problem at the building.

248. In 2023, Defendants submitted annual rent registrations to HCR falsely stating that all apartments in the building were exempt from rent stabilization due to substantial rehabilitation.

249. Defendants then marketed the building for sale. Upon information and belief, Defendants falsely represented in marketing materials that all apartments were exempt from rent stabilization due to substantial rehabilitation.

250. On January 24, 2025, Mantomi Co., Ltd. bought the building for $8,500,000, which was $3,787,500 more than Defendants paid for the building in 2022.

251. Upon information and belief, one of the factors for the sales price of $8,500,000 was the misrepresentation that Defendants made about the regulatory status of the apartments, including that there was a legal basis for deregulation of all apartments.

**3. Listings of 101 Greenpoint Ave, 311 Eckford Street, and 251 North 8th Street, Brooklyn**

252. Until recently, Defendants were marketing 101 Greenpoint Avenue, Brooklyn, 311 Eckford Street, Brooklyn, and 251 North 8th Street, Brooklyn, for sale. These complaint properties contain rent-stabilized apartments that Defendants have illegally deregulated.

253. Upon information and belief, hundreds of consumers viewed the listings for these properties.

254. The marketing materials promoting the sales of these buildings misrepresented the

rent-stabilized status of apartments at the buildings.  Upon information and belief, the rent rolls

that Defendants have caused to be created in order to market the buildings for sale list illegal

rents for the rent-stabilized apartments at the buildings.

255.    Upon information and belief, Defendants Gomez, Rabin, Labou, Lohan,

Anderson, Kaskel and Mendik personally received unlawful monetary gains as a result of the

conduct described in paragraphs 1 through 254 above.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF 9 N.Y.C.R.R. §§ 2525.1 and 2522.2:
### DEMANDING AND RECEIVING EXCESS RENT (OVERCHARGE)
### (Against All Defendants)

256.    Plaintiff HCR repeats and re-alleges paragraphs the paragraphs above as if fully

stated herein.

257.    Rent Stabilization Law § 26-516(e) and Rent Stabilization Code § 2526.3

authorize Plaintiff HCR to commence a proceeding in Supreme Court to enjoin violations of the

Rent Stabilization Law and Rent Stabilization Code.

258.    Defendants have repeatedly violated, and are continuing to violate, RSC § 2525.1

by demanding and receiving rent in excess of the legal regulated rent from tenants of rent-

stabilized housing accommodations (overcharge).

259.    Defendants have repeatedly violated, and are continuing to violate, RSC § 2522.2

by unlawfully increasing rent in excess of the legal regulated rent from tenants of rent-stabilized

housing accommodations.

260.    The housing accommodations listed in the table in paragraph 89 ("complaint

apartments") qualify as rent-stabilized pursuant to the Rent Stabilization Law and Emergency

Tenant Protection Act of 1974.

58

261.    Defendants have willfully and knowingly set rents of the complaint apartments in excess of the legal regulated rents for those apartments.  Defendants have increased the rents of the complaint apartments in excess of the annual adjustments authorized by the Rent Guidelines Board.

262.    Defendants have willfully and knowingly demanded rents in excess of the legal regulated rents from tenants of the complaint apartments.

263.    Defendants have willfully and knowingly received rents in excess of the legal regulated rents from tenants of the complaint apartments.

264.    In addition to setting rents in excess of the legal regulated rents for the complaint apartments, Defendants have additionally set rents in excess of the legal regulated rents for other apartments they own and control.

265.    Plaintiff HCR is entitled to an injunction barring the Defendants from overcharging tenants, including by violating RSC §§ 2525.1 and 2522.2 by demanding and receiving rent in excess of the legal regulated rent for all apartments owned and controlled by Defendants.

266.    Defendants are liable for damages equivalent to treble the amount of overcharges collected.  RSC § 2526.7(i).

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF 9 N.Y.C.R.R. § 2520.13:**
**ILLEGAL LEASES**
**(Against All Defendants)**

267.    Plaintiff HCR repeats and re-alleges the paragraphs above as if fully stated herein.

268.    Rent Stabilization Law § 26-516(e) and Rent Stabilization Code § 2526.3 authorize Plaintiff HCR to commence a proceeding in Supreme Court to enjoin violations of the Rent Stabilization Law and Rent Stabilization Code.

59

269.    Defendants have repeatedly violated, and are continuing to violate, RSC §

2520.13 by issuing leases to tenants of the complaint apartments that purport to waive benefits

and rights granted under the RSC.

