**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

------------------------------------------x
              :

BALANCED HOUSING SOLUTIONS, by its President, Hank Sheinkopf, PEAK CAPITAL ADVISORS, LLC, 4836 41 STREET OWNERS LLC, 48-33 47TH STREET LLC, 47-21 47TH STREET OWNER LLC, 51ST AVENUE OWNER LLC, 41ST STREET OWNER LLC, 47TH ROAD OWNER LLC, 70 MIDDAGH OWNER LLC, 45TH STREET NEW OWNER LLC, 44TH STREET OWNER LLC, 5317 SKILLMAN OWNER LLC, 32ND STREET OWNER LLC, 3070 44TH STREET OWNER LLC, 4745 43RD STREET OWNER LLC, 4707 OWNER LLC, 4709 47TH AVENUE OWNER LLC, 3093 44TH OWNER LLC, 4127 49TH OWNER LLC, 4542 VERNON OWNER LLC, 131 GREENPOINT OWNER LLC, 586 MANHATTAN OWNER, LLC, 94 MILTON OWNER LLC, 3230 OWNER LLC, 311 ECKFORD OWNER LLC, 250 OWNER LLC, 515 GRAHAM OWNER LLC, 4544 40TH OWNER LLC, 251 NORTH 8TH OWNER LLC, 2559 35TH OWNER LLC, 154 ATLANTIC OWNER LLC, 724 METROPOLITAN OWNER LLC, 101 GREENPOINT OWNER LLC,

        Plaintiff,

        -against-

RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal,

        Defendant.

------------------------------------------x

Case No. 1:25-cv-06574

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

BALANCED HOUSING SOLUTIONS, by its President, Hank Sheinkopf,

        Plaintiff,

        -against-

RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of the New York

State Division of Housing and Community Renewal,

Defendant.

x
:
:
:
: No. _____
:
: **COMPLAINT**
:
: **JURY TRIAL DEMANDED**
:
:
:
:
:
x

~~Plaintiff~~Plaintiffs Balanced Housing Solutions ("BHS"), by its President Hank Sheinkopf and on behalf of its members, Peak Capital Advisors, LLC ("PCA"), 4836 41 Street Owners LLC, 48-33 47th Street LLC, 47-21 47th Street Owner LLC, 51st Avenue Owner LLC, 41st Street Owner LLC, 47th Road Owner LLC, 70 Middagh Owner LLC, 45th Street New Owner LLC, 44th Street Owner LLC, 5317 Skillman Owner LLC, 32nd Street Owner LLC, 3070 44th Street Owner LLC, 4745

43rd Street Owner LLC, 4707 Owner LLC, 4709 47th Avenue Owner LLC, 3093 44th Owner LLC, 4127 49th Owner LLC, 4542 Vernon Owner LLC, 131 Greenpoint Owner LLC, 586 Manhattan Owner, LLC, 94 Milton Owner LLC, 3230 Owner LLC, 311 Eckford Owner LLC, 250 Owner LLC, 515 Graham Owner LLC, 4544 40th Owner LLC, 251 North 8th Owner LLC, 2559 35th Owner LLC, 154 Atlantic Owner LLC, 724 Metropolitan Owner LLC, and 101 Greenpoint Owner LLC (collectively, the "LLC Plaintiffs," or with BHS and PCA, the "Plaintiffs"), by and through their attorneys, allege for their complaint against RuthAnne Visnauskas, in her official capacity as the Commissioner of the New York State ~~Department~~Division of Housing and Community Development ("DHCR"), as follows.

## PRELIMINARY STATEMENT

1. ~~This action seeks to restrain a regulatory taking that impacts hundreds of investors, owners, and developers across New York City, who have worked for years to renovate decrepit housing stock here.~~

2. ~~The victims of this taking relied on existing law and made massive investments to renovate degraded apartment buildings across the city only to learn—after the projects were completed—that Defendant DHCR changed program requirements retroactively, disqualifying them from reaping the fruits of their investment and years-long work.~~

3. ~~Although these developers complied with program requirements—and invested millions on gutting and rehabilitating hundreds of properties across the city to create high-quality apartments—DHCR changed program requirements unilaterally and without public notice. Worse~~

2

still, DHCR is applying these changes retroactively, demanding re-regulation of apartments that were properly deregulated under then-existing regulations. DHCR's campaign against building owners would effectively wipe out hundreds of millions of dollars of investment citywide.

## BACKGROUND

4. DHCR oversees and regulates a program, created by the New York Legislature, to incentivize the real estate industry to substantially rehabilitate residential buildings that were "substandard" or had "seriously deteriorated" (the "SR Program"). 9 NYCRR (Rent Stabilization Code ("RSC")) § 2520.11(e).[1]

1. This is an action to enjoin and remedy an unconstitutional regulatory taking by the State of New York that threatens to wipe out hundreds of millions of dollars in private investment, destabilize a critical segment of New York City's housing market, and punish property owners for following the State's own rules.

2. After inducing Plaintiffs and other investors to pour capital into rehabilitating New York's aging and dilapidated housing stock, DHCR has engaged in a bad-faith campaign to retroactively nullify the very program it created and administered for three decades.

3. Defendant's actions are a classic "rug-pull"—a flagrant violation of the Takings and Due Process Clauses of the United States Constitution that demand federal judicial intervention.

### *Bait-and-Switch: A Multimillion-Dollar Investment Destroyed by Retroactive Fiat*

4. For nearly 30 years, New York State had a program (the "SubRehab Program") that offered a clear path for owners to deregulate apartments in exchange for massive capital investment. The legislative goal was to incentivize the private sector to rescue and modernize "substandard or seriously deteriorated" residential buildings. To provide certainty and encourage

this investment, a state regulatory agency, DHCR, established clear "Safe Harbor" provisions in its governing guidance, Operational Bulletin 95-2.

5. The trade-off was simple. If a developer replaced 75% or more of the systems in these buildings, it could deregulate the rent-stabilized units therein. To provide certainty for investors, DHCR created a 5. The core of that Safe Harbor was a simple, bright-line presumption: if a building was at least 80% vacant, it was presumed to be deemed "substandard or seriously deteriorated." RSC § 2520.11(e). Because this presumption anticipated that as much as 20% of any substandard building would remain occupied, the Program never required a developer to prove the building was "uninhabitable." These two rules (collectively, the "Safe Harbor Provisions") gave owners reasonable certainty about the requisite steps for satisfying the substantial rehabilitation exemption from rent stabilization. if the rehabilitation began when it was at least 80% vacant. For decades, DHCR consistently honored this presumption, routinely rejecting tenant challenges and confirming that the program was self-executing, requiring no application or pre- approval.

6. Many BHS members participated in this program. BHS' members followed program requirements to the letter. They renovated dozens of buildings. Most were fully vacant at the time construction commenced. All were at least 80% vacant. All the buildings had 75% or more of the systems replaced. All, thereafter, satisfied building code requirements. All the buildings had been built before 1974, and some were much older. All were in advanced stages of

---

[1] Unless otherwise specified, references to the RSC are to the version that was effective until Nov. 7, 2023, after which certain amendments were made (the "Amended RSC"), as discussed below.

~~deterioration before the renovations. Photographs of the pre-renovation conditions in some of these buildings are attached as Exhibit 1 hereto.~~

6.    Relying on this unambiguous and consistently applied regulatory framework, the LLC Plaintiffs and hundreds of other investors across the City invested hundreds of millions of dollars to acquire and gut-renovate buildings that met the 80% vacancy threshold, replacing over 75% of all building systems as required.

~~7.    Now that the renovations are long finished, DHCR is embarking on a political mission to re-regulate hundreds of thousands of apartments across the city, starting with buildings owned by BHS' members.~~7.    Then, without warning, public process, or legislative change, DHCR unilaterally repudiated its own 30-year-old interpretation. ~~DHCR, in~~In concert with the New York Attorney General ("NYAG"), ~~is threatening BHS' members with regulatory enforcement actions without any basis in law or fact.~~DHCR now claims—retroactively—that the vacancy-based Safe Harbor it created and enforced is meaningless. ~~Specifically, these agencies now claim that completed projects cannot rely on the very presumptions—the Safe Harbor Provisions—that DHCR adopted to provide investment certainty, a key legislative aim of the Program.~~It has launched a baseless enforcement action (the "State Action") against PCA and the LLC Plaintiffs, demanding the forcible re-regulation of apartments that were lawfully deregulated years ago under the precise rules DHCR had in place.

~~8.    More importantly, DHCR's proposed enforcement actions ignore that BHS' members relied on DHCR's own interpretation of program requirements and regulations at the time the members undertook the substantial rehabilitation efforts.  Irrefutable evidence shows that BHS' members followed program requirements, as administered by DHCR at the time these projects were undertaken and completed.~~

9.     Indeed, DHCR actually *enforced* the Safe Harbor Provisions, when challenged by tenants, for years.  Over *many* years, rent-stabilized tenants filed claims with DHCR, claiming that their apartments should remain rent-stabilized because developers did not qualify under SR Program requirements.  DHCR consistently applied the Safe Harbor Provisions to reject the tenants' claims.

10.     Now, DHCR has turned 180 degrees, moving the regulatory goalposts without any process to give public notice, which is required before any such change could lawfully be effected.

11.    The stakes for New Yorkers are high. The city is in the throes of a decades-long housing crisis, driven largely by lack of supply, which disproportionately impacts middle-income households. Rental vacancy rates hover just above 1% citywide.

12.    In neighborhoods close to mass transit and with a high density of pre-1974 buildings, the acute housing shortage causes many working-class people and young professionals to leave the city. These neighborhoods are home to large black and brown communities, who have been hit hardest by the housing crisis, including in Washington Heights, Inwood, Ocean Hill, Astoria, and the West Bronx.

13.    Most pre-1974 buildings are, almost by definition, "substandard" or "substantially deteriorated." The overwhelming majority contain asbestos, lead paint, and other hazardous substances, which can harm tenants as the buildings degrade. These buildings typically have other endemic problems—such as crumbling facades and foundations, mold, poorly functioning heating and plumbing systems, leaking roofs, and rodent infestation.[2]

14.    The Legislature looked to New York's real-estate community to solve the problem, creating the SR Program to provide financial incentives. BHS members answered the call, which is exactly what the Legislature intended. In so doing, BHS members relied on DHCR's own Safe Harbor Provisions. The threatened retroactive application of new SR Program rules will have devastating consequences, causing many buildings to go into foreclosure. Given that many of these buildings have debt obligations to federal and commercial lenders, DHCR's actions will have serious economic ripple effects.

---

[2] *See Testimony of New York Apartment Association before the NYC Rent Guidelines Board* (Apr. 24, 2025), available at https://housingny.org/s/2025_NYAA-RGB-Testimony-FINAL.pdf.

8.    Indeed, one of the last regulatory reviews conducted by DHCR and NYAG before

the State Action concerned one of the city's largest SubRehab developers ("Company A"), with a portfolio of over 100 buildings. Company A's portfolio had many buildings that are identical to the LLC Plaintiffs' portfolio in age and physical condition. DHCR and NYAG began the inquiry because tenants filed complaints of illegal deregulation of their rent-stabilized apartments. DHCR and NYAG found that Company A committed many regulatory violations—including violations

far more serious than those alleged against Plaintiffs—and yet did not require Company A to re-regulate a single apartment. *See infra* ¶¶ 80 & 81.

9.      This action is a clear indication that, through 2022, DHCR and NYAG applied the *applicable* standard, mandated by DHCR's official guidance (Operational Bulletin 95-2), not their *newly invented ones*. The stark disparity between the leniency shown to the politically powerful Company A (despite findings of harassment) and the punitive action against Plaintiffs (where no harassment exists) demonstrates that the State Action is not a neutral enforcement of law, but a targeted, bad-faith retaliation proscribed by *Diamond "D" Constr. Corp. v. McGowan,* 282 F.3d 191, 200 (2d Cir. 2002).

10.      The sudden reversal of settled policy annihilates Plaintiffs' investment-backed expectations and constitutes an uncompensated regulatory taking in violation of the Fifth and Fourteenth Amendments.

### *The State Action Is a Pretext for an Unconstitutional Agenda*

11.      The State Action, filed *after* Plaintiffs sought relief in this Court, is not a good-faith regulatory proceeding. It is a punitive and retaliatory measure designed to make an example out of Plaintiffs and chill future private investment in the City's housing stock. DHCR's action ignores decades of its own precedent and retroactively imposes a new, impossible standard of "uninhabitability"—meaning that a building cannot qualify for the SubRehab program unless it is uninhabitable—that never existed in the governing regulations or guidance and is, in fact, at odds with the 80% vacancy presumption (which always anticipated that 20% of tenants could live in the buildings during the renovations).

12.      This federal lawsuit is not merely a defense against that proceeding. It is an affirmative challenge to the State's unconstitutional conduct, which extends far beyond the 31

residential apartment buildings (the "Targeted Buildings") that are the subject of DHCR's enforcement action.

13.    DHCR's retroactive policy change places a cloud over every one of the more than 11,000 apartments that were lawfully deregulated under the SubRehab Program over the past 30 years,[1] threatening widespread financial distress, foreclosures, and a decline in the quality of the City's housing.

### *Necessity of a Federal Forum*

14.    This Court has subject-matter jurisdiction over Plaintiffs' federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343.  The declaratory and injunctive relief sought are authorized by 28 U.S.C. §§ 2201 and 2202.

15.    Plaintiffs filed this action on November 25, 2025, seeking to vindicate their federal constitutional rights before any state-court proceeding was initiated against them.  Days later, on December 1, 2025, DHCR and NYAG commenced the State Action in New York County Supreme Court, which is a bad-faith and retaliatory effort to forum-shop and divest this Court of its proper jurisdiction over Plaintiffs' pre-existing constitutional claims.

16.    The state-court proceeding is not an adequate forum to protect Plaintiffs' federal rights.  The State Action is not a neutral forum for adjudication; it is an enforcement vehicle for the very unconstitutional, retroactive policy that Plaintiffs challenge in this lawsuit.  As such, the state proceeding is incapable of providing the broad, forward-looking declaratory relief necessary to remedy the constitutional violations, which extend far beyond the 31 LLC Plaintiffs and affect the property rights of all owners who relied on DHCR's prior, long-standing rules.  A defensive

---

[1] Even the protection of the statute of limitations is uncertain, as DHCR has shown a willingness to use the rent laws as a springboard for novel claims.  *See infra* Section VI.

posture in a state enforcement action cannot undo the widespread uncertainty and harm caused by DHCR's unconstitutional conduct.

17.     Unless DHCR's conduct is enjoined, Plaintiffs will suffer great, immediate, and irreparable harm for which there is no adequate remedy at law.  The retroactive re-regulation of Plaintiffs' properties will immediately and catastrophically devalue their assets, rendering them unable to meet their debt obligations and placing the Targeted Buildings at imminent risk of foreclosure.  This harm is not speculative; the financing for these buildings, totaling just under $95,000,000, was secured based on the market-rate rents that were lawful at the time.  A forced, retroactive conversion to stabilized rents would destroy the income-generating capacity of the buildings and trigger defaults on these loans.

18.     The harm is ongoing.  The mere threat of DHCR's enforcement action has placed a cloud over the title of the Targeted Buildings, chilling Plaintiffs' ability to sell, refinance, or otherwise operate their businesses.  DHCR's press offensive with NYAG after the filing of the State Action has effectively shut down PCA, leaving it with 31 stranded assets, virtually no income, investors who are defecting, lenders threatening to call in loans, and necessitating the termination of staff members.  This uncertainty constitutes a present and continuing injury to PCA's and LLC Plaintiffs' property rights that cannot be compensated by a potential future monetary award in state court.

19.     These facts constitute extraordinary circumstances warranting federal intervention.  The State's bad-faith, retaliatory filing of the State Action, combined with the inadequacy of that forum to adjudicate Plaintiffs' affirmative claims and the irreparable financial destruction Plaintiffs face, makes abstention inappropriate.  This Court's exercise of its jurisdiction is necessary to provide a prompt and effective remedy for the ongoing violation of Plaintiffs' constitutional rights.

## THE SUBSTANTIAL REHABILITATION PROGRAM

20.     This section provides a brief overview of the SubRehab Program, which stemmed from an express legislative purpose of incentivizing investment to old buildings.

### A.     The Legislative Bargain: Rescuing New York's Deteriorating Housing Stock

21.     For decades, New York City has faced a housing crisis, driven in large part by a shortage of quality apartments and an aging, degrading housing supply. Many residential buildings, particularly those built before 1974, were falling into disrepair, plagued by hazardous materials like asbestos and lead paint, crumbling foundations, and failing plumbing and electrical systems.

