

250 Vesey Street
27th Floor
New York, NY 10281



wmhwlaw.com
T: 212-335-2030
F: 212-335-2040

March 17, 2026

**Via ECF**
Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  *Balanced Housing Solutions v. Visnauskas*, No. 25-cv-6574 (DG) (VMS)

Dear Judge Gujarati:

On Plaintiffs' behalf, we respond to Defendant's renewed dismissal motion request. *See* Dkt. 15.

**Background**. Plaintiffs invested about $150 million to renovate 31 buildings (average age: 90 years) in Brooklyn and Queens. The original infrastructure—plumbing, roofs, electric—had never been upgraded. They were in bad shape when Plaintiffs came in. The buildings are small, so their margins are thin and they are not prized projects; buildings like this suffer from disinvestment citywide. Their only savior was a self-executing program (the "SubRehab Program")—created by Defendant itself—that allows deregulation in exchange for gut renovations. Doing the work meant the owner could rent previously rent-stabilized units as free-market ones. The owner just needed to work within two safe harbors: (1) buildings were 80% vacant at construction start (presumption of substandard condition) and (2) work replaced 75% of building systems (presumption of "gut" renovation) (together, the "Safe Harbors"). The SubRehab Program required no regulatory application, approval, or post-completion certification. For the 31 buildings, all renovation work has been done for years. Every building complied with the Safe Harbors. Young professionals occupy the 200+ units at affordable rents. To make the project work, the lead developer (Peak Capital Advisors ("PCA")) gradually syndicated capital from 101 small and medium-sized investors and eight banks. Every building now has a bespoke set of investors and a financially committed bank. The buildings average less than 6% cash yield.

Years later, it became politically popular to attack developers—even those like PCA who treated tenants well (no tenant complaints). A new era emerged where government *openly* started trying to collectivize housing. The SubRehab Program fell out of favor. In December 2023 (post-PCA's projects), the legislature gutted the program on a go-forward basis—even as the City struggles through a housing crisis. What brings us here is the State's decision to go farther: to retroactively gut the Safe Harbors and force re-regulations that would put the buildings into foreclosure. And it did so in the most hyperbolic manner, accusing PCA of "fraud" without proof. Already, the State's action has ruined PCA, but many investors and banks now have stranded assets, with clouds over their titles, and legal fees consuming all operating profit. This is disastrous for everybody—including the buildings' tenants. Plaintiffs sued. Defendant asked for leave to move to dismiss. We amended. Defendant asked for leave again. We briefly explain why such a motion should fail.

## I.    The Court Should Not Abstain

Defendant urges *Younger* abstention, invoking a narrow exception to the "virtually

1

unflagging" obligation of federal courts to exercise jurisdiction. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77, 81 (2013). The doctrine generally applies to criminal proceedings. Its application to civil proceedings represents an exception within the exception, reserved for rare circumstances. *See Cavanaugh v. Geballe*, 28 F.4th 428, 430 (2d Cir. 2022) (finding state case fell outside "narrow class of state civil proceedings" to which *Younger* applies). Here, Plaintiffs brought a *civil* suit in New York state court—captioned *State of New York v. Peak Capital Advisors, LLC et al.*, Index No. 453503/2025 (Sup. Ct. N.Y. Cnty.) (the "State Action")—that bears none of the hallmarks justifying abstention. The State Action did not depend on investigative findings subject to ongoing state review, includes only civil claims without criminal equivalents, and is not "in aid of and closely related to criminal statutes." It is not the exceptional civil action "akin to a criminal prosecution" as to merit *Younger* abstention. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975).

*Younger* abstention is inappropriate for another reason: the State Action shows all the "retaliatory" motive factors in the "tightly defined" bad faith exception. *See Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 197-99 (2d Cir. 2002); *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994) (finding of bad faith precluded *Younger* abstention); *Perez v. Ledesma*, 401 U.S. 82, 118 n.11 (1971) (Brennan, J., *concurring*) ("Bad-faith harassment can, of course, take many forms," including meritless prosecutions). Defendant ran to state court days *after* we filed this federal suit—before any responsive pleading was due here—supporting an inference that it filed hastily to secure a jurisdictional or public-relations advantage rather than to enforce the law. But the complaint's content proves the bad-faith purpose with certainty. It contains no factual averments whatsoever about 36 of the 39 defendants it accuses. It alleges "fraud" and "deception" without particularized averments to support such inflammatory accusations. It includes numerous irrelevant and prejudicial averments that have no place in a well-pleaded complaint. It accuses one defendant who had *no role* in deregulating any units in its building. It singled out one small investor among many—who had no active role—apparently because he has a famous sister, ensuring media amplification of the 'fraud' narrative despite the complete absence of factual allegations against him. This strategic selection of a defendant for publicity value, rather than legal merit, exemplifies the retaliatory purpose prohibited by the bad faith exception. And, to drive the blade deep, the State issued a false and defamatory press release, accusing PCA developers of "profiteering," tarnishing their reputations on day one. The State's specific allegations of bad-faith retaliation merit discovery and an evidentiary hearing. *See Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) (recognizing necessity of hearing to resolve factual disputes on bad faith exception to *Younger* abstention); *Sica v. Connecticut*, 331 F. Supp. 2d 82, 87 (D. Conn. 2004) (same). Especially since Defendant refuses to search its files for exculpatory evidence.

