1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BALANCED HOUSING SOLUTIONS,    )
et al.,                        ) Civil Action
              Plaintiffs,     ) No. 25-CV-6574 (DG)
      vs.                      )
                           )
RUTHANNE VISNAUSKAS, in her     ) PREMOTION CONFERENCE
official capacity as           )
commissioner of the New York   )
State Division of Housing and  ) Brooklyn, New York
Community Renewal,             ) Date:  March 23, 2026
                           ) Time:  12:00 p.m.
            Defendant.         )
_____

TRANSCRIPT OF PREMOTION CONFERENCE
HELD BEFORE
THE HONORABLE JUDGE DIANE GUJARATI
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiffs:        James A. Walden, Esq.
                           Hunter Pearl, Esq.
                           Walden Macht Haran & Williams LLP
                           250 Vesey, 27th Floor
                           New York, New York  10281
                           212-335-2031

For the Defendant:         Linda Fang, Esq.
                           Bronwyn James, Esq.
                           New York State
                           Office of The Attorney General
                           28 Liberty Street
                           New York, New York  10005
                           212-416-8580

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.
_____

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

2

(Proceedings commenced at 12:00 p.m., in open court, to wit:)

THE COURTROOM DEPUTY:  Your Honor, the matter of *Balanced Housing Solutions v. RuthAnne Visnauskas.*

Is counsel for the plaintiffs ready?

MR. WALDEN:  Yes, sir.

THE COURTROOM DEPUTY:  State your appearance for the record, please.

MS. FANG:  Jim Walden of Walden Macht & Haran, joined by paralegal Katherine Mannion and associate Hunter Pearl.

And these are the cofounders of Peak, David Gomez and Alex Rabin.  And then there two of the 101 investors sitting in the back.  I assume you don't want their names.

THE COURT:  No, that's not necessary.

Good afternoon to everybody.

THE COURTROOM DEPUTY:  Counsel for defendant, please state your appearance.

MS. FANG:  Good afternoon, Your Honor.

Linda Fang from the New York State Attorney General's Office on behalf of the defendant.  With me, my colleague Bronwyn James.  I will be speaking.

Thank you.

THE COURT:  Good afternoon to both of you.

I have a threshold question here:  How many

3

plaintiffs are there?  Is it just the one plaintiff, or are there multiple plaintiffs here?  The caption of the amended complaint doesn't make that particularly clear.

MR. WALDEN:  Sorry, Your Honor.  There are multiple plaintiffs.  In response to the original letter for a premotion conference, we essentially added all of the LLCs and all of the individuals that are now the subject of what I'll call the state action.  They are all plaintiffs.

THE COURT:  Okay.  So I'm going to direct that the caption of the case be -- I'm sorry, the docket be updated. You will have to enter notices of appearance on behalf of any plaintiff that you represent.

Does the defendant want to comment on this?  Or was it your understanding that there are now multiple plaintiffs?

MS. FANG:  Yes.  That was part of our understanding, that among the amendments that were made, was to add the property owners or the LLCs that owned the properties as part of the plaintiffs in this case.

THE COURT:  Okay.  Everyone's on the same page then, and we will just clean up the docket on that, and you will enter your notices of appearance on the docket once the additional parties are added.

MR. WALDEN:  Thank you, Your Honor.

THE COURT:  Okay.  So this is the first conference you're having before me.  I think it makes sense before we get

4

into talking about the anticipated motion to dismiss for the parties to tell me from their perspective what the case is about.  Just give me, you know, really, a summary of the issues that you anticipate being involved here, even beyond the PMC request.

Mr. Walden, why don't you go ahead.

MR. WALDEN:  Your Honor, I'm going to tell you in advance I have a tendency to be a little bit long-winded, and so I'll try to keep it as short as possible --

THE COURT:  Okay.  Just speak slowly for the benefit of the court reporter and for my benefit as well.

MR. WALDEN:  Thank you, Judge.

I'll start with the regulatory context that we're in.

In the city of New York, there are rent-stabilized apartments.  They are at lower rents, obviously.  For more than 30 years there was a program that derives from an act of the legislature saying that if there was a substantial renovation of apartments, developers could deregulate the apartments.

Now, the agency that oversaw what came to be known as the Sub Rehab Program, S-u-b, R-e-h-a-b, Sub Rehab Program, was the Division of Housing and Community Renewal, which I will refer to as DHCR.

Now, DHCR could have written the regulations any way

5

it chose to.  For the first approximately nine years of the program, it didn't write, really, any regulations at all.  And it wasn't immediately apparent to the courts that were dealing with cases what it meant to have a substantial rehabilitation because tenants sometimes complained that their rents went up when they thought that they were in rent-stabilized housing after a substantial renovation.

So DHCR put out an operational bulletin that is referred to as 95-2.  And the operational bulletin, courts have said, essentially, are the regulations for the Sub Rehab Program.  And because the legislative purpose of the Sub Rehab Program was to invest -- sorry, Your Honor -- was to get investment in degraded housing in the city of New York, DHCR at that time wanted to make it super clear how a developer could comply with the program.  And, basically, there were two safe harbors.

Safe harbor number one was that a building was deemed to be in substandard condition as long as it was 80 percent vacated.  And the second condition is as long as 75 percent of the building systems were replaced, it qualified for the work.

Now, Your Honor, it's super important to understand that this program from DHCR, they could have required an application, they could have required renovation plans, they could have required a post renovation certification.  They

6

didn't do any of that.  So it's a self -- they in their own literature describe it as a self-executing program.

So, of course, what happened over the course of the time from 1995 until now is that developers, like the guys from Peak, invested substantial amounts of money in these degraded structures.  Many of them are 100 or more years old.  In terms of the 31 buildings that are the subject of this, some of the buildings are as old as before the turn of the century.  None of them had any substantial investment or building system upgrades or replacements.  So these are the exact kind of substandard buildings that the legislature was trying to promote.

So these safe harbors went along, and then the political world shifted right around the time that they were finishing all of the work on their portfolio.  What happened was that the substantial renovation program fell out of favor, the legislature gutted it in December of 2023, effective for January 2024, and then subsequently DHCR amended, through the public process, amended its operational bulletin to take into account the new tighter standards for a substantial renovation.

