Docusign Envelope ID: E6C46D40-0573-8755-8030-378441D417DC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BALANCED HOUSING SOLUTIONS, by its President, Hank Sheinkopf, PEAK CAPITAL ADVISORS, LLC, 4836 41 STREET OWNERS LLC, 48-33 47TH STREET LLC, 47-21 47TH STREET OWNER LLC, 51ST AVENUE OWNER LLC, 41ST STREET OWNER LLC, 47TH ROAD OWNER LLC, 70 MIDDAGH OWNER LLC, 45TH STREET NEW OWNER LLC, 44TH STREET OWNER LLC, 5317 SKILLMAN OWNER LLC, 32ND STREET OWNER LLC, 3070 44TH STREET OWNER LLC, 4745 43RD STREET OWNER LLC, 4707 OWNER LLC, 4709 47TH AVENUE OWNER LLC, 3093 44TH OWNER LLC, 4127 49TH OWNER LLC, 4542 VERNON OWNER LLC, 131 GREENPOINT OWNER LLC, 586 MANHATTAN OWNER, LLC, 94 MILTON OWNER LLC, 3230 OWNER LLC, 311 ECKFORD OWNER LLC, 250 OWNER LLC, 515 GRAHAM OWNER LLC, 4544 40TH OWNER LLC, 251 NORTH 8TH OWNER LLC, 2559 35TH OWNER LLC, 154 ATLANTIC OWNER LLC, 724 METROPOLITAN OWNER LLC, 101 GREENPOINT OWNER LLC,<br><br>       Plaintiffs,<br><br>       -against-<br><br>RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal,<br><br>       Defendant. | Case No. 1:25-cv-06574 |

**DECLARATION OF WOODY PASCAL**

1

Docusign Envelope ID: E6C46D40-0573-8755-8030-378441D417DC

**Woody Pascal** declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I served as the longest-tenured Deputy Commissioner of Rent Administration within the New York State Division of Housing and Community Renewal ("DHCR").

## Brief Professional Background

2. I held various positions before and after graduating from John Jay College in 1993, working for a number of elected officials.

3. In 2008, I was appointed as the Chief Executive Officer of the New York State Liquor Authority, a position I held for one year.

4. In August 2009, I was appointed as a Special Assistant to the Executive Deputy Commissioner at DHCR. After a year, I took over that role, serving as Executive Deputy Commissioner for the Office of Rent Administration ("ORA"). I held this position until March 2025.

5. In my role as Deputy Commissioner at ORA, I oversaw a staff of dozens of Rent Administrators and rent specialists which administered the Rent Stabilization Code ("RSC"). Both my staff and I were personally involved in adjudicating applications submitted by owners of buildings seeking an exemption from rent stabilization based upon substantial rehabilitation ("SubRehab"). I had oversight authority of, what can be fairly called, the SubRehab Program.

6. Over the course of my 16 years at DHCR, I was personally involved in or oversaw the adjudication of hundreds of SubRehab applications and petitions for administrative review.

7. Currently, I work at the New York Apartment Association, a not-for-profit organization that advocates for common-sense housing solutions.

8. I have also been retained as a compensated expert witness by Peak Capital Advisors, assisting with its defense against allegations of "illegal deregulation" of 31 buildings in Brooklyn and Queens.

9. I provide the facts listed herein in sum and substance as I authentically recall them, without the assistance of contemporaneous emails or notes.

### The SubRehab Program

10. As the Deputy Commissioner for ORA, I had many responsibilities. One of them was administering the SubRehab Program.

11. To do this, I had to familiarize myself with the background of, and context for, the program. Neither DHCR nor ORA had developed training materials. So I learned about the background of the SubRehab Program through discussions with those who had been responsible for it, which included professionals and lawyers within DHCR generally and ORA specifically ("SubRehab Staff").

12. I learned the following, which was confirmed through many years of administering the SubRehab Program.

13. The context and history began with the modern framework for rent-stabilization, the Emergency Tenant Protection Act ("ETPA").

14. In 1974, the NYS Legislature enacted the ETPA, which was an "enabling" statute. It gave local governments the power to declare "housing emergencies" due to an undersupply of livable housing. For buildings built before 1974, the ETPA gave local governments the power to classify them as "rent stabilized" and fix maximum rates and limit rent increases in some buildings.

3

15. This likely meant that owners would be limited in revenue and profit from the buildings, which might have led to under-investment and deterioration of housing, which, in turn, would negatively impact tenants.

