# Exhibit A

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BALANCED HOUSING SOLUTIONS, by its President, Hank Sheinkopf, PEAK CAPITAL ADVISORS, LLC, 4836 41 STREET OWNERS LLC, 48-33 47TH STREET LLC, 47-21 47TH STREET OWNER LLC, 51ST AVENUE OWNER LLC, 41ST STREET OWNER LLC, 47TH ROAD OWNER LLC, 70 MIDDAGH OWNER LLC, 45TH STREET NEW OWNER LLC, 44TH STREET OWNER LLC, 5317 SKILLMAN OWNER LLC, 32ND STREET OWNER LLC, 3070 44TH STREET OWNER LLC, 4745 43RD STREET OWNER LLC, 4707 OWNER LLC, 4709 47TH AVENUE OWNER LLC, 3093 44TH OWNER LLC, 4127 49TH OWNER LLC, 4542 VERNON OWNER LLC, 131 GREENPOINT OWNER LLC, 586 MANHATTAN OWNER, LLC, 94 MILTON OWNER LLC, 3230 OWNER LLC, 311 ECKFORD OWNER LLC, 250 OWNER LLC, 515 GRAHAM OWNER LLC, 4544 40TH OWNER LLC, 251 NORTH 8TH OWNER LLC, 2559 35TH OWNER LLC, 154 ATLANTIC OWNER LLC, 724 METROPOLITAN OWNER LLC, 101 GREENPOINT OWNER LLC,<br><br>Plaintiff,<br><br>-against-<br><br>RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal,<br><br>Defendant. | Case No. 1:25-cv-06574 |

**PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION**

***PLEASE TAKE NOTICE*** that pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and the Local Civil Rules of the Southern and Eastern Districts of New York ("Local Rules"), Plaintiffs, by and through their undersigned attorneys, hereby serve the following

Requests for Admission ("Requests") to Ruthanne Visnauskas, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal ("DHCR" or "Defendant") to answer in writing, separately and under oath, the following interrogatories in accordance with said Rules and the following Definitions and Instructions. Pursuant to Rule 36(a)(3), Defendant shall serve responses to these Requests within 30 days of service.

## DEFINITIONS

1. The Definitions set forth in Plaintiffs' First Request for the Production, dated July 3, 2026, are hereby incorporated as if fully set forth herein, unless a term is otherwise defined herein.

2. **80% Vacancy Presumption** means the presumption first established by OB 95-2 Section I.B. that "Where the rehabilitation was commenced in a building that was at least 80% vacant of residential tenants, there shall be a presumption that the building was substandard or seriously deteriorated at that time."

3. **Advisory Opinions** means an opinion issued, whether or not its release was to the general public, to limited persons, or only internal, by a Commissioner, Deputy Commissioner, or other authorized individual at DHCR establishing the position of DHCR outside the context of a case or controversy before it.

4. **Buyout** means any oral or written agreement between a building owner or its agent, on the one hand, and a tenant or their agent, on the other, to procure the surrender or vacancy of a rent-stabilized apartment in exchange for some form of valuable consideration.

5. **Comparator Buildings** means residential buildings built before 1974, with between 6 and 20 apartments, which were 80% vacant before renovations were performed to replace 75% or more of major building systems after 1974.

6. **DHCR** means the New York State Division of Housing and Community Renewal, including any predecessor agency responsible for the administration of ETPA § 5(a)(5).

7. **ETPA** means the Emergency Tenant Protection Act.

8. **ETPA § 5(a)(5)** means the New York Legislature statute exempting "substantially rehabilitated" apartments from local governments ability to declare them "rent stabilized."

9. **Instant Action** means *Balanced Housing Solutions et al. v. Visnauskas*, No. 1:25-cv-06574 (E.D.N.Y.).

10. **NYAG** means the New York State Attorney General.

11. **NYAG Complaint** means the complaint in *New York v. Peak Capital Advisors, LLC et al.*, Index No. 453503/2025 (Sup. Ct. N.Y. Cnty. 2025).

12. **NYS** means the State of New York.

13. **OB 95-2** means Operating Bulletin 95-2, a guidance document issued by DHCR on December 15, 1995 concerning substantial rehabilitation of buildings built pre-1974, where such renovations occurred after 1974.

14. **PAR** means a petition for administrative review before DHCR.

15. **PCA** means Peak Capital Advisors, LLC, Plaintiff, including any or all of its executives or officers.

16. **Prior Opinion** means a non-binding advisory prior opinion issued by DHCR in response to an application by an owner of a building in which the DHCR advises as to whether the building qualifies for the substantial rehabilitation exemption.

17. **RSC** means the Rent Stabilization Code.

18. **SAPA** means the New York State Administrative Procedures Act, N.Y. State Admin. Proc. Act §§ 100–501.

