UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BALANCED HOUSING SOLUTIONS, by its President, Hank Sheinkopf, et al.,

Plaintiffs,

– against –

RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal,

Defendant.

No. 25-cv-06574 (DG) (VMS)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Jim Walden
Hunter Pearl
**WALDEN HARAN WILLIAMS LLP**
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
jwalden@whwllp.com
hpearl@whwllp.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Pages**


PRELIMINARY STATEMENT ....1

LEGAL CONTEXT AND THE CHALLENGED ACTION ....4

ARGUMENT ....8

I. PLAINTIFFS STATE A VIABLE TAKINGS CLAIM ....8

A. The Takings Claim Satisfies *Penn Central* ....8

1. Character of Government Action ....8

2. Economic Impact ....12

3. Interference With Reasonable Investment-Backed Expectations ....14

B. The Takings Claim is Ripe ....15

II. PLAINTIFFS STATE A SUBSTANTIVE DUE PROCESS CLAIM ....17

III. PLAINTIFFS STATE A PROCEDURAL DUE PROCESS CLAIM ....19

IV. PLAINTIFFS STATE AN EQUAL PROTECTION CLAIM ....21

V. THE ELEVENTH AMENDMENT ....23

VI. ABSTENTION IS INAPPROPRIATE ....24

A. *Younger* abstention ....24

1. The Proceeding Does Not Involve An “Important” State Interest ....27

2. The State Action is not Quasi-criminal ....28

3. The “Bad Faith” Exception Applies ....30

B. *Pullman* Abstention ....34

C. *Wilton* Abstention ....35

CONCLUSION ....35

# TABLE OF AUTHORITIES

## Cases

*22 CPS Owner LLC v. Carter*,
84 A.D.3d 456 (1st Dep't 2011) .......... 5

306 *Wall St. Owners, LLC v. City of Kingston, New York*,
No. 1:25-CV-1815, 2026 WL 1266208 (N.D.N.Y. May 8, 2026) .......... 16

*74 Pinehurst LLC v. New York*,
59 F.4th 557 (2d Cir. 2023) .......... 13, 14, 17

*Acra Turf Club v. Zanzuccki*,
748 F.3d 127 (3d Cir. 2014) .......... 28

*Albert v. Lierman*,
152 F.4th 554 (4th Cir. 2025) .......... 23

*Allen v. Cuomo*,
100 F.3d 253 (2d Cir. 1996) .......... 14

*Amazon.com, Inc. v. James*,
No. 21-CV-767, 2021 WL 3516382 (E.D.N.Y. Aug. 10, 2021) .......... 29

*American Pelagic Fishing Co. v. U.S.*,
49 Fed. Cl. 36 (Fed. Cl. 2001) .......... 10

*Arkansas Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) .......... 13

*Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*,
No. 21-2448, 2024 WL 1061142 (2d Cir. Mar. 12, 2024) .......... 17

*Buffalo Teacher's Fed'n v. Tobe*,
464 F.3d 362 (2d Cir. 2006) .......... 8

*Cienega Gardens v. U.S.*,
331 F.3d 1319 (Fed. Cir. 2003) .......... 10

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) .......... 24

*Community Hous. Improvement Prog. v. City of N.Y.*,
59 F.4th 540 (2d Cir. 2023) .......... 27

*Copeland v. New York State Div. of Hous. & Cmty. Renewal*,
164 Misc. 2d 42 (Sup. Ct. N.Y. Cnty. 1994) .......... 5

*Cullen v. Fliegner*,
18 F.3d 96 (2d Cir. 1994) .......... 30

*Diamond "D" Const. Corp. v. McGowan*,
282 F.3d 191 (2d Cir. 2002) .......... 30

*DiBlasio v. Novello*,
344 F.3d 292 (2d Cir. 2003) .......... 21

*DoorDash, Inc. v. City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023) .......... passim

*E. Pork Prods. Co. v. New York State Div. of Hous. & Cmty. Renewal*,
187 A.D.2d 320 (1st Dep't 1992) .......... 15

*Eastern Enterprises v. Apfel*,
524 U.S. 498 (1998) .......... 9, 10, 13, 23

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 20

*Frein v. Pennsylvania State Police*,
47 F.4th 247 (3d Cir. 2022) .......... 23

*Galonsky v. Williams*,
96-CIV-6207, 1997 WL 759445 (S.D.N.Y. Dec. 10, 1997) .......... 33

*Huffman v. Pursue*,
420 U.S. 592 (1975) .......... 25, 28

*In re 60 E. 80th St. Equities, Inc.*,
218 F.3d 109 (2d Cir. 2000) .......... 32

*Kaiser Aetna v. U.S.*,
444 U.S. 164 (1979) .......... 10

*Kanciper v. Suffolk Cnty. Soc. for the Prevention of Cruelty to Animals, Inc.*,
722 F.3d 88 (2d Cir. 2013) .......... 35

*Katz 737 Corp. v. Cohen*,
104 A.D.3d 144 (1st Dep't 2012) .......... 29

*Kern v. Clark*,
331 F.3d 9 (2d Cir. 2003) .......... 34

*Knick v. Twp. of Scott*,
588 U.S. 180 (2019) ........ 16

*Kraebel v. New York City Dep't of Hous. Pres. & Dev.*,
959 F.2d 395 (2d Cir. 1992) ........ 20

*Lingle v. Chevron*,
544 U.S. 528 (2005) ........ 9, 18

*LiveVideo.AI Corp. v. Redstone*,
No. 24-CV-6290, 2025 WL 2933706 (S.D.N.Y. Aug. 12, 2025), *report and recommendation adopted*, 2025 WL 2778110 (S.D.N.Y. Sept. 30, 2025) ........ 33

*Lucas v. South Carolina Coastal*,
505 U.S. 1003 (1992) ........ 9

*Maron v. Chief Fin. Officer of Fla.*,
136 F.4th 1322 (11th Cir. 2025) ........ 23

*McCulley v. N.Y.S. Dep't of Envtl. Conservation*,
593 F. Supp. 2d 422 (N.D.N.Y. 2006) ........ 34

*Middlesex County Ethics Committee v. Bar Assn.*,
457 U.S. 423 (1982) ........ 25, 26

*Minn. Living Assistance, Inc. v. Peterson*,
899 F.3d 548 (8th Cir. 2018) ........ 28

*Moore v. Sims*,
442 U.S. 415 (1979) ........ 25

*Netflix, Inc. v. Babin*,
88 F.4th 1080 (5th Cir. 2023) ........ 31

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
491 U.S. 350 (1989) ........ 24

*New York v. Peak Capital Advisors, LLC et al.*,
Index No. 453503/2025 (Sup. Ct. N.Y. Cnty. 2025) ........ 7

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*,
673 F.3d 84 (2d Cir. 2012) ........ 35

*Nollan v. California Coastal Comm'n*,
483 U.S. 825 (1987) ........ 19

*Pakdel v. City & Cnty. of San Francisco, California*,
594 U.S. 474 (2021) ........ 16

*Panzella v. Sposato*,
863 F.3d 210 (2d Cir. 2017), *as amended* (July 18, 2017) .......... 21

*Pape v. Doar*,
160 A.D.2d 213 (1st Dep't 1990) .......... 4

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......... 8, 9, 11

*Pennell v. City of San Jose*,
485 U.S. 1 (1988) .......... 19

*Principia Partners LLC v. Swap Fin. Grp., LLC*,
194 A.D.3d 584 (1st Dep't 2021) .......... 32

*R.R. Comm'n of Tex. v. Pullman Co.*,
312 U.S. 496 (1941) .......... 34, 35

*Ruckelshaus v. Monsanto Co.,*
467 U.S. 986 (1984) .......... 10

*S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*,
624 F. Supp. 3d 261 (E.D.N.Y. 2022) .......... passim

*Sherman v. Town of Chester,*
752 F.3d 554 (2d Cir. 2014) .......... 8, 11, 14

*Sica v. Connecticut*,
331 F. Supp. 2d 82 (D. Conn. 2004) .......... 34

*Silver v. Queen's Hosp.*,
53 F.R.D. 223 (D. Haw. 1971) .......... 33

*Spargo v. New York State Comm'n on Jud. Conduct*,
351 F.3d 65 (2d Cir. 2003) .......... 26

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) .......... 24, 26, 29

*State Farm Mut. Auto. Ins. Co. v. Schepp*,
616 F. Supp. 2d 340 (E.D.N.Y. 2008) .......... 35

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
560 U.S. 702 (2010) .......... 19

*The 12th Co. LLC v. New York State Div. of Hous. & Cmty. Renewal*,
303 A.D.2d 328 (1st Dep't 2003) .......... 4

*Thyroff v. Nationwide Mut. Ins. Co.*,
460 F.3d 400 (2d Cir. 2006) ... 8

*Town of Castle Rock, Colorado v. Gonzales*,
545 U.S. 748 (2005) ... 20

*United States v. Sec. Indus. Bank*,
459 U.S. 70 (1982) ... 9

*Vermont Right to Life Comm., Inc. v. Sorrell*,
221 F.3d 376 (2d Cir. 2000) ... 34, 35