270.    Defendants have required that prospective tenants of the complaint apartments

sign leases falsely stating that the apartment is "not subject to the rent stabilization law" and

lease riders falsely stating that "the building became 'permanently exempt from rent stabilization

as a result of a 'substantial rehabilitation.'"

271.    In addition, Defendants have repeatedly violated, and are continuing to violate,

RSC § 2520.13 by issuing unregulated leases to tenants of other apartments they own and control

that are not exempt from rent stabilization.

272.    Plaintiff HCR is entitled to an injunction barring the Defendants from violating

RSC § 2520.13 by issuing illegal leases to rent-stabilized tenants.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF 9 N.Y.C.R.R. § 2522.5(c)(1):**
**FAILURE TO ISSUE APPROVED LEASE RIDERS**
**(Against All Defendants)**

273.    Plaintiff HCR repeats and re-alleges the paragraphs above as if fully stated herein.

274.    Rent Stabilization Law § 26-516(e) and Rent Stabilization Code § 2526.3

authorize Plaintiff HCR to commence a proceeding in Supreme Court to enjoin violations of the

Rent Stabilization Law and Rent Stabilization Code.

275.    Defendants have repeatedly violated, and are continuing to violate, RSC §

2522.5(c)(1) by failing to issue tenants of the complaint apartments lease riders, in a form

promulgated or approved by HCR, that informs the regulated tenants of their rights and duties

under the rent regulation laws.

276.    In addition, Defendants have repeatedly violated, and are continuing to violate,

60

RSC § 2522.5(c)(1) by failing to issue tenants of the other apartments they own and control lease riders, in a form promulgated or approved by HCR, that informs the regulated tenants of their rights and duties under the rent regulation laws.

277.     Plaintiff HCR is entitled to an injunction barring the Defendants from violating RSC § 2522.5(c)(1) by failing to issue rent-stabilized tenants lease riders required by that section.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF RSL § 26-517 and 9 N.Y.C.R.R. § 2528.3:
### FAILURE TO COMPLY WITH RENT REGISTRATION REQUIREMENTS
### (Against All Defendants)

278.     Plaintiff HCR repeats and re-alleges the paragraphs above as if fully stated herein.

279.     Rent Stabilization Law § 26-516(e) and Rent Stabilization Code § 2526.3 authorize Plaintiff HCR to commence a proceeding in Supreme Court to enjoin violations of the Rent Stabilization Law and Rent Stabilization Code.

280.     Defendants have repeatedly violated, and are continuing to violate, RSL § 26-517 and RSC § 2528.3 by failing to register all of the complaint apartments with HCR annually.

281.     Defendants have repeatedly violated, and are continuing to violate, RSL § 26-517 and RSC § 2528.3 by failing to indicate on annual registrations filed with HCR that the complaint apartments are subject to the RSL and RSC.

282.     Defendants have repeatedly violated, and are continuing to violate, RSL § 26-517 and RSC § 2528.3 by falsely registering the complaint apartments as permanently exempt from rent stabilization due to a substantial rehabilitation.

283.     Defendants have repeatedly violated, and are continuing to violate § 26-517 and RSC § 2528.3 by failing to correctly register other rent-stabilized apartments they own with HCR.

61

284.     Plaintiff HCR is entitled to an injunction barring Defendants from violating RSL §
26-517 and RSC § 2528.3 and an injunction directing Defendants to correct all registrations by
filing amended registrations with HCR.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF EXECUTIVE LAW § 63(12):**
**REPEATED AND PERSISTENT ILLEGAL ACTS**
**(Against All Defendants)**

285.     Plaintiff OAG repeats and re-alleges the paragraphs above as if fully stated herein.

286.     New York Executive Law § 63(12) authorizes the Attorney General to bring an
action when any person or entity engages in repeated illegal acts or persistent illegality in the
conducting of business.

287.     At all relevant times, Defendants have engaged in carrying on, conducting, or the
transaction of business in New York within the meaning of Executive Law § 63(12).

288.     Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of
any separate and distinct fraudulent or illegal act, or conduct which affects more than one
person."

289.     At all relevant times, Defendants have engaged in repeated illegal acts and
persistent illegality by their conduct described above, which includes violating each and every
provision of the RSC and RSL described in the paragraphs above, including but not limited to
RSC § 2525.1, § 2522.2, § 2520.13, RSC § 2522.5(c)(1), RSL § 26-517 and RSC § 2528.3.

290.     By engaging in repeated and persistent conduct that violated the RSC and RSL,
Defendants have engaged in repeated and persistent illegal conduct in violation of Executive
Law § 63(12).