22.     To address this crisis, the New York Legislature created a program to incentivize private developers and owners to invest the massive capital required to rescue this housing stock. This program, which came to be known as the SubRehab Program, offered a straightforward legislative bargain: an owner who substantially rehabilitated a deteriorating building could deregulate its rent-stabilized apartments. The program is governed by Section 2520.11(e) of the Rent Stabilization Code ("RSC").

### B.     DHCR Creates Investment Certainty: The "Safe Harbor Provisions"

23.     To implement the Legislature's intent and provide the investment certainty necessary to attract private capital, DHCR established clear, objective criteria for the SubRehab Program. In its Operational Bulletin 95-2 ("OB 95-2"), DHCR created what were, in effect, "Safe Harbor Provisions" with two simple prongs:

24.     **The 75% Systems Test**: The owner had to replace at least 75% of enumerated building-wide and individual apartment systems.

25.     **The 80% Vacancy Presumption**: To satisfy the requirement that the building be "substandard or seriously deteriorated," the rehabilitation had to commence in a building that was at least 80% vacant of residential tenants.

26.     This 80% Vacancy Presumption was the critical component for investment certainty.  It created a bright-line, objective standard that allowed owners to determine a building's eligibility *before* committing millions of dollars to a project.

27.     Furthermore, the SubRehab Program was intentionally "self-executing"; it required no application to DHCR, no pre-construction approval, and no post-construction certification.  Owners were expected to determine eligibility, perform the work, and deregulate the units in reliance on the plain language of the Safe Harbor Provisions.  After a project was completed, nothing in DHCR's guidance limited or prohibited an owner from marketing the apartments as "deregulated" and subject to free-market rents.

**C.     Three Decades of Settled Expectations and Reliance**

28.     For nearly 30 years, DHCR administered the SubRehab Program consistent with the Safe Harbor Provisions.  It created a settled and reliable regulatory landscape upon which an entire industry was built.  During this period, DHCR consistently applied the 80% Vacancy Presumption to reject tenant challenges to deregulation, confirming that owners who met the two prongs of the Safe Harbor had complied with the program.  For this reason, industry experts including the leading lawyer in SubRehab work, Sherwin Belkin, publicly described the SubRehab program as "**self-operating**, meaning if the developer did the work, the building would be exempt."[2]

---

[2] *See* Suzannah Cavanaugh, *How Greenbrook Weathered The Storm*, THE REAL DEAL (March 4, 2024) (emphasis added), available at https://therealdeal.com/magazine/march-2024/how-greenbrook-weathered-the-storm/.

15. More broadly, politicized and unconstitutional regulatory takings will chase developers and investors away from New York. BHS' members are simply the point of DHCR's spear. DHCR, through the NYAG, is threatening enforcement actions against SR Program participants across the city.

16. In the past 30 years, more than 11,000 previously rent-stabilized apartments have been deregulated under the SR Program.[3] DHCR's threatened *retroactive* change in regulatory requirements puts owners of all of those buildings at risk of new liabilities that could not possibly have been anticipated when they, relying on and complying with DHCR's rules, invested millions of dollars to substantially rehabilitate dilapidated housing stock with the expectation of thereafter yielding market-rate rents.

17. BHS seeks a declaratory judgment that DHCR cannot retroactively apply new program requirements for projects completed before November 8, 2023, when DHCR changed the requirements of RSC § 2520.11(e), or for projects completed before January 2024, when the Legislature changed the Program through a prospective statutory amendment (the "Amendment").[4] This action seek to restrain DHCR's *retroactive* change to the SR Program's requirements for pre-Amendment projects.

18. Plaintiff's members are directly in the cross hairs of one of the largest attempts at a regulatory taking in history. Unless enjoined, DHCR's unlawful and unconstitutional actions will

---

[3] *See* New York City Rent Guidelines Board*, Changes to the Rent-Stabilized Housing Stock in NYC in 2024* (May 22, 2025), at 15, available at https://rentguidelinesboard.cityofnewyork.us/wp-content/uploads/2025/05/2025-Changes-Report.pdf.

[4] *See* DHCR Operational Bulletin 2023-3 ("OB 2023-3"), available at https://hcr.ny.gov/system/files/documents/2023/11/operational-bulletin-2023-3.pdf. OB 2023-3 describes regulatory amendments, and the replacement of DHCR's prior Operational Bulletin 95- 2, discussed *infra in* the text, which had created the 80% vacancy presumption and was later incorporated into DHCR's regulations as RSC § 2520.11(e).

wipe out hundreds of millions of dollars of investment and erode any appetite for further investment in New York City's already degraded housing stock.

29.     A widespread, accepted, and lawful industry practice in the SubRehab Program was for owners to achieve the 80% vacancy threshold through tenant buyouts—a practice DHCR was aware of and never questioned in its administrative rulings.  These buyout agreements were not just in the owners' interests: the buyout agreements gave capital to tenants to find alternative living conditions and spared them occupancy during a gut renovation. If any tenant remained in occupancy during the substantial rehabilitation, their rent would remain at rent-stabilized levels through the term of their lease.  *See* RSC § 2520.11(e)(5); *The 12th Co. LLC v. New York State Div. of Hous. & Cmty. Renewal*, 303 A.D.2d 328, 329 (1st Dep't 2003).

30.     Relying on DHCR's consistent, decades-long interpretation, Plaintiffs and other owners invested more than $150 million (including debt) to acquire and rehabilitate properties that met the clear requirements of the Safe Harbor Provisions.

**D.     The Unconstitutional Reversal: DHCR Retroactively Moves the Goalposts**

31.     Now, after Plaintiffs and others have completed their projects in full compliance with the rules in effect at the time, DHCR has unilaterally and retroactively changed the requirements of the SubRehab Program as applied to already finished projects.  Without any new legislation or public rulemaking process, DHCR, through its enforcement action, has repudiated its own 30-year-old precedent.

32.     Specifically, DHCR now seeks to retroactively impose two new requirements that never previously existed:

33.     First, DHCR claims that the 80% Vacancy Presumption is nullified if the requisite vacancy was achieved through tenant buyouts.

34.     Second, DHCR now requires owners to prove that the building was physically

15

"uninhabitable" before work began—a standard that appears nowhere in the RSC or OB 95-2 and

directly contradicts the logic of the 80% Vacancy Presumption, which explicitly anticipated that up to 20% of tenants could remain in occupancy.

35. This retroactive and *ultra vires* rewriting of the rules forms the basis of the State Action and threatens to destroy Plaintiffs' investments, which were made in good-faith reliance on the clear and consistent guidance DHCR provided for three decades. Worse still, DHCR and NYAG branded PCA as fraudsters, who used "deceptive" and "illegal" business practices for doing precisely what DHCR itself permitted.

**THE PARTIES**

**A. The Plaintiffs**

~~19~~36. Plaintiff BHS is a membership entity, formed as an unincorporated association under Section 12 of the New York General Associations Law. Its members ~~include~~are th~~ose~~ ~~with a financial stake in the dozens of~~ 31 LLC Plaintiffs listed below, who own the buildings ~~subject to~~targeted by DHCR's ~~actions, as complained of herein.~~unconstitutional retroactive policy change. ~~A membership organization, such as~~ BHS~~,~~ has standing to sue on behalf of its members~~.~~, ~~More than 20 members of BHS are participants in the SR Program.~~

a. ~~BHS' members own buildings targeted by DHCR's threatened enforcement actions and thus have suffered or imminently will suffer concrete economic injury, including re-regulation of their buildings and liability for alleged overcharges. Each would have standing to sue in his, her, or its own right.~~

b. ~~The interests BHS seeks to protect are germane to the organization's core purpose: safeguarding its members' investment-backed expectations and ensuring lawful administration of the SR Program.~~

whose claims are at the core of BHS's organizational purpose.~~c.~~ ~~Neither~~ ~~t~~The claims asserted ~~nor~~and the relief sought are common to all members and do not require the participation

17

of individual members; the issues are purely legal and the relief — declaratory and injunctive — will apply uniformly..

        d.      Accordingly, BHS satisfies all three prongs of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

37. Plaintiff PCA is a New York State limited liability company with its principal place of business at 900 Broadway, Suite 803, New York, New York 10003, in New York County. Peak conducts business in the State of New York.

38. The LLC Plaintiffs are the owners of the 31 Targeted Buildings. Each LLC Plaintiff invested in its respective Targeted Building in reliance on the SubRehab Program's Safe Harbor Provisions.

        a. Plaintiff 4836 41 Street Owners LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 48-36 41st Street, Sunnyside, New York, a building constructed

in 1929, for which a substantial rehabilitation was completed on or about January 3, 2020.  The State Action wrongfully designated six apartments in the building as "illegally deregulated."

b.  Plaintiff 48-33 47th Street LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 48-33 47th Street, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about August 4, 2020.  The State Action wrongfully designated six apartments in the building as "illegally deregulated."

c.  Plaintiff 47-21 47th Street Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 47-21 47th Street, Sunnyside, New York, a building constructed in 1923, for which a substantial rehabilitation was completed on or about November 2, 2020.  The State Action wrongfully designated one apartment in the building as "illegally deregulated."

d.  Plaintiff 51st Avenue Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 5-13 51st Avenue, Long Island City, New York, a building constructed in 1931, for which a substantial rehabilitation was completed on or about March 26, 2021.  The State Action wrongfully designated six apartments in the building as "illegally deregulated."

e.  Plaintiff 41st Street Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at

45-35 41st Street, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about May 7, 2021. The State Action wrongfully designated five apartments in the building as "illegally deregulated."

f.   Plaintiff 47th Road Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 5-35 47th Road, Long Island City, New York, a building constructed in 1931, for which a substantial rehabilitation was completed on or about February 28, 2022. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

g.   Plaintiff 70 Middagh Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 70 Middagh Street, Brooklyn, New York, a building constructed in 1897, for which a substantial rehabilitation was completed on or about October 19, 2021. The State Action wrongfully designated eleven apartments in the building as "illegally deregulated."

h.   Plaintiff 45th Street New Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 47-34 45th Street, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about January 24, 2022. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

i. Plaintiff 44th Street Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 47-25 44th Street, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about October 8, 2021. The State Action wrongfully designated five apartments in the building as "illegally deregulated."

j. Plaintiff 5317 Skillman Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 53-17 Skillman Avenue, Sunnyside, New York, a building constructed in 1924, for which a substantial rehabilitation was completed on or about December 9, 2022. The State Action wrongfully designated three apartments in the building as "illegally deregulated."

k. Plaintiff 32nd Street Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 35-34 32nd Street, Astoria, New York, a building constructed in 1925, for which a substantial rehabilitation was completed on or about December 9, 2021. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

l. Plaintiff 3070 44th Street Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 30-70 44th Street, Astoria, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about

March 28, 2022.  The State Action wrongfully designated six apartments in the building as "illegally deregulated."

m.  Plaintiff 4745 43rd Street Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 47-45 43rd Street, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about February 28, 2022.  The State Action wrongfully designated six apartments in the building as "illegally deregulated."

n.  Plaintiff 4707 Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 47-07 47th Avenue, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about December 22, 2022.  The State Action wrongfully designated five apartments in the building as "illegally deregulated."

o.  Plaintiff 4709 47th Avenue Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 47-09 47th Avenue, Sunnyside, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about April 8, 2022.  The State Action wrongfully designated five apartments in the building as "illegally deregulated."

p.  Plaintiff 3093 44th Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 30-93 44th Street, Astoria, New York, a building constructed in 1928, for

which a substantial rehabilitation was completed on or about March 9, 2022. The State Action wrongfully designated five apartments in the building as "illegally deregulated."

q.  Plaintiff 4127 49th Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 41-27 49th Street, Long Island City, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about April 4, 2022. The State Action wrongfully designated four apartments in the building as "illegally deregulated."

r.  Plaintiff 4542 Vernon Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 45-42 Vernon Boulevard, Long Island City, New York, a building constructed in 1931, for which a substantial rehabilitation was completed on or about April 8, 2022. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

s.  Plaintiff 131 Greenpoint Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 131 Greenpoint Avenue, Brooklyn, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about May 4, 2023. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

t.  Plaintiff 586 Manhattan Owner, LLC is a limited liability company organized under the laws of New York. It is the owner of the residential

property at 586 Manhattan Avenue, Brooklyn, New York, a building constructed in 1931, for which a substantial rehabilitation was completed on or about July 28, 2022. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

u.   Plaintiff 94 Milton Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 94 Milton Street, Brooklyn, New York, a building constructed in 1894, for which a substantial rehabilitation was completed on or about February 10, 2023. The State Action wrongfully designated seven apartments in the building as "illegally deregulated."

v.   Plaintiff 3230 Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 32-30 41st Street, Astoria, New York, a building constructed in 1926, for which a substantial rehabilitation was completed on or about November 22, 2022. The State Action wrongfully designated one apartment in the building as "illegally deregulated."

w.   Plaintiff 311 Eckford Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 311 Eckford Street, Brooklyn, New York, a building constructed in 1928, for which a substantial rehabilitation was completed on or about September 30, 2022. The State Action wrongfully designated four apartments in the building as "illegally deregulated."

x.   Plaintiff 250 Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 250 North 6th Street, Brooklyn, New York, a building constructed in 1910, for which a substantial rehabilitation was completed on or about April 12, 2023.  The State Action wrongfully designated one apartment in the building as "illegally deregulated."

y.   Plaintiff 515 Graham Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 515 Graham Avenue, Brooklyn, New York, a building constructed in 1920, for which a substantial rehabilitation was completed on or about November 29, 2022.  The State Action wrongfully designated six apartments in the building as "illegally deregulated."

z.   Plaintiff 4544 40th Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential property at 45-44 40th Street, Sunnyside, New York, a building constructed in 1926, for which a substantial rehabilitation was completed on or about December 8, 2022.  The State Action wrongfully designated three apartments in the building as "illegally deregulated."

aa.  Plaintiff 251 North 8th Owner LLC is a limited liability company organized under the laws of New York.  It is the owner of the residential properties at 251-253 North 8th Street, Brooklyn, New York, two buildings constructed in 1900, for which a substantial rehabilitation was completed on or about

March 16, 2023. The State Action wrongfully designated two apartments in the buildings as "illegally deregulated."

bb. Plaintiff 2559 35th Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 25-59 35th Street, Astoria, New York, a building constructed in 1923, for which a substantial rehabilitation was completed on or about January 20, 2023. The State Action wrongfully designated five apartments in the building as "illegally deregulated."

cc. Plaintiff 154 Atlantic Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 154 Atlantic Avenue, Brooklyn, New York, a building constructed in 1852, for which a substantial rehabilitation was completed on or about March 14, 2023. The State Action wrongfully designated seven apartments in the building as "illegally deregulated."

dd. Plaintiff 724 Metropolitan Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 724 Metropolitan Avenue, Brooklyn, New York, a building constructed in 1930, for which a substantial rehabilitation was completed on or about September 19, 2023. The State Action wrongfully designated six apartments in the building as "illegally deregulated."

ee. Plaintiff 101 Greenpoint Owner LLC is a limited liability company organized under the laws of New York. It is the owner of the residential property at 101 Greenpoint Avenue, Brooklyn, New York, a building

constructed in 1928, for which a substantial rehabilitation was completed on or about May 4, 2023. The State Action wrongfully designated seven apartments in the building as "illegally deregulated."

**B.** **The Defendant**

~~20~~39. Defendant RuthAnne Visnauskas is the Commissioner and Chief Executive Officer of DHCR, the state agency responsible for administering ~~the State~~New York's rent regulation laws, including, ~~as relevant here, the SR Program.~~ the SubRehab Program. ~~DHCR has threatened to initiate legal proceedings against BHS' members for conduct related to their~~

~~substantial rehabilitation of substandard or seriously deteriorated buildings.~~ She is sued in her official capacity. DHCR, under her leadership, working with NYAG, has initiated legal proceedings against PCA and the LLC Plaintiffs and is the agency responsible for the unconstitutional retroactive policy change at issue in this complaint.

## JURISDICTION AND VENUE

~~21~~40. This Court has subject-matter jurisdiction ~~under~~ over this action pursuant to 28 U.S.C. §§ 1331 and 1343~~, and this action is properly commenced under 42 U.S.C. § 1983~~, because ~~the~~Plaintiffs' claims ~~herein~~ arise under the Constitution and laws of the United States, including the Fifth and Fourteenth Amendments ~~of the~~and 42 U.S. ~~Constitution~~C. § 1983. This Court also has jurisdiction to ~~enter a~~grant declaratory ~~judgment~~and injunctive relief under 28 U.S.C. §§ 2201~~-02~~. and 2202.

41. To the extent Plaintiffs assert any related state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as such claims form part of the same case or controversy as the federal claims.