## II.     Plaintiffs Have Stated Valid Claims

Under prevailing standards, the Amended Complaint plainly states plausible and valid claims on multiple constitutional grounds. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (averments accepted as true); *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) (all inferences support complaint). Spanning more than 100 detailed pages, the Amended Complaint makes specific factual allegations regarding how the Division of Housing and Community Renewal ("DHCR") retroactively changed program rules without public notice, in violation of state law. We made extensive, detailed averments about DHCR's 30-year history of administering the SubRehab Program's Safe Harbors, with specific examples, including an affidavit from one of its attorneys.

We included facts showing that—after the legislature gutted the program in 2023—DHCR went through a public process to change its operating guidance, proving it needed to do so to change program rules like the Safe Harbors (but did not do so before Plaintiffs completed their work). Unlike DHCR in the State Action, we pled specific facts about how each building was "substandard" within the SubRehab Program's meaning (to this day, DHCR has never defined the term). We pled specific injury to each. We included averments concerning the impact on PCA, effectively wiping it out through prejudicial name calling ("fraudsters" and "profiteers"), as well as to every building in the portfolio. *See, e.g.*, Amended Complaint ¶¶ 106, 153, 157, 158, 159-189, 190, 191, 192. These actions triggered technical defaults under loan agreements and prevented necessary refinancing that would allow Plaintiffs to continue operating these buildings for their tenants' benefit. Because profit margins are thin (average is about 6%), legal fees now consume all operating profit. As the Amended Complaint demonstrates through extensive factual detail, DHCR's conduct unconstitutionally infringes upon Plaintiffs' rights in at least four independent ways.

1) First, DHCR has confiscated Plaintiffs' property without just compensation in violation of the Takings Clause of the Fifth Amendment. DHCR retroactively nullified the deregulated status of 159 units, which Plaintiffs obtained through substantial capital investment and compliance with the Safe Harbors, effectively seizing the economic value of these properties without paying for that taking. *Id.* ¶¶ 193-207.

2) Second, DHCR violated Plaintiffs' substantive due process rights by depriving them of property without rational basis and without serving any legitimate governmental interest. The retroactive application of new standards to completed work that fully complied with the law serves no purpose other than to punish developers who followed the rules and relied on the State's own guidance. *Id.* ¶¶ 208-215.

3) Third, DHCR abridged Plaintiffs' procedural due process rights through improper retroactive application of the law and without providing fair notice of the standards by which their conduct would be judged. Plaintiffs invested $150 million based on clear statutory Safe Harbors; DHCR now seeks to impose entirely different standards retroactively, after the work is complete and the money spent. *Id.* ¶¶ 216-228.

4) Fourth, DHCR intentionally and arbitrarily subjected Plaintiffs to discriminatory enforcement compared to similarly situated persons, *in violation of the Equal Protection Clause.* Defendant can distinguish Plaintiffs from other similarly situated developers only by pointing to evidence outside the Amended Complaint—evidence that cannot be considered on a motion to dismiss. *Id.* ¶¶ 229-242.

In short, Plaintiffs' Amended Complaint states valid constitutional claims that will survive dismissal, although these buildings (sadly) may not.

The parties have met and conferred and suggest the following schedule: (1) Defendant moves on **April 17th**; (2) Plaintiffs oppose on **May 18th**; and (3) Defendant replies on **June 8th**. We defer to the Court on whether a conference would be useful.

Respectfully submitted,

*/s/ Jim Walden*

Jim Walden
Hunter Pearl
Walden Macht Haran & Williams LLP
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
jwalden@wmhwlaw.com
hpearl@wmhwlaw.com

*Attorneys for Plaintiffs*

4