So the problem we face, Your Honor, is when I came into the case, I wasn't the first law firm that was representing Peak and its investors, we were essentially forced with a gun to our head to agree to re-regulate the 159

7

buildings in the 31 -- I'm sorry, 159 apartments in the 31-building portfolio.  But to have done that would mean -- because these are very unattractive projects, because they are old and they require substantial investments and substantial mortgages to fund them, they are already operating at roughly a 6 percent margin.  For real estate in the city of New York to be throwing off 6 percent margin is basically enough to make extraordinary changes when like the boiler blows or something along those lines.  So these are very thin margin projects.  So to essentially cave to the Attorney General's demand would have meant that a substantial number of the buildings would have gone into insolvency.

So we brought this federal action hoping, hoping, hoping, hoping, that once we made clear that there was a retroactive application of a standard that did not apply at the time that my clients invested $150 million into this portfolio, that the Attorney General's Office would see the light.

Instead, what they did, six days later, was to run into state court with, clearly, a half-baked complaint.  And I don't think that the lawyers who are here are not the lawyers on this state action side.  These two lawyers are from the defensive part of the Attorney General's Office.  The tenant protection unit, so-called, are the lawyers on the state action case.  They have told us, we rushed.  You know, we know

8

that we have to amend the complaint to add allegations against the 36 people that we added nothing about.

Why they rushed, Your Honor, from my perspective was certainly PR and jurisdictional.  They wanted to be in state court where they feel they have an advantage, and they didn't like the PR that was happening with the federal suit.

THE COURT:  But you're not taking issue with the representation that there had been an investigation prior to the filing of the state case?

MR. WALDEN:  No, no, no.  There absolutely was, Your Honor.  And I can speak to that.

So, in any event -- I'm almost done -- the damage that has been done already because of the way their office did this is so incredibly unfair, but I'm not just saying that as a talking point, it has constitutional dimensions to it because this is why this case is ripe.  This is why you shouldn't abstain.  The case law has been clear.  Even as the *Younger* abstention doctrine has gotten clawed back with the advent of cases like *Sprint*, the Supreme Court case *Sprint*, and the Second Circuit case *Geballe*, it is very clear that harm means that speed should apply.

What harm do I mean, Your Honor?  Technical defaults on mortgage.  Every single one of these buildings has a mortgage that was entered into before any of the legislatures and DHCR's prospective changes to the Sub Rehab Program, and

9

certainly none of those lenders had any idea that the Attorney General and DHCR would be trying to retroactively change program requirements.

Peak is essentially at this point out of business. They've had to lay off whatever staff that they have. Obviously, it's caused immense reputational damage, and it has also caused one significant lender to exercise buyout rights under their contract so that they're going to take over the property specifically because they don't want to be affiliated with Peak anymore.

So the damage is largely because they used -- and I'm happy to unpack this Your Honor -- completely frivolous theories for two of their claims in order to accuse these developers of fraud and deceptive practices.

THE COURT:  Go ahead.  Why don't you unpack it for me.

MR. WALDEN:  Yes, Your Honor.

So under 63(12) of the executive law, it gives the Attorney General the ability to -- 63(12), by the way, Your Honor, has never been used in rent stabilization as far as we were able to tell.  So it's completely novel use of 63(12) to begin with.  Certainly they never have brought a case before this.  This is a first of its kind case with respect to the Sub Rehab Program for sure.

My guess is, Your Honor, that if you do what I'm

10

going to ask you to do today, which is to schedule a hearing and discovery before the briefing on the motion to dismiss, I think that what you're going to find is that those charges were added.  The charges, Your Honor, are 63(12) of the executive law, and then sections 349 and 350, which have to do with consumer-facing practices.

I think that what you're going to find is that the original attorneys intended to bring only a regulatory case against my clients, and then because we filed federal suit, they added claims sounding in fraud.  There was no fraud, Your Honor.

It is so well documented that Peak and the investors and the banks all knew that they were using the self-executing program, the banks did diligence on the buildings, there were lawyers involved on all sides.  This was an incredibly complicated series of transactions.  And yet without any evidence at all, they used the top two counts to accuse both the Peak guys and all of the other defendants of essentially fraud.

And what's the fraud, Your Honor?  The best that I can tell, because it's not really apparent in the complaint, is that my clients knew that the buildings wouldn't qualify as substandard, and yet was telling other people that the buildings qualified as substandard.

Now, that doesn't sound like a fact to me,

11

Your Honor.  It sounds like legal opinion.  And certainly we have found no case where that is actionable.  But putting that aside, Your Honor, those charges will not be sustained when we make our motion to dismiss in the state court action, not just because they're unprecedented, because the complaint does not actually -- the state action complaint doesn't actually plead the elements that are required for fraud and deceptive conduct.

And in particular, Your Honor, and this gets back to the original thing that I was talking about, the program is self-executing.  It doesn't require any regulatory permissions.  It is essentially a good faith effort to try to find substandard buildings.  And there's going to be no question about the fact that, A, their use of the program was disclosed to everyone, including the tenants, by the way, Your Honor, because the tenants got a rider in their lease saying that we did a substantial renovation, you can't say that this is a rent stabilized apartment.  So they were incredibly careful.

But also, Your Honor, the complaint in the state action doesn't even address whether or not they qualified for the presumptions.  If they qualified for the presumptions over a 30-year regulatory history, DHCR considered compliance with the presumptions to be irrefutable proof that the buildings qualified for the Sub Rehab Program, and now because the

12

political winds have shifted, they've decided that they're going to go after developers who had Sub Rehab cases with buildings that they now say after the fact were not substandard.

The problem, Your Honor, is, do you know how many companies or individuals they have gone after other than the people named here?  Zero.  Zero.  Why they chose Peak and its investors, it beats me, Your Honor.  What I know is that there is an enormous company that has been doing this for years, which is how these guys found out about the program to begin with, because as you can see, they are all pretty young and starting their careers, and that company was investigated by the Attorney General's office for a number of different things, including illegal deregulation of apartments using the substantial renovation program.

In that case, Your Honor, which is Company A in our complaint, the Attorney General's Office found tenant harassment.  None of that exists here.  The harassment included trying to chase tenants out of the buildings by cutting off essential services.  Nothing like that ever happened here.

During the course of their substantial renovation work, the AG's office found that there was 1,900 violations of health, safety, and maintenance code.  1,900.  And the kicker is they also found that this Company A was charging elevated

13

rents, deregulated rents, for people who remained in their apartments.  And the rent stabilization laws are super clear. If there's a tenant that stays in an apartment during a substantial renovation, the rent stabilization benefit goes to the tenant now, not the apartment.  So when the tenant leaves, then the landlord can increase the price, but you can't increase it.  The Attorney General found all that stuff.