16. So the Legislature exempted "substantially rehabilitated" buildings from a local government's power to force rent stabilization. This applied only to buildings built before 1974. But, through ETPA § 5(a)(5), the Legislature exempted all of them.

17. Deregulation was automatic if a pre-1974 building was "substantially rehabilitated," but the Legislature created no process for memorializing or certifying a deregulation or assessing whether an owner had, in fact, performed work to "substantially" rehabilitate a building, as opposed to making *de minimis* renovations that didn't meaningfully upgrade the building.

18. The ETPA gave rule-making authority to DHCR. To the best of my understanding, DHCR didn't issue any rules between 1974 and 1995.

19. Over the next 20 years, disputes sometimes reached the courts concerning SubRehab. Courts sometimes struggled to clearly define when a building was "substantially rehabilitated."

20. In 1995, DHCR issued Operational Bulletin 95-2 ("OB 95-2") to give guidance about SubRehab to courts, owners, developers, and tenants. I wasn't at DHCR then and never got information about the thinking or consideration for OB 95-2.

21. But I was responsible for its administration. And I was part of the group responsible for its interpretation and enforcement.

22. Prior to 2023, the program was self-executing in light of the Legislative exemption for all substantially rehabilitated buildings. No applications, approvals or exemption certificates

4

were required. The way we described it to people outside DHCR was, "Prove the work, get the exemption."

23. If tenants filed complaints, DHCR retained the power to investigate whether the purported SubRehab renovations complied with OB 95-2. From time to time, DHCR got complaints from tenants or elected officials about owners or landlords doing shoddy work and then increasing rents. Other times, tenants complained about the deregulation of their apartment after a gut renovation. Either way, someone needed to resolve these disputes. In the first instance, that was DHCR's job.

24. That function was generally complaint driven. If someone complained, DHCR opened a file. A junior staffer would research the issue, including the rent-stabilization history and the extent of the owner's renovation work. When the junior person had a full work-up, the matter went to a "Rent Administrator," the person I appointed to be the first decision-maker. The Rent Administrator would issue a written decision to the parties ("RA Decision"). These were unpublished decisions, made available only to the parties to the dispute.

25. Either side could appeal the RA Decision through a Petition for Administrative Review ("PAR"). Various members of DHCR's staff did a work-up on the PARs, taking information and arguments from the parties in writing. The Office of Legal Affairs ("OLA") sometimes got involved in these matters, but not always. At the end of the process, DHCR would issue an opinion in the name of a Deputy Commissioner (me). Further challenge would have to go to the courts through an Article 78 proceeding.

26. PAR decisions were the primary way DHCR administered and applied OB 95-2. It was important that they stuck to existing policy and a balanced interpretation of the rules and relevant court cases. After all, owners were making a lot of capital investments and performing

building rehabilitations, which is what the Legislature wanted. But some owners took advantage, trying to pawn apartment-level upgrades or system repairs as "substantial rehabilitations," and then unfairly increasing rents. We needed to call balls and strikes.

27.     But PAR Decisions were not a good way to decide important policy issues, in part because we were not very methodical about making the PAR decisions available to the public. We sometimes put them up on our website, but sometimes not. Those decisions were sporadically issued. We were usually not prompt even when we put them up. And we dropped them into a page on the website that was a large data dump, which lacked meaningful search features.

28.     Also, the PAR process could take a long time.

29.     To avoid this process, OB 95-2 allowed owners to seek pre-renovation opinions from DHCR ("Prior Opinions"), which were not binding but gave guidance on a prospective, specific SubRehab project.

30.     OB 95-2 also gave owners the option, after a project was completed, to seek a formal exemption certificate ("SubRehab Exemption"), whether or not they had sought a Prior Opinion.

31.     Both routes—Prior Opinions and SubRehab Exemptions—were optional under OB 95-2.

32.     To provide added certainty to developers (and to avoid administrative red tape), OB 95-2 also created "presumptions" for good-faith compliance. Although called "presumptions," DHCR treated these as compliance rules until approximately 2023 (the circumstances for the change are covered below):

   a.   Where an owner replaced 75% or more of the 17 enumerated building systems: the extent of renovations for the building was "substantial."