19. **SubRehab Exemptions** means an official record, order, certificate or writing issued by DHCR as proof that it approved a building and/or the apartments therein as excluded from rent stabilization laws under ETPA § 5 because it had been "substantially rehabilitated" on or after January 1, 1974, pursuant to the ETPA and/or Rent Stabilization Code ("RSC") §2520.11(e).

20. **SubRehab Program** means DHCR's process, including but not limited to internal policies, rules, forms, guidelines, directives and instructions, for administering which buildings were exempt under ETPA § 5(a)(5) and/or Rent Stabilization Code RSC §2520.11(e).

21. **SubRehab Staff** means those DHCR employees, in any section, unit, or department of the Agency, whose job responsibilities included drafting, reviewing or approving Advisory Opinions, Prior Opinions, Applications for SubRehab Exemptions, responding to Tenant Complaints, or any other internal processes or procedures necessary for the administration of ETPA § 5(a)(5) and/or RSC § 2520.11(e).

22. **Subject Buildings** means the 31 buildings targeted by DHCR and NYAG: 48-36 41st Street, Sunnyside, New York; 48-33 47th Street, Sunnyside, New York; 47-21 47th Street, Sunnyside, New York; 5-13 51st Avenue, Long Island City, New York; 45-35 41st Street, Sunnyside, New York; 5-35 47th Road, Long Island City, New York; 70 Middagh Street, Brooklyn, New York; 47-34 45th Street, Sunnyside, New York; 47-25 44th Street, Sunnyside, New York; 53-17 Skillman Avenue, Sunnyside, New York; 35-34 32nd Street, Astoria, New York; 30-70 44th Street, Astoria, New York; 47-45 43rd Street, Sunnyside, New York; 47-07 47th Avenue, Sunnyside, New York; 47-09 47th Avenue, Sunnyside, New York; 30-93 44th Street, Astoria, New York; 41-27 49th Street, Long Island City, New York; 45-42 Vernon Boulevard, Long Island City, New York; 131 Greenpoint Avenue, Brooklyn, New York; 586 Manhattan

Avenue, Brooklyn, New York; 94 Milton Street, Brooklyn, New York; 32-30 41st Street, Astoria, New York; 311 Eckford Street, Brooklyn, New York; 250 North 6th Street, Brooklyn, New York; 515 Graham Avenue, Brooklyn, New York; 45-44 40th Street, Sunnyside, New York; 251 North 8th Street, Brooklyn, New York; 25-59 35th Street, Astoria, New York; 154 Atlantic Avenue, Brooklyn, New York; 724 Metropolitan Avenue, Brooklyn, New York; or 101 Greenpoint Avenue, Brooklyn, New York.

23. **Tenant Complaints** means any written complaint by any tenant alleging, in sum and substance, in whole or in part, rent overcharges or illegal deregulations of apartment(s) in relation to ETPA § 5(a)(5) , RSC § 2520.11(e) and the SubRehab Program.

24. **You** and **Your** mean Defendant.

## INSTRUCTIONS

1. Answer Request in good faith and based on reasonable inquiry. These Requests should be construed in the broadest possible manner consistent with the Federal Rules of Civil Procedure and the Local Civil Rules.

2. Your good-faith response must address the core or "substance" of each request. A technically correct but misleading or incomplete answer (e.g., denying the whole request because one minor word is off) violates Rule 36.

3. The use of capital letters, lower case letters, or quotation marks in these Requests shall not be construed to limit the scope of any specific Request contained herein.

4. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Requests all responses that might otherwise be construed to be outside its scope.

5. The use of the singular of any word shall include the plural and vice versa, and the use of a verb in any tense or voice shall be construed as the use of that verb in all other tenses and voices, as necessary to bring within the scope of the Request all information that might otherwise be construed as outside its scope.

6. In each instance, if any, where You deny knowledge or information sufficient to respond to a Request, or any part thereof, include the following information: (a) describe the steps taken to make reasonable inquiry, including the names of the persons with whom You made inquiry, and (b) identify each person known or believed to have such knowledge. If You lack information to answer a whole Request, You may assert a lack of knowledge only after explaining what reasonable inquiry was made and that the available information is still insufficient (Rule 36(a)(4)). You cannot use partial knowledge as an excuse to answer an entire Request where partial knowledge requires a partial admission. With respect to these RFAs, it would be unreasonable to respond without carefully questioning the following long-standing DHCR personnel, who are still employed by DHCR: Ruthanne Visnauskas, Sheldon Melnitsky, Betsy Mallow, James Ferrara, Anthony Tatano, Bruce Falbo, Sarah McCray, Jerry Scher, Helen Matthews, and Patrice Huss.