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000) ... 21, 23

*Wilson v. One Ten Duane St. Realty Co.*,
123 A.D.2d 198 (1st Dep't 1987) ... 4

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995) ... 35

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012) ... 21

*Winston v. City of Syracuse*,
887 F.3d 553 (2d Cir. 2018) ... 17, 21

*Yelp Inc. v. Paxton*,
137 F.4th 944 (9th Cir. 2025) ... 30

*Youell v. Exxon Corp.*,
74 F.3d 373 (2d Cir. 1996) ... 35

*Younger v. Harris,*
401 U.S. 37 (1971) ... passim

**Constitutions**

U.S. Const. amend. XIV ... 17, 19

**Federal Statutes**

42 U.S.C. § 1983 ... 16, 20, 25

**New York Statutes**

ETPA § 3(a) ... 4

ETPA § 5(a)(5) ... 4, 6, 12

Executive Law § 63(12) ........ 29, 31

General Business Law ........ 29

Rent Stabilization Law ........ 13, 14, 17, 19, 29, 34

**Other Authorities**

*219 Troutman LLC*,
Admin. Review Docket No. LO210030RO (June 6, 2023) ........ 7

*Clarista Realty Corp.*,
Admin Review Docket No. L021003UC (January 21, 2025) ........ 6

*Edwina Stroud*,
Admin Review Docket No. FV210027RT (June 14, 2018) ........ 6

*Lorraine St. Pierre*,
Admin. Review Doc No. AO410028RT (July 31, 2014) ........ 6

Operational Bulletin 95-2 ........ 5

**Regulations**

Rent Stabilization Code § 2520.11(e) (2000) ........ 5

Plaintiffs[1] submit this memorandum of law in opposition to Defendant's motion (the "Motion") to dismiss the First Amended Complaint ("FAC").[2]

## PRELIMINARY STATEMENT

Key factual issues are not in dispute. Starting in 2019, PCA bought 31 small, century-old, rent-stabilized buildings intending to rehabilitate and deregulate them. Like many other developers, PCA relied on a self-executing statutory exemption that removed rehabilitated buildings from municipal rent-regulation regimes altogether (the "Exemption"). For 50 years, substantially similar buildings have been exempted, including with DHCR's explicit review and approval after tenant claims of "illegal deregulation." In reliance on the Exemption and its administration, PCA amassed $150 million of investments from people, firms, and banks to rehabilitate the buildings. PCA did ample rehabilitation work on vacant or nearly vacant buildings, gutting them and replacing most building systems.[3] All this is alleged in the FAC, so the Court must accept it as true. The state's motion contests none of it.

The central question for this Court is whether a takings claim is adequately pled when—for the first time ever—the state arbitrarily singles out one developer, applies a new, unpublished, and retroactive interpretation of the controlling law (the Exemption), and then publicly and falsely accuses the developer of "illegal deregulation" and fraud, stranding the assets, cratering the

---

[1] Plaintiffs are 31 LLC Plaintiffs that each respectively own the 31 Targeted Buildings; BHS, an unincorporated association whose members comprise the 31 LLCs; and PCA, a real estate developer that, through a large group of investors, bought and rehabilitated apartment buildings in New York like the Targeted Buildings.

[2] Doc. No. 14. Plaintiffs incorporate herein all allegations in the FAC. Capitalized terms herein have the same meaning as those in the FAC.

[3] Only 30 of the Targeted Buildings were SubRehab projects. One building, 251 North 8th Street, was not a SubRehab at all. It was falsely included in the state's enforcement action.

company, and wiping out the legislatively encouraged capital investment from investors and banks (the "Challenged Action"). If the Court sustains the claim, as it should, principles of abstention demand that the Court hear it.

In terms of preliminaries, we explain one unusual aspect of our argument. We predicted that, in seeking dismissal, the state's description of the Exemption and Challenged Action would be skewed. The state did not disappoint. The Court will, of course, accept the allegations of the FAC as true—including that the state is retroactively applying a new interpretation of the Exemption, which DHCR conceived and started applying in 2023 without public notice—and ignore the state's mischaracterizations.

But we were confident the state would elide this critical aspect, which is why we attempted to force the state to produce exculpatory evidence early.[4] We wanted the Court to see, through documentary evidence, that the retroactive component was not merely a fact that the Court was bound to accept as true, *it is actually true*. This is important because it is so central to all the issues the state's motion raises for both merits and abstention—including the character of the Challenged Action, Plaintiffs' investment-backed expectations, and whether the State Action is brought in bad faith.

For that same purpose, we submit herewith the Declaration of Woody Pascal, who is a former DHCR Deputy Commissioner, as further evidentiary support for the FAC's allegations.[5]

---

[4] The State Action is civil and does not bear the hallmarks of criminal prosecution. The use of the phrase "exculpatory evidence" is not intended to give it the quasi-criminal quality it lacks. Rather, that phrase is intended to mean that DHCR has a rich history of allowing deregulation of substantially similar buildings through unpublished decisions and internal correspondence, even when tenants have alleged "illegal deregulation" through SubRehab projects.

[5] Ironically, the state has fought to keep the declaration sealed despite conceding that it does not contain "within its four corners" any privileged or confidential information. Doc. No. 38. To the extent the state claims the Court cannot consider the declaration in the context of the abstention or

He oversaw the SubRehab Program for 16 years. His declaration confirms exactly what is alleged in the FAC: until 2023, DHCR routinely exempted buildings that were substantially similar to the Targeted Buildings and then, in 2023, changed its interpretation without public notice. Pascal attests that DHCR intended to apply this new interpretation prospectively only—which accords with the explicit prospective-only directive of the subsequent 2023 Chapter Amendments modifying the SubRehab Program. But, here, the state applied the new rules retroactively against Plaintiffs.

From this flows an inevitable conclusion: *the Targeted Buildings were not just presumptively deregulated, they were* *<u>properly</u>* *deregulated*. Despite what it says in its Motion, the state knows this—which is why it resisted early production of the exculpatory evidence. To this day, including in their motion, the state cannot produce a single example of a building where, prior to 2023, it used its police power to re-regulate a building that was presumptively deregulated under the Exemption.[6] Nor can it explain why it singled out the Targeted Buildings, which were not the subjects of any identified tenant complaints.

The state's unjustified targeting of Plaintiffs through the Challenged Action represents ongoing violations of their rights under the Fifth and Fourteenth Amendments. The consequences for Plaintiffs and their property are nothing short of catastrophic. Accordingly, we respectfully request that the Court accept this submission as both Plaintiffs' opposition to the state's motion and as Plaintiffs' premotion request to cross move for a preliminary injunction.[7]

---

dismissal analysis, we reply that its contents merely supplement the regulatory history averred in the FAC, but we otherwise seek the Court's leave to amend the FAC to explicitly include it.

[6] As noted elsewhere, the state started applying its new rules administratively in June 2023.

[7] If the Court approves this request, we will meet and confer with the state on a proposed schedule for briefing.

## LEGAL CONTEXT AND THE CHALLENGED ACTION

Relying exclusively on cases involving rent-stabilization laws, the state advances dismissal. These cases do not control here. Plaintiffs' claims are neither a facial nor as-applied challenge to rent-stabilization laws. Plaintiffs' claims are rooted in the Exemption.

### A. The Law

In 1974, the New York Legislature enacted the Emergency Tenant Protection Act ("ETPA"), an enabling statute which gave local governments the power to regulate rents. *See* ETPA § 3(a); FAC ¶ 50. From that power, the legislature carved out buildings built prior to 1974 that had been "substantially rehabilitated." ETPA § 5(a)(5); FAC ¶ 51. In other words, it precluded municipal governments from using their police powers to regulate rents in those buildings, understanding that the housing crisis needed a supply-side solution—capital investments in old buildings—not just a demand-side solution of regulating rents until supply caught up with demand. *See The 12th Co. LLC v. New York State Div. of Hous. & Cmty. Renewal*, 303 A.D.2d 328, 329 (1st Dep't 2003).

Courts repeatedly recognized the distinction between the legislature's supply-side goal in the Exemption, as opposed to its demand-side goals in the other parts of the ETPA: "The Legislature's objective, in its briefly worded exemption, was to encourage the creation and rehabilitation of housing, *not to fine tune delicate, contentious issues of rent regulation*." *The 12th Co.*, 303 A.D.2d at 329 (emphasis added). State courts have repeatedly recognized the Exemption to be a specific legislative encouragement to invest in housing stock by removing renovated units from the reach of municipal rent-control laws it authorized elsewhere in the ETPA. "The implicit purpose of the exemption is to give a landlord the investment incentive of the recoupment of his rehabilitation costs free of a stabilized rent." *Wilson v. One Ten Duane St. Realty Co.*, 123 A.D.2d 198, 201 (1st Dep't 1987); *see also Pape v. Doar*, 160 A.D.2d 213, 215 (1st Dep't 1990) (The goal

of the ETPA's exemption was to give "an investment incentive to recoup rehabilitation costs free of stabilized rents"); *22 CPS Owner LLC v. Carter*, 84 A.D.3d 456, 457 (1st Dep't 2011) ("the purpose of the exemption from rent stabilization based on the substantial rehabilitation of a building is to encourage landlords to renovate buildings and add new residential units to the housing stock"); *Copeland v. New York State Div. of Hous. & Cmty. Renewal*, 164 Misc. 2d 42, 51 (Sup. Ct. N.Y. Cnty. 1994) (the Exemption "will provide sufficient incentive to landlords to 'rehabilitate' substandard housing stock").