62

**SIXTH CAUSE OF ACTION**
**VIOLATION OF EXECUTIVE LAW § 63(12):**
**FRAUDULENT BUSINESS PRACTICES**
**(Against All Defendants)**

291. Plaintiff OAG repeats and re-alleges the paragraphs above as if fully stated herein.

292. New York Law Executive Law § 63(12) authorizes the Attorney General to bring an action when any person or entity engages in repeated and persistent fraud in the carrying on, conducting, or transaction of business.

293. At all relevant times, Defendants have engaged in carrying on, conducting, or the transaction of business in New York within the meaning of Executive Law § 63(12).

294. Repeated fraud or illegality under Executive Law § 63(12) includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

295. Fraud under Executive Law § 63(12) is broadly defined to include "any device, scheme, or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

296. Defendants' acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12) in that Defendants engaged in persistent and repeated fraudulent acts. As set forth in the allegations above, Defendants made or caused to be made misrepresentations, false or misleading statements, concealment, or suppression of information.

297. These fraudulent acts include, but are not limited to: (a) falsely stating to lenders, investors, prospective tenants, tenants, prospective purchasers, and purchasers that the complaint apartments were deregulated; (b) renumbering the apartments in each building upon completion of the renovations so as to create confusion and deceive prospective tenants as to the rent-stabilized history of the apartments; and (c) requiring that prospective tenants of the complaint

63

apartments sign leases falsely stating that the apartment is "not subject to the rent stabilization law" and lease riders falsely stating that "the building became permanently exempt from rent stabilization as a result of a 'substantial rehabilitation.'"

298.    In addition, Defendants committed repeated and persistent fraud by engaging in deceptive conduct in response to Plaintiff HCR's investigation.  In particular, Defendants retained a consulting company that drafted form affidavits for James Chai to sign that falsely stated that all systems in each building for which affidavits were prepared were in substandard condition before renovation.  Defendants submitted those false affidavits to HCR in an attempt to deceive HCR about the true condition of the buildings before renovation.

299.    In addition, Defendants committed repeated and persistent fraud by engaging in deceptive conduct in connection with their sale of the buildings at 161 East 89th Street and 163 East 89th Street, Manhattan, and 150 North 9th Street, Brooklyn.  Defendants knew or should have known that apartments in the buildings did not qualify as exempt from rent stabilization yet, upon information and belief, they persisted in representing to the purchaser that the apartments were unregulated.  Furthermore, upon information and belief, Defendants failed to conduct an honest inquiry in the rent-stabilized status of all apartments in the building.  As a result of these fraudulent practices, Defendants fraudulently increased the value of the buildings and obtained improper gains from the sales of the buildings.

300.    In addition, Defendants committed repeated and persistent fraud by engaging in deceptive conduct in connection with the listings for sale of the buildings at 101 Greenpoint Avenue, 311 Eckford Street, and 251 North 8th Street, Brooklyn.  Defendants knew or should have known that apartments in the buildings do not qualify as exempt from rent stabilization yet, upon information and belief, they persist in representing in marketing materials that the

64

apartments are unregulated.

## SEVENTH CAUSE OF ACTION
## DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF
## N.Y. GENERAL BUSINESS LAW § 349
### (Against All Defendants)

301.    Plaintiff OAG repeats and re-alleges the paragraphs above as if fully stated herein.

302.    Under the New York General Business Law, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).

303.    Defendants have engaged in deceptive consumer-oriented conduct.

304.    Defendants have engaged in misleading consumer-oriented conduct.

305.    Defendants have deceived prospective tenants of the regulated status of apartments.

306.    Defendants falsely stated to prospective tenants that the complaint apartments were not rent regulated and required that prospective tenants of the complaint apartments sign leases falsely stating that the apartment is "not subject to the rent stabilization law" and lease riders falsely stating that "the building became 'permanently exempt from rent stabilization as a result of a 'substantial rehabilitation.'"

307.    Defendants have misled tenants and prospective tenants by renumbering the majority of the complaint apartments so that prospective tenants and tenants could not easily find the registered rent history for their apartments and therefore understand that they those apartments were subject to rent stabilization.

308.    Upon information and belief, Defendants have falsely represented in marketing materials and other documents in connection with the sales of 161 East 89th Street, Manhattan, 163 East 89th Street, Manhattan, and 150 North 9th Street, Brooklyn, and in connection with the

65

listings of 101 Greenpoint Avenue, 311 Eckford Street, and 251 North 8th Street, Brooklyn, that

the apartments in those buildings are not subject to rent stabilization.

309.    By reason of the conduct alleged above, Respondents have engaged in repeated

and persistent deceptive acts and practices in the conduct of business in violation of G.B.L.