~~22~~42. This ~~case~~action is ripe for judicial review. DHCR ~~has~~and NYAG have taken ~~a~~ final and definitive position~~s~~ ~~that members of BHS who completed substantial rehabilitations before November 2023 must nonetheless comply with DHCR's~~regarding the retroactive application of ~~its~~new ~~interpretation of the law or face enforcement consequences.~~standards to the SubRehab Program. ~~NYAG imminently intends to~~ On December 1, 2025, DHCR and NYAG commenced civil enforcement proceedings against ~~several members of BHS – including the owners described above, in ¶ 19.~~Plaintiffs and similarly situated owners, seeking ~~The retroactive application of new rules to past conduct would impose immediate and significant hardship, requiring BHS' members to either re-regulate their buildings and pay alleged damages for rent overcharges or to face enforcement actions carrying~~ severe civil and financial penalties.

No further factual development is ~~needed~~necessary; the dispute ~~here~~ turns on ~~a~~ pure question~~s~~ of law~~, *i.e.*, whether~~regarding the constitutionality of retroactive ~~application of a new standard violates BHS members' rights under the Fifth and Fourteenth Amendments.~~enforcement. ~~Therefore, d~~Delaying judicial review would subject ~~BHS' members~~Plaintiffs to

immediate, concrete, and irreparable ~~consequences~~harm, including the imminent risk of foreclosure, loss of property value, and deprivation of their investment-backed expectations. The State Action is not an adequate forum to remedy these constitutional injuries, as it is designed to enforce the very policy being challenged and cannot provide the full declaratory and injunctive relief sought here.

~~23~~43.   Venue is proper in this ~~d~~District ~~under~~pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to ~~this action have~~the claims occurred~~, and will continue to occur,~~ in this ~~d~~District~~,~~. ~~and much of the property that is the subject of this action is situated in this district.~~Specifically, the Targeted Buildings owned by the Plaintiff LLCs are located in this District; the challenged regulatory actions and enforcement proceedings have been directed at properties and owners within this District; and the harm to Plaintiffs' property interests is being suffered here. Additionally, Defendant resides in this District for purposes of venue.

**<u>FACTUAL ALLEGATIONS</u>**[3]

I.   **NEW YORK'S RENT-STABILIZED BUILDINGS HAVE SERIOUSLY DEGRADED**

~~24~~44.   In New York City, approximately 996,600 apartments—representing about 41% of the total rental units—are rent stabilized.[4]

~~25~~45.   Approximately 80% of buildings with rent-stabilized units were built before 1974. More than half were built before 1947.[5]   The median age of all residential buildings in NYC is nearly 80 years.[6]

---

[3] The facts herein are pled on information and belief, with sources noted where appropriate.

[4] NYC Div. Housing Preservation & Development, *2023 New York City Housing and Vacancy Survey, Selected Initial Findings* ("*Survey*"), at 5, available at https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023%20NYCHVS%20Selected%20Initial%20Findings.pdf.

[5] *Id.* at 3.

[6] *Id.* at 4–5.

26 46.  Maintenance deficiencies in rent-stabilized buildings have reached epic proportions.  Pre-1974 rent-stabilized units have 75% more problems than post-1974 units.[9][7]  These problems include water leaks, crumbling facades and foundations, heating and electrical breakdowns, blackouts, leaching asbestos, peeling lead paint, mold, non-functioning toilets and rodent infestation.[10][8]

27 47.  The primary reason for the deterioration of rent-stabilized buildings is obvious: owners of buildings with artificially capped rents cannot recover the cost of the improvements from the buildings' operating revenue.  Thus, the buildings are subject to chronic under- investment.

[5] The facts herein are pled on information and belief, with sources noted where appropriate.
[6] NYC Div. Housing Preservation & Development, *2023 New York City Housing and Vacancy Survey, Selected Initial Findings* ("*Survey*"), at 5, available at https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023%20NYCHVS%20Selected%20Initial%20Findings.pdf.
[7] *Id.* at 3.
[8] *Id.* at 4–5.
[9] Sean Campion, Director of Housing and Economic Development Studies, Citizens Budget Commission (Submitted to the New York City Rent Guidelines Board, May 22, 2025), at 2, *available at* https://cbcny.org/sites/default/files/media/files/CBCTESTIMONY_NYC-Rent-Stabilized_05222025_2.pdf.
[10] *See Survey, supra* n.6, at 32, 35–37.

2848.    A building's operating revenue is rent.  If the rent is artificially capped at a below-market rate, then buildings will not generate income to meet the substantial additional expense of renovating and maintaining an upgraded building.  The problem becomes worse with new regulatory requirements, which make building upgrades ever-more expensive.  This is just one of the dysfunctions of the rent-stabilization regime.

2949.    To address this problem, the New York State Legislature created an exemption to the rent-stabilization law to incentivize significant capital investments in substandard buildings, to wit, the SR: the SubRehab Program.

---

7 Sean Campion, Director of Housing and Economic Development Studies, Citizens Budget Commission (Submitted to the New York City Rent Guidelines Board, May 22, 2025), at 2, *available at* https://cbcny.org/sites/default/files/media/files/CBCTESTIMONY_NYC-Rent-Stabilized_05222025_2.pdf.

108 *See Survey, supra* n.64, at 32, 35–37.

## II. ~~DHCR'S PROGRAM TO SPUR~~ II. NEW YORK'S PROGRAM TO SPUR RENOVATIONS ~~OF~~ OF DEGRADED BUILDINGS

~~30~~50. Pursuant to the New York State Emergency Tenant Protection Act ("ETPA"),[~~11~~9] rent stabilization in New York City is governed by the ~~Rent Stabilization Code ("RSC"),[12]~~RSC,[10] promulgated by DHCR.

~~31~~51. ETPA § 5,[~~13~~1] titled "Housing accommodations subject to regulation," created an exemption from the rent-stabilization laws for buildings that have been "substantially rehabilitated" on or after January 1, 1974. *Id.* § 5(a)(5).

~~32~~52. The phrase "substantially rehabilitated" in ETPA § 5(a)(5) is not technical term of art. Rather, as the Appellate Division has held, it is a "general, commonly used [phrase] which may not be limited by judicial or administrative construction, and should be accorded [its] commonly understood meaning."[~~14~~12]

---

[~~11~~] ~~NY UNCON. LAWS §§ 8621–8634.~~

[~~12~~] ~~9 NYCRR §§ 2520–2530.~~

[~~13~~] ~~NY UNCON. LAWS §§ 8625.~~

[~~14~~] ~~*E. Pork Prods. Co. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 187 A.D.2d 320, 323 (1st Dep't 1992).~~

~~33~~53.    Implementing this section of the ETPA, DHCR promulgated RSC § 2520.11(e) to address the exemption from rent stabilization for "substantially rehabilitated" buildings.

~~34~~54.    The "substantial rehabilitation" exemption sought to spur widespread renovation of degraded buildings, which the regulation refers to as buildings in "substandard or seriously deteriorated condition."  RSC § 2520.11(e)(3).

~~35~~55.    This exemption was intended "to encourage landlords to renovate buildings," thus restoring units to the housing stock.[~~15~~13]

~~36~~56.    There are two requirements under the ~~SR~~SubRehab Program to qualify for the exemption:

[9] NY Uncon. Laws §§ 8621–8634.

[~~12~~10] 9 NYCRR §§ 2520–2530.

[~~13~~11] NY Uncon. Laws §§ 8625.

[~~14~~12] E. Pork Prods. Co. v. N.Y.S. Div. of Hous. & Cmty. Renewal, 187 A.D.2d 320, 323 (1st Dep't 1992).

[13] 22 CPS Owner LLC v. Carter, 84 A.D.3d 456, 457 (1st Dep't 2011).

a.  The rehabilitation must be done to a building that was in "substandard or seriously deteriorated condition," and

b.  Certain "building-wide and individual housing accommodation systems," such as plumbing, heating, electrical wiring, windows and roofs, must be replaced.— RSC

§ 2520.11(e)(1), (3).

## III.  ~~DHCR ISSUED~~ OFFICIAL DHCR GUIDANCE ~~TO ADMINISTER THE SR~~FOR THE SUBREHAB PROGRAM

~~37~~57.  The ~~SR~~SubRehab Program requirements appeared in DHCR's official guidance, to wit, an Operational Bulletin issued in 1995.[164] The Bulletin was the definitive agency guidance between December 1995 and November 2023~~.17~~ (the "Bulletin").[15]

### A.  The Bulletin's Two Criteria for Exemption under the ~~SR~~SubRehab Program

~~38~~58.  Courts have long held the Bulletin to be DHCR's authoritative guidance.[1816]

59.  DHCR was compelled to issue the Bulletin because of a lack of regulatory clarity. ~~15~~ *22 CPS Owner LLC v. Carter*, 84 A.D.3d 456, 457 (1st Dep't 2011). Before December 1995, courts struggled to define the circumstances under which ETPA § 8625(a)(5) permitted a building to be deemed "substandard or seriously deteriorated" before renovations began, and "substantially rehabilitated" by a Program participant's work thereafter.[17]

---

[1614] *See* DHCR Operational Bulletin 95-2 (1995), at 1, available at https://hcr.ny.gov/system/files/documents/2023/11/operational-bulletin-95-2.pdf.

[1715] On November 21, 2023, DHCR issued new guidance on substantial rehabilitation under the ETPA, Operational Bulletin 2023-3, which replaced Operational Bulletin 95-2 and eliminated the 80% vacancy presumption. ~~See supra~~ n.4.

[1816] *See H.M. Village Realty v. DHCR*, 304 A.D.2d 346, 347 (1st Dep't 2003) (observing that, "[i]n the seven years since the promulgation of Operational Bulletin 95-2, neither the courts nor the Legislature have disturbed DHCR's substantial rehabilitation criteria," and that the First Department "implicitly recognized the validity of those criteria" in a prior decision);

*446 Realty Co. v. Higbie*, 718 N.Y.S.2d 567, 570 (Civ. Ct. N.Y. Cty. 2000) ("Courts have struggled greatly over the years in seeking to define what work constitutes substantial rehabilitation sufficient to remove a building from the purview of the rent stabilization laws. In reaching a determination of whether or not a building is substantially rehabilitated pursuant to the ETPA [prior to 2023], DHCR employs Operational Bulletin 95–2."), *aff'd as modified*, 761 N.Y.S.2d 428 (App. Term, 1st Dep't 2003).

39.     DHCR was compelled to issue the Bulletin because of a lack of regulatory clarity. Before December 1995, courts struggled to define the circumstances under which ETPA § 8625(a)(5) permitted a building to be deemed "substandard or seriously deteriorated" before renovations began, and "substantially rehabilitated" by a Program participant's work thereafter.[19]

[17] *See, e.g., 81 Russell Street Assoc. v. Scott,* 625 N.Y.S.2d 400, 401 (App. Term, 2d Dep't 1995).

4060.　　Thus, on December 15, 1995, DHCR promulgated the Bulletin to "clarify the procedures the [DHCR] will use to determine issues of exemption from rent regulation due to substantial rehabilitation." (OB 95-2, at 1.)

4161.　　The Bulletin acknowledged that confusion about the law would cause the SRSubRehab Program to backfire by making owners unwilling to invest in deteriorated buildings.

4262.　　The Bulletin acknowledged that DHCR "has not previously issued any formal directive or clarification on this subject and the lack of such guidance has made it difficult for applicants to have an understanding of how an application for exemption will be treated." (OB 95-2, at 1.)

4363.　　The Bulletin also acknowledged that "potential applicants have indicated that uncertainty about our procedures could contribute to an unwillingness to undertake substantial rehabilitation projects in deteriorated buildings. Accordingly, lack of clear procedures works to prevent use of this mechanism as intended in law and regulation." (OB 95-2, at 1.)

Legislature have disturbed DHCR's substantial rehabilitation criteria," and that the First Department "implicitly recognized the validity of those criteria" in a prior decision); *446 Realty Co. v. Higbie*, 718 N.Y.S.2d 567, 570 (Civ. Ct. N.Y. Cty. 2000) ("Courts have struggled greatly over the years in seeking to define what work constitutes substantial rehabilitation sufficient to remove a building from the purview of the rent stabilization laws. In reaching a determination of whether or not a building is substantially rehabilitated pursuant to the ETPA [prior to 2023], DHCR employs Operational Bulletin 95-2."), *aff'd as modified*, 761 N.Y.S.2d 428 (App. Term, 1st Dep't 2003).

[19] *See, e.g., 81 Russell Street Assoc. v. Scott*, 625 N.Y.S.2d 400, 401 (App. Term, 2d Dep't 1995).

44~~44~~64.   To provide "clear procedures" for administering the ~~SR~~SubRehab Program, and to promote "use" of the ~~SR~~SubRehab Program "as intended in law and regulation," the Bulletin announced the Safe Harbor Provisions:

a.   **Building Condition**: if a building is 80% vacant at the time of construction, DHCR will presume it was "substandard or seriously deteriorated" unless vacancy was procured by arson or tenant harassment. (*Id.* at 2)

b.   **Scope of Renovation**: if an owner replaces 75% or more of the building-wide and apartment systems, DHCR will presume it qualified as a substantial rehabilitation. (*Id.* ~~at 2.~~))

45~~45~~65.   DHCR's creation of the Safe Harbor Provisions for the "substantial rehabilitation" of buildings in a "substandard or seriously deteriorated condition" was critically important because DHCR's authoritative pronouncement superseded judicial interpretations which, before the Bulletin, had required Program participants to make a particularized showing in every project.

66.    Although DHCR now claims these rules were "presumptions," which it was free to rebut, this claim is false.  In 30 years of oversight, i.e., before 2023, DHCR routinely considered and treated the Safe Harbor Provisions as dispositive and conclusive standards for qualification and program compliance.

B.    **What the Bulletin *Did Not* Say**

1.    ***The Bulletin Did Not Prohibit the Use of Buyout Agreements to Obtain 80% Vacancy***

~~46~~67.   Owners who wanted to substantially rehabilitate their rent-stabilized buildings, and who also wanted to be certain that their buildings satisfied DHCR's criteria for the ~~SR~~SubRehab Program, knew the buildings should be at least 80% vacant prior to commencing the rehabilitation work.

~~47~~68.   Moreover, substantial rehabilitation projects are generally easier, more comprehensive, and safer if the buildings are vacant before the work starts.

~~48~~69.   Accordingly, one common transaction in the real estate industry was for a landlord and tenant to enter into a "surrender agreement"—sometimes called a *buyout*—where the tenant

agrees to vacate the unit in exchange for some consideration, which could range from a modest amount covering moving expenses or a few months' rent, to cash payments of six-figures or more.

49~~70~~.    Tenants in degraded buildings may wish to move elsewhere but may lack the resources to move or to pay higher rent in a desirable environment.  The cash payments from a buyout can unlock the door to a better life for these tenants.

~~50~~71.   Crucially, neither DHCR's regulations nor its official guidance in the Bulletin mention, much less prohibit, buyouts.  DHCR never promulgated rules to provide for regulatory review or approval of buyout agreements.  That remains true to this day.

~~51~~72.   As relevant here, the Bulletin *does not* preclude or limit the use of buyouts to obtain vacancies in order to make a project qualify for the 80% vacancy presumption.

~~52~~73.   To the contrary, the Bulletin expressly provided two—and only two—grounds for rebutting the presumption: if a program participant committed (and was convicted of) arson or if DHCR made an express finding of tenant harassment.[~~20~~18]

~~53~~74.   More to the point, DHCR regulatory oversight permitted ~~SR~~SubRehab Program participants to negotiate buyout agreements with tenants, so long as those agreements were not procured through threats or harassment.  This was true for almost ~~true for almost~~ 30 years (~~1995–December~~ 1995– November 2023).

~~54~~75.   Indeed, so-called "buyout agreements" were common and widely used in the New York City real estate industry.[~~21~~19]

76.     In short, DHCR's policy was to count vacancies procured by buyouts as part of the 80% vacancy presumption, without interrogation or regulatory scrutiny.

~~56~~77.   DHCR's policy was repeatedly reaffirmed, *inter alia*, in sworn affidavits, DHCR agency decisions, DHCR Fact Sheets, and industry guidance.  As examples:

---

[~~20~~18] "DHCR will not find the building to have been substantially rehabilitated if it can be established that [i] the owner has attempted to secure a vacancy by an act of arson resulting in criminal conviction of the owner or the owner's agent, and/or [ii] DHCR has made an outstanding finding of harassment . . . ."  (OB 95-2, at 2)

[~~21~~19] *See* Marc Santora, *The Lucky Break of Rent Stabilization*, N.Y. TIMES (Feb. 4, 2011), available at https://www.nytimes.com/2011/02/06/realestate/06cov.html.