Nothing like any of that happened here.  Company A, how many of its units or its buildings was it forced by the Attorney General's office to re-regulate?  Zero.

THE COURT:  All right.  Can you tell me what the state of the state action is right now?  You mentioned that you intend to file a motion to dismiss.  But what is the schedule in that court and where do things stand?

MR. WALDEN:  Yes.  So our motion to dismiss is -- we're moving to dismiss, to stay, to sever, and to strike paragraphs of the complaint.  And that's due on April 2.

Now, to be fair, Your Honor, I just want to be completely candid with the Court, obviously this is wreaking havoc, and, ultimately, the people that are going to be hurt by what's going on right here are the tenants.  It's not just Peak, it's not just their investors, it's not just the banks. It's the tenants.  And so we've been trying to settle the case.  We made a very substantial offer.  That was rejected without a counter.  We made a second offer.  That wasn't

14

rejected, but nor was it accepted.  We understood we were going to be getting some sort of counterproposal, and it's been a month now.  And in the meantime, although I am trying to do everything possible to keep my legal fees as low as possible, my legal fees alone are literally eating up almost every single dollar of that 6 percent.

So this is not a sustainable situation.  And we have been very transparent and clear with the AG's office about that.  But we've also been transparent with the AG's office about the fact that we know, because we have L&T experts that are consulting with our case that have long histories with DHCR, including some that used to be at DHCR, that there's a tremendous amount of exculpatory evidence in DHCR's files about buildings that look exactly like ours, that actually for various reasons submitted, because you have the option of submitting an application first, actually submitted applications before anything got approved.  And the Attorney General's office will not, voluntarily at least, disclose any of that information to us.

THE COURT:  Okay.  Let me turn to counsel for defendant to tell me from your perspective about the case and then about your anticipated motion.

MS. FANG:  Sure, Your Honor.  Thank you for this opportunity.  I just want to address a few threshold points that I just want to make sure I don't forget to address.

15

I think one of the two points I wanted to make at the outset, this is not a -- counsel's mentioned a bunch of times, and in the complaint as well, referencing this is a Sub Rehab Program.  This is not a program.  It's an exemption from rent regulation, and that's all it is.  That's what the operational bulletin has always operationalized it as such.

And just because this is a self-executing exemption doesn't mean that individuals can choose whatever standards they want and hope that they are the only -- they get to decide on their own whether or not they meet the exemption or not.  Because the standards are always clear, even in the operational bulletin, about the owner has to demonstrate that they qualify for the exemption, if it's ever challenged, to the satisfaction of the division.  So that's the first threshold point.

And the second one I just want to respond, I don't -- I am here defending against this particular action. I am not in the part of my office that's bringing the affirmative action.  But I do want to be able to respond to the extent that counsel has cast aspersions on my office and the complaint and the timing of this, which he's brought up. And I really try to keep a lot of this out of the letters because I don't think it's really relevant to the legal analysis, which I do want to talk about here in terms of what claims are actually at issue in this complaint that Your Honor

16

is considering.

This was a 67-page complaint that my office filed on behalf of the Attorney General's Office and also on behalf of my client agency, DHCR. That complaint, which we attached as Exhibit A to our first premotion letter, is a fulsome -- it's a fulsome filing. And I just want to respond a little bit to the timing of how things occurred.

As plaintiffs acknowledge in their complaint, this investigation has been going on for two years prior to 2025. So I believe it started in 2023. That's referenced in the state court complaint that my office filed. That's also acknowledged in plaintiffs' pleading, that it was going on for two years before plaintiffs brought this federal action.

And I don't think it's -- to breach any sort of confidentiality, but the parties were in, what I understand, settlement discussions to resolve that investigation, and they had what my office and DHCR had understood were continuing settlement obligations. In fact, from what I understand, they had a settlement, a further follow up meeting scheduled for the day after the federal complaint was filed in this case.

And that's the posture which the federal complaint was filed. It was filed two days before Thanksgiving. And on the Monday thereafter, my office filed the 67-page complaint. It is incredibly detailed. We did want to attach it as an exhibit, which we did. It details, I think, the theory of the

17

state court enforcement action.

And, ultimately, though, I want to turn to this case, because the merits in what Mr. Walden has spent a lot of time talking about, the program and the purported change of standards and things like that, and whether or not the state court action complaint is adequately pled, those are all claims and defenses and arguments that can and should be raised in the state court action.  And the only reason that the timing of the two actions are the way that they are is because my client believed that we were still in ongoing settlement discussions with, I guess, Mr. Walden's clients at the time that they decided to file the federal complaint.  So they won the race to the courthouse, but it was not a race that we understood we were in until the federal action was filed.

But I want to turn now to really talk about the claims that are actions before this Court.  And the claims here, as stated in the amended complaint, are a regulatory takings claim, a substantive due process claim, a procedural due process claim, and as most recently amended, an equal protection class of one theory claim.

I think we've detailed -- even putting aside the threshold issues we've raised about the lack of associational standing, that was the original plaintiff that brought the case, the Balanced Housing Solutions association, now

18

plaintiffs have amended the complaint to basically make the identity of the parties exact across the two cases now.

But putting aside the issues of standing and ripeness that we raised in our first premotion submission, I think fundamentally *Younger* is dispositive here because everything that plaintiff has raised about the problems with the investigation or what the division may have in terms of, quote, purported exculpatory evidence, can all be litigated and should be litigated in the state court.  And the state court, federal courts have consistently recognized, is a neutral and competent forum for litigating constitutional claims and defenses like those plaintiffs have brought here.

And turning to the other -- I think even putting aside the threshold issues, we've detailed in -- I think the case law is pretty clear as to why all of the claims that plaintiffs have pled, even if you were to get to the merits, fail as matters of law.  I think the Second Circuit has issued a pair of decisions, most recently 2023, that addressed pretty much all of the arguments that plaintiffs are trying to raise here in terms of a regulatory takings claim.  And the Circuit has consistently rejected plaintiffs' contention that loss of profits or investments can be sufficient to plead a regulatory takings claim.  And that's really all that's been pled here, even when plaintiffs amended.