6

Docusign Envelope ID: E6C46D40-0573-8755-8030-378441D417DC

b. Where a building was 80% vacant without any prior finding of tenant harassment or arson: The building was "substandard or seriously deteriorated," which DHCR had added as a requirement in OB 95-2, in an apparent effort to reserve exemptions only for truly degraded buildings.[1]

33. The SubRehab Program functioned using these two rules between 1995 and 2023. We treated the presumptions as, effectively, safe harbors (although we didn't use those words, to my recollection), since renovations often were major capital commitments.

34. These rules were embedded in the forms that the SubRehab Staff used when processing applications for Prior Opinions or SubRehab Exemptions. For example, the forms instructed the SubRehab Staff to check a box to indicate whether the owner showed that 75% of building-wide and individual apartment systems were replaced. The forms instructed the SubRehab Staff to check another box to indicate whether the owner provided sufficient evidence that the building was either (a) substandard, or (b) 80% vacant when the SubRehab commenced.

35. In my more-than-decade experience as Deputy Commissioner prior to 2023, I do not recall a single instance when DHCR challenged a SubRehab project, or refused to uphold the owner's right to deem apartments as deregulated, when an owner satisfied both the 80%-vacancy and 75%-systems-replacement rules.

36. Because many lawyers specialized in counseling clients during SubRehab work, the legal bar appropriately treated these two presumptions as safe harbors. For that reason, requests for Prior Opinions (pre-renovation) or SubRehab Exemptions (post-renovation) would often focus only on: (a) 80% vacancy, rather than separately trying to show the "substandard or seriously

---

[1] I do not recall any internal discussions within DHCR about whether this standard—"substandard or seriously deteriorated"—somehow conflicted with ETPA § 5(a)(5)'s broad exemption of all substantially rehabilitated buildings, regardless of their condition.

deteriorated" condition of a building, and (b) 75% systems replacement, rather than showing graphic detail of all work performed.

37.     From time to time, DHCR knew that owners were using tenant-buyout or surrender agreements ("Tenant Buyouts") in an effort to create vacancies.  The circumstances for using Tenant Buyouts varied greatly.  Nothing in OB 95-2 prohibited Tenant Buyouts, except if an owner was pressuring a tenant to sign one, which could be a form of tenant harassment.  If there had been no finding or complaint of tenant harassment before a SubRehab, DHCR did not take a stance regarding Tenant Buyouts, owners and tenants were free to sign buyout agreements.   Until around 2023, our practice was to count vacancies from Tenant Buyouts as part of the 80% vacancy rule. Owners were not even required to disclose Tenant Buyouts, but, if they did, we sometimes asked for copies of the buyout agreements for our records.

38.     Asking for copies of buyout agreements was more common after the New York City Council passed a law regulating Tenant Buyouts in 2019.  Even so, DHCR never had a Memorandum of Understanding with the relevant city agency over Tenant Buyouts, so we were free to administer them as we had (counting Tenant Buyouts as part of the 80% vacancy rule).

39.     The paragraphs above describe the way I administered the SubRehab Program between 2010 and 2023.  The SubRehab Staff was experienced with this whole process.  OLA had a role overseeing it and signed off on several aspects, including some PAR decisions and Article 78 proceedings.  The SubRehab bar was experienced with it.  Some of the major SubRehab developers were experienced with it and relied on us to apply program requirements in an even-handed manner when disputes arose.  We did that.  During my administration, I like to think that, as a result, there were very few Article 78 proceedings challenging our decisions.

8

**Unannounced Change to the SubRehab Program**

40.     In the period between 2018 and 2023, state government began to change as tenant groups became more influential.  These changes impacted DHCR as well.  The Office of the New York Attorney General ("NYAG") also played a role.  More and more, DHCR was under pressure from elected officials, NYAG and organized tenant groups to "take their side" and start applying regulations in a way they deemed "more favorable" to tenants or creating new or changed regulations for that purpose.

41.     From the neutral perspective of an agency head, I did not see the problems in our system as so binary.  Every time we might interpret (or bend) a rule toward a tenant, it had two results.  First, we ceased being a neutral arbiter and violated the public trust.  Second, we provided less clarity to developers and owners, which would create stranded buildings and chase capital away, neither of which is in the tenants' long-term interests.  Suffice it to say, I kept advocating to maintain our role as a neutral arbiter of our programs.

42.     The pressure was most intense from NYAG, which had created a "Housing Protection Unit" that sought to encroach on DHCR and push for more "tenant-friendly" administration and enforcement.  I sometimes butted heads with personnel from that unit.  For example, they demanded unfiltered access to DHCR's computer database with the identifying information of tenants and owners—a demand I rejected.