7. If, in responding to this set of Requests, or any part of it, You encounter any ambiguity in construing either any Request or instruction relevant to the Request, You shall construe the Request in the broadest manner reasonably calculated to lead to information relevant to any issues or potential issues in this case and set forth in Your response the construction chosen or used in answering the Request.

8. If Defendant contends that any Request, in whole or in part, is objectionable on privilege grounds or otherwise, state the basis for each objection, state the part of the Request to which the objection applies, and respond to the Request to the extent it is not deemed objectionable.

9. If a partial admission is required, Defendant shall specify the scope of the admissions. For example, if a Request states "Admit that, between 1 and 5 pm, Defendant was at home," and Defendant must give a partial admission, Defendant could state "Admission that defendant was at home between 1 and 4 pm."

10. If, in responding to a Request, Defendant claims any ambiguity in construing either the Request or the Definitions and Instructions relevant to the Request, Defendant shall set forth the matter deemed ambiguous, the construction of the ambiguity that it believes is most reasonable and answer the Request applying that construction.

11. The Requests are continuing in nature and require that You promptly produce additional or amended responses if new or further information is obtained or discovered after the time responses are served in accordance with Federal Rule of Civil Procedure 26(e).

**REQUESTS FOR ADMISSION**

1. Admit that DHCR is the exclusive agency in NYS with regulatory authority to administer and evaluate which buildings are exempt from rent regulation under ETPA § 5(a)(5) and RSC § 2520.11(e).

2. Admit that DHCR is the exclusive agency in NYS to administer Prior Opinions, Advisory Opinions, Exemptions or Tenant Disputes, as it pertains to which buildings are exempt from rent regulation under ETPA § 5(a)(5) and RSC 2520.11(e).

3. Admit that DHCR is the only agency in NYS government that administers the SubRehab Program.

4. Admit that, between 1974 and December 14, 1995, DHCR issued no official or formal guidance to the public for the SubRehab Program.

5. Admit that, between 1974 and December 14, 1995, DHCR issued no guidance to the public on qualification standards for SubRehab Exemptions.

6. Admit that, between 1974 and December 14, 1995, DHCR issued more than 10 SubRehab Exemptions to Comparator Buildings located in the City of New York.

7. Admit that, between 1974 and December 14, 1995, DHCR issued more than 50 SubRehab Exemptions to Comparator Buildings located in the City of New York.

8. Admit that, between 1974 and December 14, 1995, DHCR issued more than 100 SubRehab Exemptions to Comparator Buildings located in the City of New York.

9. Admit that, between 1974 and December 14, 1995, DHCR issued more than 500 SubRehab Exemptions to Comparator Buildings located in the City of New York.

10. Admit that, between 1974 and December 14 1995, DHCR issued more than 1,000 SubRehab Exemptions to Comparator Buildings located in the City of New York.

11. Admit that, between December 15, 1995 and November 21, 2023, DHCR's policy and internal rules treated the SubRehab Program as a self-executing program for building owners and their agents.

12. Admit that, between December 15, 1995 and November 21, 2023, DHCR's policy and rules did not require building owners to submit any pre-renovation application to DHCR before substantially rehabilitating a pre-1974 building and deregulating apartments therein.

13. Admit that, between December 15, 1995 and November 21, 2023, DHCR's policy and rules did not require building owners to submit any post-renovation application to DHCR to certify or approve a substantial rehabilitation to a pre-1974 building before apartments therein were deregulated.

14. Admit that, between December 15, 1995 and November 21, 2023, DHCR's policy and rules did not prohibit or restrict an owner from marketing and selling a pre-1974 building subject to substantial rehabilitation.

15. Admit that, between December 15, 1995 and November 21, 2023, DHCR's policy and rules did not prohibit or restrict an owner from marketing and selling a pre-1974 building subject to substantial rehabilitation if the owner sought neither a Prior Opinion nor a SubRehab Exemption.

16. Admit that, between December 15, 1995 and November 21, 2023, DHCR had ample notice that many substantial rehabilitations of pre-1974 buildings occurred in the City of New York for projects where the owner sought no Prior Opinion or SubRehab Exemption.

17. Admit that, between December 15, 1995 and November 21, 2023, DHCR issued no guidance to the public about the SubRehab Program other than OB 95-2.

18. Admit that, between December 15, 1995 and November 21, 2023, DHCR issued no guidance to the public on qualification standards for SubRehab Exemptions other than OB 95-2.

19. Admit that, between December 15, 1995 and November 21, 2023, DHCR issued no Advisory Opinion, whether or not publicly available, on qualification standards for SubRehab Exemptions other than OB 95-2.