Twenty years after the Exemption became law, DHCR promulgated rules for the Exemption, first in guidance and then in a regulation, which were in accord with the self-executing nature of the Exemption. FAC ¶¶ 50-57 (citing Operational Bulletin ("OB") 95-2 and Rent Stabilization Code ("RSC") § 2520.11(e)). It required no application nor any post-work certification. Acknowledging "the very significant financial commitment that a substantial rehabilitation necessitates," DHCR agreed to provide "prior opinions" for close cases. *See* OB 95-2; RSC § 2520.11(e) (2000); FAC ¶¶ 54-55. To provide greater certainty for capital investors, it created presumptions, which it treated as conclusive:

a. **80% Vacancy**: if a building was 80% vacant prior to construction, DHCR presumed it was substandard (absent arson/tenant harassment).

b. **Scope of Renovation**: if an owner replaced 75% or more of the building-wide and apartment systems, DHCR presumed it qualified as a substantial rehabilitation.

FAC ¶ 64.

This guidance and regulation governed from 1995 to 2023 and was applied consistently by DHCR through its agency decisions and representations in court proceedings, including when defending SubRehabs against tenant claims of "illegal deregulations." FAC ¶¶ 58-66. Put

differently, DHCR treated the presumptions as "safe harbors," i.e., conclusive proof of compliance with the SubRehab Program. FAC ¶¶ 66, 95-100; Declaration of Woody Pascal (Ex. A) ¶ 33 ("We treated the presumptions as, effectively, safe harbors").[8] To the extent DHCR had a hypothetical power to "overcome" the presumptions with proof a building was other than "substandard or seriously deteriorated," it never used it. Never. Developers were permitted to secure vacancy with surrender agreements, or "buyouts," which DHCR counted toward the 80% vacancy threshold. FAC ¶¶ 67-79. DHCR never defined the term "substandard," nor did it require owners to prove the buildings were "uninhabitable" prior to SubRehab construction. FAC ¶¶ 82-90.

This was the law when Plaintiffs acquired the buildings and performed SubRehab work. There were no changes to the Exemption, applicable regulation, or OB 95-2 in this period.

**B. The Challenged Action**

Shortly after Plaintiffs completed their rehabilitation work, the legal and regulatory landscape shifted considerably. Starting on November 8, 2023, the applicable regulation and guidance, as well as ETPA § 5(a)(5), were amended on a prospective-only basis, eliminating the 80% vacancy presumption and the self-executing nature of the SubRehab Program.[9] FAC ¶¶ 120-35. A few months earlier, in June 2023, DHCR started administratively applying its new

---

[8] Even without the state's production of exculpatory evidence, we found many examples of DHCR treating 80% vacancy as conclusive proof of substandard condition over many years. *See, e.g.*, *Lorraine St. Pierre*, Admin. Review Doc No. AO410028RT at 3, 5 (July 31, 2014) (treating 80% vacancy as conclusive proof of substandard condition); *Edwina Stroud*, Admin Review Docket No. FV210027RT at 4 (June 14, 2018) (same); *Clarista Realty Corp.*, Admin Review Docket No. L021003UC (January 21, 2025) (evaluating past SubRehab from 1989); Ex. C (attaching decisions). The 2025 decision in *Clarista* exemplifies Mr. Pascal's averment that "the administration of this policy change—unannounced as it was—was haphazard," since it used vacancy as conclusive of pre-renovation condition even after June 2023. Ex. A ¶ 53.

[9] Although the original version of the amendment applied retroactively and would have imposed new standards on the Target Buildings, the final bill eliminated retroactivity. FAC ¶¶ 128-34.

interpretation of the Exemption and regulation without any prior public guidance, including by retroactively applying it to completed rehabilitation projects.[10]

In this same window, DHCR and NYAG commenced an "investigation" of PCA. Never once did NYAG claim the investigation was based on tenant complaints. Never once did NYAG interview anyone from PCA. What NYAG made abundantly clear is that PCA's work contravened the new standards for SubRehabs, which (retroactively) prohibited "buyout" agreements to meet the 80% vacancy rule and required a showing of "uninhabitability." This interpretation buttressed its uncompromising demand to re-regulate all 159 units at the last-registered rent-stabilized level, which would have triggered mortgage defaults and portfolio-wide bankruptcy. On November 25, 2025, Plaintiff BHS filed this action to obtain relief for its members from the state's threats.

On December 1, 2025, the state made good on its threats. DHCR and NYAG filed the State Action against PCA and the LLC Plaintiffs. *See New York v. Peak Capital Advisors, LLC et al.*, Index No. 453503/2025 (Sup. Ct. N.Y. Cnty. 2025). The state simultaneously issued a scathing press release.[11] FAC ¶ 18. In it, NYAG accused PCA of "deceiving tenants, investors, lenders, and state housing regulators about the true status of these units." It called them "bad actors illegally [raking] in profit." It called them "bad landlords [trying] to cheat housing laws." It claimed PCA "chose to line their own pockets at New Yorkers' expense." It accused PCA of "unlawful profiteering." The state turned a simple regulatory dispute into a character assassination.

---

[10] As alleged in the complaint, DHCR changed its position in or around June 2023 and began to apply this changed position through administrative decisions thereafter. FAC ¶ 105-19 (citing *219 Troutman LLC*, Admin. Review Docket No. LO210030RO (June 6, 2023)).

[11] Press Release, *Attorney General James and HCR Commissioner Visnauskas Sue New York City Real Estate Developer for Illegally Deregulating Rent Stabilized Apartments*, OAG (Dec. 1, 2025), *https://tinyurl.com/3f48km5a;* Press Release, *Attorney General James and HCR Commissioner Visnauskas Sue New York City Real Estate Developer for Illegally Deregulating Rent Stabilized Apartments*, DHCR (Dec. 2, 2025), *https://tinyurl.com/4h9mvuyu*.

Plaintiffs subsequently amended the complaint to add PCA and the LLC Plaintiffs and specific averments of DHCR's bad-faith enforcement campaign, which had become a central element of the Challenged Action.

## ARGUMENT

### I. PLAINTIFFS STATE A VIABLE TAKINGS CLAIM[12]

#### A. The Takings Claim Satisfies *Penn Central*

As-applied regulatory takings claims are "ad hoc, factual inquiries." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Unable to develop a "set formula," and demanding that district courts look at the "particular circumstances" of each case, *Penn Central* embraced three factors of particular significance: (1) the economic impact of the regulation on the owners; (2) the extent to which the regulation interferes with reasonable, investment-backed expectations; and (3) the character of the governmental action. *Id.* The "gravamen of a regulatory takings claim" is determining whether the challenged action "goes too far" and "in essence 'effects a taking.'" *Buffalo Teacher's Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006).

To understand "how far" the state has gone here, we naturally begin by examining the "character" of that Challenged Action against controlling authority. We then analyze the economic impact of that action on Plaintiffs and how it upended investment-backed expectations.

##### 1. Character of Government Action

The inquiry into the "character" of the challenged action is "the most elusive" part of *Penn Central*'s factors. *Sherman v. Town of Chester,* 752 F.3d 554, 565 (2d Cir. 2014). At bottom, it

[12] On a motion to dismiss, the court "examin[es] all facts and draw[s] all inferences in plaintiff's favor." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403 (2d Cir. 2006). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Id.*

requires the Court to assess the unique qualities of the state's action: Is the Challenged Action a bona fide attempt to "adjust[] the benefits and burdens of economic life to promote the common good," or is it more akin to an "appropriation"? *Lingle v. Chevron*, 544 U.S. 528, 539 (2005). Put differently, what did the state actually do and do the facts suggest an element of unfairness?

For the first part (what did the state do), the Court is bound to accept the allegations of the FAC. The Challenged Action is richly described. FAC ¶¶ 138-58.[13] For the second part (do the facts suggest an element of unfairness), post-*Penn Central* cases identified several different indicators. These opinions often reflect judicial skepticism of the motivations behind the challenged action. *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 528-29 (1998) (calling the challenged action "quite unusual").

So, for example, many courts have found that where the challenged action was based on a retroactive application of rules, its "character" is that of an appropriation rather than simple legislative balancing. *Lucas v. South Carolina Coastal*, 505 U.S. 1003, 1029-30 (1992) (taking by post-acquisition restriction on coastal development rights); *United States v. Sec. Indus. Bank*, 459 U.S. 70, 78 (1982) (retroactive destruction of liens effects a taking).

Courts have come to similar conclusions when the challenged action appeared to "balance societal interests" by placing too much of that weight on a private party. *See, e.g., Apfel*, 524 U.S.

---

[13] We briefly restate it. For the first time in history, the state launched a suit to extinguish a legislative exemption for 31 separately owned buildings in one fell swoop, retroactively applying new, previously unpublished interpretations of a long-standing regulation. It invoked an alleged power that, if it exists at all, has never been used in 50 years. Not even toward a single building, let alone 31 at once. It did so without bothering to specify what, specifically, about each building made it unqualified for the legislative exemption. It did so without acknowledging the buildings' compliance with the regulatory presumptions. It did so despite a regulatory history of defending substantially similar SubRehabs in the face of tenant claims of "illegal deregulation." It did so alongside a press release that vilified the developers as profiteers, criminals and fraudsters. It relied on demonstrably false averments. And, it did so while steadfastly refusing to provide exculpatory evidence, of which it is well aware.

at 528-29 (taking where pension liability assigned to company without basic proportionality). In *Cienega Gardens v. U.S.*, building owners were contractually obligated to provide stabilized rents to low-income persons unless or until they satisfied a federal mortgage. 331 F.3d 1319, 1323 (Fed. Cir. 2003). They originally had the right to pre-pay the mortgage to deregulate the units faster, but Congress later abrogated this right, extending rent-stabilization protection for 20 years. *Id.* Although the challenged action did not denude the ability to collect lower rents, the Court still held that Congress "went too far" under *Penn Central* and that abrogating pre-payments constituted a taking. *Id.* at 1337. As to the "character" of the action in dispute, the Court's holding was clear: "Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners." *Id.* at 1338.