Article 22-A § 349.

**EIGHTH CAUSE OF ACTION**
**FALSE ADVERTISING IN VIOLATION OF**
**N.Y. GENERAL BUSINESS LAW § 350**
**(Against All Defendants)**

310.    Plaintiff OAG repeats and re-alleges the paragraphs above as if fully stated herein.

311.    Under the New York General Business Law, "False advertising in the conduct of

any business, trade, or commerce or in the furnishing of any service in this state" is unlawful.

N.Y. Gen. Bus. Law § 350.

312.    Defendants have engaged in false advertising.

313.    Defendants have misled consumers in material respect by failing to disclose the

regulatory status of their apartments and by listing illegal rents for the complaint apartments.

314.    Defendants have misled consumers in material respect by using renumbered

apartment numbers to advertise apartments.

315.    Defendants have misled consumers in material respect by failing to disclose the

regulatory status of the apartments in the listings for 101 Greenpoint Avenue, 311 Eckford Street,

and 251 North 8th Street, Brooklyn.

316.    By reason of the conduct alleged above, Respondents have engaged in repeated

and persistent false advertising in violation of N.Y. Gen. Bus. Law § 350.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request an order and judgment:

1. Permanently enjoining the Defendants from engaging in the fraudulent, deceptive, and illegal conduct alleged in this Complaint, including violating the rent regulation laws, Executive Law § 63(12), GBL § 349, and GBL § 350;

2. Directing disgorgement, restitution, and other such equitable relief as may be necessary to redress the Defendants' fraudulent and illegal practices;

3. Directing Defendants to take each of the following remedial actions:

a. Immediately set the legal regulated rent for each complaint apartment at the last legal regulated rent registered with HCR ("new legal regulated rent");

b. Provide current tenants of the complaint apartments with the option to sign rent-stabilized leases and approved riders at the new legal regulated rent;

c. Amend all HCR rent registrations to reflect the new legal regulated rent for the complaint apartments, and provide tenants receipts of the amended registration;

d. Pay penalties to current tenants in the complaint apartments who have been overcharged in an amount equivalent to three times the amount of the overcharged rent; and

e. With respect to former tenants of the complaint apartments, make diligent efforts to locate former tenants and pay to them penalties equivalent to three times the overcharged rent for the period of their occupancy. If such former tenants cannot be located after diligent efforts, disgorge a sum equivalent to the unpaid penalties to Plaintiffs to be distributed to the Affordable Housing-AG Settlement Fund established by HPD.

4. Appointing an independent third-party administrator approved by Plaintiffs for a period of three years to do the following:

a. Monitor and report to Plaintiffs on Defendants' compliance with the Court's judgment, including the remedial actions in paragraph 3 above;

b. Review and respond to all tenant inquiries and complaints originating in Defendants' buildings; and

c. Conduct an audit of all properties currently owned and formerly owned by each and every Defendant and any entity affiliated with any Defendant, including but not limited to the buildings at 161 and 163 East 89th Street, Manhattan, and 150 North 9th Street, Brooklyn. The purpose of this audit is to analyze whether Defendants are complying and did comply with all provisions of the rent regulation laws for all properties under their control. In order to conduct this analysis, the court should direct Defendants to make available all records in their possession to the administrator, and Plaintiffs will provide the administrator with records in their possession, including HCR rent registration histories for all properties currently and formerly owned (in whole or in part) by Defendants or by any entity affiliated with Defendants. The administrator should prepare a report summarizing the findings in the audit, including whether Defendants are or were violating rent regulation laws with respect to additional apartments that are not listed among the complaint apartments;

5. Directing Defendants to pay a civil penalty to the State of New York of $5,000 for each violation of N.Y. General Business Law § 349, pursuant to N.Y. General Business Law § 350-d, or $10,000 for each violation of N.Y. General Business Law § 349

68

for each violation against an elderly person, pursuant to N.Y. General Business Law §

349-c;

6. Directing Defendants to pay a civil penalty of $5,000 for each violation of

N.Y. General Business Law § 350, pursuant to N.Y. General Business Law § 350-d; and

7. Granting such other and further relief as the Court deems just and proper.

New York, NY
December 1, 2025

Respectfully submitted,
LETITIA JAMES
Attorney General of New York

By _____

RACHEL HANNAFORD
Senior Enforcement Counsel
BRENT MELTZER
Chief, Housing Protection Unit
STEPHANIE CUNNINGHAM
Special Assistant Attorney General
OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL
28 Liberty Street
New York, NY 10005