55. ~~In short, DHCR's policy was to count vacancies procured by buyouts as part of the 80% vacancy presumption, without interrogation or regulatory scrutiny.~~

56. ~~DHCR's policy was repeatedly reaffirmed, *inter alia*, in sworn affidavits, DHCR agency decisions, DHCR Fact Sheets, and industry guidance. As examples:~~

a. **Sworn Statement**: In determining program eligibility for a program participant, DHCR Attorney Patrice Huss submitted a sworn affidavit, dated April 23, 2021, in which she counted units rendered vacant through buyout agreements in calculating whether a building was 80% vacant at the time of construction.[~~22~~20]

b. **DHCR Agency Decisions**: A consistent pattern of decisions applying the 80% vacancy Safe Harbor, without any inquiry into whether vacancies were obtained through buyout or surrender agreements:

    i. **2004**: DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[~~23~~21]

    ii. **2005**: DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[~~24~~22]

    iii. **2008**: DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.[23]

[22][20] *See 852 Hart LLC v. DHCR*, Index No. 502737/2021, NYSCEF Doc. No. 27, Answering Affirmation of Patrice Huss in Opposition to Article 78 Petition, dated Apr. 23, 2021, at ¶ 26.

[23][21] *In the Matter of 445 17th Street*, Docket No. RJ210007UC (10/13/04).

[24][22] *In the Matter of Akpan*, Docket No. SF210002UC (5/19/2005).

[23] *In the Matter of Cholakian*, Docket No. VG210054RO (1/9/2008).

iii. ~~2008: DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.~~[25]

iv. **2010**: DHCR applied the 80% vacancy presumption, without inquiry into whether vacancies were procured with buyout agreements.~~[26]~~[24]

v. ~~2016: DHCR declared an apartment exempt from rent regulation, overruling a tenant's complaint~~**And it continued**: The above shows that DHCR's historical acceptance of buyouts was not merely passive silence; it was a matter of explicit agency ruling. And it continued through the years until November 2023. For example, in Matter of the Administrative Appeal of Amos Fisher (Docket No. BO210007UC, May 18, 2016), a tenant challenged the substantial rehabilitation exemption specifically on the grounds that the owner used a buyout agreement to procure a vacancy.[27] DHCR rejected this challenge. The agency ruled that because "it is not contested that the building was more than 80% vacant," the Safe Harbor provision in Operational Bulletin 95-2 "dictated" that the building was presumed substandard. DHCR held that the existence of the surrender agreement was irrelevant to the presumption.[25]

vi. These authorities confirm that, contrary to Defendant's current litigation position, DHCR's controlling interpretation for decades was that vacancies obtained via non-harassing buyouts contributed validly to the 80% threshold.

[24] *In re Matter of Various Tenants of 505 Lafayette Avenue*, Docket No. WE2100022RT (5/7/2010).

[27][25] *In re Appeal of Amos Fisher*, Docket No. BO210007UC (5/18/2016).

c. **Fact Sheets**: In 2019, DHCR issued a "Fact Sheet" to the real estate community, stating that the 80% vacancy rule applied unless there had been a "criminal conviction of the owner or the owner's agent" for arson or an actual agency "finding" of tenant harassment, precluding DHCR from failing to apply the presumption where a vacancy followed a voluntary tenant buyout.[28][26]

d. **Industry Guidance**: Over the years, many lawyers advertised to tenants about their right to seek buyouts of rent-stabilized leases. Other lawyers also provided guidance to developers to retain buyout agreements as proof

[25] *In the Matter of Cholakian*, Docket No. VG210054RO (1/9/2008).
[26] *In re Matter of Various Tenants of 505 Lafayette Avenue*, Docket No. WE2100022RT (5/7/2010).
[27] *In re Appeal of Amos Fisher*, Docket No. BO210007UC (5/18/2016).
[28] DHCR Fact Sheet #38 (Substantial Rehabilitation), available at https://hcr.ny.gov/system/files/documents/2025/06/fact-sheet-38-06-2025.pdf.

of vacancy, all confirming DHCR's policy was to allow and count them toward the 80% vacancy Safe Harbor.[29][27]

57[78].    Not only did DHCR policy and practice explicitly and implicitly accept that buyout agreements play a legitimate role in a rent-regulated building becoming at least 80% vacant, but other guidance from DHCR and NYAG also sanctioned the use of buyouts in rent-regulated buildings. For example:

58[a].    DHCR uses a form titled "Report and Certification to Alter or Demolish Rent Controlled Occupied Housing Accommodations," which alerts tenants to their right to "negotiate an agreement with your owner for the voluntary surrender" of their rent-controlled apartments.[30]

59.    NYAG's Department of Law issued a Memorandum in 2015, titled "Tenant Buyouts,"[31] which defines a "buyout agreement" as "a private contract between a building owner and a tenant under which the tenant agrees to surrender their unit in return for some consideration, usually a lump sum payment." The Memorandum then explains that the Department of Law is "permitting buyout offers to be made to tenants in rent-regulated units, under certain circumstances and with certain disclosures."

---

[26] DHCR Fact Sheet #38 (Substantial Rehabilitation), available at https://hcr.ny.gov/system/files/documents/2025/06/fact-sheet-38-06-2025.pdf.

[29][27] For examples of lawyers offering guidance to tenants about buyout transactions, see https://alblawfirm.com/press-mentions/can-i-still-get-a-buyout-of-my-rent-stabilized-apartment/; https://www.queenslandlordtenantlaw.com/landlord-tenant-law/lease-buyout-agreements/; https://www.singhranilaw.com/post/understanding-and-negotiating-buyout-agreements.                    For examples of due diligence concerning retention of buyout agreements as proof of program

requirements, see Rent Stabilization Due Diligence for Multifamily Buildings, available at https://itkowitz.com/booklets/Rent-Stabilization-Due-Diligence-for-Multi-Family-Acquisitions.pdf.

to their right to "negotiate an agreement with your owner for the voluntary surrender" of their rent-controlled apartments.[30][28]

59b.    NYAG's Department of Law issued a Memorandum in 2015, titled "Tenant Buyouts,"[31][29] which defines a "buyout agreement" as "a private contract between a building owner and a tenant under which the tenant agrees to surrender their unit in return for some consideration, usually a lump sum payment."  The Memorandum then explains that the Department of Law is "permitting buyout offers to be made to tenants in rent-regulated units, under certain circumstances and with certain disclosures."

79.    Even in the context of prior enforcement actions, NYAG explicitly permitted buildings owners to offer tenants buyout agreements.[30]

80.    Given this context, it is no surprise that DHCR and NYAG's treatment of Plaintiffs stands in stark contrast to their prior enforcement practices, revealing arbitrary and discriminatory application of purportedly uniform regulatory standards.  This disparate treatment is most clearly demonstrated by comparing the State Action here to DHCR and NYAG's 2022 investigation and settlement with Company A, the city's largest developer using the SubRehab Program.  The investigation of Company A resulted in an Assurance of Discontinuance ("AOD").  Although not all details of the investigation are publicly available, several contemporaneous media articles make clear that Company A's tenants filed specific complaints about the illegal deregulation of rent-

---

[30][28] DHCR Form RC-50, available at https://hcr.ny.gov/system/files/documents/2021/06/rc-50- fillable.pdf.
[31][29] Available at https://ag.ny.gov/sites/default/files/tenant_buyouts_7-9-2015.pdf.

60. ~~Even in the context of prior enforcement actions, NYAG explicitly permitted buildings owners to offer tenants buyout agreements.~~[32]

61. ~~BHS' members reasonably relied on these authoritative regulatory interpretations.~~

---

[30] *See, e.g.*, *People v. Croman*, Index No. 450545/2016, NYSCEF Doc. No. 155, Consent Decree (Amended) (Aug. 9, 2018), at 3, 47; *People v. Toledano*, Index No. 450919/2019, NYSCEF Doc. No. 11, Consent Order and Judgment (June 20, 2019), at 2, 9–10 (allowing buyouts with compliance assurances).

stabilized units,[31] which was not true with Plaintiffs.  But the AOD illuminates three aspects of DHCR and NYAG's arbitrary enforcement when compared with the State Action: disparate findings, disparate outcomes, and arbitrary enforcement:

    a.  **Disparate Findings.**  NYAG's investigation of Company A uncovered conduct far more serious than anything alleged against PCA or the LLC Plaintiffs in the State Action:

        i.  **Tenant Harassment**: Company A procured tenant vacancies to qualify for the 80% vacancy presumption using methods that NYAG characterized as involving tenant harassment.  The State Action makes no allegation of tenant harassment against Plaintiffs.

        ii.  **Regulatory Violations and Tenant Complaints**: During the renovation work, Company A committed numerous regulatory violations (1,200 open Housing Maintenance violations and 716 construction-related violations), resulting in many more tenant complaints, including violations that disrupted essential services (heat, hot water, electricity) in multiple buildings.  The State Action makes no similar allegations against Plaintiffs.

        iii.  **Rent Overcharges**.  Company A increased rents for rent-stabilized tenants who remained in occupancy during the renovations, which the law forbids.  *See* RSC § 2520.11(e)(5) (restricting rent increases

---

[31] *See, e.g.*, Cavanaugh, *supra* n.2 ("Greenbrook was getting sued by New York City over housing violations and by tenants claiming their apartments had been unlawfully removed from rent stabilization.").

for occupied rent-stabilized apartments).  The State Action makes no similar allegations against Plaintiffs.

    iv.  **Construction Code Violations**: Company A engaged in extensive unpermitted construction work, failed to file required Tenant Protection Plans, and created unsafe conditions during renovation.  The State Action does not allege that Plaintiffs engaged in such conduct.

    v.  **Building Maintenance Failures**: Company A failed to maintain its properties, neglected tenant repair requests, and failed to provide essential services during the rehabilitation period.  The State Action does not allege that Plaintiffs failed to maintain their properties or neglected tenant needs.

b.  **Disparate Outcomes.**  Despite the serious findings against Company A detailed above, DHCR and NYAG, as part of the AOD, did **not** require Company A to re-register as rent-stabilized **any** of its deregulated apartments.  By contrast, the State Action demands the forced re-regulation of **ALL** of Plaintiffs' 159 deregulated apartments across the 31 Targeted Buildings, despite the absence of comparable wrongdoing.

c.  **Arbitrary Enforcement.**  The disparate treatment cannot be explained by any meaningful factual distinction:

    i.  **Portfolio Size and Alleged "Profiteering"**: Company A's portfolio was much larger than Plaintiffs', with over 60 buildings specifically listed in the AOD and additional properties referenced.  Company A

sold at least 19 buildings for approximately $112 million to another developer, yet Company A (unlike Plaintiffs) was not accused of "profiteering" or operating an exploitative business model.

ii. **Building Characteristics**: Company A's portfolio included many buildings that are substantially identical to the Targeted Buildings in age, physical condition, size, locations, and scope of renovations required.

iii. **Use of the 80% Vacancy Presumption**: Like Plaintiffs, Company A relied on the 80% vacancy presumption established in OB 95-2 to qualify its buildings for the SubRehab Program exemption.

d. In sum, the AOD shows the malign disparity. DHCR and NYAG applied a lenient form of the actual regulatory standards in effect at the time against Company A—permitting deregulation to stand despite findings of serious misconduct. DHCR and NYAG are now selectively applying a retroactive and restrictive set of standards against PCA and LLC Plaintiffs, who engaged in none of the problematic conduct found in Company A's case. This arbitrary and disparate enforcement violates those plaintiffs' constitutional rights to equal protection and due process.

e. DHCR's and NYAG's retaliatory action against LLC Plaintiffs and PCA, by filing the State Action, cannot be explained by any new factual findings against those plaintiffs in the six-day window between the filing of this action and the filing of the State Action. Both DHCR and NYAG were

obviously on notice of this Action. They made no new findings against PCA or the LLC Plaintiffs in that six-day window.

81.     More broadly, BHS's members had no notice, and no reason to believe, that the rules of the substantial rehabilitation exemption were not DHCR's promulgated rules and guidance, but rather were malleable and discretionary policies that would be retroactively applied to achieve the desired result: re-regulation of formerly rent-stabilized buildings, especially ones that had recently been dramatically upgraded. Indeed, the DHCR's actions were a *stark departure from DHCR's prior enforcement practices*, as demonstrated in their settlement with Company A.

### 2.     *The Bulletin Did Not Have an "Uninhabitability" Requirement*

~~62~~82.   The Bulletin did not define the phrase "substandard or seriously deteriorated," but the circumstances of adoption make clear that the phrase "substandard or seriously deteriorated" did *not* mean "uninhabitable."

~~63~~83.   The Bulletin "recognize[d] a recent court decision" (apparently a reference to *Eastern Pork*), which held that "a building did not have to be completely vacant to qualify for [the substantial rehabilitation] exemption       "~~33~~32

~~64~~84.   To address how building vacancy pertained to the "substandard condition" requirement, DHCR did *not* set forth discretionary standards or a qualitative multifactor test. Rather, DHCR announced a bright-line, easy to administer rule that the agency, owners, and courts could understand and apply—the 80% vacancy presumption. Provided there was no showing of arson or tenant harassment, demonstrating at least 80% vacancy was sufficient proof of substandard condition.~~34~~33

---

[32] OB 95-2, at 1.
[33] OB 95-2, at 2.

85. According to DHCR's own bright-line rule, *substandard* cannot mean

*uninhabitable* because a building can be substandard while still having 20% occupancy.

---

[32] *See, e.g.*, *People v. Croman*, Index No. 450545/2016, NYSCEF Doc. No. 155, Consent Decree (Amended) (Aug. 9, 2018), at 3, 47; *People v. Toledano*, Index No. 450919/2019, NYSCEF Doc. No. 11, Consent Order and Judgment (June 20, 2019), at 2, 9–10 (allowing buyouts with compliance assurances).

[33] OB 95-2, at 1.

[34] OB 95-2, at 2.

66 86.    For this reason, in the period between 2004 and 2023, DHCR accepted that many projects qualified for the substantial rehabilitation exemption even though tenants still lived in those buildings.  Thus, those buildings were not "uninhabitable."[35 34]

67 87.    The Bulletin explicitly addresses the topic by stating that, if a unit is not rehabilitated because it remains occupied while the rest of the building is rehabilitated, then the unit remains rent regulated.[36 35]

68 88.    Tellingly, the Bulletin uses the term "habitable condition" elsewhere,[37 36] showing that DHCR was aware of the term and could have used it to define building conditions that are or are not substandard.  But DHCR chose not to use that term.

69 89.    If DHCR's Bulletin or RSC § 2520.11(e) meant "uninhabitable" by "substandard or seriously deteriorated," then they would have said "uninhabitable"; they would not have created a presumption of substandard condition upon a showing of 80% vacancy.  The Bulletin and the regulation could have referenced the definition of habitability, *see* N.Y. Real Prop. § 235-b or required 100% vacancy or a vacate order (full or partial) or some other finding of uninhabitability.  Again, DHCR did no such thing.

70 90.    BHS's members reasonably relied on these authoritative regulatory interpretations.

---

[35 34] *See, e.g.*, *Copeland v. New York State Div. of Hous. & Cmty. Renewal*, 623 N.Y.S.2d 505, 511 (Sup. Ct. Kings Cnty. 1994) ("Allowing landlords to raise the rents on *substantially all* apartments will provide sufficient incentive to landlords to 'rehabilitate' substandard housing stock, while protecting continuously occupying tenants against the monumental intrusion imposed, willy-nilly, by destabilized rent.").

[36 35] OB 95-2, § I.F., at 2.  RSC § 2520.11(e)(6 5) incorporated the same point, *i.e.*, that tenants may remain in their units during a substantial rehabilitation.

[37 36] OB 95-2, IV, at 3.

**C.    DHCR Administered the Mandatory 80% Presumption Consistent with the Actual Text of the Regulation for Almost 30 Years**

~~71~~91.    In 2000, five years after issuing guidance in the Bulletin on the criteria for satisfying the substantial rehabilitation exemption, DHCR promulgated parallel regulations that were incorporated into the Rent Stabilization Code, at 9 NYCRR § 2520.11(e).

~~72~~92.    In particular, the mandatory 80% vacancy presumption was incorporated into the RSC: "Where the rehabilitation was commenced in a building in which at least 80 percent of the housing accommodations were vacant of residential tenants, <u>there shall be a presumption</u> that the

building was substandard or seriously deteriorated at that time."  RSC § 2520.11(e)(3) <u>(2000)</u> (emphasis added).

~~73~~93.    DHCR's regulations also incorporated the two and only two grounds for overcoming the presumption: "except in the case of extenuating circumstances, the DHCR will not find the building to have been in a substandard or seriously deteriorated condition where it can be established that the owner has attempted to secure a vacancy by <u>an act of arson resulting in</u>

<u>criminal conviction of the owner or the owner's agent</u>, or <u>the DHCR has made a finding of harassment</u> . . . ."  RSC § 2520.11(e)(4) <u>(2000)</u> (emphasis added).