Even in cases -- there's, you know, a lot of cases

19

we can collect, and we did collect in the first premotion submission about even if there is a severe diminution of property value, which is not pled here, that the properties become essentially valueless, or 75 percent loss of property value in light of a state regulatory action is still not sufficient to state a regulatory takings claim as a matter of law.  And putting that aside, the substantive due process and the procedural due process claims, there's still no cognizable property interest because loss of profits or being able to only charge regulated rents as opposed to unregulated rents has not been recognized to be a property interest because the Second Circuit has made clear that the proper -- those claims are properly analyzed under the takings clause, so taking you back to the regulatory takings analysis.

And, here, for the additional reasons we put in our second premotion letter about the equal protection claim, there just isn't sufficient allegations of anyone who's similarly situated, because all they've cited to is this supposed settlement agreement that the division and my office reached.  But if you look at the AOD in that case, there is no mention of substantial -- of the investors in that case or the property developer in that case improperly taking advantage of the substantial rehabilitation exemption.  And so in that case that's also a settlement, which is a very different situation than what we're facing right now, which is an enforcement

20

action.  And for those reasons we don't think that claim has also been adequately pled.

And on the final point about the *Younger* abstention, one of the things that plaintiffs said they wanted to amend their claim to do is to add the bad faith allegations in order to hopefully bypass *Younger*.  And as we set forth in our second submission, they've not pled anything that comes close to warranting even pleading as a matter of law that there is bad faith.  All they've said is, there's a novel legal theory, or the idea that this hasn't been litigated in this way before, and the alleged fraud claims shouldn't be -- shouldn't go forward because they potentially should be dismissed in a motion to dismiss.  But that's going to be present in -- you know, a party's disagreement about how a government agency is proceeding in an enforcement action, that alone isn't going to be sufficient to demonstrate bad faith, or otherwise that exception wouldn't be really the narrow exception that the Second Circuit has repeatedly said is the standard by which it should be judged.

And in this case, because the inadequacy of the pleading here, even though what they pled, even if true, is not sufficient to satisfy bad faith, that's why there is no -- there shouldn't be an evidentiary hearing.  And the cases that plaintiff has cited for going to have an evidentiary hearing are distinguishable.  The *Kern* case, which is cited, that was

21

a Second Circuit case.  That involved a preliminary injunction, and also involved factual sworn affidavits of bad faith based on actual motivations that in that case they claimed that the government was retaliating against them or harassing them for an improper purpose.  We don't have any of that here.

And one of the things that Mr. Walden said was actually I think dispositive, I think he said, you know, why are they going after these guys.  Beats me.  And if you don't know why, that's not -- there's no basis for alleging any sort of retaliation or bad faith.

And, here, when we look at the timeline, this investigation has long predated the federal action so there's no allegation sufficient to sustain the bad faith exception that plaintiffs are hoping or trying to invoke, and there's no reason for having an evidentiary hearing when even if you take what they pled, knowing that this is what they were trying to counter, and they haven't been able to plead sufficient subjective motivation on behalf of the state agency in harassment or retaliation, that's the end of the analysis and the complaint should be dismissed without leave to conduct an evidentiary hearing.

THE COURT:  Okay.  Your adversary spoke about settlement discussions that he or maybe his predecessor may have been having with counterparts in your office that are

22

handling the state matter.

Have there been any discussions among the parties in this federal action about resolving either the entirety of this case or any portion of this case?

MS. FANG:  I believe -- you want to speak to that?

We've talked about the federal case.  I think Mr. Walden has said -- I mean, I think really that settlement is about the state court action.  I think Mr. Walden had proposed potentially staying the federal case?  I mean, I don't want to speak --

THE COURT:  Is there more that you wanted to tell me, and then I can go to Mr. Walden, or no?

MS. FANG:  No.  We haven't had real discussions about settling the federal case because I think from our perspective, I guess, it's really about whether they settle the state court case.  But I don't think we were entertaining, really, settlement of the federal cases because the relief that's being sought is basically enjoining the state enforcement action or the ability to enforce the state laws. So it's not something that we're entertaining at this stage with respect to the federal action.

THE COURT:  Okay.  Can you comment on what I think I heard Mr. Walden say, which was that the second offer made was made about a month ago, and there has been no response?

Did I summarize your position on that?

23

MR. WALDEN:  Yes, Your Honor.

THE COURT:  Okay.  Can you speak to that?  Are things moving along at all in your office on that side in terms of resolution?

MS. FANG:  I think there's still discussions, but from what I understand, you know, the reason the extension dates have gone out so far is plaintiffs asked for the ability to extend their time to file a motion to dismiss in state court because they wanted to have these settlement discussions.  I think that's -- maybe Mr. Walden disagrees about that.  But I think it's -- I think they're still ongoing, but I'm not sure whether they will be productive or they will be fruitful.

THE COURT:  I mean, why don't you tell me your position, though, as to whether it makes sense to proceed with the litigation here, including with your motion, while these discussions on the state side are proceeding?  Or does it make sense to stay this matter or defer the motion briefing for some period of time?

MS. FANG:  It is our position that we'd like to move forward on the motion practice here.  I think Mr. Walden had discussed potentially staying the federal action, and I suggested that we could -- I suggested that potentially we could just -- he could dismiss without prejudice, and then he could reinstate it later, which would accomplish the same

24

purpose, but short of that, we'd like to proceed on the motion.

THE COURT: Okay. I will hear from Mr. Walden on that issue of sort of next steps and what you think you're looking for in terms of the state and the federal cases.

MR. WALDEN: I understand completely, Your Honor.

So on that issue, let me just clarify. What was happening before I entered the case from -- I wasn't there, so I'm repeating what the other lawyers told me, was not a settlement negotiation. It was essentially, from their perspective, an ultimatum, that if there wasn't an agreement to re-regulate at a formula that would put the buildings in insolvency anyway, that there was not going to be any resolution.

Whether that's accurate or not, Your Honor, I can't really say. What I know is that when I came in the case I said one of the things we need to do is to try to stop this from going and try to level-set the playing field.

Since I've been in the case, I've personally made two settlement offers. One was an incredibly complex and complete set of relief that would have essentially gotten the AG and DHCR an equivalent number, not exactly equivalent, but a roughly equivalent number of re-regulated apartments, including for a new building. That was the one that was shot down.

25

Then we went back to them with a very, very detailed set of spreadsheets for every single building that listed every single apartment, and what would happen to every single apartment if the rents were recalculated at lower than their current amount.  And it was insolvency.  Not across the board. I think for 28 of the 31 buildings, Your Honor.  And we offered to re-regulate a certain number of the 159 units at their current rent.  That was -- I don't know if it was rejected or not yet.  That's the one that's been pending for a month.