43.     Despite my efforts, the changing political climate had a direct impact on the SubRehab Program.

44.     In mid-2023, I attended a meeting with several executives at DHCR, including Linda Rosenthal, Anthony Tatano, Bruce Falbo, Sarah McCray, Pavita Krishnaswamy, Jerry Scher,

9

Mark Palomino, and Sheldon Melnitsky. At this meeting, I learned—for the first time—that DHCR planned to change the SubRehab Program without public notice.

45. The change involved the treatment of Tenant Buyouts. Specifically, DHCR planned to take the position that such agreements might reflect that a building still had "value" and was therefore "habitable." On this basis, a buyout agreement might, in that view, reflect that a building was not "substandard or seriously deteriorated." On that basis, DHCR proposed to eliminate any disclosed Tenant Buyouts from the 80% vacancy rule.

46. From my experience, I knew that Tenant Buyouts could be used in many scenarios, including giving tenants who wanted a new home or apartment the financial means to procure it. Without investigating every Tenant Buyout, DHCR could never be sure whether a specific Tenant Buyout was evidence of financial need, habitability, practicality, something else or nothing at all. Moreover, DHCR did not have the means to investigate every Tenant Buyout. And, because no application was required for a SubRehab project during that period, DHCR generally wouldn't know if Tenant Buyouts were used. So, discounting them would only punish owners who volunteered them. To me and a few others, none of this made sense.

47. But it would be a gross generalization to say that every Tenant Buyout was proof of a building's inherent value.

48. And, without publicly disclosing the rule in advance or requiring every owner to disclose them, we would punish only owners who chose to disclose them.

49. Whether a rule change required a public process is beyond my experience and knowledge. But no one from OLA raised this issue during the meeting.

10

50. Also, the point of OB 95-2's presumptions always was to keep compliance simple and predictable to attract investment in the housing stock, which was the essential point of the SubRehab program. The new rule on Tenant Buyouts didn't fit.

51. For all these reasons, I disagreed with the change of policy on Tenant Buyouts, including because there was no intention of giving advance notice to those who might be impacted. To accommodate my latter point, during the meeting, DHCR decided to make the policy change only on prospective SubRehab applications.

52. DHCR made the change around May 2023 without public notice. I no longer have access to my DHCR records, so my estimate of May 2023 may be wrong.

53. Going forward, the administration of this policy change—unannounced as it was— was haphazard. DHCR's forms were not changed to require disclosure of Tenant Buyouts. When DHCR got requests for Prior Opinions or SubRehab Exemptions, individual DHCR specialists sometimes discounted Tenant Buyouts and sometimes did not. When DHCR got tenant complaints and DHCR investigated completed SubRehab projects, DHCR usually enforced the rule, even for projects that predated the rule change.

54. As a result, owners who had no advance notice of the new anti-buyout rule invested money in substantial renovations, but then had their exemptions denied.

### My Departure

55. In late 2024, I made the decision to leave DHCR the following year. I left, in part, because, in my view, DHCR was losing its neutrality and impartiality. In the end, there are two sides to the housing issue: people need safe and ample housing, but we also need capital investment and to respect contracts. All too often, only the first part seemed to matter.

56. Toward the very end of my tenure, I was apprised of NYAG's investigation of Peak Capital for alleged "illegal deregulation" of apartments through the SubRehab Program. I was not involved in any aspect of the investigation.

57. Having reviewed no documentation concerning the 31 buildings at issue, I express no opinion concerning whether they were properly deregulated.

58. But I will add two things:

a. First, if the record demonstrates that the apartments in these 31 buildings were 80% vacant at the start of construction, without tenant harassment, and 75% of building systems were replaced, the apartments in those buildings ARE deregulated under OB 95-2 and ETPA § 5(a)(5) based on the administration of the SubRehab Program between 1995 and 2023.

b. Second, if DHCR concedes that the buildings were sufficiently vacant, without tenant harassment, and the buildings' renovations complied with OB 95-2, but DHCR now claims the units remain rent-stabilized, it will have a significant number of documents undercutting its litigation position because DHCR approved hundreds and hundreds of buildings on this specific basis.

Docusign Envelope ID: E6C46D40-0573-8755-8030-378441D417DC

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 6th day of July, 2026, in New York, New York.

Signed by:

66A6EAC00DCF4A4...

Woody Pascal

13