20. Admit that between December 15, 1995 and November 21, 2023, DHCR treated OB 95-2 as having "binding legal effect."

21. Admit that between December 15, 1995 and November 21, 2023, DHCR OB 95-2 was not excluded from SAPA §102(2)(b)(iv)).

22. Admit that, when DHCR changed or modified any official public guidance or regulation that administered statutory commands, its policy and practice was to follow the requirements of SAPA.

23. Admit that, when DHCR changed or modified any official guidance or regulation in a manner having a potential adverse impact on putative program participants, its policy and practice was not to classify those changes as "internal management" under SAPA §102(2)(b).

24. Admit that DHCR did not officially change or modify OB 95-2 between December 15, 1995 and November 21, 2023.

25. Admit that, between December 15, 1995, and November 21, 2023, DHCR never defined the words "substandard or seriously deteriorated" in connection with the SubRehab Program in any document issued to the public.

26. Admit that, between December 15, 1995, and November 21, 2023, DHCR never defined the words "substandard or seriously deteriorated" in any Operational Bulletin, whether or not such opinion was available to the public.

27. Admit that, between December 15, 1995, and November 21, 2023, DHCR never defined the words "substandard or seriously deteriorated" in any Advisory Opinion, whether or not such opinion was available to the public.

28. Admit that, between December 15, 1995, and November 21, 2023, DHCR never defined the words "substandard or seriously deteriorated" in any Prior Opinion, whether or not such opinion was available to the public.

29. Admit that, between January 1, 1974, and December 14, 1995, DHCR never defined the words "substandard or seriously deteriorated" in any order issued by the DHCR,

whether by Rent Administrator, Deputy Commissioner, or other person authorized to issue an order, whether or not such response was available to the public.

30. Admit that, between December 15, 1995, and June 14, 2019, DHCR never defined the words "substandard or seriously deteriorated" in any order issued by the DHCR, whether by Rent Administrator, Deputy Commissioner, or other person authorized to issue an order, whether or not such response was available to the public.

31. Admit that, between June 15, 2019, and December 31, 2021, DHCR never defined the words "substandard or seriously deteriorated" in any order issued by the DHCR, whether by Rent Administrator, Deputy Commissioner, or other person authorized to issue an order, whether or not such response was available to the public.

32. Admit that, between January 1, 2022, and July 2, 2026, DHCR never defined the words "substandard or seriously deteriorated" in any order issued by the DHCR, whether by Rent Administrator, Deputy Commissioner, or other person authorized to issue an order, whether or not such response was available to the public.

33. Admit that DHCR never made the Rent Administrator's decision in *Matter of 219 Troutman*, Rent Administrator's Docket No. KR210002RP (DHCR Nov. 18, 2020), available to the general public.

34. Admit that DHCR never made the PAR decision *Matter of 219 Troutman*, Admin Review Doc No. LO210030RO (DHCR June 6, 2023), available to the general public.

35. Admit that the online repository of PAR decisions, called "Landlord v. Tenant" (https://www.landlordvtenant.com) is outside DHCR's possession and control.

36. Admit that DHCR lacks administrator access to the online repository of PAR decisions called "Landlord v. Tenant."

37. Admit that DHCR is not responsible for the content maintained by the online repository of PAR decisions called "Landlord v. Tenant."

38. Admit that DHCR does not, in the ordinary course of business, use the online repository of PAR decisions, called "Landlord v. Tenant," to publish PAR decisions for SAPA purposes.

39. Admit the date upon which DHCR made the PAR decision *Matter of 219 Troutman*, Admin Review Doc No. LO210030RO (DHCR June 6, 2023), (hereinafter, the "Buyout Change Date") was first available to the public.

a. If admitted in whole or in part, ANSWER RFAs 40, 41 and 42; otherwise, skip to Request 43.

40. Admit that the Buyout Change Date was the first date on which the public was advised that DHCR considered Buyouts as evidence of a building's condition for the purpose of qualifying for substantial rehabilitation.

41. Admit that the Buyout Change Date was the first date on which the public was advised that DHCR considered Buyouts as evidence of habitability.

42. Admit that the Buyout Change Date was the first date on which the public was advised that DHCR considered Buyouts as evidence to overcome the 80% Vacancy Presumption.

43. Admit that, when the legislature initially passed Bill S2980-C (the "Bill"), the Bill contained a provision requiring owners of buildings that had been substantially rehabilitated between 1974 and 2023 to file a post-renovation/post-completion exemption application with the DHCR for a determination as to whether the building qualified for exemption under the SubRehab Program (the "Retroactive Application Provision").

44. Admit that, after reviewing the Bill, members of the administration of Governor Kathy Hochul (outside DHCR) consulted with anyone at DHCR concerning the Retroactive Application Provision.

45. Admit that DHCR advised the Hochul Administration, in words or substance, that the Retroactive Application Provision was unworkable or that DHCR lacked the resources to process the resulting SubRehab Exemption Applications which would result from the enactment of the Retroactive Application Provision.