Courts have come to similar conclusions when the challenged action counteracted something the government, itself, had arguably invited. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1012 (1984) (taking when agency required disclosure of valuable data designated as confidential trade secrets); *Kaiser Aetna v. U.S.*, 444 U.S. 164, 179 (1979) (taking when agency allowed private dredging project but then demanded public access to site).

Courts have come to similar conclusions when the challenged action singled out one among many. *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 298 (S.D.N.Y. 2023) (taking where government "imposed the burden of the permanent price caps on a small handful of companies—namely, Plaintiffs"); *American Pelagic Fishing Co. v. U.S.*, 49 Fed. Cl. 36 (Fed. Cl. 2001) (taking where permit revoked for a single operator).

Many of these factors came together in *Sherman v. Town of Chester*. There, the plaintiff had applied for a subdivision approval for a specific housing project, which municipal authorities

thwarted through a series of actions over the course of years. 752 F.3d 554, 565-66 (2d Cir. 2014). The Second Circuit evaluated the as-applied, regulatory takings claim under *Penn Central*, in a land-use context that surely did not destroy all uses for, or the economic value of, the disputed parcel. In evaluating the "character" of the town's actions, the court held that the town "singled out" the plaintiff in a manner that was "unfair, unreasonable, and in bad faith," including by retroactively issuing a 6-month development moratorium. *Id.* at 562. Thus, the town's action fell "safely within [the] ambit" of a taking. *Id.* at 565-66.

All these attributes are present here. The Challenged Action was based on new rules devised by DHCR after Plaintiffs acquired these buildings and invested millions into SubRehab projects. FAC ¶ 31. The state singled out PCA and its projects rather than the legion of developers with prior SubRehab buildings. FAC ¶¶ 232-42. It eviscerated investments that the legislature itself encouraged. The FAC's allegations are supported by the Pascal Declaration, attesting to DHCR's consistent policy and practice from 2009 to 2023 and its unannounced, changed interpretations thereafter. Ex. A. Mr. Pascal exposes that the state's position regarding uninhabitability, the 80% vacancy presumption, and buyouts are starkly at odds with the understanding fostered for 30 years. *See* Ex. A ¶¶ 32-39. Similarly situated buildings, he attests, were certified for Exemption even after tenants claimed illegal deregulation, as the state now claims here. Ex. A ¶¶ 23, 58 (affirming that "DHCR approved hundreds and hundreds of buildings" based on the 80% vacancy presumption). The Challenged Action represents a "quite unusual" (in fact, unprecedented) and retroactive targeting, not a balanced application of a regulatory scheme.

Unsurprisingly, the state's motion—in the two paragraphs about the character of the Challenged Action, *see* Motion at 22-23—addresses none of this. It makes no factual statements

about its action. It doesn't deny the lack of historical precedent. It doesn't deny that the renovation work complied with the regulation as written. It doesn't deny the lack of specificity about grounds for disqualification. It doesn't deny the agency's history of approving substantially similar buildings. It doesn't deny the press release, obviously. It makes no factual statement about its action other than that it allegedly represents "enforcement of the [rent-stabilization laws]." Even that is a misstatement. The Exemption is not about "rent-stabilization"—it's the opposite. It *removed* buildings from municipal power to regulate rent, explicitly, to encourage investment. The most charitable motivation that could be ascribed to the Challenged Action is that—of the tens or hundreds of thousands of apartments exempted under ETPA § 5(a)(5) over 50 years—the state seeks to re-regulate 159 of them, singling out Plaintiffs, and effecting an appropriation from more than 100 investors. The state action "goes too far" and is "safely within [the] ambit" of a taking.[14]

### 2. Economic Impact

The state's action immediately stranded the assets. The economic impact on the owners here is not just about future rents. It is about economic devastation. The Targeted Buildings have mortgages. Some Plaintiffs made personal guarantees on some of those mortgages. Some of those mortgages are reaching maturity. None of the buildings can be resold. As of today, even Plaintiffs' ability to extend or refinance the mortgages is in peril. The only option is wide-scale foreclosures,

[14] As is obvious, several of the judicial authorities outlined above deal with land-use decisions that did not amount to outright confiscation or destruction of all inherent economic value. One even involved issues of rent stabilization. But all demonstrate that action—even action that falls short of destroying all uses or economic value—went too far because of qualities that made the state's action, in context, heavy-handed, unusual or simply out-of-balance. In that way, the one remarkable quality of the state's action here is destroying the very investment that the legislature itself encouraged through the Exemption, which has the quality of a "confiscation" of the majority of the economic losses. Whether or not this Court agrees that the state's action here is bad faith, it is "safely in the ambit" of prior takings cases.

personal bankruptcies, and a cascade of years-long litigation. Because these buildings had razor-thin margins, most now cannot afford to pay current expenses in light of legal costs. Some cannot afford to make repairs. The lead Plaintiff, PCA, had to lay off its staff and is winding down its business, with its principals looking for other work, which has been complicated because of the state's decision to vilify them and, essentially, cast them as scoundrels and criminals. Indeed, based on the press coverage, a small handful of tenants have begun withholding rents entirely. More will do so.

These are the "economic impacts."[15] The FAC details them on a building-by-building basis. In the aggregate, $150 million is frozen and may be wiped out entirely. In other words, the state has rendered the Targeted Buildings "unusable for permitted purposes"—here, resale—"or otherwise unmarketable." *74 Pinehurst LLC v. New York*, 59 F.4th 557, 566 (2d Cir. 2023). Certainly, the FAC demonstrates, to say it mildly, a "considerable financial burden," which other courts have sustained as a taking. *Apfel*, 524 U.S. at 529. At a bare minimum, the stranding and freezing of the assets, even if temporary, constitutes a taking now. *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 26 (2012) (holding temporary actions qualify as takings).

The state's motion ignores the overall economic devastation, casually claiming that these impacts are "plainly insufficient." Motion at 17. It quotes again passages from rent-stabilization cases. In that context, it is true that courts have tolerated a heavy hand when "fine tuning" the relationship between landlords and tenants. We agree that several cases hold that lost profits, lowered rent and diminution of property values are generally insufficient to find a taking as against a broad legislative scheme like the Rent Stabilization Law ("RSL"). *See* Motion at 18.

---

[15] We do not believe the state will contest any of these facts. If their reply brief does so, we shall request permission to file substantiating affidavits.

But Plaintiffs' takings claim launches no broad attack, facial or applied, against the RSL, making those cases irrelevant. The ETPA's exemption spares these buildings from that analysis, having removed them from the City's power over rent regulation. Further, the economic harm alleged is not caused by the regulation itself but by targeted agency enforcement which "effectively prevent[s]" economic use of one's property through a "war of attrition." *See Sherman*, 752 F.3d at 565. Outside the context of rent-regulation, the level of financial impact easily qualifies, especially since the legislature and DHCR itself encouraged the investments. *See DoorDash*, 692 F. Supp. 3d at 296 (upholding taking when challenged action results in actual loss).[16] Even *Pinehurst* supports finding a taking where the economic impact makes a property "unusable for permitted purposes or otherwise unmarketable." 59 F.4th at 566; *See S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*, 624 F. Supp. 3d 261, 276 (E.D.N.Y. 2022) (considering whether property "remains marketable"). This case meets *Pinehurst*'s requirement.

**3. Interference With Reasonable Investment-Backed Expectations**

As the law permitted, the owners and investors intended to fix these properties and flip them. It is that simple. That legal expectation has been upended. *Pinehurst*, 59 F.4th at 566.

We agree that—in takings parlance—"reasonable" expectations often involve an assessment of whether the plaintiff should have known or foreseen the challenged action, be it a new or revised law or enforcement action. As the Second Circuit put it in *Allen v. Cuomo*, a plaintiff should be able to "demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged [action]." 100 F.3d 253, 262 (2d Cir. 1996). Courts

---

[16] For 28 of the Targeted Buildings, current revenues are insufficient to sustain all costs (including legal fees) and debt, and for all 31 buildings the state's demands would force foreclosure. These numbers can be substantiated with affidavits, if necessary, *see supra* note 15.

often consider this in the pure rent-stabilization context because frequent amendments adjust rents and conditions.

Here, the Challenged Action was utterly unforeseeable when Plaintiffs bought these buildings. Fifty years of an unchanged Exemption. Thirty years of straightforward regulation and consistent application. The FAC makes this clear. Lest there be any doubt, we submit the Declaration of Woody Pascal, who oversaw the program for the past 16 years. Ex. A. Even he didn't see it coming. The state vainly argues over the meaning of the Exemption and the regulation, *see* Motion at 19-22, including false quotes of the leading case,[17] but it is all beside the point. They do not and cannot contest its consistent application before June 2023. That is averred in the FAC and supported by the Pascal Declaration. This is not a disagreement about "legal conclusions," but about regulatory and enforcement history. Again, they have not and cannot cite a single example of DHCR having clawed back a presumptively deregulated building before PCA acquired the Targeted Buildings. Plaintiffs' takings claim is adequately pled.