~~74~~94.    Notably, DHCR did not include any general or policy-oriented catch-all basis to rebut the 80% vacancy presumption.  It did not declare that buyouts were invalid, despite being on notice of their widespread use.  It incorporated no requirement of uninhabitability.

~~75.    For many years after the Bulletin was issued in 1995, and the regulations were adopted in 2000, DHCR consistently and repeatedly applied the 80% vacancy presumption, and recognized two and only two grounds for rebutting the presumption:  arson and harassment.  It never suggested that buyouts disqualify a project from the 80% vacancy presumption.~~

95. For nearly thirty years, DHCR's administrative decisions consistently held that the 80% vacancy rate was not merely a proxy for condition, but conclusive legal proof of it, effectively barring any requirement to prove physical 'uninhabitability.' For example:

~~76. For example, in~~a. In *Matter of Various Tenants of 505 Lafayette Avenue*, Docket No.

XJ210022RT (May 7, 2010), DHCR denied tenants' challenge of an

owner's application for deregulation based on a substantial rehabilitation, where "the underlying record supports the owner's contention that at least 80% of the subject building was vacant *giving rise to the presumption* that the building was 'substandard or seriously deteriorated' prior to rehabilitation" (emphasis added).

77b.     In *Matter of the Administrative Appeal of Lorraine St. Pierre*, Docket No. AO410028RT (July 31, 2014), DHCR denied a tenant's challenge to the approval of owner's application for exemption due to substantial rehabilitation, where "[i]t is uncontested that the building was vacant when the rehabilitation work was performed in 1984-1986 and, *as such*, was

in a

substandard or seriously deteriorated condition" (emphasis added).  DHCR also noted that "[t]he fact that the building was vacant at the time of the rehabilitation is proof that the building was in [substandard or seriously deteriorated] condition."

78c.     In *Matter of the Administrative Appeal of Amos Fisher*, Docket No. DT210040RT (May 18, 2016), DHCR denied a challenge by a tenant to the deregulation of the building, where "it [wa]s not contested that the building was more than 80% vacant of residential tenants at the relevant time." Despite acknowledging that the last tenant in the building "moved out of the premises pursuant to a surrender agreement," DHCR nonetheless concluded without any inquiry into the departure of the other five tenants, that because the building was "more than 80% vacant," OB 95-2 dictated that "the building is presumed to have been 'substandard or seriously

deteriorated at that time,' and the owner was permitted to commence the substantial rehabilitation at issue."

79d. In *Matter of the Administrative Appeal of Edwina Stroud*, Docket No.

FV210027RT (June 14, 2018), DHCR denied a tenant's challenge to the deregulation of the

building due to substantial rehabilitation, where DHCR rejected the tenant's allegation that the building was not in substandard condition because an engineer's affidavit stated that the building was vacant when the rehabilitation commenced, and "[s]uch evidence satisfies the Operational Bulletin requirement that the building was in substandard or seriously deteriorated condition at the time the work commenced." DHCR also noted that "[t]he fact that the building was vacant at the time of the rehabilitation is proof that the building was in [substandard or seriously deteriorated] condition."

8096. In every one of these cases and others, DHCR reinforced that the 80% vacancy rule was a safe harbor for project participants.

97. By now demanding proof of 'uninhabitability' for these same projects, the agencies are retroactively imposing a burden of proof that their own appellate decisions explicitly held did not exist.

8198. It was extremely important to the public and to courts for DHCR's positions to be clearly set forth first in the Bulletin and then in RSC § 2520.11(e) because the rent stabilization laws are notoriously confusing and opaque. The Court of Appeals has "described the patchwork-

of rent-control legislation as 'an impenetrable thicket, confusing not only to laymen but to lawyers.'"[3837]

8299. Between 1995 and about 2022, based on DHCR's promulgated regulations and practice, the New York City real estate community—including owners, investors, brokers, attorneys, and former DHCR personnel—understood and acted in reliance on DHCR's policy position that buyout agreements counted towards the 80% vacancy presumption. Indeed, the leading lawyer in SubRehab work publicly described the program plainly: "**self-operating**, meaning if the developer did the work, the building would be exempt."[38]

83100. DHCR treated 80% vacancy, unless caused by proven arson or tenant harassment, as conclusive and did not pretend that there were other exceptions to the presumption.

---

[38] *City of New York v. New York State Div. of Hous. & Cmty. Renewal*, 97 N.Y.2d 216, 219 (2001).

84101.  DHCR did not purport to disqualify vacancies based on secret criteria outside its promulgated regulation.

85102.  DHCR's consistent approach to the SRSubRehab Program gave the real estate market sufficient certainty to be incentivized to make capital investments on the understanding that the rehabilitated buildings would be deregulated.

## IV.  DHCR BEGINS A *RETROACTIVE* ENFORCEMENT CAMPAIGN TO CLAW BACK SUBSTANTIALLY REHABILITATED BUILDINGS

### A.  DHCR's Novel Presumptions

86103.  In 2019, the New York State Legislature passed the Housing Stability and Tenant Protection Act, which eliminated several paths to deregulate rent-stabilized buildings.  These changes made it even harder for owners to recoup their investments in renovating substandard residential housing stock.

---

[37] *City of New York v. New York State Div. of Hous. & Cmty. Renewal*, 97 N.Y.2d 216, 219 (2001).

[38] *See* Cavanaugh, *supra* n.2 (emphasis added).

87104. The ~~SR~~SubRehab Program remained the last available avenue to de-regulate apartments in exchange for substantial renovations.

88105. But ~~DHCR~~, as "tenant protection" became more politically popular (in part because of tenant-group organizing), DHCR started to quietly ~~began~~ dismantl~~ing~~e the ~~SR~~SubRehab Program on its own.

89106. ~~From about 2021 to~~In or around 2023, without notice, public comment, or promulgation of regulatory amendments, DHCR began to challenge substantial rehabilitations on grounds that contradicted its own regulations, almost 30 years of enforcement policy, and the investment-backed expectations of building owners.

90107. DHCR began attacking already completed substantial rehabilitations by making up new criteria and flipping the burden of proof.

91108. For example, DHCR began taking the position that vacancies pursuant to buyout agreements did not count towards the 80% vacancy presumption.

92109.  This is not hypothetical or speculative.  For example, in a 2023 administrative appeal, DHCR looked past the owner's proof of 80% vacancy, refused to apply the presumption, and focused instead, not on arson or harassment, but on the fact that five of the six apartments had been vacated pursuant to buyout agreements.[39]  In so doing, DHCR applied a new presumption: if there were tenant buyouts, then the building presumptively was *not* in substandard condition.

93110.  In other words, DHCR now presumes that the very fact that a tenant vacated pursuant to a buyout agreement means that the units in the building had value and were habitable.  This turns OB 95-2 and RSC § 2520.11(e) on their heads by placing additional requirements on

---

[39] *See Matter of the Administrative Appeal of Cypress Hills Ventures LLC*, Docket No. LQ11007RO (July 24, 2023).  DHCR decisions cited herein are collected in Exhibit 21.

the 80% vacancy presumption that do not exist, *i.e.*, that the 80% number cannot include buyouts and, even if the 80% number did not include buyouts, the owner must also prove uninhabitability.[40]

~~94~~111.  That is, DHCR—shortly after resolving Company A's matter without any requirement of re-regulating units removed from the rent-stabilization program—began demanding that owners show that the buildings were essentially uninhabitable prior to the rehabilitation work, regardless of whether the owner had proven 80% vacancy.

~~95~~112.  In one brief, filed in 2023, DHCR went so far as to cite a 30-year-old unpublished local civil court's decision, issued before the 80% vacancy presumption was established, to argue that a building must be *uninhabitable* in order to qualify as substandard.[41]  DHCR cited that case despite the fact that the First Department had long ago rejected the contention that *substandard* meant *uninhabitable*.[42]  The appellate court held that DHCR could not condition the substantial rehabilitation exemption on the "'gutting' of an entire, *vacant building*," and in attempting to do so, DHCR had "employed overly rigid standards which are inconsistent with the intent and language of the statute, and unreasonable."[43]  If the Legislature had intended the exemption only to apply if "all apartments and rooms are vacant," then "the Legislature could easily have so specified."[44]

---

[39]  ~~*See Matter of the Administrative Appeal of Cypress Hills Ventures LLC*, Docket No. LQ11007RO (July 24, 2023).  DHCR decisions cited herein are collected in Exhibit 2.~~

[40]  *See also, e.g., Matter of the Administrative Appeal of 219 Troutman LLC*, Docket No. LO210030RO (June 6, 2023) (holding that "a majority of the apartments in the subject building were in fact habitable prior to the work at issue, as shown by the fact that the vacancies of said apartments were obtained by surrender agreements providing for substantial payments      ").

[41]  *See In the Matter of the Application of 245 Sullivan Ave LLC v. N.Y.S. Div. of Housing and*

*Community Renewal*, No. 524550/2023, 2023 WL 11997153 (Sup. Ct. N.Y. Cnty. Nov. 1, 2023). [42] *E. Pork Prods. Co. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 187 A.D.2d 320, 324–25 (1st Dep't 1992).

meant *uninhabitable*.[42] The appellate court held that DHCR could not condition the substantial rehabilitation exemption on the "'gutting' of an entire, *vacant building*," and in attempting to do so, DHCR had "employed overly rigid standards which are inconsistent with the intent and language of the statute, and unreasonable."[43] If the Legislature had intended the exemption only to apply if "all apartments and rooms are vacant," then "the Legislature could easily have so specified."[44]

[43] *Id.* at 325 (emphasis added).
[44] *Id.* at 323.

~~96~~113. In another administrative appeal from 2024, DHCR likewise took the position that only uninhabitable buildings can be in substandard condition, treating the mandatory 80% vacancy presumption ("there shall be a presumption") as an optional proxy for substandard housing, rather than according the 80% vacancy presumption the force of law.[45]

~~97~~114. As alleged above, RSC § 2520.11(e) sets forth explicitly the 80% vacancy presumption, as well as the two (and only two) grounds for rebutting that presumption (arson and tenant harassment).

~~98~~115. Although RSC § 2520.11(e) provided that the criteria set forth in the regulation, § 2520.11(e)(1)–(10), may, at the DHCR's discretion, "be effectuated by operational bulletin," the regulation did not give DHCR the power to invent new criteria as it pleases.

~~99~~116. Without amending its regulations and without issuing new guidance, DHCR simply created new policies, backed by threats of enforcement action, namely: (a) if a tenant vacated a unit pursuant to a buyout agreement, the building must not have been in substandard or seriously

---

[42] ~~*E. Pork Prods. Co. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 187 A.D.2d 320, 324–25 (1st Dep't 1992).~~
[43] ~~*Id.* at 325 (emphasis added).~~
[44] ~~*Id.* at 323.~~
[45] ~~*See Matter of the Administrative Appeal of Creas, Inc.*, Docket No. MN210018RO (Oct. 30, 2024).~~

deteriorated condition; and (2) every unit in a substandard or seriously deteriorated building must be uninhabitable.  Neither of DHCR's novel presumptions are the law, and in fact both are *contradicted* by the law.  *See supra* ¶¶ 71–85.Section III.B-C.

100.   DHCR has applied its new, unlawful standards to BHS members, holding that vacancies pursuant to buyout agreements do not count towards the 80% vacancy presumption and, even where the 80% vacancy threshold is satisfied without buyout agreements, demanding a showing the buildings were *uninhabitable* in order for DHCR to deem them substandard or seriously deteriorated, effectively gutting the Safe Harbor Provisions.

10017.   DHCR's Operational Bulletin, regulations, and prior enforcement practice have not deterred the DHCR Office of Rent Administration from repeatedly asserting in recent administrative appeals that, *even if the owner demonstrates 80% vacancy*, and even without any proof of arson or tenant harassment in rebuttal, an owner must still demonstrate that the building was *uninhabitable* in order to satisfy the requirement that the building is in substandard or seriously deteriorated condition.

---

[45] *See supra* ¶ 93.*Matter of the Administrative Appeal of Creas, Inc.*, Docket No. MN210018RO (Oct. 30, 2024).

102118. Accordingly, it is clear that DHCR intends, through administrative action and litigation, to try to erase 30 years of its own substantial rehabilitation precedent and practice by pretending the 80% vacancy presumption was never the law.

103119. These sorts of retroactive changes are precisely what the New York Court of Appeals invalidated in *Regina Metro. Co. v. DHCR*, which held, under the Housing Stability and Tenant Protection Act of 2019, that "enforcement provisions may not be applied retroactively."[46] Such action "would impose new liability . . . altering substantive rights in multiple ways      "[47]

---

[46] 35 N.Y.3d 332, 350 (2020).
[47] *Id.* at 367.

**B.      DHCR Amends RSC § 2520.11(e) and Issues New Operational Bulletin 2023–3**

1~~20~~4.     In August 2022, DHCR published proposed regulatory changes in the State Register for public review and comment. Most significantly, DHCR proposed to eliminate the 80% vacancy presumption.[48]  This was just two months before DHCR and NYAG settled their investigation of Company A without any requirement of re-regulating apartments and despite their finding that Company A used buyouts (sometimes constituting tenant harassment) to procure vacancies.

~~105~~121. In connection with this publication, DHCR also included a Regulatory Impact Statement, dated August 16, 2022, which confirmed that the 80% vacancy presumption had long *required* the finding of substandard condition absent arson or harassment: "A presumption regarding the deteriorated condition of the premises due to being at least 80% vacant is repealed as the [presumption] seemingly rewards keeping units off the market, in favor of *making a true factual evaluation of the circumstances surrounding the vacancies*."[49]

---

[46] 35 N.Y.3d 332, 350 (2020).

[47] *Id.* at 367.

[48] *See* 8/31/22 N.Y. St. Reg. HCR-35-22-00007-P (referring to DHCR website for additional reports), available at https://dos.ny.gov/system/files/documents/2022/08/083122.pdf.

[49] DHCR Regulatory Impact Statement, Rent Stabilization Code, at ~~16~~14, available at https://hcr.ny.gov/system/files/documents/2022/08/rsc-reg-impact-stmt-ris-8.16.22.pdf (emphasis added).

~~106.~~122.     That is to say, "making a true factual evaluation of the circumstances surrounding the vacancies" is the *new* policy enacted in the regulatory change.  DHCR's own explanation of

the new regulation admitted that, under the prior regulation, the 80% vacancy presumption required a finding of substandard condition without evaluating "the circumstances surrounding the vacancies."

~~107~~123.Thus, DHCR's publication confirmed that the 80% vacancy rule had operated as a ~~s~~Safe ~~h~~Harbor for project participants.

124.     The proposed changes to RSC § 2520.11(e) took effect November 8, 2023, after work on the Targeted Buildings was completed and most of the units were already occupied by free-market tenants.

~~108~~125.To this day, DHCR has not promulgated regulations addressing buyouts, or stating that a unit can only be in substandard condition if it is uninhabitable or requiring owners to file substantial rehabilitation exemption applications for projects initiated prior to ~~January~~November ~~1~~8, 202~~4~~3.

~~[48] *See* 8/31/22 N.Y. St. Reg. HCR-35-22-00007-P (referring to DHCR website for additional reports), available at https://dos.ny.gov/system/files/documents/2022/08/083122.pdf.~~
~~[49] DHCR Regulatory Impact Statement, Rent Stabilization Code, at 16, available at https://hcr.ny.gov/system/files/documents/2022/08/rsc-reg-impact-stmt-ris-8.16.22.pdf (emphasis added).~~

109126.On November 21, 2023, DHCR replaced Operational Bulletin 95-2 with a revised

Operational Bulletin 20023-2, dated November 21, 20233, mainly to eliminate the 80%

vacancy presumption. Thus, the new rule—scrapping the 80% presumption—became effective

no earlier than November 8, 2023, and had no relevance to projects completed before that date.

110127.As noted elsewhere, all of the BHS members commenced and completed— work

on the buildings prior to November 21, 2023.8, 2023.[50]

---

[50] The Targeted Buildings named in the State Action complaint were completed between January 3, 2020 and September 19, 2023.

**V.** ~~ETPA § 8625(e) WAS AMENDED TO PLACE NEW~~ <u>FURTHER LEGISLATIVE</u> **RESTRICTIONS** ~~ON THE~~ <u>ON THE</u> **SUBSTANTIAL REHABILITATION EXEMPTION**

~~111~~128. On December 22, 2023, the New York State Legislature amended ETPA

§ 8625(a)(5) by adding several qualifications to the provision that created the substantial rehabilitation exemption to the rent stabilization laws.

~~1~~129. The Legislature initially passed a version of § 8625(a) that required owners claiming exemption from rent stabilization to seek prior approval from DHCR~~,~~ *and made this application requirement retroactive*. Owners of "any building previously alleged to have been substantially rehabilitated" would have been required to apply for DHCR approval of the deregulation within six months of the effective date of the amendment.