Would you like me to stop now or --

THE COURT:  Yes.

MR. WALDEN:  -- address abstention?

THE COURT:  Well, let me -- I would like you to address abstention, but let me ask you specifically to speak to the *74 Pinehurst* case, because I think that is the case that defense was referencing.

Is that right?  The 2023 Second Circuit case.

MS. FANG:  There were two cases issued around the same time.  There's *Community Housing Improvement Program* and *Pinehurst*.  I think *Pinehurst* came slightly later, but they were litigated at the same time.  But they both address all of these issues.

THE COURT:  Right.  And I do want to speak to that because your adversary takes the position that those cases

26

sort of dispose of your arguments.

MR. WALDEN:  Yes, Your Honor.

So the *Pinehurst* case, Your Honor, if you remember, it was a question about enjoining a piece of legislation, the HSTPA of 2019, which is one of the bills that has -- according to the development community, has substantially degraded the interest in any investment.  And in that *Pinehurst* matter, the court said that there needed to be an application of the legislation to the properties at issue before it could decide any sort of regulatory takings claim.

But what my colleague did not talk to you about is the cases that are apples to apples.  That had to do with legislation and holding up forward-looking legislation.  We're talking about a retroactive regulatory taking.  So I would draw Your Honor's attention to two other recent cases, the *Variscite v. New York Cannabis Control Board*.  In that, it was the change to a licensing scheme that would have had a significantly negative impact on cannabis shops I believe in mostly disadvantaged neighborhoods.  And in that case the court allowed the case to go forward under Second Circuit and Supreme Court authority that said you don't have a ripeness problem if you're dealing with a pure issue of law, which this is.  Are they allowed to retroactively change the requirements of the Sub Rehab Program and immediate harm.  And under that case and the cases like it, and we can provide additional

27

briefing on this, Your Honor, I honestly didn't realize that they were still making the ripeness argument because it wasn't repeated in the second submission.  I just realized it late last night.

And there's another case that is essentially a different sort of ripeness analysis where the agency in question has essentially made a de facto final decision.  And that case is called *Ateres*, A-t-e-r-e-s, *Academy v. The Town of Clarkstown*.  It's a Second Circuit case in 2023.  There, Your Honor, a religious group was trying to open -- was trying to buy a piece of land to start a new school for kids of a certain religion.  And the town would not hold a hearing on their application to get a zoning variance that would be required to get the school built.

And even before taking any sort of action, including going to City Hall, they filed a regulatory takings claim on the basis of the fact that they lost a mortgage, right, which is very similar to this.  And the court in that case permitted the regulatory takings claim to go forward.

Obviously, the *Pinehurst* case and cases like it, they're really ripeness cases, Your Honor.  And I think that you'll find very clearly in the case law, that if there is an immediate impact, and we wrestled with whether to make an injunction application and decided that it would be better and more effective to just try to get a quick decision on the

28

court, which is why we filed originally the way that we did, was mostly focused on declaratory relief.

In any event, Your Honor, I believe that there is no ripeness gateway to us proceeding, and I can stop talking and just wait for you to ask questions on abstention if you'd like, Your Honor.

THE COURT:  Why don't you talk to the issue of the state court and whether -- the adequacy of the state court to address the federal issues.

MR. WALDEN:  Yes, Your Honor.

So, Your Honor, I think the leading case there is the *Gerstein v. Pugh* case.  And that made -- and this kind of ties to why we did this as a membership organization to begin with, Your Honor, because that membership organization was intended to be a vehicle for all of the real estate development community that had Sub Rehab programs because of the fear that the Attorney General's office, because of the flexibility in this statute of limitations, would start after getting done with us, start picking off others.

So *Gerstein v. Pugh* says very clearly that where you have declaratory relief that goes beyond the people -- the individuals in the case, that the alternative forum is not adequate.  The only case that they cite on this issue, Your Honor, by the way, for whatever it's worth, is the *Wilton* case.  It's 515 U.S. 277.  It's a 1995 Supreme Court case.

29

And that case is not even an abstention case, Your Honor. That case is about the declaratory judgment act and whether or not in the context of the DJA, what the standards are for adequate forum.

So I answered the wrong question, Your Honor, and I will stop and wait for another one, unless you'd like me to address that abstention --

THE COURT:  If there's anything more you want to say on abstention, go ahead.

MR. WALDEN:  Oh, sure, Your Honor.  And I'll try to keep this as brief as possible, Your Honor.

I have three points to make.  The first is that scheduling -- we would ask you not to schedule the briefing, but, rather, to do what I believe the law compels you to do, which is to give us a hearing and discovery on the bad faith exception.  The cases couldn't be clearer, Your Honor, from the Supreme Court breakdown to the Second Circuit, that the issue of bad faith is a subjective one.  So, of course, that is why a lot of plaintiffs can only plead it on information and belief in general terms.  And in those cases, even to this day, in candor to Your Honor, there are cases like the *Augustin* case, which is a slip opinion from this court, not you, Your Honor, but another judge in 2025.  It was an unconstitutional gun law case where the court said your allegations are not specific enough.  The *Wilson v. Emond*

30

case, a District of Connecticut case from 2009, says the same thing.

But *Kern v. Clark* makes abundantly clear, Your Honor, that where the plaintiff makes specific allegations of bad faith --

THE COURT:  What are the specific allegations you're making here?

MR. WALDEN:  So, Your Honor, there are a number of them listed in the complaint, but I'm just going to review the top ones for you.

They fall largely into three categories.  One, disparate treatment is a form of bad faith, Your Honor, and what Ms. Fang may have omitted, because, honestly, she's probably not as familiar with the Company A case as I am.  I'm sure she's read the AOD, but if she Googles, you will see that the whole case was started in a way that's very different from here.  There were no DHCR complaints against my clients.  Again, we don't know how or why they decided to come after us.  But in that case there were tenant complaints about illegal deregulations of the buildings, and there were protests, and the protests were covered by the media.  So the comparator with Company A is a demonstration of bad faith.

Secondly, Your Honor, the timeline strongly suggests that -- and I'm -- the timeline is relevant in two ways.  First of all, it's a gating item to them even raising *Younger*,

31

right, because of this Court's decision in *Liberty Mutual*, 585 F.3d 639.  This Court has been super clear, as everyone else has, that a state court case can't be incipient, it can't be threatened.  It has to be ongoing at the time of the federal filing or else *Younger* doesn't apply.