46. Admit that, as a result of these consultations between DHCR and the Hochul Administration, the Hochul Administration removed or struck the Retroactive Application Provision from the final bill.

47. Admit that, thereafter, DHCR's internal policy was, or procedures dictated, that it would not initiate reviews of, or administrative actions to challenge, SubRehab projects in progress or completed on or before December 22, 2023, whether through Prior Opinions, Applications for SubRehab Exemptions, or responses to Tenant Complaints.

48. Admit that, after December 22, 2023, DHCR conditionally approved Prior Opinion Applications for projects commenced before January 1, 2024 where any Buyout was disclosed.

49. Admit that, after December 22, 2023, DHCR conditionally approved Prior Opinion Applications for projects commenced after January 1, 2024 where any Buyout was disclosed.

50. Admit that, after December 22, 2023, DHCR approved Applications for SubRehab Exemptions for projects commenced before January 1, 2024 where any Buyout was disclosed.

51. Admit that, after December 22, 2023, DHCR approved Applications for SubRehab Exemptions for projects commenced after January 1, 2024 where any Buyout was disclosed.

52. Admit that, after December 22, 2023, DHCR disapproved or rejected Tenant Complaints for projects commenced before December 22, 2023 where any Buyout was disclosed.

53. Admit that, after December 22, 2023, DHCR disapproved or rejected Tenant Complaints for projects commenced after December 22, 2023 where any Buyout was disclosed.

54. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 10 SubRehab Exemptions to Comparator Buildings located in the City of New York.

55. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 50 SubRehab Exemptions to Comparator Buildings located in the City of New York.

56. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 100 SubRehab Exemptions to Comparator Buildings located in the City of New York.

57. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 500 SubRehab Exemptions to Comparator Buildings located in the City of New York.

58. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 1,000 SubRehab Exemptions to Comparator Buildings located in the City of New York.

59. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 5,000 SubRehab Exemptions to Comparator Buildings located in the City of New York.

60. Admit that, between December 15, 1995, and June 6, 2023, DHCR issued more than 10,000 SubRehab Exemptions to Comparator Buildings located in the City of New York.

61. Admit that, between December 15, 1995, and June 6, 2023, it was the policy and/or practice of DHCR to count Buyouts when calculating the 80% Vacancy Presumption for Prior Opinions.

62. Admit that, between December 15, 1995, and June 6, 2023, it was the policy and/or practice of DHCR to count Buyouts when calculating the 80% Vacancy Presumption for SubRehab Exemption Applications.

63. Admit that, between December 15, 1995, and June 6, 2023, it was the policy and/or practice of DHCR to count Buyouts when calculating the 80% Vacancy Presumption for purposes of responding to Tenant Complaints.

64. Admit that, between December 15, 1995, and June 6, 2023, it was the policy and/or practice of DHCR to count Buyouts when calculating the 80% Vacancy Presumption for purposes of approving attorney affidavits for any purpose, including in responding to Article 78 petitions.

65. Admit that, between December 15, 1995, and June 6, 2023, DHCR never issued an Advisory Opinion that DHCR required a showing of "uninhabitability" to qualify a building as "substandard or seriously deteriorated" under OB 95-2.

66. Admit that, between December 15, 1995, and June 6, 2023, DHCR never stated in a Prior Opinion that DHCR required a showing of "uninhabitability" to qualify a building as "substandard or seriously deteriorated" under OB 95-2.

67. Admit that, between December 15, 1995, and June 6, 2023, DHCR never took the position when responding to an Application for a SubRehab Exemption that DHCR required a showing of "uninhabitability" to qualify a building as "substandard or seriously deteriorated" under OB 95-2.

68. Admit that, between December 15, 1995, and June 6, 2023, DHCR never took the position when responding to a Tenant Complaint that DHCR required a showing of "uninhabitability" to qualify a building as "substandard or seriously deteriorated" under OB 95-2.

69. Admit that, between December 15, 1995, and June 6, 2023, DHCR never defined the term "uninhabitability" in any public guidance.

70. Admit that, between December 15, 1995, and June 6, 2023, DHCR never challenged a SubRehab Exemption through a Prior Opinion where the owner satisfied the 80% Vacancy Presumption and replaced 75% or more of the building's major systems.

71. Admit that, between December 15, 1995, and June 6, 2023, DHCR never denied an Application for SubRehab Exemption where the owner satisfied the 80% Vacancy Presumption and replaced 75% or more of the building's major systems.

72. Admit that, between December 15, 1995, and June 6, 2023, DHCR never approved or validated a Tenant Complaint where the owner satisfied the 80% Vacancy Presumption and replaced 75% or more of the building's major systems.