### B. The Takings Claim is Ripe

A takings claim is ripe so long as the government agency has "reached a final decision regarding the application of the regulations to the property at issue." *See S. Nassau Bldg. Corp.*, 624 F. Supp. 3d at 270. This "finality requirement is relatively modest," merely requiring that

[17] The state's motion thrice quotes *E. Pork Prods. Co. v. New York State Div. of Hous. & Cmty. Renewal*, 187 A.D.2d 320, 324 (1st Dep't 1992) as saying that the purpose of the SubRehab Program is to "encourage rehabilitation of dilapidated and basically uninhabitable housing stock." Motion at 4, 22, 24. Those words **do not** appear anywhere in *E. Pork* or any other case. Instead, they originate from DHCR and NYAG themselves. State Action Complaint ¶ 62. In fact, *E. Pork rejected* DHCR's "overly rigid standards which are inconsistent with the intent and language" of the ETPA and explained that "substantially rehabilitated" merely requires "a true or significant restoration of a former good quality." 187 A.D.2d at 324-25.

there be "no question" about how the "regulations at issue apply to the particular [property] in question." *Pakdel v. City & Cnty. of San Francisco, California*, 594 U.S. 474, 478 (2021).

The state has made a final decision regarding the applicability of the Exemption, so Plaintiffs' takings claim is ripe. In *Pakdel*, the Supreme Court found a takings claim against the city of San Francisco's lease regulations was ripe because there was "no question about the city's position," as the city had threatened to bring an "enforcement action" upon noncompliance. *Id.*; *see also S. Nassau Bldg. Corp.*, 624 F. Supp. 3d at 270 (finding takings claim ripe where town "reached a conclusive position" by recommending landmark status over plaintiff's objection). Here, the state made the same threat, demanding that Plaintiffs re-regulate the Targeted Buildings or else face a civil action to impose re-regulation as well as other penalties. There was no question about the state's position with respect to the Targeted Buildings.

The state's argument that Plaintiffs cannot assert their Fifth Amendment rights until judgment has been entered in the State Action, Motion at 15-16, has been foreclosed. In *Knick v. Twp. of Scott*, the Supreme Court overruled cases that held that the Fifth Amendment right to compensation did not vest until a party had exhausted all state remedies and procedure. 588 U.S. 180, 191 (2019). It held the "Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Id.* at 190. The "general rule" that "plaintiffs may bring constitutional claims under § 1983 without first bringing any sort of state lawsuit, even when state court actions addressing the underlying behavior are available" is "as true for takings claims as for any other claim grounded in the Bill of Rights." *Id.* at 194; 306 *Wall St. Owners, LLC v. City of Kingston, New York*, No. 1:25-CV-1815, 2026 WL 1266208, at *17 (N.D.N.Y. May 8, 2026) (finding that after *Knick* plaintiffs are "no longer required to seek compensation through state procedures before bringing their § 1983 takings claim.").

The state further insists Plaintiffs' claim is unripe because the FAC does not state Plaintiffs were denied variances, relying on *Pinehurst*. Motion at 16. But that case is inapposite. In *Pinehurst*, the plaintiffs brought as-applied as well as facial challenges to the RSL shortly after the law was amended. 59 F.4th at 562. Contrasting the factual circumstances from those of *Pakdel* where there was "no question about the city's position," the Second Circuit found that there were significant questions as to how if at all DHCR would apply the RSL to the plaintiffs. *74 Pinehurst*, 59 F.4th at 565. The same finding was made in *Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*, No. 21-2448, 2024 WL 1061142, at *3-4 (2d Cir. Mar. 12, 2024). Here, by contrast, Plaintiffs *did* seek exemption from the RSL through the SubRehab Program, successfully complying with the then-applicable law. Then the state brought a retroactive enforcement campaign, contending Plaintiffs had no ability to deregulate the Targeted Buildings' apartments through SubRehab or any other exemption. *See* State Action Complaint ¶ 89 (asserting that there is "no basis to exempt the [targeted apartments] from rent stabilization coverage"). It is this retroactive enforcement campaign, rather than a facial or as-applied challenge to the RSL itself, that is the subject of the takings claim. Therefore, Plaintiffs' claim is ripe.

## II. PLAINTIFFS STATE A SUBSTANTIVE DUE PROCESS CLAIM

The Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "To establish a substantive due process violation, a plaintiff must show both (1) that she has an interest protected by the Fourteenth Amendment, and (2) that the statute, ordinance, or regulation in question is not rationally related to a legitimate government interest." *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018) (finding the plaintiff had adequately pled a substantive due process violation of her "valid property interest in continued water service").

Here, Plaintiffs have alleged that DHCR arbitrarily and irrationally deprived them of their property rights and interests through a retroactive enforcement campaign to force the Targeted Buildings to be operated in a way that could not satisfy ongoing expenses and loan payments. FAC ¶¶ 210-15. In *S. Nassau Bldg. Corp.*, this Court found that the plaintiff (a property development corporation) plausibly alleged that it owned a vested property interest in building and selling houses on two subdivisions and that that interest had been infringed when the government actors arbitrarily and irrationally landmarked the existing property. 624 F. Supp. 3d at 277-80. Here too, Plaintiffs had vested property rights to legally rent their properties at rates sufficient to cover their reasonable investments which was arbitrarily and irrationally targeted with retroactive enforcement. In *DoorDash*, the court found the plaintiffs had stated a substantive due process claim where they alleged that a city ordinance capping prices that food delivery platforms could charge restaurants "force[d] them to operate at a loss—depriving them of the opportunity to obtain a reasonable income-productive use of their property." 692 F. Supp. 3d at 300. So too here, where the demanded retroactive re-regulation of Plaintiffs' properties "will immediately and catastrophically devalue their assets, rendering them unable to meet their debt obligations and placing the Targeted Buildings at imminent risk of foreclosure"; moreover, the enforcement campaign has already "placed a cloud over the title of the Targeted Buildings, chilling Plaintiffs' ability to sell, refinance, or otherwise operate their businesses." FAC ¶¶ 17-18.

The state suggests that Plaintiffs cannot bring a due process claim because its actions can be challenged under the Takings Clause instead. Motion at 23. But the substantive due process inquiry is "logically prior to and distinct from the question whether a regulation effects a taking." *See Lingle v. Chevron*, 544 U.S. 528, 543 (2005). Indeed, the Supreme Court has stated that there is "no reason to believe" that "so long as the regulation of property is at issue the standards for

takings challenges, due process challenges, and equal protection challenges are identical." *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 836 n.3 (1987); *cf. Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988) (analyzing rent control ordinance under Takings Clause, Due Process Clause, and Equal Protection Clause and finding due process satisfied where ordinance reflected a "rational attempt to accommodate the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords are guaranteed a fair return on their investment"). Courts in the Second Circuit regularly conduct both takings and due process analyses of the same challenged actions. *See, e.g.*, *S. Nassau Bldg. Corp.*, 624 F. Supp. 3d at 279; *DoorDash*, 692 F. Supp. 3d at 300.

Finally, the state argues that the interests protected by the Due Process Clause "do not include economic liberties." Motion at 23 (quoting *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010)). But Plaintiffs seek to protect property rights, and the Fourteenth Amendment explicitly protects against deprivations of "property, without due process of law." U.S. Const. amend. XIV. In a similar sleight-of-hand, the state defends its conduct by relying on cases upholding the RSL against facial challenges, but Plaintiffs do not challenge the RSL. Rather, Plaintiffs challenge DHCR's *retroactive* application of its policy changes through an arbitrary and irrational enforcement campaign. Because that campaign has resulted in impending foreclosures of Plaintiffs' properties without any rational relation to a legitimate government interest, Plaintiffs have stated a substantive due process claim.

## III. PLAINTIFFS STATE A PROCEDURAL DUE PROCESS CLAIM

As alleged, the state's retroactive and *ultra vires* application of novel rules, which destroyed the millions of dollars Plaintiffs invested in the Targeted Buildings in reliance on DHCR's then-existing policy, states a procedural due process claim. There are two questions in the procedural due process inquiry: was the plaintiff deprived of a property interest, and if so,

what process was due? *Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 404 (2d Cir. 1992).

Plaintiffs undoubtedly have property rights in the buildings they own and were entitled to recoup their investments based on reasonable reliance with then-existing law. *See Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 756 (2005) (procedural due process protects benefits for which one has a "legitimate claim of entitlement"). And, as regulated parties, Plaintiffs were entitled to receive fair notice of the conduct that will subject them to liability. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Plaintiffs did not receive fair notice, or indeed any notice. Plaintiffs did not even have a reason to believe that the rules for the Exemption were not DHCR's promulgated rules and guidance, but rather were malleable and discretionary policies that would be retroactively applied to achieve the desired result: re-regulation of formerly rent-stabilized buildings that had just been dramatically upgraded through investments the state itself encouraged. FAC ¶ 222. Plaintiffs have been irreparably harmed by DHCR's undisclosed, *post-hoc* reinterpretations of the law and the penalties—including re-regulation and overcharge liability—which the state demands. FAC ¶¶ 223-28.