~~1~~130. As initially proposed, this amendment would have meant that every building in New York that had undergone substantial rehabilitation, and had not previously been approved by DHCR, would need to apply for deregulation. The implications would be staggering, given the number of buildings affected, passage of time and the investment-backed expectations suddenly at stake.

1~~3~~14. ~~The~~ Governor <u>Kathy Hochul</u> understood the problem. She agreed to sign this amendment on the condition that the Legislature amend the chapter further to remove the retroactive requirement that owners seek approval for prior exemptions due to substantial rehabilitation.

~~115~~132.Accordingly, the Legislature removed the retroactivity provision from the final bill.[~~50~~51]

---

~~116.    The clear intent of the Legislature, therefore, in enacting the 2023 amendments to ETPA § 8625 (the "Amendments"), and of the Governor in signing those amendments, is that the changes are prospective and *not* retroactive.~~

~~117.    By its terms, the Amendments applied only to projects started on or after January 1, 2024.[51]~~

~~118.    Because all the work for the substantial rehabilitations undertaken by BHS's members was commenced—and completed—prior to January 1, 2024, both the new application regime and the new statutory grounds for denying such an application cannot lawfully be applied to BHS's members.~~

[~~50~~51] Senate Bill S8011 explained that the Chapter Amendment "amends the underlying chapter by removing the provision in Part A allowing the Division of Housing and Community Renewal to set new rents upon the combination or division of a rent-regulated unit and to require that only new substantial rehabilitation to rent-stabilized units be approved by the Division of Housing and Community Renewal, removing the portion of the Part A applying retroactively." *See* Summary

133. The clear intent of the Legislature, therefore, in enacting the 2023 amendments to ETPA § 8625 (the "Amendments"), and of the Governor in signing those amendments, is that the changes are prospective and *not* retroactive.

117134. By its terms, the ETPA Aamendments applied only to projects started on or after January 1, 2024.5142

118135. Because all the work for the substantial rehabilitations undertaken by BHS's members was commenced and completed— prior to January 1, 2024, both the new application regime and the new statutory grounds for denying such an application cannot lawfully be applied to BHS's members.

136. Nevertheless, as outlined above, DHCR is attempting to retroactively eliminate the 80% vacancy presumption for projects completed before November 8, 2023—including the Targeted Buildings here—by making up new exceptions and requiring proof of uninhabitability even when 80% vacancy is established.

VI137. DHCR's retroactive changes to the SubRehab Program are therefore *ultra vires* and illegal.

---

of Provisions, 2023-S8011 (ACTIVE) - Sponsor Memo, available at https://www.nysenate.gov/legislation/bills/2023/S8011.

5152 Following the Chapter Amendment, which was signed by the Governor, the new law stated that "housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four" are exempt from the rent control laws, "provided that an owner claiming exemption from rent stabilization on the basis of a substantial rehabilitation, **where the work for such rehabilitation was initiated on or after the first day of January, two thousand twenty-four**, shall seek approval from state division of housing and community renewal within one year of the completion of the substantial rehabilitation, and ultimately obtain such approval, which shall be denied on the following grounds: (a) the owner or its predecessors in interest have engaged in harassment of tenants in the five years preceding the completion of the substantial rehabilitation; (b) the building was not in a substandard or seriously deteriorated condition requiring substantial rehabilitation; or (c) any additional grounds

as set forth by regulation." ETPA § 8625(a)(5) (emphasis added).

119. ~~Nevertheless, DHCR is attempting to retroactively eliminate the 80% vacancy presumption by making up new exceptions and requiring proof of uninhabitability even when 80% vacancy is established.~~

## ~~VI.~~ ~~DHCR THREATENS BHS MEMBERS WITH A RUINOUS ENFORCEMENT~~VI. STATE **ACTION BASED ON AN UNCONSTITUTIONAL LEGAL THEORY**

120. ~~Using threats of enforcement as a cudgel, backed by the New York Attorney General and its Tenant Protection Unit, DHCR is attempting to secure *retroactive* application of the Amendments, just as it has sought to impose *retroactive* program requirements nowhere mentioned in the Bulletin. The law does not permit this.~~

138. On December 1, 2025—six days after the original complaint was filed in this action—DHCR and NYAG applied its new, unlawful standards retroactively to PCA and the LLC Plaintiffs by initiating the State Action. *See New York v. Peak Capital Advisors, LLC et al.*, Index No. 453503/2025 (Sup. Ct. N.Y. Cnty. 2025).

139. The State Action does not represent a genuine attempt to enforce rent regulations after an investigation but rather is a baseless and bad-faith suit. Despite spending the prior two years investigating Plaintiffs, DHCR did not base the State Action on any investigative findings regarding BHS's members. Instead, the agencies allege eight civil causes of action, including violations of rent regulations and fraud,[53] based only on conclusory allegations that each of the buildings listed in their complaint were *insufficiently substandard* prior to construction to qualify for the SubRehab Program.

140. Indeed, the State Action complaint is plainly insufficient on its pleading, let alone having any chance of succeeding at trial. The State Action seeks re-regulation of 159 apartments across 31 different buildings but only makes factual allegations specific to three of those buildings. Despite the imperative of a building-by-building determination of "substandard or seriously

deteriorated," the agencies use blanket and conclusory allegations, claiming that the Targeted Buildings were *not* substandard prior to construction such as to qualify them for the SubRehab program. They cite no evidence proving that position. The agencies' discussion of the preconstruction condition of the buildings is limited to criticizing the BHS Members' basis for

---

[53] Because the suit did not depend on any investigative findings and includes only civil claims without criminal equivalents, it is not "in aid of and closely related to criminal statutes" such as to be sufficiently "akin to a criminal prosecution" to implicate the exceptional circumstances meriting *Younger* abstention. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975).

concluding the buildings were in substandard condition.[54]  This is plainly inadequate to satisfy the agencies' affirmative burden of proof as plaintiffs in the State Action. Moreover, the State Action's failure to allege *specific* facts regarding the condition of 28 of the Targeted Buildings is an admission that DHCR and NYAG lack evidence to prove the buildings were standard, as opposed to substandard or seriously deteriorated, which is their burden.

141.  As further evidence of bad faith, DHCR and NYAG included a building located at 251 North 8th Street, Brooklyn, New York, owned by Plaintiff 251 North 8th Owner LLC, even though no apartments were de-regulated therein.  All apartments in this building had been de-regulated prior to Plaintiff's acquisition of the building in 2022.

142.  As further evidence of bad faith, the State Action nowhere states whether any or all of the buildings enjoy the benefit of the Safe Harbor Provisions, even though each was at least 80% vacant at the start of construction and 75% or more of buildings systems were replaced in each—costing more than $150m (in equity and debt).

143.  Although it is not acknowledged in the agencies' complaint, the theory animating the State Action is an improperly *retroactive* application of statutes and guidance published after the substantial renovations of all the BHS members' buildings were completed.  The Bulletin (OB 95-2) created Safe Harbor Provisions under RSC § 2520.11(e) where 80% of a building is vacant prior to construction, with the exception of cases where it is established that the owner secured that vacancy through arson or tenant harassment.  DHCR consistently enforced these Safe Harbor

---

[54] Notably, the documents which the agencies criticized were not submitted to DHCR during any regulatory review, nor were any such submissions necessary.  The BHS Members did not rely on these documents for the SubRehab Program because they were entitled to the 80% vacancy presumption under the Safe Harbor Provisions.  Even still, DHCR had received in its investigation photographs and evaluations confirming that Targeted Buildings had seriously deteriorated prior to renovation, with essential systems past their useful life and in need of major repair.  Photographs of the pre-renovation conditions in some of these buildings are attached as Exhibit 2 hereto.

Provisions without regard to whether the common industry practice of a tenant buyout occurred prior to the vacancy. *See Supra* Section III.C. The Bulletin and the Safe Harbor Provisions remained in effect for nearly 30 years until it was replaced by OB 2023-3 on November 21, 2023—after all the BHS members' SubRehab Program constructions were completed.

144. Indeed, in other matters, DHCR has conceded that the 2024 statutory and regulatory amendments, and the November 21, 2023 Operational Bulletin 2023-3 (which replaced Operational Bulletin 95-2), apply *only* to rehabilitation work that occurred subsequent to the effective date.[55]

145. Nonetheless, the agencies in the State Action wrongly imply that they had always viewed buyouts skeptically, ignoring their own past enforcement and failing to acknowledge their sudden retroactive application. The agencies also imply that all 31 of the BHS members' buildings involved buyouts, when in fact PCA procured buyouts in less than half the buildings.[56]

146. Applying this *post-hoc* view, the agencies argue that vacancies pursuant to buyout agreements do not count toward the 80% vacancy presumption and suggest that the very existence of a buyout agreement is evidence that the building was not substandard prior to construction. Further, even where the 80% vacancy threshold was satisfied *without* buyout agreements—as is the case for 55% of the buildings put at issue in the State Action—the agencies demand a showing that the buildings were *uninhabitable* in order for DHCR to deem them substandard or seriously deteriorated. In so arguing, the agencies have effectively gutted the Safe Harbor Provisions retroactively. Nowhere in the State Action do NYAGA and DHCR even state whether any of the

---

[55] *See Matter of the Administrative Appeal of ZG Court LLC*, MQ210009RO (Oct. 8, 2024) ("The [Rent Administrator] erred in retroactively applying the rent law amendments of November 2023 and Operational Bulletin 2023-3 to the owner's substantial rehabilitation application.").

[56] No more than 14 of the Targeted Buildings—or 45%—involved tenant buyouts prior to construction.

Targeted Buildings enjoy the Safe Harbor presumptions at all. This retroactive change without public notice is unlawful. 121. The New York State Administrative Procedure Act ("NY SAPA"), § 202(1)(a) provides that, "[p]rior to the adoption of a rule, an agency shall submit a notice of proposed rule making to the secretary of state for publication in the state register and shall afford the public an opportunity to submit comments on the proposed rule."

122147. N.Y. Const. Art. IV § 8 provides that "[n]o rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state department, board, bureau, authority or commission shall be effective until it is filed in the office of the department of state."

123148. DHCR has not followed these procedures. Instead, DHCR arrogated to itself the power to contrive new rules, and now accuses BHS's members of gaming the system for substantial rehabilitation projects that were completed years ago.

124. BHS's members have substantially renovated dozens of substandard buildings, including buildings in Queens and Brooklyn.

149. The State Action is unprecedented. Indeed, the State Action identifies no examples of DHCR bringing retroactive claims for alleged violations of the SubRehab program. DHCR's suit—which is brought against relatively small actors for practices engaged in by much larger companies—therefore has the purpose and effect of chilling the BHS members' exercise of their constitutional rights to property and due process.

150. The State Action gilded the lily of its legal theories to garner press attention, to irreparable damage to Plaintiffs, and was brought for the purpose of harassment. Rather than sticking to regulatory claims under the rent laws, the agencies characterized standard-development practices, pursuant to official guidance, as fraudulent business practices under New York Executive Law § 63(12) and deceptive business practices and false advertising under New York General

Business Law §§ 349 and 350. These fraud-based claims have featured prominently in NYAG's statements to the press and have had disastrous consequences for PCA's reputation.

151. Yet the fraud-based claims are entirely frivolous, containing none of the particularized pleadings necessary under New York Civil Practice Law and Rules § 3016(b).

152. As further evidence of its bad faith, the State Action wholly ignored exculpatory evidence it collected during its investigation. For every building, the Plaintiffs disclosed reliance on the SubRehab Program as the basis for deregulation of apartments, which resulted in its cash- flow analyses provided to investors and lenders. It made similar disclosures to tenants through a rider to their leases. Nothing about Plaintiffs' actions was "fraudulent" or "deceptive." Despite this, DHCR's chose to bring trumped up fraud-and-deceptive-practices claims that captured headlines but have no chance of success in court, all to maximize the reputational damage to Plaintiffs. This is bad-faith harassment.

125. BHS' 153. BHS's members, their investors, and their lenders put tens of over a hundred millions of dollars into these projects. Such huge investment is only possible if the parties can be assured that the resulting housing will be commercially viable. This is all the more important because the SubRehab Program was self-executing, meaning that rehabilitation projects were expected to proceed without DHCR's approval or even consultation. Instead, Plaintiffs and their investors and lenders reasonably relied on statutory text, agency guidance, industry practice, and administrative precedent, as the SubRehab Program intended. The result is that hundreds of New Yorkers moved into beautiful apartments, many

of which had previously been off-market, at rents they can afford because they met the income requirements for market-rate units.

126.   Even where the 80% vacancy presumption was satisfied, and DHCR made no finding of arson or tenant harassment, DHCR has nonetheless threatened enforcement actions against BHS members who substantially rehabilitated buildings, claiming that buyouts disqualify reliance on the 80% vacancy rule, or that the buildings, although substantially degraded, were not uninhabitable.

127.   DHCR is making these threats because it knows full well that once any program participant is accused—even falsely—of regulatory violations they will suffer severe reputational and other harm.  Making these threats despite knowing that BHS's members complied with all applicable SR Program requirements is tantamount to extortion.

128.   Indeed, in other matters, DHCR has conceded that the 2024 statutory and regulatory amendments, and the November 21, 2023 Operational Bulletin 2023-3 (which replaced Operational Bulletin 95-2), apply *only* to rehabilitation work that occurred subsequent to the effective date.[52]

129154.BHS's members performed extensive and substantial rehabilitations on many buildings *by the book—DHCR's book.*  Now, DHCR inexplicably claims that BHS's members

broke the rules and that previously deregulated buildings must be recaptured by the rent stabilization regime and returned to the prior rents. DHCR also demands that BHS's members pay the difference between the prior regulated rent for the un-rehabilitated buildings and the market-rate rent for the rehabilitated buildings, calling market rent "overcharges."

## VII. CATASTROPHIC FINANCIAL CONSEQUENCES TO PLAINTIFFS: A BUILDING-BY-BUILDING ASSESSMENT[57]

[52] ~~*See Matter of the Administrative Appeal of ZG Court LLC*, MQ210009RO (Oct. 8, 2024) ("The [Rent Administrator] erred in retroactively applying the rent law amendments of November 2023 and Operational Bulletin 2023-3 to the owner's substantial rehabilitation application.").~~

155.    The agencies' attempted retroactive re-regulation of the 159 disputed apartments would have disastrous consequences for BHS's members, as well as their lenders and owners. By putting the Targeted Buildings into foreclosure, their actions will hurt tenants too.

156.    Plaintiff PCA is a real estate development company that recruits investors, secures loans, and coordinates the acquisition and financing of rental buildings in New York City. Its business market consists of pre-war buildings that need significant repair but, due to overrun costs and insufficient revenue, are unable to finance those repairs without outside funding. These buildings are generally composed of mainly rent-stabilized apartments and often include units that lay dormant because the rental price would be outweighed by the cost of repairs. PCA was involved in the procurement and rehabilitation of all 31 Targeted Buildings.

157.    The impact of the State Action on PCA has been catastrophic already. DHCR's press offensive with NYAG after the filing of the State Action has effectively shut down PCA, leaving it with 31 stranded assets, virtually no income, investors who are defecting, and lenders threatening to call in loans. As specific examples of harm:

a.    Three investor groups have notified PCA of their intent to trigger buyout rights, at a discount, due to "reputational risks" from the State Action.

b. A new transaction for PCA, valued at $110,000,000, was cancelled by counterparties, who cited the State Action.

c. Another transaction, to sell one of the Targeted Buildings, was cancelled by counterparties, who cited the State Action.

d. Because PCA's principals are minority owners of the Targeted Buildings (between 2% and 15%), it shares in the harms specified below, on a building-by-building basis.