But the timeline also speaks to retaliation, Your Honor, because when you look at the frailties of the state court action, it's abundantly clear, as the Attorney General's Office has basically admitted, that they did it hastily.  They didn't say it was for PR reasons or for a jurisdictional advantage, but that seems obvious to me.  A six date period where -- and this goes to frailty, the frivolousness of it, Your Honor --

THE COURT:  But do you dispute what your adversary said about the timing, that there was a meeting that was scheduled to take place the day after this action was filed?

MR. WALDEN:  Well, I wasn't at said meeting, Your Honor, but my understanding is it was not a settlement meeting.  It was a meeting to discuss, for the umpteenth time, according to those lawyers, the rent roll calculations and whether or not the Attorney General's Office would agree with them.  Because my understanding of what happened was, the Attorney General's office was demanding re-regulation at the lowest possible formula, which means the highest amount of damage to the buildings, and the lawyers on that side were

32

saying, but you're going to put them under water.  And the Attorney General's Office -- and I don't mean any -- I am not disparaging anyone.  They were doing their job the way that they saw it.  But the Attorney General's Office was turning a blind eye to this, so it was yet another meeting when the Attorney General's Office wouldn't provide -- and they represent DHCR.  DHCR has the rent rolls.  They could have provided their own spreadsheet of what the calculations would look like, and they refused to do it.

So in any event, Your Honor, I was going to the frivolousness of the case.  And, again, I don't want to go into too much detail, and I don't want the Attorney General's Office to take it the wrong way because I don't mean it this way, Your Honor, but it's obvious that it was hastily put together for some other reason other than the enforcement of the law, in part because it didn't follow the law.  Like a number of the claims are barred by the statute of limitations.  There's authorities that strongly suggest that their use of 63(12) and 349 are not appropriate in this circumstance.  For example, 349, as I'm sure Your Honor is aware, is a consumer-facing statute, and the law is super clear that the relationship between tenants and landlords is not a consumer issue.  For 36 of the 39 defendants, they rely on what's called group pleading.  And the case law is super clear, Your Honor, you can't do it in this context.

33

If you're talking about the -- there's federal authority on this as well, because the federal standards are different than states, and in some circumstances, federally, group pleading is more permissible than it is under state law. But you can look at like the *Loreley* case, which is 797 F.3d 160, where the court says it was okay to sue three Wachovia -- or Wells Fargo corporate entities with the same scheme without breaking it out.

But if you go to state law, Your Honor, and you look at cases like *Principia*, which is 194 A.D.3d 584, especially where you're alleging anything that has to do with wrongful conduct, you have to provide a specific breakdown, a specific breakdown of what each person is alleged to have done to contribute to the scheme.

And, Your Honor, I don't know if this is obvious, if this was obvious to you in our letters. It may not have been. But one of the people that they charged is the brother of Lindsay Lohan. And he had nothing to do with the operating. He was an investor. All he did, and which they don't even allege, is to help with some mortgage connections. And I'm not even sure they're on these 31 buildings. But he's really just an investor. They named him for the PR, Your Honor. I think that's what the discovery is going to show.

Who else did they accuse, Your Honor? The general counsel. Now, the general counsel was responsible for issuing

34

legal opinions.  He consulted with L&T counsel regularly, quality L&T counsel regularly.  He didn't have any operational control over it whatsoever.  And they accused the general counsel of fraud?

So, Your Honor, it's not just any 36 defendants that they have no allegations.  If you called either of those two men and said why are you accused of anything, they would say we have no idea other than as an investor and someone providing legal advice.  And, by the way, Your Honor, I assume you know this, but under New York law, you can't sue a lawyer because his advice ends up being wrong.

THE COURT:  Let me turn back to counsel for defendant for a moment on the issue of the suggestion that a hearing is required in connection with this motion, the anticipated motion.

MS. FANG:  Yes.  So courts in this district, most recently Judge Cogan in the *Amazon* case, which had very similar facts, especially in terms of the timing of when lawsuits were filed, and also Judge Merle in the *Augustin* case, both routinely -- so these are just two examples.  But courts routinely dismiss bad faith allegations at a motion to dismiss stage without conducting an evidentiary hearing.

And the *Jackson Hewitt* case we also cited, I think we cited judge -- I think Judge Koeltl's decision in that case, but it did go up to the Second Circuit, and one of the

35

issues there was actually whether or not the case should be remanded for evidentiary hearing on bad faith allegations. And, there, the Second Circuit said it was not necessary because the pleading was not sufficient to sustain the bad faith. So I think that's what's really distinguishable here, in that -- from the cases that did proceed or allowed an evidentiary hearing on the bad faith, is you have to look at what is actually being pled is the bad faith.

And I know Your Honor did ask that question of Mr. Walden, and his response was -- I think I heard a couple of different things throughout, which is like the novel pleading theory, the group pleading. None of those things are sufficient to state a bad faith claim. It needs to be something more.

In the *Kern* case, like I said, there was a factual -- there was a sworn affidavit that set forth the basis for -- if those allegations could be proven true, there was a potential factual dispute as to whether there's bad faith. What we have here is the typical motion to dismiss situation. Is even if you assume everything they've pled about bad faith, what they call is bad faith, what they characterize as bad faith is true, that's not enough for bad faith.

I think that the standard is quite high because of this exact gamesmanship that we have here. And I really

36

hesitate to call it that, but I think there's been enough said here that's cast aspersions on how my office has proceeded, how my client has proceeded in this allegation.

I mean, I think you can say -- maybe it wasn't a settlement discussion, but settlement discussions do have to come to an end.  And as Mr. Walden has admitted, there was -- the meeting was scheduled to provide some sort of rent calculations about the regulation.  That sounds like some step in a settlement discussion to me.  But, again, I'm not privy to those discussions.  I'm not really privy to the offers that have been made since the lawsuits have been filed about settling the state court action.  But I think I just want to make clear that I don't think any of that is really germane here to the *Younger* question, which is, you know, was it a hastily filed complaint?