73. Admit that, between December 15, 1995, and June 6, 2023, DHCR never issued written guidance to SubRehab Staff to provide internal policies, rules or practices concerning the administration of OB 95-2, including, but not limited to, (a) whether 80% Vacancy was both a requirement and a presumption, (b) whether staff should challenge or interrogate buildings presumed to be "substandard or seriously deteriorated" based on actual, pre-renovation building conditions, (c) the impact on SubRehab qualification if Buyouts were used, (d) whether actual Buyout agreements should be requested as proof to establish the 80% Vacancy Presumption, and (e) circumstances where DHCR should conduct inspections in connection with requests for Prior Opinions, SubRehab Exemption Applications, or Tenant Complaints. **If You deny, specify the date(s) of such written guidance by topic.**

74. Admit that, between December 15, 1995, and June 6, 2023, DHCR never created or maintained a guidebook or rulebook for the administration of the SubRehab Program for use by the SubRehab Staff.

75. Admit that, between December 15, 1995, and June 6, 2023, DHCR never required SubRehab Staff to attend in-person training concerning administration of the SubRehab Program.

76. Admit that, between December 15, 1995, and June 6, 2023, DHCR never required SubRehab Staff to attend on-line training concerning administration of the SubRehab Program.

77. Admit that, between December 15, 1995, and June 6, 2023, DHCR promulgated a form to SubRehab Staff that had boxes for staff to check when evaluating SubRehab Prior Opinions or Applications for SubRehab Exemptions concerning the pre-renovation condition: (using words to the effect of) the building was (a) substandard or (b) 80% vacant.

78. Admit that, between December 15, 1995, and June 6, 2023, it was DHCR's policy and practice to conditionally approve Prior Applications for building projects that were 80% vacant before the commencement of renovation work, without requiring additional proof of substandard condition, where the project involved substantial rehabilitations consistent with OB 95-2.

79. Admit that, between December 15, 1995, and June 6, 2023, it was DHCR's policy and practice to approve Applications for SubRehab Exemptions for building projects that were 80% vacant before the commencement of renovation work, without requiring additional proof of substandard condition, where the project involved substantial rehabilitations consistent with OB 95-2.

80. Admit that, between December 15, 1995, and June 6, 2023, it was DHCR's policy and practice to invalidate or reject Tenant Complaints for building projects that were 80% vacant

before the commencement of renovation work, without requiring additional proof of substandard condition, where the project involved substantial rehabilitations consistent with OB 95-2.

81. Admit that, between December 15, 1995, and June 6, 2023, it was DHCR's policy and practice to defend against tenant-initiated Article 78 petitions challenging PAR rejections of Tenant Complaints for building projects that were 80% vacant before the commencement of renovation work, without requiring additional proof of substandard condition, where the project involved substantial rehabilitations consistent with OB 95-2.

82. Admit that, upon administrative review, in the period between December 15, 1995, and June 6, 2023, DHCR's Rent Administrators had a policy and/or practice to approve buildings as "substandard or seriously deteriorated" if, before renovation, the building was 80% vacant, without requiring additional proof of substandard condition.

83. Admit that, upon administrative review, in the period between December 15, 1995, and June 6, 2023, DHCR Commissioners and Deputy Commissioners had a policy and/or practice to approve buildings as "substandard or seriously deteriorated" if, before renovation, the building was 80% vacant, without requiring additional proof of substandard condition.

84. Admit that, in connection with Article 78 proceedings, in the period between December 15, 1995, and June 6, 2023, it was DHCR's policy and/or practice to take the position that a building was in substandard or seriously deteriorated condition upon proof that the building was 80% vacant, without requiring additional proof of substandard condition.

85. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a building being at least 80% vacant prior to substantial rehabilitation construction was sufficient to establish the building was in a substandard or seriously deteriorated condition.

86. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a vacancy procured through a Buyout required disclosure of the Buyout in connection with a Prior Opinion in order to be counted towards the 80% Vacancy Presumption under OB 95-2 or RSC § 2520.11(e)(3).

87. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a vacancy procured through a Buyout required disclosure of the Buyout in connection with an Application for a SubRehab Exemption in order to be counted towards the 80% Vacancy Presumption under OB 95-2 or RSC § 2520.11(e)(3).

88. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a vacancy procured through a Buyout required disclosure of the Buyout in connection with a Tenant Complaint in order to be counted towards the 80% Vacancy Presumption under OB 95-2 or RSC § 2520.11(e)(3).

89. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a vacancy procured through a Buyout required submission of a written agreement in connection with a Prior Opinion in order to be counted towards the 80% Vacancy Presumption under OB 95-2 or RSC § 2520.11(e)(3).

90. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a vacancy procured through a Buyout required submission of a written agreement in connection with an Application for a SubRehab Exemption in order to be counted towards the 80% Vacancy Presumption under OB 95-2 or RSC § 2520.11(e)(3).

91. Admit that, prior to June 6, 2023, DHCR changed its internal policy or practice regarding whether a vacancy procured through a Buyout required submission of a written

agreement in connection with a Tenant Complaint in order to be counted towards the 80% Vacancy Presumption under OB 95-2 or RSC § 2520.11(e)(3).

92. Admit that, prior to June 6, 2023, DHCR did not make a public notice of a changed internal policy or practice regarding the 80% Vacancy Presumption or Buyouts.

93. Admit that, prior to June 6, 2023, DHCR did not give advance notice to the public of a changed internal policy or practice regarding the 80% Vacancy Presumption or Buyouts to those who would be impacted.

94. Admit that, prior to June 6, 2023, DHCR did not issue any regulation, bulletin, memorandum, or guidance indicating a changed position with respect to the 80% Vacancy Presumption or Buyouts.

95. Admit that, prior to June 6, 2023, NYAG influenced, whether official or unofficial, DHCR's decision to change its internal policies or procedures concerning Buyouts in connection with the SubRehab Program.

96. Admit that, prior to June 6, 2023, NYAG had input, whether official or unofficial, in DHCR's decision to change its internal policies or procedures concerning Buyouts in connection with the SubRehab Program.

97. Admit that, prior to June 6, 2023, any elected official influenced, whether official or unofficial, DHCR's decision to change its internal policies or procedures concerning Buyouts in connection with the SubRehab Program.

98. Admit that, prior to June 6, 2023, any elected official had input, whether official or unofficial, in DHCR's decision to change its internal policies or procedures concerning Buyouts in connection with the SubRehab Program.

99. Admit that, prior to June 6, 2023, DHCR gave NYAG advance notice of its intention to change internal policies or procedures with respect to the 80% Vacancy Presumption or Buyouts.

100. Admit that, prior to June 6, 2023, DHCR gave any elected official advance notice of its intention to change internal policies or procedures with respect to the 80% Vacancy Presumption or Buyouts.

101. Admit that, with respect to Greenbrook Holding LLC and Greenbrook SPEs (hereinafter, "Greenbrook"), DHCR received Tenant Complaints concerning Greenbrook's buildings before entering an Assurance of Discontinuation on or about October 11, 2022. If admitted, provide the dates of all tenant complaints alleging, in whole or in part, overcharges or illegal deregulations.

102. Admit that, prior to October 11, 2022, NYAG knew that any of Greenbrook's buildings were renovated, or were being renovated, for the purposes of deregulation under OB 95-2.

103. Admit that, prior to October 11, 2022, with respect to Greenbrook, DHCR knew or had reason to know that Greenbrook used Buyouts for its SubRehab buildings.

104. Admit that, between December 15, 1995, and June 6, 2023, because no prior application or exemption to DHCR was required by OB 95-2, DHCR had no established method, process or protocol to calculate the number of units actually deregulated under the SubRehab Program in that timeframe.

105. Admit that, prior to June 6, 2023, DHCR knew, had reason to know, or was on notice that owners routinely engaged in Buyouts to satisfy the 80% Vacancy Presumption.

106. Admit that DHCR never conducted a pre-renovation inspection of any of the Subject Buildings before substantial rehabilitation work commenced.

107. Admit that DHCR never conducted a pre-renovation inspection of any of the Subject Buildings after substantial rehabilitation work was completed.

108. Admit that, prior to the filing of NYAG Complaint, DHCR never directed or instructed an employee, contractor, vendor or agent to visit any of the Subject Buildings to evaluate or assess indicia of pre-renovation condition or the extent or quality of substantial-rehabilitation work therein.

109. Admit that, as of the filing of the NYAG Complaint, DHCR had no factual basis to contest that any of the Subject Buildings failed to replace 75% or more of its major building systems.

110. Admit that DHCR has no factual basis to contest that any of the Subject Buildings replaced 75% or more of its major building systems.

111. Admit that, prior to the filing of the Instant Action, DHCR had received no written Tenant Complaints concerning the Subject Buildings.

112. Admit that, prior to the filing of the Instant Action, DHCR had received no complaint from any elected official concerning the SubRehab status of any of the Subject Buildings.

113. Admit that the 2-year investigation of PCA and the Subject Buildings, which is the subject of the Instant Action, was initiated by NYAG, not DHCR.

114. Admit that the filing of NYAG Complaint, was motivated, in whole or in part, on public-relations concerns and/or influence from elected officials.

115. Admit that the timing of the filing of NYAG Complaint was motivated, in whole or in part, based on public-relations concerns and/or influence from elected officials.

116. Admit that DHCR or NYAG contacted reporters to elicit coverage of NYAG Complaint in the five days before and after its filing.