The state's sole contention regarding Plaintiffs' procedural due process claim is that Plaintiffs, "as parties to the pending state court action, will have the opportunity to be heard before the state court." Motion at 24. But "[i]t is well-established that § 1983 generally allows plaintiffs with federal or constitutional claims the right to sue in federal court without first resorting to state judicial remedies . . . or state administrative remedies." *Kraebel*, 959 F.2d at 404 (internal citations omitted). And, as a general rule, "due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest." *DiBlasio v. Novello*, 344 F.3d

292, 302 (2d Cir. 2003).[18] The state afforded Plaintiffs no hearing or even notice before imposing penalties based on undisclosed, *post-hoc* reinterpretations of regulations and guidance which differed from the promulgated rules, violating due process.

Finally, even if, *arguendo*, the availability of post-deprivation state judicial remedies could constitute due process, the State Action is not an adequate forum to protect Plaintiffs' federal rights. FAC ¶¶ 16-19, 42. And even if the State Action could *ultimately* provide a proper remedy, the burdens of proceeding in a defensive posture in the state's chosen forum after Plaintiffs brought their action here creates a "significant risk of erroneous deprivation" while the State Action proceeds. *See Panzella v. Sposato*, 863 F.3d 210, 218 & n.9 (2d Cir. 2017), *as amended* (July 18, 2017). Plaintiffs have thus stated a procedural due process claim.

## IV. PLAINTIFFS STATE AN EQUAL PROTECTION CLAIM

The Fourteenth Amendment's Equal Protection Clause protects all individuals from "intentional and arbitrary discrimination," whether by regulatory language or "improper execution." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citation omitted). For a "class of one" claim, a plaintiff must show he or she has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* This rational-basis review "is not meant to be 'toothless,'" *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (citation omitted), and indeed "imposes a requirement of some rationality in the nature of the class singled out," *Winston*, 887 F.3d at 560 (citation omitted).

---

[18] This general rule contains exceptions for "random and unauthorized" acts by a state employee and "certain emergency circumstances," *id.* at 302-04, but they do not apply here. The "random and unauthorized" exception applies to decisions made by "lower-echelon state employees" lacking "final authority over significant matters," which does not apply to Defendant. *See id.* at 302 (the Commissioner of the NY Department of Health had "final authority"). Nor can the state find emergency justifications here.

Plaintiffs have alleged that they are "similarly situated in all relevant respects to a specific group of property owners in New York City: owners of the approximately 11,000 housing units who, between 1995 and 2023, claimed exemption from rent stabilization under the Substantial Rehabilitation program in reliance on OB 95-2 (the "Comparators"). FAC ¶¶ 232-33. Yet the state has targeted Plaintiffs for unique and retroactive enforcement, refusing to apply the 80% vacancy presumption and demanding that Plaintiffs satisfy a novel, stricter evidentiary standard. FAC ¶ 234. A stark example of this disparity comes from a comparison of the state's treatment of Plaintiffs and the state's treatment of "Company A," one of the highly similar Comparators and a major New York City developer. FAC ¶¶ 235-40. As alleged, the state's retroactive enforcement action—motivated by bad faith and a "spiteful effort" to single out Plaintiffs for punishment—demonstrates a pattern of harassment intended to injure Plaintiffs rather than to exercise legitimate regulatory oversight. FAC ¶¶ 241-42.

The state contests Company A as a comparator as it was "found to have engaged in wholly different conduct unconnected to the" SubRehab Program. Motion at 25. Yet that unjustified difference in how the state prosecuted the respective cases shows exactly the disparity. Company A also used the SubRehab Program, and was accused of "illegal deregulation" by tenants. The state actually confirmed that Company A violated two core parts of the SubRehab Program: it harassed tenants into vacating and, for those who stayed, it illegally jacked up their rents. Yet, neither DHCR nor NYAG filed a lawsuit to strip away the Exemption and re-regulate the impacted buildings. FAC ¶ 80. The state cannot seriously contend that this discrepancy can be explained by Company A *also* engaging in serious misconduct not applicable to Plaintiffs.

The state further argues that favorable treatment of other developers is insufficient to establish differential treatment, but Plaintiffs have alleged that their class of one was intentionally

singled out for a unique and "spiteful effort." FAC ¶ 241. Evidence of unique treatment may be shown through unexplained disparities in treatment of others who are similarly situated. In *Village of Willowbrook*, the Supreme Court found that the plaintiff had stated an equal protection claim by alleging the village irrationally and arbitrarily "intentionally demanded a 33–foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15–foot easement from other similarly situated property owners." 528 U.S. at 565. Similarly, in *DoorDash*, the S.D.N.Y. found an equal protection claim adequately stated where the plaintiffs alleged the city ordinance capped the plaintiffs' fees for marketing services, but left "the fees charged by Google and others for the same services untouched." 692 F. Supp. 3d at 301. Here, DHCR consistently applied the standard rules to thousands of similarly situated Comparators, but irrationally and arbitrarily singled out Plaintiffs for retroactive enforcement.

Plaintiffs have thus stated a claim under the Equal Protection Clause.

## V. THE ELEVENTH AMENDMENT

Plaintiffs concede that a State and its agents are protected by sovereign immunity from retrospective, monetary claims in federal court, absent a statute or waiver to the contrary. Plaintiffs thus voluntarily dismiss their claims for monetary relief and proceed solely for prospective declaratory and injunctive relief.[19]

---

[19] As the state concedes, prospective relief is available through *Ex Parte Young*. Although the state also contends Plaintiffs are precluded from seeking injunctive relief for their takings claims, Motion at 16, courts have found injunctive as well as declaratory relief appropriate as "prospective relief to end an ongoing violation" of the Takings Clause. *See, e.g.*, *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333-36 (11th Cir. 2025) (finding declaratory and injunctive relief for ongoing violation of Takings Clause properly before the court); *Frein v. Pennsylvania State Police*, 47 F.4th 247, 258 (3d Cir. 2022) (same); *cf. Albert v. Lierman*, 152 F.4th 554, 563 (4th Cir. 2025) (dismissing takings claim tied to pre-judgment interest but allowing prospective declaratory and injunctive relief based on post-judgment interest). Injunctive relief is warranted here as there is "no adequate remedy at law." FAC ¶¶ 17-19, 207, 227; *see Apfel*, 524 U.S. at 522 (finding injunctive relief "an appropriate remedy" based on "the nature of the taking alleged").

## VI. ABSTENTION IS INAPPROPRIATE

Abstention is an extraordinary exception to the rule of state-federal concurrent jurisdiction, justified in the rare circumstances where prudential considerations outweigh the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (citation omitted). Because this action does not present any of the narrow circumstances for which *Younger*, *Pullman*, or *Wilton* abstention applies, this action should proceed in federal court.

### A. *Younger* abstention

*Younger v. Harris* held that, based on equity jurisprudence, a court "should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." 401 U.S. 37, 43-44 (1971). This principle is limited: the Supreme Court has reiterated that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).

The state correctly cites *Sprint*, which held that *Younger* abstention applies to three categories of cases, including "civil enforcement proceeding[s]" initiated by a state actor following an investigation to sanction a party for some wrongful act. 571 U.S. at 78-79. But the state skips important steps when asking the Court to fit this case within *Sprint*'s framework, despite the Court's "caution" that "federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refus[e] to decide a case in deference to the States.'" *Id.* at 73 (citation omitted). We briefly cover the necessary terrain.

*Younger* was a criminal case, emphasizing the narrowness of the exception. 401 U.S. at 43-44 (prosecution of California Criminal Syndicalism Act). The Supreme Court slightly expanded *Younger* to certain civil-enforcement proceedings in *Huffman v. Pursue*, 420 U.S. 592 (1975). There, an Ohio sheriff sought to close a theater showing pornographic films. *Id.* at 595. After a trial on public nuisance claims, a state court ordered the theater closed and the property seized. *Id.* at 598. Rather than appealing the state-court judgment, a new owner filed a § 1983 claim, seeking injunctive and declaratory relief against the application of state law. *Id.* Based on the principles of comity and federalism, the Court extended *Younger* to the ongoing state judicial proceeding because the case was "more akin to criminal prosecution than are most civil cases" and was "both in aid of and closely related to criminal statutes." *Id.* at 604. Similar reasoning emerged in later *Younger* cases. *See, e.g.*, *Moore v. Sims*, 442 U.S. 415, 423 (1979) (abstaining when state proceeding was "in aid of and closely related to criminal statutes").

These cases marked opportunities for the Court to emphasize—as it did each time—that a state criminal analogue was required for *Younger* abstention. Then the Court confronted *Younger* in an administrative-enforcement proceeding in *Middlesex County Ethics Committee v. Bar Assn.*, 457 U.S. 423 (1982). There, an attorney was subjected to state ethics proceedings for public statements decrying a prosecution (not of his client) as a "legalized lynching" before a "kangaroo court." *Id.* at 428. After an ethics committee accused him of "conduct prejudicial to the administration of justice," the attorney filed a § 1983 claim in federal court. *Id.* Recognizing that states "traditionally have exercised extensive control" over attorney conduct, which is ultimately for the protection of the public, the Court characterized New Jersey's interests as "significant" and of "special importance." *Id.* at 434. Although the Court noted that a state's important interests

may be shown by "a close relationship to proceedings criminal in nature," it held that proceedings that "are necessary for the vindication of important state policies" satisfied *Younger*. *Id.* at 432.