158. With respect to PCA and the LLC Plaintiffs, the State Action does not merely cause immediate, and threaten future, financial loss; it creates an immediate 'cloud on title' that effectively freezes $150 million in assets today, triggering technical defaults and preventing necessary refinancing in a high-interest environment. This constitutes 'extraordinary circumstances' because the State Action itself—by dragging on for years—will cause the insolvency of the LLC Plaintiffs before a final judgment can ever be rendered. Indeed, legal fees to defend the State Action will consume the entirety of net-operating income for ALL of the Targeted Buildings, which, in the aggregate, is less than $175,000/month with existing rents. A building-by-building impact assessment follows:

159. The building owned by Plaintiff 48-36 41 Street Owners LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 48-36 41st Street in Sunnyside, is a 96-year-old building constructed in 1929.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about January 3, 2020.

d. The project perfectly matched the State's policy goals: it commenced when the building was 83% vacant, and replaced over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,039,140.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $63,357, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,737,032 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

160. The building owned by 48-33 47th Street LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 48-33 47th Street, Sunnyside, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about August 4, 2020.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,799,013.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $28.477, rendering the property insolvent, triggering a mortgage default, destroying the owners' $964,047 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

161. The building owned by Plaintiff 47-21 47th Street Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 47-21 47th Street in Sunnyside, is a 102-year-old building constructed in 1923.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about November 2, 2020.

d. The project perfectly matched the State's policy goals: it commenced when the building was 83% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Webster Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,493,152.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to $45,324, destroying $379,366 of property value at a 6.5% cap rate.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

162. The building owned by Plaintiff 51st Avenue Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 5-13 51st Avenue in Long Island City, is a 94-year-old building constructed in 1931.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about March 26, 2021.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Webster Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,274,230.

f. Although the complete extent of damages resulting from the State's retroactive attempt to re-regulate the property is unknown due to the previous owners' lack of registrations, re-regulation would, upon information and belief, significantly harm the owners' $1,267,400 equity investment.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

163. The building owned by Plaintiff 41st Street Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

      a. The property, located at 45-35 41st Street in Sunnyside, is a 97-year-old building constructed in 1928.

      b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

      c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about May 7, 2021.

      d. The project met the State's policy goals: it commenced when the building was 80% vacant, with only one tenant having previously agreed to a buyout, and it involved the replacement of over 75% of all building systems.

      e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,759,714.

      f. The State's retroactive attempt to re-regulate the property would reduce budgeted 2026 net income to negative $35,455, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,095,000 in equity, eroding collateral coverage, and creating a real risk of principal loss to the lender.

      g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property,

demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

164. The building owned by Plaintiff 47th Road Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 5-35 47th Road in Long Island City, is a 94-year-old building constructed in 1931.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about February 28, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,425,517.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $127,043, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,093,750 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g.  The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

165.    The building owned by Plaintiff 70 Middagh Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a.  The property, located at 70 Middagh Street in Brooklyn, is a 128-year-old building constructed in 1897.

b.  Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c.  In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about October 19, 2021.

d.  The project perfectly matched the State's policy goals: it commenced when the building was 81.81% vacant, and it involved the replacement of over 75% of all building systems.

e.  The mortgage, underwritten by Webster Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment.  The balance on the mortgage is $5,429,689.

f.  The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $331,466, rendering the property insolvent, triggering a mortgage default, destroying

the owners' $2,778,520 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

166. The building owned by Plaintiff 45th Street New Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 47-34 45th Street in Sunnyside, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about January 24, 2022.

d. The project met the State's policy goals: it commenced when the building was 100% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank, now held by Santander Bank and the FDIC, was predicated on the lawful, market-rate rents

achievable after this substantial investment. The balance on the mortgage is $2,286,373.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $98,298, rendering the property insolvent, triggering a mortgage default, destroying the owners' $736,910 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. Despite the owner's compliance with the rules in effect at the time, the State Action singles out this property as a "Representative Building," demonstrating the State's intent to punish good-faith reliance on its own prior guidance.

167. The building owned by Plaintiff 44th Street Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 47-25 44th Street in Sunnyside, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about October 8, 2021.

d. The project met the State's policy goals: it commenced when the building was 83% vacant, with tenants having previously agreed to buyouts in

reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank and currently held by Santander Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,911,651.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $84,297, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,000,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

168. The building owned by Plaintiff 5317 Skillman Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 53-17 Skillman Avenue in Sunnyside, is a 101-year-old building constructed in 1924.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff

invested in a complete gut rehabilitation, which was completed on or about December 9, 2022.

d.   The project met the State's policy goals: it commenced when the building was 83% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e.   The mortgage, underwritten by Signature Bank, currently held by Santander Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment.  The balance on the mortgage is $2,286,806.

f.   The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $6,912, rendering the property insolvent, triggering a mortgage default, destroying the owners' $950,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g.   The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

169.     The building owned by Plaintiff 32nd Street Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a.   The property, located at 35-34 32nd Street in Astoria, is a 100-year-old building constructed in 1925.

b.   Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c.   In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about December 9, 2021.

d.   The project met the State's policy goals: it commenced when the building was 100% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e.   The mortgage, underwritten by Signature Bank currently held by Wells Fargo, was predicated on the lawful, market-rate rents achievable after this substantial investment.  The balance on the mortgage is $2,520,414.

f.   The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $63,983, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,302,252 equity investment, erodes collateral coverage and creates a real risk of principal loss to the lender.

g.   The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

130. The financial consequences for BHS's members would be catastrophic. Because many of BHS members' buildings have federal or commercial loans, there will also be substantial ripple effects. For example, the federal government (through Freddie Mac and Fannie Mae) invested over $15 million in BHS's members' buildings.

170. The building owned by Plaintiff 3070 44th Street Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

  a. The property, located at 30-70 44th Street in Astoria, is a 97-year-old building constructed in 1928.

  b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

  c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about March 28, 2022.

  d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

  e. The mortgage, underwritten by Signature Bank currently held by Wells Fargo, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,779,063.

  f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $72,051, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,185,000 equity investment, eroding collateral coverage, and

103

creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property,

demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

171.    The building owned by Plaintiff 4745 43rd Street Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

    a.   The property, located at 47-45 43rd Street in Sunnyside, is a 97-year-old building constructed in 1928.

    b.   Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

    c.   In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about February 28, 2022.

    d.   The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

    e.   The mortgage, underwritten by Signature Bank currently held by Wells Fargo, was predicated on the lawful, market-rate rents achievable after this substantial investment.  The balance on the mortgage is $2,587,403.

    f.   Although the complete extent of damages resulting from the State's retroactive attempt to re-regulate the property is unknown due to the previous owners' lack of registrations, re-regulation would, upon information and belief, significantly harm the owners' $1,250,000 equity investment.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

172. The building owned by Plaintiff 4707 Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 47-07 47th Avenue in Sunnyside, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about December 22, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 83% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,600,000.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $96,640,

rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,101,407 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

173. The building owned by Plaintiff 4709 47th Avenue Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 47-09 47th Avenue in Sunnyside, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about April 8, 2022.

d. The project met the State's policy goals: it commenced when the building was 83% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank currently held by Silverhill Capital, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,526,869.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $24,853, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,190,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

174. The building owned by Plaintiff 3093 44th Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 30-93 44th Street in Astoria, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about March 9, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank currently held by Wells Fargo, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,779,066.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $55,205, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,260,627 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

175. The building owned by Plaintiff 4127 49th Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 41-27 49th Street in Long Island City, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff

invested in a complete gut rehabilitation, which was completed on or about April 4, 2022.

d.  The project met the State's policy goals: it commenced when the building was 83% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e.  The mortgage, underwritten by Signature Bank currently held by Santander Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,279,300.

f.  The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $78,803, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,200,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g.  The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

176.  The building owned by Plaintiff 4542 Vernon Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a.  The property, located at 45-42 Vernon Boulevard in Long Island City, is a 94-year-old building constructed in 1931.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions— specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about April 8, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank currently held by Blackstone (Rialto), was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,519,225.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to $30,855, destroying $379,366 of property value at a 6.5% cap rate.

g. Despite the owner's compliance with the rules in effect at the time, the State Action singles out this property as a "Representative Building," demonstrating the State's intent to punish good-faith reliance on its own prior guidance.

177. The building owned by Plaintiff 131 Greenpoint Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a.   The property, located at 131 Greenpoint Avenue in Brooklyn, is a 97-year-old building constructed in 1928.

b.   Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c.   In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about May 4, 2023.

d.   The project met the State's policy goals: it commenced when the building was 83% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e.   The mortgage, underwritten by Signature Bank currently held by Santander Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment.  The balance on the mortgage is $3,690,159.

f.   The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $139,762, rendering the property insolvent, triggering a mortgage default, destroying the owners' greater-than-$1,950,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g.   The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property,

demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

178. The building owned by Plaintiff 586 Manhattan Owner, LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 586 Manhattan Avenue in Brooklyn, is a 94-year-old building constructed in 1931.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about July 28, 2022.

d. The project met the State's policy goals: it commenced when the building was 100% vacant, with only one tenant having previously agreed to a buyout, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank currently held by Blackstone (Rialto), was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $3,285,716.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $154,565, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,375,000 in equity.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

179. The building owned by Plaintiff 94 Milton Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 94 Milton Street in Brooklyn, is a 131-year-old building constructed in 1894.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about February 10, 2023.

d. The project met the State's policy goals: it commenced when the building was 87.5% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Chase Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,391,088.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to $168,844, destroying $1,500,668 of property value at a 6.5% cap rate.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

180. The building owned by Plaintiff 3230 Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 32-30 41st Street in Astoria, is a 99-year-old building constructed in 1926.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about November 22, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 95% vacant without the use of any rent stabilized tenant buyouts, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Signature Bank currently held by Santander Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $4,458,747.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to $40,447, destroying $301,317 of property value at a 6.5% cap rate.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

181. The building owned by Plaintiff 311 Eckford Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 311 Eckford Street in Brooklyn, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions— specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about September 30, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Webster Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $3,417,482.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $43,009, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,750,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

182. The building owned by Plaintiff 250 Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 250 North 6th Street in Brooklyn, is a 115-year-old building constructed in 1910.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about April 12, 2023.

d. The project perfectly matched the State's policy goals: it commenced when the building was 90% vacant without the use of any rent stabilized tenant buyouts, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Amalgamated Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $8,685,332.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to $171,511, destroying $528,681 of property value at a 6.5% cap rate.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

183. The building owned by Plaintiff 515 Graham Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 515 Graham Avenue in Brooklyn, is a 105-year-old building constructed in 1920.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions— specifically the bright-line 80% Vacancy Presumption—the plaintiff

invested in a complete gut rehabilitation, which was completed on or about November 29, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 100% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,852,000.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $133,584, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,525,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

184. The building owned by Plaintiff 4544 40th Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 45-44 40th Street in Sunnyside, is a 99-year-old building constructed in 1926.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about December 8, 2022.

d. The project perfectly matched the State's policy goals: it commenced when the building was 83% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $1,923,000.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $30,188, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,025,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

185. The buildings owned by Plaintiff 251 North 8th Owner LLC were wrongly included in the State Action.

a. The properties, located at 251-253 North 8th Street in Brooklyn, are 125-year-old buildings constructed in 1900.

b. DHCR and NYAG sued Plaintiff 251 North 8th Owner LLC in the State Action even though none of its units were de-regulated as part of a substantial rehabilitation.

c. Plaintiff 251 North 8th Owner LLC has been injured by its inclusion in the State Action. Although the complete extent of damages resulting from the State's retroactive attempt to re-regulate the property is unknown, re-regulation would, upon information and belief, significantly harm the owners' $1,267,400 equity investment.

d. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning these properties, demonstrating that they are the target of a blanket policy, not a fact-based enforcement action.

186. The building owned by Plaintiff 2559 35th Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 25-59 35th Street in Astoria, is a 102-year-old building constructed in 1923.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about January 20, 2023.

d. The project met the State's policy goals: it commenced when the building was 83% vacant, with only one tenant having previously agreed to a buyout, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Freddie Mac, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,068,000.

f. The State's retroactive attempt to re-regulate the property would immediately erase reduce budgeted 2026 net income to negative $71,717, rendering the property insolvent, triggering a mortgage default, destroying the owners' $1,200,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

187. The building owned by Plaintiff 154 Atlantic Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 154 Atlantic Avenue in Brooklyn, is a 173-year-old building constructed in 1852.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff

invested in a complete gut rehabilitation, which was completed on or about March 14, 2023.

d.   The project met the State's policy goals: it commenced when the building was 100% vacant, with tenants having previously agreed to buyouts in reliance on DHCR's long-standing acceptance of the practice, and it involved the replacement of over 75% of all building systems.

e.   The mortgage, underwritten by Derby Copeland Capital, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $3,350,000.

f.   The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $186,997, rendering the property insolvent, triggering a mortgage default, destroying the owners' greater-than-$2,025,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g.   The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

188.   The building owned by Plaintiff 724 Metropolitan Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a.   The property, located at 724 Metropolitan Avenue in Brooklyn, is a 95-year-old building constructed in 1930.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about September 19, 2023.

d. The project perfectly matched the State's policy goals: it commenced when the building was 83% vacant, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Patriot Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $2,477,464.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $108,705, rendering the property insolvent, triggering a mortgage default, destroying the owners' greater-than-$1,910,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. The State Action's bad faith is underscored by the fact that it makes no specific factual allegations whatsoever concerning this property, demonstrating that it is the target of a blanket policy, not a fact-based enforcement action.

189. The building owned by Plaintiff 101 Greenpoint Owner LLC exemplifies the good-faith investment the SubRehab Program was designed to induce.

a. The property, located at 101 Greenpoint Avenue in Brooklyn, is a 97-year-old building constructed in 1928.

b. Prior to its rehabilitation, few, if any, of the building's 17 essential systems had been replaced since its original construction.

c. In direct reliance on DHCR's decades-old Safe Harbor Provisions—specifically the bright-line 80% Vacancy Presumption—the plaintiff invested in a complete gut rehabilitation, which was completed on or about May 4, 2023.

d. The project met the State's policy goals: it commenced when the building was 87.5% vacant, with only one tenant having previously agreed to a buyout, and it involved the replacement of over 75% of all building systems.

e. The mortgage, underwritten by Patriot Bank, was predicated on the lawful, market-rate rents achievable after this substantial investment. The balance on the mortgage is $3,078,680.

f. The State's retroactive attempt to re-regulate the property would immediately reduce budgeted 2026 net income to negative $161,252, rendering the property insolvent, triggering a mortgage default, destroying the owners' greater-than-$2,250,000 equity investment, eroding collateral coverage, and creating a real risk of principal loss to the lender.

g. Despite the owner's compliance with the rules in effect at the time, the State Action singles out this property as a "Representative Building," demonstrating the State's intent to punish good-faith reliance on its own prior guidance.

~~131~~190. **The bottom line** ~~here is that~~: BHS's members invested ~~tens of~~(through equity and debt) approximately $150 million~~s of dollars~~ in rehabilitating housing for New Yorkers, and DHCR is attempting to seize and/or redistribute the fruits of that investment through a fundamentally unfair, retroactive application of new rules to already completed projects, despite the fact that the Governor and then the Legislature expressly rejected any retroactive application of the ~~A~~amendments~~.~~ to the SubRehab Program.

~~132~~191. If DHCR is allowed to proceed with its attempt to unlawfully and retroactively re- regulate buildings that were properly exempted from rent stabilization through the ~~SR~~SubRehab Program, then many buildings will be left with insufficient income to cover their operating expenses——including repaying loans taken out to finance the substantial rehabilitations—likely pushing these buildings into foreclosure and either removing them from the rental market or returning them to uninhabitable conditions.

~~133~~192. DHCR's attempt to capture the investments of BHS members for its own political purposes is unconstitutional and violates applicable statutes and regulations. To protect New Yorkers from this lawless agency overreach, this Court's intervention is urgently needed.

**<u>FIRST CAUSE OF ACTION</u>**
**Regulatory Taking, As Applied**
**U.S. Const. Amend. V and XIV**

19~~3~~4.    Plaintiff~~s~~ repeat~~s~~ and realleges each ~~and every~~ allegation ~~of this Complaint~~<u>above</u> as if fully set forth herein.

~~135~~194.The Fifth Amendment Takings Clause, incorporated against the States by the

Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without

just compensation."

~~136~~195. "The aim of the [Takings] Clause is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[~~53~~58]

~~137~~196. DHCR's ~~threatened enforcement~~ action_s_ would effect an unconstitutional regulatory taking, under *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) and its progeny.

### *Economic Impact of DHCR's Regulatory and Enforcement Action*

~~138~~197. By retroactively imposing new and contradictory rules on substantial rehabilitation projects completed years ago, DHCR seeks to confiscate the rents, value, and economic benefits earned from those rehabilitations—benefits BHS's members lawfully obtained under the regulatory framework in place at the time. This action constitutes a forced transfer of private investment value to tenants, the public, and the State without just compensation.

~~139~~8. For nearly 30 years, DHCR administered the substantial rehabilitation exemption pursuant to a uniform and authoritative regime. Under that regime: (1) 80% vacancy at the commencement of rehabilitation mandated a presumption that a building was "substandard or

---

[~~53~~] ~~*E. Enter's. v. Apfel*, 524 U.S. 498, 522 (1998) (internal quotation marks and citation omitted).~~

seriously deteriorated," and (2) that presumption could be rebutted only by proof of arson or tenant harassment.

~~140~~199.DHCR reaffirmed these rules repeatedly through Operational Bulletin 95-2, the Rent Stabilization Code, agency determinations, published guidance, and sworn affidavits. Owners, investors, and lenders—including BHS's members—invested tens of millions of dollars rehabilitating deteriorated buildings in reliance on these well-settled assurances.