Well, you know, if we were believing that we were engaged in discussions, and maybe we were towards the end of those discussions because they had been drawn out for some period, and they kind of got to the end, it's not bad faith to, you know, get to the end of those discussions before we commence any sort of action.  And so I think what is really dispositive here is that what's been pled as bad faith is not sufficient to establish bad faith as a matter of law.  So that there's not any need for evidentiary hearing, because even if the facts are what they plead, it is not sufficient to bypass

37

*Younger.*

And I just want to say, on the abstention argument, without going into *Pinehurst* and the *CHIP* case which we cited for ripeness, but also with respect to the more dispositive questions about whether they can state a claim under substantive due process, procedural due process or regulatory takings, but I think going on to the abstention argument, we actually cited *Wilton* for a separate basis for abstention. And *Wilton* is a case that says if you're looking for declaratory judgment, courts considering declaratory judgments, because of the unique discretion that district courts have under the declaratory judgment act, they should abstain in hearing cases that basically involve kind of this race to the courthouse forum shopping that I think is present here.

And in the *Amazon* case, like I mentioned Judge Cogan decided a couple years ago, it was very similar. In that case my office, the labor unit, was investigating Amazon for labor violations connected to COVID, how they were -- whether or not they were providing, you know, sufficient protections for workers during the COVID pandemic. And while in the midst of trying to resolve my office's investigation, Amazon filed a suit first, and then we filed a few days later. In that case they also alleged bad faith, and Judge Cogan found that was not sufficient and dismissed the complaint.

38

THE COURT:  Okay.  Let me go back to the issue of there being now two actions involving the same subject matter, essentially.

One view of why this case was brought here in federal court could be that it was being used as leverage in the state negotiations.  Maybe that's a cynical way of viewing it.

Why are there two actions at this point?

MR. WALDEN:  Your Honor, so I want to be super clear about something.  And I don't think take stuff personally, so I don't mean it for this reason.  But when I came into the case, I didn't know that they weren't going to send the marshals there, right.

We are in a very -- I mean, literally shortly before this meeting, they met with someone from the City who has advocated for the state to -- the state and the city to essentially release the government to take over as much housing as possible.  And what I heard from the lawyers that were responding was that they were completely -- they could care less -- and, again, I'm not casting aspersions on the lawyers that bore the case, I am just giving you the perspective of the lawyers that I spoke to.  They were not interested in whether or not it would cause insolvency in the buildings, and words to the effect of, good, we'll just deal with the bankruptcy trustee then.

39

So that is essentially why, Your Honor, we brought this as a membership organization case, which, as I'm sure Your Honor's aware, New York law specifically has a statute on this.  So we're entitled to do that.

It was only after their motion to dismiss that we decided that we would add all the plaintiffs, essentially stop taking new members to the membership organization, and just try to speed this up so that we could move this along.  So --

THE COURT:  Do you think it would be helpful in moving this case along if I sent the parties to court-annexed mediation?

MR. WALDEN:  I can answer that question for myself, Your Honor, but I'd love a chance to talk to my clients for a minute first.

THE COURT:  Sure.  Do you want to talk to your adversary as well?  If so, we can recess for a few minutes.

MR. WALDEN:  Yes, Your Honor.

THE COURT:  Okay.  Why don't the parties talk to each other.  And there will be a couple of options here.

One is to simultaneously proceed with a motion to dismiss.  I don't think that's particularly efficient.  But I'm open to the parties' views on next steps.  I'd like to do what's more efficient here.  And I think what I'm hearing is that at least from Mr. Walden's perspective, you have some motivation to try to settle these -- both these matters,

40

correct?

MR. WALDEN:  Yes, Your Honor.

And if it was a mediator or go to a magistrate for settlement, either one is fine with us, Your Honor.

THE COURT:  Okay.  Why don't you talk to your clients, and then talk to your adversary, and I'll hear from everyone.  We can recess for five minutes or so.  And if you need more time, just let Mr. D'Agostino know.

MR. WALDEN:  Thank you.

MS. FANG:  I would just state, because my clients are not here --

THE COURT:  Yes.

MS. FANG:  -- so I may be at a disadvantage to speaking with them about --

THE COURT:  Do you want to make some calls?

MS. FANG:  I'm not sure I'm going to be able to get anyone because there's a big group --

THE COURT:  Okay.  Why don't you have whatever discussions with your adversary, and then you can report back to me on where things stand.  But I do think that the next step in this federal case being mediation and/or a settlement conference might make a lot of sense in terms of efficiency. I will leave you with that.

We will recess.

(Recess taken.)

41

THE COURT:  Okay.  Everyone may be seated.

I will take an update from anyone who wants to give me an update on the parties' proposed next steps.

MR. WALDEN:  Your Honor, we are willing, and the other side is not.  So I'll let them speak for themselves.

Obviously, it would be, I think, a tremendous step in the direction of getting something that we all want, oddly enough.  But, in any event, that is what it is.

THE COURT:  Okay.  When you say you're willing, you are willing to do what, engage in mediation or a settlement conference?

MR. WALDEN:  Either.

THE COURT:  Okay.  I'll hear from defendant's counsel now.

MS. FANG:  Yes.  So, respectfully, Your Honor, I haven't had the chance to speak with my clients.  I tried to reach them, but some of them are out of the office.  I got bounces back.

So I would just -- subject to confirmation, I think like we're in the same posture as we were when we last spoke with plaintiffs about kind of next steps in the litigation as well.  I think if any mediation or settlement discussions should happen, they should, and they are now, but they should happen in the state court proceedings, and I think the claims here are not really ones that are generally amenable to

42

settlement, which is, you know, basically enjoining a state enforcement of exemption that's been long-standing.  And the regulatory taking, substantive due process, those are typically not -- you know, we do sometimes resolve them in certain cases, but I think in this case, because of the -- and the reason we have two cases is plaintiffs brought this case first, and, ultimately -- but the subject matter of the two cases is really the same.  And here we're talking about constitutional claims, and the substance of the actual settlement discussions will focus on the exemption, how it applies to particular buildings.  And for those reasons, I think we think that this case really belongs and should be in state court.

THE COURT:  But doesn't that argue, though, for not setting a schedule for briefing at this time, but really encouraging Mr. Walden and you to encourage your colleagues to really focus on the state side?  Because I think Mr. Walden wants this case to resolve and wants that case to resolve.

Do I have that right?

MR. WALDEN:  Yes, Your Honor.

THE COURT:  Okay.  So I want to do what's efficient here.  And if I set a briefing schedule here, you're not going to get a decision anytime soon.  That's just the reality of the way it's going to be.