117. Admit that DHCR or NYAG named Michael Lohan as a defendant in NYAG Complaint, in whole or in part, based on its interest in garnering public and media attention to NYAG Complaint.

118. Admit that, within 5 days before or after the filing of NYAG Complaint, NYAG contacted members of the media to draw their attention to the inclusion of Michael Lohan therein.

119. Admit that Defendant has no factual basis to conclude that the building located at 48-36 41st Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

120. Admit that Defendant has no factual basis to conclude that the building located at 48-33 47th Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

121. Admit that Defendant has no factual basis to conclude that the building located at 47-21 47th Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

122. Admit that Defendant has no factual basis to conclude that the building located at 5-13 51st Avenue, Long Island City, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

123. Admit that Defendant has no factual basis to conclude that the building located at 45-35 41st Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

124. Admit that Defendant has no factual basis to conclude that the building located at 5-35 47th Road, Long Island City, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

125. Admit that Defendant has no factual basis to conclude that the building located at 70 Middagh Street, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

126. Admit that Defendant has no factual basis to conclude that the building located at 47-34 45th Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

127. Admit that Defendant has no factual basis to conclude that the building located at 47-25 44th Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

128. Admit that Defendant has no factual basis to conclude that the building located at 53-17 Skillman Avenue, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

129. Admit that Defendant has no factual basis to conclude that the building located at 35-34 32nd Street, Astoria, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

130. Admit that Defendant has no factual basis to conclude that the building located at 30-70 44th Street, Astoria, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

131. Admit that Defendant has no factual basis to conclude that the building located at 47-45 43rd Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

132. Admit that Defendant has no factual basis to conclude that the building located at 47-07 47th Avenue, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

133. Admit that Defendant has no factual basis to conclude that the building located at 47-09 47th Avenue, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

134. Admit that Defendant has no factual basis to conclude that the building located at 30-93 44th Street, Astoria, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

135. Admit that Defendant has no factual basis to conclude that the building located at 41-27 49th Street, Long Island City, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

136. Admit that Defendant has no factual basis to conclude that the building located at 45-42 Vernon Boulevard, Long Island City, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

137. Admit that Defendant has no factual basis to conclude that the building located at 131 Greenpoint Avenue, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

138. Admit that Defendant has no factual basis to conclude that the building located at 586 Manhattan Avenue, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

139. Admit that Defendant has no factual basis to conclude that the building located at 94 Milton Street, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

140. Admit that Defendant has no factual basis to conclude that the building located at 32-30 41st Street, Astoria, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

141. Admit that Defendant has no factual basis to conclude that the building located at 311 Eckford Street, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

142. Admit that Defendant has no factual basis to conclude that the building located at 250 North 6th Street, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

143. Admit that Defendant has no factual basis to conclude that the building located at 515 Graham Avenue, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

144. Admit that Defendant has no factual basis to conclude that the building located at 45-44 40th Street, Sunnyside, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

145. Admit that Defendant has no factual basis to conclude that the building located at 251 North 8th Street, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

146. Admit that the building located at 251 North 8th Street, Brooklyn, New York, was mistakenly listed as a claimed substantial rehabilitation when its two previously rent-stabilized apartments (4L and 4R) were deregulated through high-rent vacancy in 2006 and 2009, respectively. If a partial admission is required, specify scope of admission.

147. Admit that Defendant has no factual basis to conclude that the building located at 25-59 35th Street, Astoria, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

148. Admit that Defendant has no factual basis to conclude that the building located at 154 Atlantic Avenue, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

149. Admit that Defendant has no factual basis to conclude that the building located at 724 Metropolitan Avenue, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

150. Admit that Defendant has no factual basis to conclude that the building located at 101 Greenpoint Avenue, Brooklyn, New York, was more than 20% occupied when Plaintiffs undertook their substantial rehabilitation of the building.

151. Admit that NYAG and/or DHCR consulted with members of the administration of NYC Mayor Zohran Mamdani concerning PCA or the Subject Buildings, including, but not limited to, discussion about its investigation or NYAG Complaint. If admitted, specify by name, title, date and topic, the nature of such consultation.

Dated: New York, New York
July 3, 2026

WALDEN HARAN WILLIAMS LLP

By: */s/ Jim Walden*

Jim Walden
Hunter Pearl
250 Vesey Street, 27th Floor
(212) 335-2030
New York, New York
jwalden@whwllp.com
hpearl@whwllp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2026, a true copy of the foregoing was served via electronic mail to:

Linda Fang and Bronwyn James
Office of the New York State Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-8580
Linda.Fang@ag.ny.gov
Bronwyn.James@ag.ny.gov

*Attorneys for Defendants*

*/s/ Hunter Pearl*
Hunter Pearl