Following *Middlesex*, many courts viewed the case as having removed the tether to criminal proceedings and, rather, embracing a broader "important state interests" test. *See, e.g.*, *Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 75 (2d Cir. 2003) (finding *Younger* "equally applicable" to civil proceedings involving "important state interests"). *Sprint* represents a correction. There, the court restated the importance of the quasi-criminal requirement from its prior cases. 571 U.S. at 81 (*Middlesex* factors cannot be "[d]ivorced from their quasi-criminal context"). It declined to "extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Id.* at 81-82. Emphasizing the imperative of exercising jurisdiction, the Court reaffirmed that *Younger* applied only to three categories of cases: ongoing state criminal proceedings, civil proceedings akin to criminal ones, and cases uniquely in furtherance of certain judicial functions. *Id.* at 72-73. If, and only if, the action conforms to one of these categories—here, the state argues solely for the second category, Motion at 9-10—courts should then consider whether the "*additional* factors" laid out in *Middlesex* counsel against abstention. *Id.* at 81.

In sum, this Court's decision on *Younger* abstention should be guided by: whether (1) there is an ongoing proceeding brought by a state, (2) the proceeding seeks to vindicate important state interests, (3) the proceeding is quasi-criminal (i.e., it was initiated to sanction the federal plaintiff for some wrongful act, it has important similarities to criminal actions, and the state could have alternatively sought to enforce a parallel criminal statute), and (4) the federal plaintiff could raise constitutional challenges therein. *See id.* Even if the proceeding satisfies all these factors, abstention is inappropriate if it was brought in bad faith. *Id.* at 77.

We agree that factors 1 and 4 apply here. As explained below, the state's abstention request fails factors 2 and 3, making *Younger* abstention inappropriate.

**1. The Proceeding Does Not Involve An "Important" State Interest**

The state contends that rent-stabilization laws are important. We agree, but that is beside the point. Plaintiffs do not challenge the rent stabilization laws themselves. The issue at stake is whether these specific buildings were legislatively exempted from the precursor to those laws. The legislature made the Exemption self-executing, requiring neither an application nor a certification. For 30 years, while tens or hundreds of thousands of apartments were exempted under the SubRehab Program, neither NYAG nor DHCR ever brought a suit like the State Action for alleged illegal deregulation. FAC ¶ 149. Moreover, the law has now changed, making the issues in this case limited to projects completed before the legislative change in 2024 (which is not retroactive).

The state's abstention request addresses none of this. Rather, it relies on *Community Hous. Improvement Prog. v. City of N.Y.*, 59 F.4th 540, 556 (2d Cir. 2023) and its restatement of the state's broader interests in rent-stabilization laws. The specific interest cited there—preventing "serious threats to the public health, safety and general welfare"—is not, in any way, implicated by this regulatory dispute. The state's citation to it is simply misdirection because it cannot honestly or directly articulate why these 159 units—in a city with over a million rent-stabilized apartments—raise some "important state policy." Because they do not. In short, this unprecedented case—which may be the only one of its kind ever filed—involves no "important" state policy.

### 2. The State Action is not Quasi-criminal

At the heart of the state's action lies a regulatory dispute, not a quasi-criminal one. The state alleges that the Targeted Buildings were "illegally deregulated." Plaintiffs allege—with substantial authority—that the Targeted Buildings are presumptively deregulated.

In pressing its case for *Younger* abstention, the state's motion tries to elide the regulatory nature of the dispute with rhetoric, not authority. Calling this a "prototypical civil enforcement proceeding requiring abstention under *Sprint*," Motion at 9, it fails to mention that no case—none—has ever recognized civil-enforcement proceedings over rent-stabilization laws, generally, or the SubRehab Program, specifically, among the limited types of civil cases over which *Younger* has been extended. *See Minn. Living Assistance, Inc. v. Peterson*, 899 F.3d 548, 554 (8th Cir. 2018) (collecting cases). In its bare two paragraphs of argument, the state ignores *Sprint*'s caution against abstaining in every case with a "plausibly important state interest." Motion at 9-10.

So, the problem with the state's abstention argument is its implicit suggestion that the State Action is "akin to a criminal proceeding." *See Acra Turf Club v. Zanzuccki*, 748 F.3d 127, 137 (3d Cir. 2014) ("After *Sprint*, the threshold requirement for applying *Younger* abstention is that the state civil enforcement proceeding must be 'quasi-criminal' in nature"). Interestingly, the state nowhere states the State Action is quasi-criminal. Because it is not.[20]

To be sure, the State Action was initiated by New York State, it was preceded by (what the state calls) an "investigation," and it does seek civil damages to tenants and a fine. One

[20] The suit seeks re-regulation of apartments, re-payment of rents to tenants, and a civil fine. None of the alleged behaviors are covered by criminal statutes. None of the remedies have criminal analogues. None of those remedies include disciplinary sanctions against individuals or LLCs. None of those remedies require forfeiture of corporate charters. None of those remedies carry licensing revocations. None of this allows seizure of properties. There is nothing akin to criminal proceedings at all, let alone "similar in *important respects*," as the law requires. *See Huffman*, 420 U.S. at 604 (emphasis added).

unpublished decision found these factors were sufficient to justify *Younger* abstention in a labor-law case. See *Amazon.com, Inc. v. James*, No. 21-CV-767, 2021 WL 3516382, *4 (E.D.N.Y. Aug. 10, 2021). The problem is that the *Amazon* decision falls into the *Middlesex* trap, focusing on the "important state interests" in labor-law enforcement "[d]ivorced from" the quasi-criminal requirement. *Sprint*, 571 U.S. at 81. This Court should decline the state's invitation to step into the same trap.

More fundamentally, none of the conduct at issue involves "wrongful" conduct "akin" to any prior case where courts abstained. Wisely, the state does not argue that its claims under Exec. Law § 63(12) or General Business Law have criminal analogues. They don't. This is a niche regulatory dispute involving presumptively deregulated buildings under the state's own statutory scheme. The only "analogues" are regulatory, which DHCR would have normally brought in administrative proceedings. *See Katz 737 Corp. v. Cohen*, 104 A.D.3d 144, 149 (1st Dep't 2012) (state legislature intended RSL disputes to be decided in DHCR proceedings).

The only factor that could possibly squeeze the State Action into the "quasi-criminal" category is the fact that it was preceded by an "investigation." The state's abstention request relies on this factor nearly exclusively. Motion at 9-10. Yet, other than invoking the word "investigation," it provides no details. The investigation consisted of issuance of two subpoenas, one interview of PCA's building expert (who attested to the Targeted Buildings' substandard condition), and then predetermined conclusions (rejecting the expert's affidavits) summarized in a draft "Assurance of Discontinuation," which terms of which would have thrown all the buildings into foreclosure. The state's motion isn't honest about its purpose—as a means to retroactively enforce rules not in place during the rehabilitation work. And, among many other deficiencies, the "investigation" included not a single interview of Peak principals. Not one. In conducting its

"investigation," it consulted no building expert of its own to assess the pre-renovation condition of the Targeted Buildings (or none mentioned in the State Action). The state never even inspected the buildings. This is why the resulting enforcement complaint includes no detail whatsoever about 29 of the buildings, including why each fails to satisfy the condition of being "substandard." It is painfully apparent, too, that the investigation involved little or no examination of the way in which DHCR administered the SubRehab Program, including whether it possessed exculpatory information. The state never even bothered to interview former Deputy Commissioner Woody Pascal, who oversaw the program for 16 years. *Younger* abstention requires more of an "investigation" than just invoking the word.

Because the State Action is not quasi-criminal, under *Sprint*'s categorical approach, *Younger* cannot apply.

**3. The "Bad Faith" Exception Applies**

*Younger* abstention is further inappropriate because the State Action shows all the "retaliatory" motive factors in the "tightly defined" bad faith exception. *See Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 197-99 (2d Cir. 2002); *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994) (finding of bad faith precluded *Younger* abstention); *Perez v. Ledesma*, 401 U.S. 82, 118 n.11 (1971) (Brennan, J., *concurring*) ("Bad-faith harassment can, of course, take many forms," including meritless prosecutions). We fully concede this is a narrow ground, that we shoulder the burden, and that neither the timing of the Challenged Action, deficiencies in the investigation, and an outlandish process release are sufficient standing alone. *Diamond "D"*, 282 F.3d at 198; *Yelp Inc. v. Paxton*, 137 F.4th 944, 956 (9th Cir. 2025).

Despite these acknowledgments, the State Action suffers from all these problems and more. The aspects of bad-faith enforcement include the pretextual investigation (described above), a woefully deficient pleading, false accusations against individuals and an entity with no connection

to the claims, a defendant included for PR purposes only, and a false and inflammatory press release. But it begins with the use of a clearly inapplicable law.

**Use of a Clearly Inapplicable Law**

The state's primary claim is its Executive Law claim. Under it, the state argues that Plaintiffs engaged in persistent "illegality" or "fraud." No authority exists for the application of § 63(12) when the act of illegality is noncompliance with internal, unpublished agency rules that seek to interpret a term (here, "substandard or seriously deteriorated") that is undefined in the regulation. This preposterous application of § 63(12) is accentuated by two factors. First, Plaintiffs satisfied the presumption of compliance offered in the regulation itself. Second, the state has never before brought a case under this theory, i.e., that failure to qualify with an undefined regulatory term is an act of "illegality" under § 63(12).[21] In this way, the state is applying a "clearly inapplicable law" to plaintiffs. *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1095 (5th Cir. 2023) (finding bad faith when, *inter alia*, the state applied an inapplicable law).