~~141~~200.Beginning in ~~2021~~ 2023, DHCR abruptly reversed its interpretation, without rulemaking, statutory authority, or public notice. DHCR now asserts for the first time that vacancies obtained

---

[58] *E. Enter's. v. Apfel*, 524 U.S. 498, 522 (1998) (internal quotation marks and citation omitted).

through voluntary buyouts cannot count toward the 80% presumption, that buildings must be "uninhabitable" to qualify as "substandard," that the presumption is discretionary, and that owners must meet additional criteria never before codified or announced.

~~142~~201. DHCR intends to apply these novel standards retroactively to projects completed between 2020 and 2022~~3   years~~all completed before the November 2023 amendments to ~~the~~RSC § 2520.11(e) and Operational Bulletin 95-2 ~~and RSC § 2520.11(e)~~, and the December 2023 amendments to ETPA § 8625(a)(5), intentionally disregarding that the Legislature *expressly rejected retroactive application of those amendments*.

### Interference with Reasonable Investment-Backed Expectations

~~143~~202. If allowed to proceed, DHCR would interfere with BHS members' reasonable investment-backed expectations in those properties. DHCR's aggressive interference with these investment-backed expectations is the functional equivalent of a government appropriation without just compensation.

~~144~~203. Applying these unprecedented rules retroactively would destroy the reasonable, investment-backed expectations of BHS's members. DHCR seeks to re-regulate buildings long ago deregulated under DHCR's own rules, to impose crippling "overcharge" liability for years of

lawful rents, and to strip owners of the economic value created by their capital investment – all without compensation.

### *Character of the Governmental Action*

~~145~~204.The character of ~~DHCR's threatened~~the State ~~a~~Action shows that it is undertaken solely for the benefit of private persons and not to serve important public interests because ~~DHCR's threatened~~the State ~~a~~Action would take the investment of ~~a~~ small ~~firm~~companies and small investors (*i.e.*, deprive them of the opportunity to be made whole after having put millions into the buildings) and give that investment for free to tenants who enjoy high incomes and who agreed to rent and pay for market rate apartments.

146205.For the foregoing reasons, ~~DHCR's threatened~~the State ~~a~~Action is arbitrary and irrational and "goes 'too far'" in depriving BHS members of (a) their rights to use, control, improve, and make productive economic use of their own properties and (b) their investment in the rehabilitated buildings.

147206.The destruction of these reliance interests and appropriation of the value generated by BHS's members' investments constitutes an unconstitutional regulatory taking.

148207.BHS members will be irreparably harmed and deprived of their constitutional rights in the absence of declaratory and injunctive relief.

**SECOND CAUSE OF ACTION**
**Substantive Due Process, As Applied**
**U.S. Const. Amend. XIV; 42 U.S.C. § 1983**

149208.Plaintiff~~s~~ repeat~~s~~ and realleg~~es~~ each allegation above as if fully set forth herein.

150209.The retroactive application of new rules to transform what were lawful, valuable, and expensive investments to substantially rehabilitate substandard building (thereby lawfully causing their deregulation) into coerced windfall payments to tenants violates the rights of BHS members to Substantive Due Process.

*Valid Property Interest*

~~151~~210. ~~DHCR's threatened enforcement~~ The State a~~A~~ction violates substantive due process because it represents an arbitrary, irrational, and retroactive change in the applicable legal rules that destroys vested rights and legitimate reliance interests.

~~152~~211. For nearly 30 years, DHCR assured owners—through the text of the RSC, through Operational Bulletin 95-2, and through agency determinations and affirmations—that 80% vacancy gave rise to a mandatory presumption of substandard condition, that no further showing of substandard condition was required (certainly no showing of uninhabitability), and that buyouts counted toward that 80% vacancy threshold.

153212.Owners reasonably relied on these long-settled rules when undertaking expensive and complex rehabilitations of substandard buildings.

***Arbitrary or Irrational Infringement of Property Interest***

154213.DHCR now asserts the opposite of these settled rules: that buyouts invalidate the presumption, that buildings must have been "uninhabitable," and that the presumption was never binding. DHCR seeks to apply these new, contradictory standards retroactively to fully completed projects. The Legislature explicitly rejected retroactive application of the 2023 amendments, yet DHCR attempts to achieve the same result by changing the rules and retroactively enforcing them.

155214.DHCR's conduct serves no legitimate governmental purpose; it appears driven by political pressure to revisit and invalidate previously settled deregulations, despite the Legislature's explicit rejection of retroactive application in the 2023 statutory amendments.

2156. Such harsh retroactive imposition of onerous liabilities for beneficial and expensive renovations and lawful deregulation is unconstitutional because it arbitrarily and irrationally infringes upon owners' property interests. Where an agency seeks to give retroactive application to changes in the law that the Legislature and Governor expressly forbade from applying

retroactively, it is deliberately flouting the law in a manner that violates the owners' significant personal or property rights.

~~157~~216.Plaintiff~~s~~ repeat~~s~~ and realleges each allegation above as if fully set forth herein.

~~158~~217.The retroactive and *ultra vires* application of new rules to transform what were lawful, valuable, and expensive investments to substantially rehabilitate substandard building (thereby lawfully causing their deregulation) into coerced windfall payments to tenants violates the rights of BHS members to Procedural Due Process.

~~159~~218.BHS's members have property rights in the buildings they own, including the improvements and renovations made through the substantial rehabilitation process.

~~160~~219.Regulated parties must receive fair notice of the conduct that will subject them to liability.

~~161~~220.At the time BHS's members commenced and completed their projects, DHCR had never suggested that buyouts were disqualifying, that buildings must be uninhabitable, or that the 80% vacancy presumption was discretionary. DHCR did not amend its regulations before November 2023, did not issue revised guidance via amended operational bulletin, and did not engage in regular rulemaking.

~~162~~221.The 2023 amendments to the ETPA expressly rejected (via the Governor's Chapter Amendments) retroactive application of the requirement that owners must file substantial renewal applications with DHCR prior to deregulation.

~~163~~222.BHS's members had no notice, and no reason to believe, that the rules of the substantial rehabilitation exemption were not DHCR's promulgated rules and guidance, but

malleable and discretionary policies that would be retroactively applied to achieve the

desired

result—re-regulation of formerly rent-stabilized buildings, especially ones that had recently been dramatically upgraded.

~~164~~223.DHCR (and NYAG) now seeks to impose penalties—including re-regulation and overcharge liability—based on interpretations that did not exist when BHS's members acted.

~~165~~224.By attempting to impose penalties based on undisclosed, *post*—*hoc* reinterpretations, DHCR ~~threatens~~attempts to deprive BHS's members of their property without due process of law.  Because DHCR's enforcement standards are different from its promulgated rules, the risk of erroneous deprivation under existing procedures is great.

~~166~~225.DHCR's new enforcement policy flouts the law that was in effect when the BHS members made investments and took out loans to finance substantial rehabilitations.  DHCR's new enforcement policy would also make *retroactive* state laws that are expressly *not retroactive*.  These retroactive actions will cause harsh and oppressive consequences because the owners will lose their investments and be unable to make whole their investors or repay their loans.  Thus, DHCR's actions are *ultra vires* and illegal.

~~167~~226.Aspects of DHCR's new enforcement policy have been challenged via Article 78 proceeding in New York State court.[~~54~~59]  However, the state courts give substantial deference to the agency's judgment, interpretations, and findings.  On information and belief, to date, no Article 78 proceeding has resulted in DHCR's determinations under its new enforcement policy being enjoined, vacated, or corrected.  Accordingly, the post-deprivation state procedures in place would be insufficient under the Fourteenth Amendment.

---

[~~54~~59] *See Creas v. DHCR*, Index No. 535355/2024, 2025 WL 1913548 (Sup. Ct. Kings Cnty. July 2, 2025).

168227.Moreover, the property interest at issue here is real property, which is unique and not adequately compensable with money damages.  Thus, the threat of loss of real property, for example, through foreclosure, cannot adequately be addressed in a post-deprivation hearing.

169228.Consequently, in the absence of declaratory and injunctive relief, BHS members will be irreparably harmed and deprived of their substantive and procedural due process rights.

**FOURTH CAUSE OF ACTION**
**Equal Protection, As Applied**
**U.S. Const. Amend. XIV; 42 U.S.C. § 1983**

229.     Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

230.     The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  This mandate prohibits the government from treating similarly situated persons differently without a rational basis and protects against arbitrary and discriminatory enforcement.

231.     The Equal Protection Clause of the Fourteenth Amendment protects individuals against intentional and arbitrary discrimination, even when the plaintiff does not belong to a protected class (a "class of one").

232.     LLC Plaintiffs and PCA are similarly situated in all relevant respects to a specific group of property owners in New York City: owners of the approximately 11,000 housing units who, between 1995 and 2023, claimed exemption from rent stabilization under the Substantial Rehabilitation program in reliance on OB 95-2 (the "Comparators").

233.     Like LLC Plaintiffs and PCA, the Comparators:

      a.   Renovated buildings that were at least 80% vacant;

      b.   Replaced at least 75% of building systems; and

    c. Relied on the 80% vacancy rate as a presumptive satisfaction of the "substandard or seriously deteriorated condition" requirement without providing independent proof of structural impairment or "uninhabitability."

234. Acting under color of law, Defendant intentionally treated LLC Plaintiffs and PCA differently from the Comparators. While Defendant has permitted the Comparators to maintain their substantial rehabilitation exemptions based solely on the 80% vacancy presumption set forth in OB 95-2, Defendant has targeted LLC Plaintiffs and PCA for unique and retroactive enforcement. Specifically, Defendant is refusing to apply the OB 95-2 presumption to the Targeted Buildings and are instead demanding that LLC Plaintiffs and PCA satisfy a novel, stricter evidentiary standard—proof of "uninhabitability"—that has not been applied to the similarly situated Comparators.

235. In particular, LLC Plaintiffs and PCA are similarly situated to one of the Comparators: "Company A," a major New York City developer. Both Plaintiffs and Company A are property owners who undertook substantial rehabilitation projects during the same time period (prior to November 2023). Both relied on the exact same regulatory framework—Operational Bulletin 95-2 and the Rent Stabilization Code § 2520.11(e)—to deregulate apartments. Both relied specifically on the "80% Vacancy Presumption" to qualify their buildings as "substandard or seriously deteriorated."

236. Despite these similarities, Defendant has treated LLC Plaintiffs and PCA, on the one hand, and Company A, on the other, with gross disparity.

237. In 2022, Defendant concluded an investigation into Company A, which has a portfolio of over 60 buildings—double the size of the Targeted Buildings. Defendant's own investigation found that Company A had committed serious misconduct that LLC Plaintiffs and

PCA have not, including: (a) actual findings of tenant harassment to procure vacancies; (b) over 1,200 open housing maintenance violations; (c) 716 construction violations; and (d) failures to provide essential services like heat and hot water.

238.    Notwithstanding these harsh findings—which under Defendant's current theory should have disqualified Company A from the Substantial Rehabilitation exemption—DHCR and NYAG entered into a settlement that did not require Company A to re-regulate a single apartment or roll back rents.

239.    In stark contrast, LLC Plaintiffs and PCA—who have no findings of harassment, no history of systemic code violations, and who voluntarily utilized buyouts in accordance with industry standards—have been targeted for the "death penalty" of civil enforcement: the forced re-regulation of 159 apartments and potential insolvency. This has disparately infringed upon Plaintiffs' "natural, fundamental right" to property. *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 510 (2005) (Thomas, J., *dissenting*).

240.    There is no rational basis for this difference in treatment. The LLC Plaintiffs' buildings and the Comparators' buildings are subject to the same Rent Stabilization Laws and Codes. Defendant has selectively applied a retroactive "uninhabitability" standard to LLC Plaintiffs and PCA that they knowingly waived for Company A. There is no legitimate governmental interest in retroactively applying a stricter "actual condition" standard to Plaintiffs' Targeted Buildings while permitting thousands of other buildings to remain deregulated under the "vacancy presumption" standard of OB 95-2. The distinction is not based on any material difference in the properties or the work performed, but is arbitrary, capricious, and irrational.

241.    Defendant's disparate treatment of LLC Plaintiffs and PCA is not an exercise of legitimate regulatory discretion but is motivated by bad faith and a "spiteful effort" to single out

these plaintiffs for punishment. The selection of the 31 LLC Plaintiffs for this retroactive enforcement action, while turning a blind eye to identical conduct by virtually every other developer in the industry, demonstrates a pattern of harassment intended to injure Plaintiffs rather than to exercise legitimate regulatory oversight.

242.    As a direct and proximate result of Defendant's unconstitutional conduct, Plaintiffs have suffered, and continue to suffer, significant damages, including the potential loss of their property, diminution in value, and substantial legal costs, for which they are entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, ~~BHS~~Plaintiffs respectfully request~~s~~ that this Court enter judgement in its favor and grant the following relief:

A.    A declaration that administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the 80% vacancy presumption (as detailed above), would effect an unlawful regulatory taking in violation of U.S. Const. Amend. V and XIV.

B.    A declaration that administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the 80% vacancy presumption (as detailed above), would violate BHS'~~s~~ members' substantive due process rights in violation of U.S. Const. Amend. XIV.

C.    A declaration that any manner of administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the

80% vacancy presumption (as detailed above), would violate BHS's members' procedural due process rights in violation of U.S. Const. Amend. XIV.

D.     A declaration that any manner of administrative or enforcement action by or on behalf of DHCR with respect to substantial rehabilitation projects initiated prior to November 8, 2023, that applies DHCR's new construction of "substantial rehabilitation" and rejects the 80% vacancy presumption (as detailed above), would violate BHS's members' procedural due process rightsequal protection of the law in violation of U.S. Const. Amend. XIV.

D̶E. A preliminary injunction enjoining the enforcement, by or on behalf of DHCR, of DHCR's new construction of "substantial rehabilitation" and rejection of the 80% vacancy presumption (as detailed above) with respect to any substantial rehabilitation projects initiated prior to November 8, 2023, on account of the violations of the Takings Clause a̶n̶d̶, the Due Process Clause (Substantive and Procedural), and the Equal Protection Clause enumerated above.

E̶F. A permanent injunction enjoining the enforcement, by or on behalf of DHCR, of DHCR's new construction of "substantial rehabilitation" and rejection of the 80% vacancy presumption (as detailed above) with respect to any substantial rehabilitation projects initiated prior to November 8, 2023, on account of the violations of the Takings Clause a̶n̶d̶, the Due Process Clause (Substantive and Procedural), and the Equal Protection Clause enumerated above.

G. Enter judgment awarding PCA and LLC Plaintiffs just compensation under the Fifth and Fourteenth Amendments to the United States Constitution for the regulatory taking of their property interests, in an amount to be determined at trial, representing the full diminution

in the fair market value of the Targeted Buildings and the value of the deregulated leasehold interests destroyed by Defendant's conduct, plus pre-judgment and post-judgment interest.

H.     Enter judgment awarding PCA and LLC Plaintiffs compensatory damages pursuant to 42 U.S.C. § 1983 for all actual and consequential economic injuries suffered as a result of Defendant's violations of Plaintiffs' Due Process, Equal Protection, and property rights, including but not limited to:

      i.   Lost rental income and operating revenue;

      ii.   Destruction of equity and collateral value;

      iii.   Increased financing costs, penalties, and losses associated with the inability to refinance or sell the Targeted Buildings; and

      iv.   Any other pecuniary harms directly resulting from Defendant's unconstitutional retroactive enforcement actions.

I.     Award PCA and LLC Plaintiffs nominal damages for the violation of their constitutional rights, irrespective of actual economic loss.

~~F.     An award of BHS's~~ J.     Award Plaintiffs' reasonable costs, litigation expenses, and attorney's fees pursuant to 42~~ ~~ U.S.C. § 1988; and

~~G~~K.   Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.[60]

Dated: New York, New York ~~November~~February 25, 202~~5~~6

WALDEN MACHT HARAN & WILLIAMS LLP

*/s/ Jim Walden*

Jim Walden
~~Brian Mogck~~Hunter Pearl
250 Vesey Street, 27th Floor
New York, New York
jwalden@wmhwlaw.com
~~bmogck~~hpearl@wmhwlaw.com
(212) 335-2030

*Counsel for Plaintiff*

~~Dated: New York, New York November 25, 2025~~

~~WALDEN MACHT HARAN & WILLIAMS LLP~~

~~Jim Walden~~
~~Brian Mogck~~
~~250 Vesey Street, 27th Floor~~
~~New York, New York~~
~~jwalden@wmhwlaw.com~~
~~bmogck@wmhwlaw.com~~
~~(212) 335-2030~~

~~*Counsel for Plaintiff*~~

---

[60] *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999).