So if you want to have a week to talk to your

43

clients and to come back and let me know whether you want me to send you to mediation or you want to stay this action, or you want to proceed with a briefing schedule, but to the extent that you think that you are going to be getting an answer on a motion to dismiss in this case anytime soon, it's just simply not going to happen.

MR. WALDEN:  Your Honor, could I prevail -- I'm sorry.  You were talking to --

THE COURT:  I'm done.  Go ahead.

MR. WALDEN:  Okay.  Could I prevail on you, Your Honor, to spend a little bit -- you've already been so generous with your time -- to spend a little bit more time on the hearing?  Because, Your Honor, I am just going to be as blunt with you as I can.

I can't tell you the number of times I have been in this exact situation with a government agency.  It is endemic to my practice, right, to the extent that I do this kind of work.

And they will take no stock of -- or report to their supervisors, which is the real problem, the litigation risks that they face, and nothing gets settled until some significant event in court.  And, Your Honor, I think that based on the cases that we've cited, we have more than -- if you look at every single one of the cases that allege bad faith where a hearing wasn't granted -- I have actually looked

44

at the complaints.  The complaints were completely ambiguous and conclusory.

THE COURT:  I don't think that bad faith is your strongest argument, based on what I've seen.

MR. WALDEN:  What I can say, Your Honor, I agree that we have -- I will take that as we have many strong arguments.  But this one, Your Honor, *Kern*, I think, makes it abundantly clear, and the *Babin* case after it, citing *Kern* makes clear --

THE COURT:  Well, I wouldn't be -- even if you could persuade me that a hearing is required, I wouldn't be addressing that outside the context of a motion.  There would be a motion made, you would make whatever arguments you want to make about the need for a hearing, and we take it from there.

MR. WALDEN:  Is Your Honor open to an argument for why a hearing should happen -- a hearing in discovery should happen first?

THE COURT:  No.  I'm really not at this point.  I think you need to -- you would need to put that in a response to a motion.  I can hear you on that, if you think that there's a reason to address the hearing issue ahead of time, ahead of a motion, but I'm not sure that there's a good reason to do that.

MS. FANG:  No.  For the reasons we've stated, that

45

isn't the right posture or the procedure to do this.  And that's kind of the push here in terms of not agreeing to mediation, you know, Mr. Walden's pushed that they're going to -- he's going to get discovery to this expedited process, which we don't think is procedurally proper.

But I would just say, I think that having a week to confer with our clients and getting back to Your Honor is helpful, but I would just say, I have had this happen in other cases, too, is that I think we would like to still probably have the motion go forward, understanding that, you know, obviously goes on your calendar in the order it comes in when it's fully briefed, but, you know, negotiations have been happening for years in this case.  So there's also the likelihood of whether or not those will ultimately be productive or not.  And so I think it certainly came to a head at some point that, you know, this case came to be filed on the federal court or Mr. Walden got involved as well after years of negotiation.

So I think there's -- I want to kind of caveat or hedge for that I think pretty likely scenario, is that if settlement discussions to ultimately resolve the state court proceeding have been proceeding as they have for the last two years, and they're ultimately not productive, at least then we will be ready for this Court to decide a motion that -- you know, we can defer for a week or a month or two months, but I

46

think we're probably going to end up in the same place.  So from our perspective, we'd be happy to just brief it and have it ready.

THE COURT:  Okay.  I mean, what I said earlier is that mediation can take place at the same time as briefing.  Parties typically don't want to do that.  But there's no reason that it can't be done.  But I am going to give you a week to consult with your client, maybe consult with your adversary further.

I will also note that I don't need your consent to send you to mediation, of course.  So if that's something you want to maybe convey to your client as well.

But I will wait for a joint letter from the parties one week from today, which is March 30.  And when I say joint letter, I am aware that you may not agree, but just put one letter in with the parties' respective positions.  And if you need more time, if you're having productive conversations and you need more time, you can let me know that as well.

MR. WALDEN:  Your Honor, can I say one more thing?

THE COURT:  Yes.  Go ahead.

MR. WALDEN:  I just wanted to clarify what I think is a developing misnomer here, misunderstanding that there was two years worth of settlement communications.  That's not what happened here.  I assume you know that.  There was a very long period of investigation where they were interviewing people

47

and asking for documents, and then at the tail end -- and there's documentary evidence of this, for whatever it's worth. That much I saw, Your Honor.  There was a demand for a specific resolution that was conveyed in writing and said agree to this or else.  That was it.  So it --

THE COURT:  When did you come into both cases? Roughly.

MR. WALDEN:  November of last year, Your Honor.  I know it was after the --

THE COURT:  2025?

MR. WALDEN:  Yes.  Yes, Your Honor.

THE COURT:  Okay.

MR. WALDEN:  And, Your Honor, for whatever it's worth, the two settlement proposals that there have been, they have been because I've made them.  Not because they asked for them.  Because they said they were open to hearing me, after a period where they were very, very, angry about the filing of the federal case, which kind of proves the point, Your Honor. So --

THE COURT:  I'm not sure what you mean by proves the point.

MR. WALDEN:  Well, Your Honor, I don't want to -- I never want to overstay my welcome, Your Honor, so I don't need to explain that unless you really want me to, Your Honor.

THE COURT:  No, I don't think it's necessary.

48

MR. WALDEN:  I thought that might be your answer.

THE COURT:  Okay.  So a week from today, March 30, I will look out for the joint letter.  I want the parties' position on what their proposed next steps are.  And if you need more time, you will let me know.

Let me just tell you, in terms of mediation, I would not be expecting a long and drawn out process.  I think mediation conducted in a relatively short period of time could be very productive.  But I think what may end up being the most productive is for the parties to come to some common ground or at least next steps in the state case.  But that's not a case over which I am presiding so I am going to just be setting the deadlines here and we will take it from there after I get your letter.

MR. WALDEN:  Thank you, Judge.

THE COURT:  Thank you.  I appreciate everybody's thorough presentations today and answering my questions.  It was very helpful.

MR. WALDEN:  Thank you, Judge.

MS. FANG:  Thank you.

THE COURT:  We're adjourned.

(Proceedings concluded at 1:21 p.m.)

**REPORTER'S CERTIFICATE**
I certify this is a true and accurate transcript of the proceedings.
Dated this 10th day of April, 2026.
/s/Annette M. Montalvo
Annette M. Montalvo, CSR, RDR, CRR, Official Court Reporter