**Deficient Pleading**

The State Action seeks remedies against 31 separate buildings, each with its own unique qualities and pre-renovation condition. Had the state actually investigated each of the Targeted Buildings, it would have easily learned that each building is about 100 years old without replacement of original building systems. *See* FAC ¶¶ 159-89; Declaration of Alexander Stoltz, attached as Exhibit B (providing an analysis of the lack of any rehabilitation history for the 31 buildings). So, they exist in the general heartland of buildings targeted by the legislature for investment and rehabilitation under the ETPA. FAC ¶¶ 50-55.

---

[21] As discussed in the FAC, the state previously reviewed other buildings in which there were highly publicized tenant complaints of illegal deregulation through the SubRehab Program. FAC ¶ 80. There, it brought no similar action against the owners. *Id.*

The state's theory tries to overcome the obvious (old buildings that were never maintained) by saying—not that the buildings were in good shape—but that they were, in essence, "not that bad." To carry that burden, it needed to allege and prove what about each building made it *not* "substandard" and "seriously deteriorated," especially since all qualified as presumptively "substandard or seriously deteriorated" under DHCR's own regulation. In other words, a building-by-building assessment is required. *See Principia Partners LLC v. Swap Fin. Grp., LLC*, 194 A.D.3d 584 (1st Dep't 2021) (complaint which failed to distinguish between defendant entities was "an improper group pleading"). Yet, the State Action contains no averments whatsoever about 28 of the buildings, providing no notice about why the condition of them was "too good" to qualify. Even more, the State Action alleges an "illegal deregulatory" scheme without any averments of whether the buildings were presumptively deregulated under the regulations and without regard to DHCR's history of approving similar buildings. *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000) (bad faith may be inferred from the clear lack of merit of the claims). Similarly, DHCR's refusal to produce exculpatory evidence is further evidence of its malintent.

**False and Misleading Pleadings**

The State Action itself includes false and misleading information. Four examples bear mention. First, the complaint accuses three defendants—Michael Lohan, Bryan Anderson, and Alex Mendik—of being principals at PCA (they were not) and suggests they had operating authority at PCA (they did not). State Action Complaint ¶¶ 12-13, 15. Second, the complaint accuses 251 North 8th Owner LLC of being a participant in the alleged scheme, even though its building never underwent a SubRehab. *Id.* ¶¶ 42, 89. Third, more broadly, the State Action claims that Plaintiffs lacked legal advice, when the state knew full well that Plaintiffs had relevant legal counsel throughout their work. *Id.* ¶¶ 3, 102. Fourth, the complaint states that Plaintiffs submitted

"false affidavits" to DHCR, without a single averment of a falsely stated fact, but bizarrely, on a falsely held belief. *Id.* ¶¶ 298, 117, 147, 181, 204, 229, 230.

**Defendant Included for PR Purposes Only**

In the State Action, the state named Michael Lohan—a small investor, with no role in PCA's business operations—because he has a famous sister (Lindsay Lohan), ensuring media amplification of the "fraud" narrative. We believe the state intended to—and did—leak this information to the New York Post, resulting in another opportunity for the state to hawk its "sinister scheme" theory.[22] This strategic selection of a defendant for publicity value, rather than legal merit, exemplifies the retaliatory purpose prohibited by the bad faith exception. *See LiveVideo.AI Corp. v. Redstone*, No. 24-CV-6290, 2025 WL 2933706, at *18 (S.D.N.Y. Aug. 12, 2025), *report and recommendation adopted*, 2025 WL 2778110 (S.D.N.Y. Sept. 30, 2025) (finding choice of defendants for reasons other than legal merits indicative of bad faith).

**False and Inflammatory Press Release**

Concurrently with the filing of the State Action complaint, DHCR and NYAG went on a press offensive, releasing statements accusing PCA of "illegally deregulating at least 159 rent stabilized apartments across 31 buildings in Brooklyn and Queens while deceiving tenants, investors, lenders, and state housing regulators." *See supra* note 11. The press release includes information that is false, misleading and inflammatory, revealing the bad-faith motivation. *See Galonsky v. Williams*, 96-CIV-6207, 1997 WL 759445, at *6 (S.D.N.Y. Dec. 10, 1997) (finding bad faith evidenced by "baseless claims as part of a public relations campaign in order to embarrass the defendants"); *Silver v. Queen's Hosp.*, 53 F.R.D. 223, 226 (D. Haw. 1971) (media campaign

---

[22] Emily Crane, *Lindsay Lohan's brother sued for sinister scheme to allegedly illegally overcharge rent in NYC*, NY Post (Dec. 11, 2025), https://tinyurl.com/4zyavf57.

upon filing complaint constituted "a serious lack of professional restraint in publicity seeking amounting to an abuse of judicial process").[23]

### B. *Pullman* Abstention

Abstention under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), is implicated in the narrow case where "difficult and unsettled questions of state law must be resolved" before considering federal constitutional issues, *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 384 (2d Cir. 2000). Abstention "may be appropriate when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue." *Id.* at 385 (citation modified). Even then, abstention is not automatic and "involves a discretionary exercise of a court's equity powers," considering "important federal rights" which may outweigh the interests underlying *Pullman*. *Id.*

*Pullman* abstention is inappropriate for two reasons. First, contrary to the state's position, there is no lack of clarity in the applicable state laws or regulations, and no decisions by the state court are necessary for this Court to decide the constitutionality of the Challenged Action. The ETPA clearly exempts all "substantially rehabilitated" buildings from the RSL as a legislative encouragement for investment. DHCR defined regulatory presumptions; Plaintiffs complied. The state's subsequent targeting of Plaintiffs for retroactive enforcement is unconstitutional *regardless* of the ultimate outcome of the State Action.

---

[23] At the very least, Plaintiffs' specific allegations of bad-faith merit discovery and an evidentiary hearing. *See Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) (recognizing necessity of hearing to resolve factual disputes on bad faith exception to *Younger* abstention); *Sica v. Connecticut*, 331 F. Supp. 2d 82, 87 (D. Conn. 2004) (same); *McCulley v. N.Y.S. Dep't of Envtl. Conservation*, 593 F. Supp. 2d 422, 426 n.4 (N.D.N.Y. 2006) (same).

Second, this case involves important federal rights which outweigh *Pullman* interests. In *Sorrell*, the Second Circuit affirmed the district court's rejection of *Pullman* abstention, finding the interests underlying *Pullman* were outweighed by the "importance and immediacy of the problem" and the "delay inherent in referring questions of state law to state tribunals." *Id.* at 386. As described fully above, the same "importance and immediacy" applies to Plaintiffs' claims. Plaintiffs would be irreparably harmed waiting for state court rulings, even if ultimately successful.

### C. *Wilton* Abstention

Abstention under *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) is entirely inappropriate. In *Wilton*, the Court held that the Declaratory Judgment Act ("DJA") vested federal courts with discretion to stay declaratory judgment actions. *Id.* at 286. *Wilton* abstention applies *only* where a plaintiff seeks purely declaratory relief. *Kanciper v. Suffolk Cnty. Soc. for the Prevention of Cruelty to Animals, Inc.*, 722 F.3d 88, 93 (2d Cir. 2013) ("*Wilton* does not apply where . . . a plaintiff does not seek purely declaratory relief"). Here, Plaintiffs also seek injunctive relief, a "coercive" remedy that "removes this suit from the ambit of" the DJA and *Wilton*. *See State Farm Mut. Auto. Ins. Co. v. Schepp*, 616 F. Supp. 2d 340, 347 (E.D.N.Y. 2008) (citation omitted).

Further, *Wilton* abstention was designed to address federal actions wherein there were parallel state proceedings "presenting the same issues, *not governed by federal law*." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir. 2012) (emphasis in original). Federal actions that "involve questions of federal law are 'fundamentally distinct from *Wilton* because federal law supplies a rule of decision,' whereas *Wilton* 'involved state law only.'" *Id.* (quoting *Youell v. Exxon Corp.*, 74 F.3d 373, 376 (2d Cir. 1996)). This action involves questions of federal law only, so *Wilton* abstention is inapplicable.

## CONCLUSION

The Court should deny Defendant's motion to dismiss the First Amended Complaint.

Dated: New York, NY
August 24, 2026

Respectfully submitted,

**WALDEN HARAN WILLIAMS LLP**

By: /s/ *Jim Walden*

Jim Walden
Hunter Pearl
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
jwalden@whwllp.com
hpearl@whwllp.com

*Attorneys for Plaintiffs*

CERTIFICATION PURSUANT TO CIVIL RULE 7.1(C) OF THE JOINT LOCAL RULES OF THE UNITED STATES DISTRICT COURTS FOR THE SOUTHERN AND EASTERN DISTRICTS OF NEW YORK

The undersigned certifies that, excluding the cover page, captions, tables of contents and authorities, and signature block, this Memorandum of Law in Opposition to Defendant's Motion to Dismiss is 35 pages long and 11,472 words, fewer than the 35-page limit set by Judge Diane Gujarati by order on August 12, 2026, and the applicable 12,250 word limit set by Local Rule 7.1(c).

Dated: New York, NY
August 24, 2026

Respectfully submitted,

**WALDEN HARAN WILLIAMS LLP**

By: /s/ *Jim Walden*

Jim Walden
Hunter Pearl
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
jwalden@whwllp.com
hpearl@whwllp.com

*Attorneys for Plaintiffs*